# EXHIBIT "A"

JS-6 (Admin)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 17-2514 JGB (SHKx)** | Date | March 31, 2022 |
|---|---|---|---|
| Title | ***Raul Novoa, et al. v. The GEO Group, Inc.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Plaintiff(s):         Attorney(s) Present for Defendant(s):

None Present                                  None Present

**Proceedings:**    **Order (1) GRANTING Defendant's Motion to Stay Pending Related Appeals (Dkt. No. 553); and (2) VACATING the April 4, 2022 Hearing (IN CHAMBERS)**

Before the Court is Defendant GEO Group, Inc.'s ("GEO") motion to stay the entire case pending Ninth Circuit rulings on related appeals. ("Motion," Dkt. No. 553.) The Court finds this matter appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering all papers filed in support of and in opposition to the Motion, the Court GRANTS the Motion. The Court VACATES the hearing set for April 4, 2022.

## I.   BACKGROUND

The parties are familiar with the extensive procedural and factual history of this case; the Court relates only the background necessary to understand the Motion. On December 19, 2017, Plaintiff Raul Novoa ("Novoa") initiated the instant putative class action against GEO. (Dkt. No. 1.) Following various amendments, Mr. Novoa, Jaime Campos Fuentes, Abdiaziz Karim, and Ramon Mancia (collectively, "Plaintiffs") filed the third amended complaint—the operative complaint—on September 16, 2019. ("TAC," Dkt. No. 184.)

The TAC alleges seven causes of action arising from Plaintiffs' detention at California's Adelanto Detention Center ("Adelanto"): (1) violation of California's Minimum Wage Law ("CMWL"), Cal. Labor Code §§ 1194, 1197, 1197.1; (2) unjust enrichment; (3) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.; (4) violation of California's Trafficking Victims Protection Act ("CTVPA"), Cal. Civ. Code § 52.5; (5) forced labor under the Federal Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§

**EXHIBIT A-1**

1589(a), 1594(a); (6) forced and attempted forced labor under the TVPA; and (7) retaliation. (See TAC.)

On November 26, 2019, the Court granted Plaintiffs' motion for class certification and certified the Adelanto Wage Class, Adelanto Forced Labor Class, and Nationwide HUSP Class. ("Class Cert. Order," Dkt. No. 223.)  On September 30, 2021, the Court denied GEO's motion to decertify the Adelanto Forced Labor Class, but granted the motion to decertify the Nationwide HUSP Class.  ("Decertification Order," Dkt. No. 524.)

On January 25, 2022, the Court granted in part and denied in part Plaintiffs' motion for partial summary judgment, and denied GEO's motion for summary judgment.  ("MSJ Order," Dkt. No. 542.)  The Court dismissed GEO's derivative sovereign immunity and preemption affirmative defenses.  (Id. at 28, 33.)

On February 22, 2022, GEO filed the instant Motion.[1]  (See Mot.)  In support, GEO filed the declaration of Wayne Calabrese.  ("Calabrese Declaration," Dkt. No. 553-1.)  Plaintiffs opposed on March 7, 2022.  ("Opposition," Dkt. No. 554.)  On March 14, 2022, GEO replied.  ("Reply," Dkt. No. 555.)

## II.   LEGAL STANDARD

A district court has discretionary power to stay proceedings in its own court.  Landis v. North American Co., 299 U.S. 248, 254 (1936).  This power includes "enter[ing] a stay of an action before it, pending resolution of independent proceedings which bear upon the case." Levya v. Certified Grocers of Cal., Ltd., 593 F.2d 857, 863 (9th Cir. 1979).  When addressing a motion to stay pending appeal in a different matter, a court weighs the competing interests that will be affected.  CMAX, Inc. v. Hall, 300 F.2d 265, 268 (9th Cir. 1962); see also Lockyer v. Mirant Corp., 398 F.3d 1098, 1109 (9th Cir. 2005) (affirming and applying the framework set forth in CMAX).  The competing interests include (1) the damage that may result from granting a stay; (2) the hardship or inequity a party may suffer if required to proceed in the litigation; and (3) "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay."  CMAX, Inc., 300 F.2d at 268 (internal citation omitted).  The moving party bears the burden to "make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else."  Id. at 255.

//
//
//
//

---

[1] The Court reminds the parties that all documents presented to the Court must use a font size "14-point or larger," including in the footnotes. L.R. 11-3.1.1. Footnotes in the Motion and Opposition appear to be in a smaller size font.

**EXHIBIT A-2**

### III.   DISCUSSION

GEO moves to stay this action pending resolution of appeals before the Ninth Circuit in two related matters, <u>Nwauzor v. GEO Group, Inc.</u>, No. 3:17-cv-05769-RJB (W.D. Wash.), <u>appeal docketed</u>, No. 21-36024 (9th Cir. Jan. 11, 2022), and <u>Washington v. GEO Group, Inc.</u>, No. 3:17-cv-05806-RJB (W.D. Wash.), <u>appeal docketed</u>, No. 21-36025 (9th Cir. Jan. 11, 2022) (collectively, "Washington Appeals").[2]  (<u>See</u> Mot.)  For the reasons below, the Court finds that a stay is justified.

### A.  Damage Resulting from a Stay

GEO first argues that Plaintiffs will suffer minimal damages, if any, if the Court issues a stay pending a decision in the Washington Appeals.  (<u>See</u> Mot.)  The Court agrees in part.

The Court initially rejects GEO's position that Plaintiffs will not suffer harm because they only seek monetary relief.  (<u>Id.</u> at 5.)  Though GEO is correct that monetary damages that accrue during the stay can be redressed through an award at final judgment, Plaintiffs' potential harms are not solely financial.  They claim forced labor, as well as uncompensated labor.  As Plaintiffs note, a stay may further subject Plaintiffs and other individuals at Adelanto to possibly illegal practices.  (Opp'n at 3–4.)  While GEO represents that it asked U.S. Immigration and Customs Enforcement ("ICE") to suspend the Voluntary Work Program ("VWP") at Adelanto, it has not submitted evidence that ICE has responded to the request or halted the VWP.  (Calabrese Decl. ¶ 8; Opp'n at 5 n.3.)  As such, GEO's request, without other assurances, fails to mitigate the harm of continued forced labor.[3]

The Court also agrees with Plaintiffs that a stay would delay the instant litigation, which is in its late stages and set for trial on October 4, 2022.  However, contrary to Plaintiffs' assertion, any delay is unlikely to be indefinite.  The Ninth Circuit has held that "lengthy and indefinite stays" weigh against granting a stay because they "place a plaintiff effectively out of court."  <u>Blue Cross & Blue Shield of Ala. V. Unity Outpatient Surgery Ctr., Inc.</u>, 490 F.3d 718, 724 (9th Cir. 2007).  Here, opening briefs have already been filed in the Washington Appeals, answering briefs are due on April 20, 2022, and optional reply briefs are due twenty-one days after service of the answering brief—a few months from now.  (Calabrese Decl., Ex. A. at 2; Washington Appeals Docket, Dkt. No. 21.)  These deadlines provide sufficiently definite markers, even if the Ninth

---

[2] The Court, on its own motion, takes judicial notice of the Ninth Circuit's docket in the consolidated appeal, <u>State of Washington v. The GEO Group</u>, No. 21-36025 (9th Cir.) ("Washington Appeals Docket").  <u>See</u> Fed. R. Evid. 201(c)(1); <u>Reyn's Pasta Bella, LLC v. Vista USA, Inc.</u>, 442 F.3d 741, 746 n. 6 (9th Cir. 2006).

[3] Plaintiffs assert that the VWP's suspension may cause damages, as suspension without the implementation of alternative solutions for cleaning and sanitizing Adelanto may lead to deteriorated conditions.  (Opp'n at 5–6.)  The Court agrees with GEO that this potential harm is outside the scope of this litigation.  (Reply at 3.)  Moreover, such conditions rely on ICE's suspension of the VWP at Adelanto—an event that has not occurred.

**EXHIBIT A-3**

Circuit has not yet set a date for oral argument.  Plaintiffs aver that the Ninth Circuit's median time period to reach a merits decision is 15.3 months after the filing of the notice of appeal.  (Opp'n at 4.)  While this is not, as GEO contends, a "brief period" (Reply at 3), it is not the kind of lengthy delay that counsels against entry of a stay.  See Blue Cross & Blue Shield of Ala., 490 F.3d at 724 (finding a potential delay of five or six years, or longer, as "indefinite" and "lengthy").

Accordingly, even if Plaintiffs may suffer some prejudice from a stay, the harm is not so great as to deny a stay.  Therefore, this factor weighs in favor of GEO's request.

**B.  Hardship or Inequity to Defendant**

GEO next argues that it will suffer hardship without a stay because it will be forced to litigate issues that the Ninth Circuit may resolve in its favor in the Washington Appeals and will have to bear the costs of calling out-of-state witnesses to trial.  (Mot. at 7–8.)

In general, "being required to defend a suit, without more, does not constitute a 'clear case of hardship or inequity' within the meaning of Landis."  Lockyer, 398 F.3d at 1112 (quoting Landis, 299 U.S. at 255).  However, courts routinely grant stays in complex cases when a forthcoming appellate decision could reverse the proceedings below and require the lower court to "consider [the] issue twice.  Robledo v. Randstad US, L.P., 2017 WL 4934205, at *4 (N.D. Cal. Nov. 1, 2017) (granting stay in "large class action," which "could be rendered moot" by a pending appellate ruling).

The instant case is a complex, class action that involves two separate classes.  (MSJ Order at 2.)  A Ninth Circuit ruling in GEO's favor on intergovernmental immunity, derivative sovereign immunity, or preemption may render moot any jury verdict reached at trial, as well as portions of this Court's MSJ Order.  A stay would avoid the risk of litigating these issues twice.  By contrast, to proceed without a stay risks forcing the parties and the Court to expend needless resources.  Accordingly, this second factor also weighs in favor of entry of a stay.

**C.  Orderly Course of Justice**

Finally, GEO argues that a stay is appropriate because the Washington Appeals are substantially similar to the instant case and would narrow the issues that must be determined.  (Mot. at 8.)

Whether disposition of a related case would "narrow the issues in the pending cases and assist in the determination of the questions of law involved" is relevant under this factor.  Landis, 299 U.S. at 253.  Here, it is possible that a decision in the Washington Appeals may not narrow the issues in the instant case.  As both parties recognize, whether GEO is an "employer" or participants in the VWP are "employees" is determined by state law.  (Opp'n at 7; Reply at 6–7.)  The Washington Appeals address Washington's minimum wage laws ("WMWL"), whereas Plaintiffs' claims arise under the CMWL.  The Ninth Circuit may also rule against GEO on its

**CIVIL MINUTES—GENERAL**

**EXHIBIT A-4**

affirmative defenses or narrowly limit its holding to the WMWL.  Moreover, as Plaintiffs note, GEO's affirmative defenses do not affect Plaintiffs' federal TVPA claims.  (Opp'n at 7.)

However, a decision on the merits in the Washington Appeals will hold precedential value.  Further, as discussed above, a Ninth Circuit decision in favor of GEO on the issues of intergovernmental immunity, derivative sovereign immunity, and preemption may moot the instant action.  However likely such an outcome may be, a stay avoids the risk of relitigating the entire case a second time and is the most efficient course of action.

In sum, all three factors weigh in favor of entry of a stay.  Accordingly, the Court GRANTS the Motion.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS the Motion.  The Court STAYS the case pending the appellate proceedings in Nwauzor v. GEO Group, Inc., No. 3:17-cv-05769-RJB (W.D. Wash.), appeal docketed, No. 21-36024 (9th Cir. Jan. 11, 2022), and Washington v. GEO Group, Inc., No. 3:17-cv-05806-RJB (W.D. Wash.), appeal docketed, No. 21-36025 (9th Cir. Jan. 11, 2022).  The parties are ORDERED to file a joint report on the status of these cases every 90 days, and within 10 days of any case being resolved.  A report upon the resolution of any case must set forth the parties' position as to that case's impact on this instant litigation and whether the stay should be maintained or lifted.  The April 4, 2022 hearing is VACATED.

**IT IS SO ORDERED.**

**EXHIBIT A-5**

# EXHIBIT "B"

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JAN 11 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UGOCHUKWU GOODLUCK NWAUZOR; FERNANDO AGUIRRE-URBINA, individually and on behalf of all those similarly situated, | No.  21-36024 |
| | D.C. No. 3:17-cv-05769-RJB Western District of Washington, Tacoma |
| Plaintiffs-Appellees, | |
| v. | ORDER |
| THE GEO GROUP, INC., | |
| Defendant-Appellant. | |

| | |
|---|---|
| STATE OF WASHINGTON, | No.  21-36025 |
| Plaintiff-Appellee, | D.C. No. 3:17-cv-05806-RJB Western District of Washington, Tacoma |
| v. | |
| THE GEO GROUP, INC., | ORDER |
| Defendant-Appellant. | |

The motions to consolidate and expedite (Docket Entry No. 12 in 21-36024;

Docket Entry No. 15 in 21-36025) are granted in part.

The request to consolidate is granted.  Appeal Nos. 21-36024 and 21-36025

are consolidated.

The request to expedite briefing is deemed withdrawn.  The consolidated

AC/MOATT

**EXHIBIT B-1**

opening brief is due March 21, 2022.  The answering briefs are due April 20, 2022.

The optional consolidated reply brief is due within 21 days after service of the

answering briefs.

The request to expedite calendaring is granted.  The Clerk will place these

consolidated appeals on the next available calendar upon the completion of

briefing.  *See* 9th Cir. Gen. Order 3.3(f).

FOR THE COURT:

MOLLY C. DWYER
CLERK OF COURT

By: Alex Christopher
Deputy Clerk
Ninth Circuit Rule 27-7

2

**EXHIBIT B-2**

# EXHIBIT "C"

117TH CONGRESS } HOUSE OF REPRESENTATIVES { REPORT
1st Session 117–87

## DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS BILL, 2022

---

JULY 15, 2021.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

---

Ms. ROYBAL-ALLARD of California, from the Committee on Appropriations, submitted the following

# R E P O R T

together with

## MINORITY VIEWS

[To accompany H.R. 4431]

The Committee on Appropriations submits the following report in explanation of the accompanying bill making appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2022.

INDEX TO BILL AND REPORT

| | Page number | |
|---|---|---|
| | Bill | Report |
| TITLE I—DEPARTMENTAL MANAGEMENT, OPERATIONS, INTELLIGENCE, AND OVERSIGHT | | |
| Office of the Secretary and Executive Management | 2 | 5 |
| Operations and Support | 2 | 6 |
| Federal Assistance | 2 | 18 |
| Management Directorate | 3 | 19 |
| Operations and Support | 3 | 19 |
| Procurement, Construction, and Improvements | 3 | 20 |
| Federal Protective Service | 3 | 22 |
| Intelligence, Analysis, and Operations Coordination | 4 | 22 |
| Operations and Support | 4 | 22 |
| Office of Inspector General | 4 | 23 |
| Operations and Support | 4 | 23 |
| Administrative Provisions | 4 | 24 |
| TITLE II—SECURITY, ENFORCEMENT, AND INVESTIGATIONS | | |
| U.S. Customs and Border Protection | 10 | 25 |
| Operations and Support | 10 | 25 |
| Procurement, Construction, and Improvements | 12 | 35 |

45–101

**EXHIBIT C-1**

2

| | *Page number* | |
|---|---|---|
| | *Bill* | *Report* |
| U.S. Immigration and Customs Enforcement | 12 | 38 |
| Operations and Support | 12 | 38 |
| Procurement, Construction, and Improvements | 14 | 51 |
| Federal Assistance | 14 | 51 |
| Transportation Security Administration | 15 | 51 |
| Operations and Support | 15 | 51 |
| Procurement, Construction, and Improvements | 15 | 53 |
| Research and Development | 15 | 54 |
| Coast Guard | 16 | 54 |
| Operations and Support | 16 | 54 |
| Procurement, Construction, and Improvements | 17 | 57 |
| Research and Development | 17 | 58 |
| Health Care Fund Contribution | ........ | 58 |
| Retired Pay | 18 | 59 |
| United States Secret Service | 18 | 59 |
| Operations and Support | 18 | 59 |
| Procurement, Construction, and Improvements | 20 | 60 |
| Research and Development | 20 | 60 |
| Administrative Provisions | 20 | 60 |
| TITLE III—PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY | | |
| Cybersecurity and Infrastructure Security Agency | 40 | 63 |
| Operations and Support | 40 | 63 |
| Procurement, Construction, and Improvements | 40 | 72 |
| Research and Development | 41 | 73 |
| Cybersecurity Response and Recovery Fund | 41 | 74 |
| Federal Emergency Management Agency | 42 | 75 |
| Operations and Support | 42 | 75 |
| Procurement, Construction, and Improvements | 42 | 78 |
| Federal Assistance | 42 | 79 |
| Disaster Relief Fund | 47 | 85 |
| National Flood Insurance Fund | 48 | 89 |
| Administrative Provisions | 50 | 90 |
| TITLE IV—RESEARCH, DEVELOPMENT, TRAINING, AND SERVICES | | |
| U.S. Citizenship and Immigration Services | 60 | 90 |
| Operations and Support | 60 | 91 |
| Federal Assistance | 60 | 96 |
| Federal Law Enforcement Training Centers | 61 | 96 |
| Operations and Support | 61 | 96 |
| Procurement, Construction, and Improvements | 61 | 97 |
| Science and Technology Directorate | 61 | 98 |
| Operations and Support | 61 | 98 |
| Procurement, Construction, and Improvements | 62 | 98 |
| Research and Development | 62 | 99 |
| Countering Weapons of Mass Destruction Office | 62 | 102 |
| Operations and Support | 62 | 102 |
| Procurement, Construction, and Improvements | 62 | 103 |
| Research and Development | 63 | 103 |
| Federal Assistance | 63 | 103 |
| Administrative Provisions | 63 | 103 |
| TITLE V—GENERAL PROVISIONS | | |
| This Act | 73 | 104 |
| Compliance with House Rules | ........ | 118 |
| Tables | ........ | 131 |

**EXHIBIT C-2**

3

## Overview

The Committee recommendation includes $76,154,086,000 in total discretionary appropriations for the Department of Homeland Security, including $52,811,000,000 within the bill's 302(b) budget allocation, $4,544,086,000 in discretionary appropriations offset by fee collections, and $18,799,000,000 as a budget cap adjustment for major disaster response and recovery activities. The overall total is an increase of $931,023,000 above the fiscal year 2021 total and $387,333,000 above the President's budget request. The total within the allocation is $934,000,000 above the fiscal year 2021 level.

## Balanced Homeland Security Investments

Investments in this bill are intended to balance competing priorities across the Department's important missions, all of which are critical to the security of the country. The bill continues important investments to recapitalize Coast Guard air and sea fleets, including continued support for the Polar Security Cutter and Offshore Patrol Cutter programs; hire more Secret Service agents and Uniformed Division officers to reduce mandatory overtime; expedite the procurement of more effective imaging technology for the Transportation Security Administration and U.S. Customs and Border Protection (CBP); help communities develop public health-focused approaches by providing help to individuals before they commit a crime or engage in violence, including through grants, technical assistance, and research; and expand the capacity of the Federal Emergency Management Agency's disaster response workforce. The bill also establishes new initiatives, such as a Migration Analysis Center to assess migration-related programs and policies and establish integrated planning profiles to inform budget requests and emergent resource requirements.

## Cybersecurity and Infrastructure Security

The Committee recommends an increase of $397,372,000 above the fiscal year 2021 level for the Cybersecurity and Infrastructure Security Agency to better protect federal civilian cyber networks and better help state and local governments and the private sector secure both cyber and physical infrastructure, including election infrastructure.

## Border Security

There is a strong bipartisan consensus on the importance of homeland security, even if the focus in recent years has too often been on funding and policy disagreements related to border security and immigration enforcement. The COVID–19 pandemic has reinforced the importance of homeland security beyond the immigration issue, particularly as the Federal Emergency Management Agency has taken a major response coordination role.

The bill's recommendation for CBP operations is $653,886,000 above the fiscal year 2021 level and $136,000,000 above the request, including $35,000,000 for border security technology at and between the ports of entry; $30,000,000 for cameras, including body-worn cameras and cameras in Border Patrol facilities; and $23,000,000 to improve conditions in migrant holding facilities.

**EXHIBIT C-3**

4

Within CBP's Procurement, Construction and Improvements account, the recommendation includes $142,600,000 above the request for new technology, both at and between the ports of entry, and makes available up to $100,000,000 in prior-year funding available for mitigation of the environmental impacts of border barrier construction. An additional $170,000,000 is recommended through the Management Directorate for migrant processing facilities at the border; and $655,000,000 is provided in title V of the bill for land port of entry construction and modernization.

The bill rescinds $2,063,000,000 from prior-year border barrier construction appropriations and redistributes those funds to high priority areas across the fiscal year 2022 bill, including CBP, ICE, and Coast Guard mission areas.

### Civil Immigration Enforcement

Immigration detention is civil detention; almost no one in the custody of U.S. Immigration and Customs Enforcement (ICE) is a criminal in the sense of having been convicted of a crime for which they have not served a criminal sentence. That is not to say that some individuals ICE arrests and detains are not threats to public safety; but the vast majority pose no such threat and, were they U.S. citizens, there would be no clamor to keep them in detention.

The bill continues to expand ICE's reliance on noncustodial, cooperative immigration compliance models by increasing funding for alternatives to detention (ATD) programs. It funds at least two detention facility inspections per year at ICE's over-72 hours facilities; expands inspections at other detention facilities; and provides funding consistent with an average daily population in detention for single adults of 28,500 during fiscal year 2022. This detention capacity for single adults will allow ICE to arrest, detain, and remove individuals who are enforcement priorities without over-detaining anyone who is determined to be neither a flight risk nor a threat to public safety or national security.

The bill funds a new Non-Custodial Migrant Shelter grant program to support the establishment and operation of shelters at the border for migrants released from CBP custody, which will include a separate space for ICE personnel to carry out processing related to immigration adjudication proceedings and place migrants into an alternative to detention program with appropriate case management services. While CBP will continue to transfer most single adults to ICE custody for processing, these shelters will replace detention as the primary mechanism for initial processing for families and vulnerable single adults.

The bill also continues and increases funding for an ATD case management pilot grant program, overseen by the Office for Civil Rights and Civil Liberties, which will make its first awards in fiscal year 2022 with a combined $20,000,000 in funding.

A modified provision in the bill prohibits the use of funds to delegate federal immigration enforcement authorities under the 287(g) program to any state or local law enforcement officer for activities outside of a jail or prison. Under the 287(g) Jail Model, those officers only use delegated ICE authorities to verify whether someone who was arrested for a non-immigration offense is potentially removable and fits an ICE priority removal category; those officers are then able to place such individuals into removal proceedings

**EXHIBIT C-4**

5

and transfer them to ICE custody. The modified provision also requires ICE to withdraw from a 287(g) agreement if the DHS Office for Civil Rights and Civil Liberties or ICE's Office of Professional Responsibility find evidence that a jurisdiction has violated the civil rights or civil liberties of an individual that was later taken into ICE custody, absent evidence of mitigating factors.

The bill provides $99,735,000 above the request for Homeland Security Investigations (HSI) and ensures that HSI resources remain focused on criminal investigations by prohibiting its engagement in civil immigration enforcement activities without probable cause that an individual who is the subject of enforcement action has committed a criminal offense not solely related to immigration status.

### References in the Report

This report refers to certain entities, persons, funds, and documents as follows: the Department of Homeland Security is referenced as DHS or the Department; the Government Accountability Office is referenced as GAO; and the Office of Inspector General of the Department of Homeland Security is referenced as OIG. In addition, "full-time equivalents" are referred to as FTE; "Information Technology" is referred to as IT; "program, project, and activity" is referred to as PPA; any reference to "the Secretary" should be interpreted to mean the Secretary of Homeland Security; "component" should be interpreted to mean an agency, administration, or directorate within DHS; any reference to SLTT should be interpreted to mean state, local, tribal, and territorial; and "budget request" or "the request" should be interpreted to mean the budget of the U.S. Government for fiscal year 2022 that was submitted to Congress on May 28, 2021.

### TITLE I—DEPARTMENTAL MANAGEMENT, OPERATIONS, INTELLIGENCE, AND OVERSIGHT

#### Mission

The mission of Departmental Management, Operations, Intelligence, and Oversight is to provide leadership and services to Department of Homeland Security (DHS) components; formulate policy guidance and directives; disseminate intelligence; identify and track performance measurements relating to DHS missions; and provide oversight for all DHS operations.

#### OFFICE OF THE SECRETARY AND EXECUTIVE MANAGEMENT

| | |
|---|---|
| Appropriation, fiscal year 2021 | $205,819,000 |
| Budget request, fiscal year 2022 | 249,747,000 |
| Recommended in the bill | 268,153,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +62,334,000 |
| Budget request, fiscal year 2022 | +18,406,000 |

The Office of the Secretary and Executive Management (OSEM) plans and executes departmental strategies to accomplish agency objectives and provides policy guidance to departmental components.

**EXHIBIT C-5**

6

OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2021 ........................................................ | $180,819,000 |
| Budget request, fiscal year 2022 ..................................................... | 224,747,000 |
| Recommended in the bill ................................................................. | 233,153,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 ................................................. | +52,334,000 |
|     Budget request, fiscal year 2022 ............................................. | +8,406,000 |

The recommendation includes increases above the request totaling $8,406,000, including increases of $4,700,000 for the Office of Strategy, Policy, and Plans; $3,500,000 for the Office for Civil Rights and Civil Liberties (CRCL); $410,000 for the Office of the Immigration Detention Ombudsman (OIDO); and $400,000 for Operations and Engagement (O&E). The proposed realignment of $604,000 for the Office of Faith and Neighborhood Partnerships to O&E from FEMA is denied.

*Blue Campaign.*—The recommendation includes an increase above the request of $400,000 to the Office of Public Engagement (OPE) for the Blue Campaign, for a total of $3,000,000 for the program in direct appropriations. A department-wide initiative to combat human trafficking, the Blue Campaign has historically been funded through end-of-year contributions from components, an approach that is inappropriate for the program's long-term sustainment. In addition to this direct appropriation, DHS is directed to account for and propose full, direct funding for program operations in the justification materials that accompany future budget submissions.

*Border Barrier Mitigation.*—The Department's past use of authority provided in the REAL ID Act (Public Law 109–13) to broadly waive federal and state laws to expedite the construction of border barriers has resulted in significant, unjustified harms to border communities, tribal lands, the environment, and wildlife. The Committee supports the recent decision by the Department to withdraw active waivers, except for those necessary to address immediate health and safety concerns, and includes a provision is included in title II of the bill authorizing the Department to use border barrier construction funds that become available after enactment of this Act for the mitigation of these harms. Those funds are in addition to funds already available for that purpose.

Within 120 days of the dates of enactment of this Act, the Secretary of Homeland Security, in consultation with the Secretary of the Interior, shall convene a multi-agency working group that includes the Department of Agriculture, the Council on Environmental Quality, and other relevant departments and agencies to identify the impacts of border security infrastructure on local environments, wildlife, communities, and tribes. Not later than 240 days after the date of enactment of this Act, the Secretary shall provide the Committee with a plan for remediating harmful impacts of such infrastructure, including recommendations about where existing infrastructure should be decommissioned or altered in conjunction with alternative approaches for addressing border security requirements. In carrying out this directive, the Secretary is directed to consult with local governments, tribes, communities, scientists, environmental experts, and other stakeholders.

*Case Management and Community Support Services.*—To expand the focus of case management programs beyond compliance with

**EXHIBIT C-6**

7

immigration proceedings and to increase participation in these services, the Committee directs DHS to coordinate with the Department of Health and Human Services (HHS) to provide an analysis of existing programs, including existing case management services funded through U.S. Immigration and Customs Enforcement and the recently funded Alternatives to Detention Case Management Pilot Program to be designed and overseen by CRCL that will provide these services though Federal Emergency Management Agency (FEMA)-administered grants to community-based organizations. Further, DHS and HHS shall explore the feasibility of funding and managing case management services currently offered by DHS through agencies or offices within HHS that serve similar populations.

The Committee directs the departments to provide a briefing about the results of the analysis and their evaluation within 180 days of the date of enactment of this Act, which shall also include a recommendation for the appropriate organizational placement for case management services to serve additional populations through community-based organizations seeking to provide case management and social services focused on fair and equitable outcomes for individuals and families. The briefing shall clearly outline the risks and opportunities associated with existing and proposed programs and mitigation strategies that could be deployed to address those, and it shall include any funding and staffing impacts.

*Center for Prevention Programs and Partnerships.*—Based on concerns about the effectiveness and potential negative impacts of previous departmental efforts on countering violent extremism (CVE), the Department recently established a Center for Prevention Programs and Partnerships (CP3), which took the place of the former Office of Targeted Violence and Terrorism Prevention. The former approach lacked the confidence of many civil rights organizations and communities with which the Department was attempting to engage—particularly communities with significant Muslim, South Asian, and Arab populations. A major criticism of the Department's earlier CVE efforts was its disproportionate focus on foreign-supported and foreign-inspired terrorism, with relatively little emphasis on helping communities prevent violence based on personal grievances or on racially or ethnically motivated ideologies, which have been the predominant motivation for violent attacks over the last few decades and particularly in recent years.

According to CP3, the Department's current effort is based on a public health approach to preventing targeted violence and terrorism that is supported by the Centers for Disease Control and Prevention and grounded in strong empirical evidence for how communities can effectively help prevent violence by providing help to individuals before they commit a crime or engage in violence. A central factor in this community-based, public health approach is the proactive integration of civil rights, civil liberties, and privacy concerns into every aspect of CP3's programs and outreach efforts in collaboration with CRCL, the Privacy Office, and the Office of the General Counsel.

The Committee notes that CP3 has embedded CRCL experts within its internal deliberation processes for content-creation, along with a senior CRCL advisor focused on ensuring CP3's programs and initiatives maintain a clear focus on the protection of civil

**EXHIBIT C-7**

8

rights and civil liberties. In addition, CP3 has initiated a community engagement strategy, including outreach to civil rights and civil liberties advocacy organizations, as a key component in the development and implementation of local targeted violence and terrorism prevention frameworks around the country.

The Committee strongly supports this community-based approach to preventing targeted violence and terrorism and looks forward to regular updates on CP3's progress.

*Chief Medical Officer (CMO).*—A general provision is included in title V that permits the Secretary to use authority established under section 872 of the Homeland Act of 2002 (6 U.S.C. 452) to establish a new executive management office led by the CMO to better coordinate the Department's medical and public health policies and operations. The provision authorizes the transfer to that office of the functions and position of the current CMO from the Countering Weapons of Mass Destruction Office and the departmental workforce health and medical support functions and responsibilities from the Management Directorate.

*Counter-Drug Efforts in the Caribbean.*—The Committee notes that the strategic location of Puerto Rico and the U.S. Virgin Islands in the Eastern Caribbean make them targets for transnational criminal organizations seeking to import illicit narcotics and other contraband into the continental United States. The Committee expects the Secretary to continue prioritizing border security and counter-drug efforts in and around Puerto Rico and the U.S. Virgin Islands, including through the Department-led Caribbean Border Interagency Group and Joint Interagency Task Force-South.

*Domestic Violent Extremism Review.*—The Committee is encouraged by the Secretary's announcement of an internal review to address the threat of domestic violent extremism within the Department. Within 30 days of the date of enactment of this Act, the DHS Chief Security Officer (CSO) shall brief the Committees on the status of this review, including a description of its methodology, scope, results, and recommendations.

*Facial Recognition Technology.*—The Committee is aware of a DHS component's use of a commercial facial recognition technology platform for biometric identification that relies on the extraction of photographs from social media websites. Within 30 days of the date of enactment of this Act, the Office of Strategy, Policy, and Plans shall brief the Committee on the Department's policies and oversight of components related to the use of facial recognition technologies and platforms. The briefing should particularly focus on how the Department ensures that biometric data obtained through contracts with commercial entities have not obtained data in violation of laws, regulations, or commercial agreements related to the protection of individual privacy.

*Family Separation.*—The Department must ensure that family unity is a primary factor when making criminal and civil charging decisions and, whenever possible and consistent with an assessment that it is in the best interest of a child, that separated family units are reunited and transported together prior to removal, release from U.S. Customs and Border Protection (CBP) custody, or transfer to U.S. Immigration and Customs Enforcement (ICE) or Office of Refugee Resettlement (ORR) custody. Under no cir-

EXHIBIT C-8

9

cumstances shall a child be separated from a parent or legal guardian solely to deter migration or promote compliance with immigration laws.

The familial relationships of each family unit taken into DHS custody must be immediately documented and the location of every member of a separated family unit must be continuously tracked and a specific justification for the initial separation must be recorded, along with a justification for any continued separation. DHS must ensure that individuals being transferred from CBP to ICE custody, in CBP or ICE custody, under ICE supervision, or referred to the Department of Justice (DOJ) for prosecution are asked about and have opportunities to report family separation incidents; verify the status, location, and disposition of family members; and regularly communicate with one another.

The Department should also work with DOJ to establish a mechanism for ensuring that any information related to family separation that is shared during the course of a criminal prosecution is conveyed to DHS for purposes of family tracking and reunification.

*Family Separation—Extended Family.*—DHS has assured the Committee that it is no longer separating families at the border, absent indications of abuse or serious criminal activity by an adult family member. Because current law defines a family as a child accompanied by a parent or legal guardian, however, children traveling with other adult relatives are still routinely separated from them. CBP and ICE shall take the interests of extended family unity into consideration in determining whether to place such adults into section 240 removal proceedings in lieu of expelling them under title 42 authority or placing them into expedited removal, specifically those who would be categorized by ORR as a category 2—immediate relative.

If such adult migrants are placed into section 240 removal proceedings based on family unity considerations, the Department shall ensure that ORR is made aware of the family relationship as soon as possible to help facilitate and expedite the potential sponsorship of those unaccompanied children by the immediate relative while they both proceed through the immigration adjudication process. Specifically, CBP should ensure that its electronic processing systems are modified to document immediate family relationships relevant to potential sponsorship of an unaccompanied child.

*Family Reunification.*—Not later than 90 days after the date of enactment of this Act, the Secretary shall submit a report to the Committee detailing the conclusions and recommendations of the Task Force established pursuant to Executive Order 14011, which shall include:

(1) the number of children separated from a parent or legal guardian between January 20, 2017, and January 20, 2021, and the reasons for the separations;

(2) the number of such children who have been reunited with such parent or legal guardian, differentiated by the number and legal status of reunited families present in the United States and the number reunited outside of the United States;

(3) the number of such children who have not been so reunited, differentiated by the number present in the United States and the number not present;

**EXHIBIT C-9**

10

(4) a description of efforts by the Secretary to reunite families described in (3), obstacles to such reunification, and plans to overcome such obstacles; and

(5) data on the exercise of parole under section 212(d)(5)(A) of the Immigration and Nationality Act of 1952 (8 U.S.C. 1182(d)(5)(A)), the award of other immigration benefits, and the provision of services and support to families who were separated.

An administrative provision is included in title II of the bill that provides authority to use CBP and ICE Operations and Support funding to support the reunification of families who were separated under the so-called "zero tolerance" policy of the prior administration or were otherwise separated without a valid reason, such as acting in the best interest of a child when there is evidence of child abuse. The Department shall provide quarterly updates to the Committee detailing the use of funding for this purpose, with the first such report due not later than 30 days after the date of enactment of this Act.

*Freedom of Information Act (FOIA) Backlog Reduction Plan.*— The Committee notes that House Report 116–458 directed the Department to update a plan for eliminating the department-wide backlog of FOIA requests by the end of fiscal year 2022 because the initial plan failed to include any funding estimates, as required by House Report 116–80. The Committee expects to receive the updated plan, which was due in late March, as soon as possible.

*Homeland Security Academic Advisory Council (HSAAC).*—The HSAAC was formed in 2012 to serve as a convening forum for the higher education community and homeland security officials to discuss shared interests and exchange best practices on a range of issues, including foreign influence, cybersecurity, international students and scholars, and emergency preparedness. HSAAC has not had any public meetings since 2017 and DHS quietly disbanded the council last year, citing an executive order cutting back on the number of federal advisory committees. Universities are grappling with a host of issues within DHS jurisdiction, including processing delays for international students and concerns about foreign efforts to influence faculty or gain access to research. By facilitating regular communications between leaders in the homeland security and higher education community, the HSAAC can ensure universities have the information they need to provide a safe and productive education experience while being kept abreast of real or potential threats to the academic community. The Committee urges the Secretary to reconstitute the HSAAC as soon as possible.

*Humanitarian Response at the Border.*—The Committee is aware that the Department has a Surge Force mechanism in place to deploy volunteer DHS personnel for emergency and disaster response around the country, as well as to help respond to migrant surges at the southern border. The Committee directs the DHS Chief Medical Officer (CMO) to collaborate with the Department of Health and Human Services Office of Refugee Resettlement (HHS ORR) and relevant stakeholders to develop a combined Humanitarian Response Operating Plan for responding to future migrant surges, particularly those involving large numbers of families or unaccompanied children. The plan should include:

**EXHIBIT C-10**

11

(1) an assessment of the capabilities and capacity of DHS, HHS, and relevant stakeholders to provide the specialized services necessary to prioritize the welfare of children and families while in government custody and help avoid unnecessary delays in releasing families together on Alternatives to Detention with case management and releasing unaccompanied children to appropriate sponsors;

(2) mechanisms for participating federal agencies to deploy personnel from across the government to the southern border as necessary during migration surges, in coordination with affected state and local jurisdictions and national and local non-government humanitarian organizations, along with an estimate of the funding requirements associated with such deployment; and

(3) mechanisms for including personnel who are licensed to provide trauma-informed care, case management, and child welfare and plans for training other participating personnel in these areas, including estimates of the funding requirements for initial and recurrent training.

In developing the plan, the DHS CMO and HHS ORR should also consult with child welfare experts and organizations to incorporate best practices into the plan. The Committee directs the DHS CMO and HHS ORR to submit the plan to the Committee within 180 days of the date of enactment of this Act and to update the plan annually to reflect new information and lessons learned.

*Joint Requirements Council.*—The Committee directs the Department to continue providing quarterly updates on Joint Requirements Council activities.

*Joint Task Forces (JTF).*—The Committee was alarmed to discover that the Department deactivated two of its three JTFs, which were established in 2014 as part of then-Secretary Johnson's Unity of Effort initiative and subsequently authorized by Public Law 114–328, without notification to Congress. The absence of JTF–West, in particular, became evident through an initial lack of coordination in responding to the most recent surge in unaccompanied children, family units, and single adults along the southwest border. The Committee notes that while there has been improvement, significant coordination challenges remain, leading to avoidable undesirable outcomes.

The Committee notes that the OIG released a report (OIG–20–80) on September 30, 2020, which found that the Department did not maintain oversight over the JTFs; update policies and procedures related to the JTFs; identify JTF staffing and resource requirements; or identify JTF costs. The Committee directs the Department to provide a briefing, within 30 days of the date of publication of this Committee Report, on its plans for restoring the JTFs and addressing the findings of OIG–20–80 or establishing alternate mechanisms for ensuring that the Department's law enforcement components efficiently coordinate their respective roles and responsibilities.

*Management Directive 0810.1.*—Promptly and thoroughly investigating allegations of personnel misconduct are critical to ensuring the integrity, accountability, and transparency of the Department of Homeland Security and its components. In June 2004, shortly after the Department was first established, the Secretary issued

EXHIBIT C-11

12

Management Directive (MD) 0810.1, outlining the roles and responsibilities of the Office of Inspector General (OIG).This directive requires DHS components to refer all allegations of serious and criminal misconduct to OIG, which has the right to claim exclusive jurisdiction over the investigation of such allegations. While such referrals are appropriate for ensuring third party oversight of the most serious or systemic investigations, they too often result in eventual OIG declinations that unnecessarily delay investigations that component oversight personnel could otherwise carry out.

Over the 17 years since DHS MD 0810.1 was issued, the Department and Congress have established a broad framework of oversight offices with jurisdiction and authority to investigate personnel misconduct, including Offices of Professional Responsibility within TSA, CBP, and ICE that employ criminal investigators with the authority to investigate allegations of administrative and criminal misconduct. Most recently, Congress established the Office of the Immigration Detention Ombudsman, which has broad authority to inspect, review, and investigate matters under its purview.

To ensure DHS has an efficient and effective oversight framework, the Committee directs the Secretary to review MD 0810.1 to ensure the Department has clearly delineated roles and responsibilities for each of its oversight bodies, while also preserving the OIG's independence and authorities granted by the Inspector General Act of 1978. In reviewing this directive, for matters where the Secretary determines the OIG shall have the opportunity to claim exclusive jurisdiction, such jurisdiction shall be reviewed to ensure it is narrowly tailored to ensure that the Department's other oversight functions are able to continue to execute their responsibilities, such as ensuring that immediate medical needs of detainees are met at a facility where the OIG is also conducting an investigation into medical malpractice. The Secretary shall brief the Committees not later than 90 days after the date of enactment of this Act on the interim findings of this review and issue a revised directive, as warranted by the review, not later than 180 days after the date of enactment of this Act.

*Migration Analysis Center.*—The Committee is concerned about the lack of data- and evidence-based decision-making models and analyses to inform policy and resource decisions impacted by the U.S. immigration system. Annual budget submissions and emergency budget requests lack a detailed, consistent articulation of documented planning profiles for anticipated migration at the border that can be used to identify various resources requirements for CBP, ICE, USCIS, ORR, DOJ's Executive Office for Immigration Review, the Department of State Bureau of Consular Affairs, and the Department of Labor Employment and Training Administration. Further, there continues to be a lack of integrated policy analysis and data collection requirements across all relevant agencies to objectively evaluate policies and programs—such as whether changes to temporary work visa programs impact migration between the ports of entry or whether United States Agency for International Development investments in the northern triangle countries are having the intended stabilization impact to curb economic migration.

To address this challenge, the recommendation provides an increase of $4,700,000 above the request for the Office of Strategy,

**EXHIBIT C-12**

13

Policy, and Plans to establish an interagency Migration Analysis Center (MAC) in partnership with the Immigration Data Integration Initiative (IDII). While the scope of the MAC should mature and evolve over time to continue the study of migration-related programs and policies, the initial focus shall be to establish integrated planning profiles to inform budget requests and emergent resource requirements analysis. The MAC shall include participation across DHS, as well as other agencies whose missions intersect with immigration-related policies and programs. Additionally, the MAC shall engage with academia; state, local, tribal, and territorial communities; the private and non-profit sectors; and research communities to better understand migration-related issues. The MAC shall also work to establish an independent peer-review process for its models and other work products to improve and strengthen their validity and utility for decision making.

To the extent required data are available, the MAC shall utilize the OIS/IIDI Statistical Immigration Data System of Record, which is designed to serve as a single authoritative source of enterprise-wide statistical immigration data, while working with OIS to address any deficiencies or weaknesses in such data. To ensure success, MAC staff, along with the broader IDII data collection effort, shall have uninhibited access to query federal data management systems for the purposes of developing models and analyses and shall also be consulted as part of the IDII data governance process on changes to data systems to ensure that necessary information is being collected for its analyses.

Additionally, the MAC shall examine the utility of the Migrant Model Integration decision support tool developed by S&T's System of Systems Operational Analytics in collaboration with CBP's Enterprise Analytics Division. The Committee is encouraged by the progress made on this tool and recommends the MAC work with S&T to build upon its capabilities to meet its analysis, planning, and modeling requirements.

Not later than 60 days after the date of enactment of this Act, the Under Secretary for the Office of Strategy, Policy, and Plans shall consult with the Committee on plans for establishing the MAC, which shall include a general vision and overview; a schedule of anticipated milestones for the upcoming fiscal year; and a budget and staffing plan, to include any anticipated procurement-related actions.

*Minority Serving Institutions.*—The Secretary is encouraged to enhance partnerships with Historically Black Colleges and Universities, Hispanic-Serving Institutions, Asian American and Native American Pacific Islander Serving Institutions, Tribal Colleges and Universities, and other minority-serving institutions with respect to administering the research and development activities of the Department by:

(1) encouraging the participation of such colleges, universities, and institutions in the research, development, testing, and evaluation programs and activities of the Department;

(2) facilitating partnerships between such colleges, universities, and institutions and private sector stakeholders, national laboratories, and other academic institutions in areas important to homeland security, including cyber security, emergency management, and counter terrorism; and

**EXHIBIT C-13**

14

(3) distributing funds through Science and Technology Directorate (S&T) grants, cooperative agreements, and contracts to such colleges, universities, and institutions for enhancements in areas important to homeland security, including cyber security, emergency management, and counter terrorism.

The Department is directed to brief the Committee on these efforts within 120 days of the date of enactment of this Act. The Committee notes that the recommendation includes $7,657,000 for the Minority Serving Institutions Program (MSIP) through the S&T Research and Development account, an increase of $2,500,000 or 33 percent.

*Office for Civil Rights and Civil Liberties (CRCL).*—The Committee recommends $42,160,000 for CRCL, $3,500,000 above the request, including an increase of $750,000 for management and administration of the Alternatives to Detention Case Management Pilot Program; $500,000 for additional capacity to support the participation of women from partner nations in government capacity building, peace keeping, law enforcement, and border security, as authorized by the Women, Peace, and Security Act; and $5,961,000 for additional staffing. Of the funds provided for additional staffing, $3,711,000 supports the requested staffing increases and an additional $2,250,000 is for the Compliance Division.

CRCL shall ensure that all individuals whose complaints it investigates receive information within 30 days of the submission of a final report or recommendations memorandum, including findings of fact, conclusions, and recommendations. CRCL shall also ensure that such information is included in its annual report to Congress, consistent with individual privacy protections.

The Committee reminds CRCL of the directive in the explanatory statement accompanying the Department of Homeland Security Appropriations Act, 2021 (Division F of Public Law 116–260) requiring the office to conduct an analysis of component language access plans and looks forward to a briefing on the results of that analysis, including recommendations for improvement, as soon as possible.

*Office of the Immigration Detention Ombudsman.*—The recommendation includes $20,304,000 for the Office of the Immigration Detention Ombudsman, an increase of $410,000 above the request to maintain current services. The annual report of the Immigration Detention Ombudsman required by Public Law 116–93 shall include descriptions of the office's activities, findings, and recommendations, including copies of complaint forms and descriptions of complaint mechanisms; the number and types of complaints received, investigated, resolved, and referred to the ICE Office of Detention Oversight, CRCL, or the OIG. In addition, the Ombudsman shall brief the Committee quarterly on the office's activities.

*Oversight of CBP Surveillance Technology.*—Within 120 days of the date of enactment of this Act, the Committee directs DHS to make available on a public website the following information on each type of border security surveillance technology in use between the ports of entry:

(1) the type of technology, including its mechanism for collecting data and the type of data it collects;

(2) the justification for the use of the technology;

**EXHIBIT C-14**

15

(3) potential privacy rights impacts that could result from the use of the technology and requirements in place to mitigate such impacts;

(4) privacy or civil liberties reviews submitted to or carried out by CRCL or the Privacy Office;

(5) oversight mechanisms in place to ensure adherence to privacy laws and policies;

(6) the data collection, handling, and disposal policies for the technology;

(7) any contract or other agreement for the acquisition or use of the technology, with appropriate redactions for proprietary information; and

(8) any memoranda of understanding with other agencies related to the use of the technology and accompanying justification for each agreement.

DHS shall also make such information available for any new type of surveillance technology as part of a public notice and comment period of not fewer than 60-days prior to its deployment to allow for input from privacy and technology stakeholders. In addition, the Department shall provide a 60-day notice to communities prior to the initial deployment of any type of surveillance technology and host public forums in such communities to provide opportunities for community comment and feedback.

*Performance Measures.*—The Committee directs all agencies funded by this Act to comply with title 31 of the United States Code, including the development of their organizational priority goals and outcomes such as performance outcome measures, output measures, efficiency measures, and customer service measures. The Department is directed to report back to the Committees on these efforts within 60 days of the date of enactment of this Act.

*Public Complaint and Feedback System Working Group.*—The Committee recommends continued funding of $500,000, as requested, to support the activities of the Public Complaint and Feedback System Working Group, as directed in prior House reports. In addition, the Working Group should collaborate with the Department in developing standards to improve customer service and incorporating such standards into the performance plans required under 31 U.S.C. 1115. The Office of Public Engagement shall brief the Committee semi-annually on the progress of the Working Group, as described in the explanatory statement accompanying Public Law 115–141, as well as on progress in developing customer service standards.

*Racial Profiling in Law Enforcement.*—The Committee directs CRCL to develop a specialized mechanism, in collaboration with ICE, CBP, local law enforcement stakeholders, and civil rights and civil liberties organizations, for receiving complaints from the public about racial profiling, implicit bias, and other civil liberties violations arising from state and local law enforcement involvement in federal immigration enforcement, including through the 287(g) program, continued detention based on ICE detainers, and the Secure Communities program.

*Review of Law Enforcement Officer (LEO) Duties.*—In lieu of increasing the number of Border Patrol Agents, CBP Officers, or Detention and Deportation Officers in this Act, the Committee directs DHS to examine the feasibility and impact of reclassifying job func-

**EXHIBIT C-15**

16

tions that require an immigration officer to assess whether such functions can be conducted by individual other than an LEO if currently executed by one. The Secretary of Homeland Security shall engage with an independent entity that has expertise in such matters, such as a Federally Funded Research and Development Center, to review the legal definition of an immigration officer and employees as described in 8 U.S.C. 1357, 8 U.S.C. 1225, and relevant regulations regarding their duties and responsibilities to determine the extent to which various functions that require such employees can be executed by a non-LEO. The Committee recommends that DHS decrease its reliance on LEOs for functions where the unique training, expertise, and access to firearms available to LEOs is not required, such decreasing reliance on LEOs for processing of recent border crossers into DHS systems. The Committee requests that the review evaluate whether functions currently performed by LEOs could be reassigned to a non-LEO position to achieve a more efficient and effective use of resources. DHS is directed to brief the Committee on the results of this evaluation not later 120 days after the date of enactment of this Act and shall include recommendations for consideration in future budget requests and Congressional consideration.

*Rural Broadband Access.*—To expand rural broadband infrastructure in unserved rural areas and tribal lands along the southwest and northern borders, the Committee encourages the Secretary to identify opportunities for public-private partnerships with broadband providers to incorporate affordable public accessible broadband into current and future tactical infrastructure projects. The Department is directed to brief the Committee on such efforts within 60 days of the date of enactment of this Act.

*Sodium Cyanide.*—The Committee notes that House Report 116–458 directed the Department to provide a briefing on the safety and security of "bag-box" containers when used to import sodium cyanide briquettes using in mining operations, and looks forward to receiving this now overdue briefing as soon as possible.

*State and Local Law Enforcement.*—The Committee directs the Office of Strategy, Policy, and Plans to evaluate the Department's interactions and relationships with local law enforcement agencies, including but not limited to the 287(g) program and Secure Communities. This evaluation should result in specific recommendations for ensuring that the Department does not inappropriately incentivize the involvement of local law enforcement agencies in the enforcement of federal immigration law or impose duties on such agencies that may be harmful to the relationships between such agencies and the communities they serve. The Office is directed to brief the Committee on the results of its evaluation not later than 120 days after the date of enactment of this Act.

*Strategic Response Strategy for Biological Threats.*—The Committee notes that House Report 116–458 directed the Secretary to establish and maintain a strategic response strategy for biological threats that have the potential to impact the ability of the Department to execute or sustain its homeland-security mission, and to provide a briefing on the strategy not later than 120 days after the date of enactment of Public Law 116–260. The Committee looks forward to receiving that now overdue briefing in the near future.

**EXHIBIT C-16**

17

*Support to Law Enforcement Agencies.*—Section 532 of the bill requires the Department to publicly report on requests from state, local, and other federal law enforcement agencies for support from a DHS law enforcement component, as well as when such support is provided. The provision also requires the Secretary's approval for such support to be provided in the context of a mass gathering or public protest event. In addition, the Secretary shall ensure that DHS law enforcement personnel participating in support activities for state, local, or other federal law enforcement agencies wear uniforms that clearly indicate the name of their DHS component.

*Training.*—The Committee supports vigorous action to improve training for all federal, state and local law enforcement officers on racial profiling, implicit bias, procedural justice, the use of force, and the duty for officers to intervene when witnessing the use of excessive force against civilians. The Committee therefore directs the Secretary to work with the Attorney General and the Federal Law Enforcement Training Centers to implement improved, mandatory training on these topics for all federal law enforcement officers, along with the development of related standards that can be applied in hiring and performance assessments. The Secretary should also consider establishing incentives through the State Homeland Security Grant Program and the Urban Area Security Initiative for states and local jurisdictions to adopt the standards. These training requirements and standards should be based on the related provisions in H.R. 1280, as passed by the House of Representatives in March 2021.

*Translation Services.*—In response to a directive in House Report 116–180 regarding translation services for migrants in DHS custody, the Department advised the Committee that it uses a DHS-wide contract vehicle for language services, including translation services, through which approximately 60 percent of the Department's translation services have been acquired in recent years, including those of CBP, ICE, and USCIS. As the current contract expires in fiscal year 2021, the Committee directs the Department to ensure that the replacement contract includes translation services for Indigenous, African, and Caribbean languages.

*Use of Force.*—DHS shall prioritize use of force policies and practices that direct officers and agents to place paramount value on the preservation of human life, deploy de-escalation and non-lethal responses, and train agents to use lethal force as a last resort in responding to an imminent, life-threatening situation after all reasonable alternatives have been exhausted.

Not later than 24 hours after any use of force incident resulting in serious injury or death, DHS shall make public a summary of the known facts of the incident, with appropriate due process protections for the involved parties. Beginning not later than 90 days after the date of enactment of this Act and quarterly thereafter, the Department shall collect and publish data on all use-of-force incidents, including vehicle pursuits. The summaries shall include the location; type(s) of force used; justification for each use-of-force; number of law enforcement personnel involved; number of individuals injured, delineated by age, gender, nationality, race, and ethnicity; and type, source, and location of any medical care provided. The reports should be updated, as necessary, to include the results

**EXHIBIT C-17**

18

of agency incident reviews and any disciplinary or other agency actions or outcomes.

Not later than 120 days after the date of enactment of this Act, the Department shall brief the Committee on a plan for establishing an independent commission of experts to serve as a permanent civilian oversight body for DHS law enforcement components to review component use of force and misconduct reviews and make public recommendations for changes in policy, practice, or oversight. Commission members should have authority to observe Discipline Review Board and Use of Force Review Board proceedings. Membership of the Commission should include a balanced variety of stakeholder perspectives, including members representing law enforcement organizations, border communities, legal experts, and immigrant advocacy organizations.

The Committee directs GAO to review use of force policies, incident tracking mechanisms, and training for DHS law enforcement components, including an assessment of whether use of force policies, standards, and practices—including vehicle pursuit policies, apprehension tactics, and training on de-escalation and non-lethal responses—reflect law enforcement best practices and adhere to standards developed by expert organization such as the Police Executive Research Forum and the International Association of Chiefs of Police. The review should also assess whether policies and oversight mechanisms reflect recommendations from the Homeland Security Advisory Council's Integrity Advisory Panel, including recommendations to reward professionalism, prevent abuse and corruption, and create a culture of accountability.

*Use of Force Reporting.*—The Committee encourages the Secretary to make participation in the National Use of Force Data Collection Program of the Federal Bureau of Investigation by state and local law enforcement agencies a condition for eligibility for federal grant funding, including State Homeland Security Program grants and Urban Area Security Initiative grants.

*Visa Overstay and Border Security Metrics.*—The Committee directs the Department to continue to provide the report on visa overstay and border security metrics detailed in section 107 of the Department of Homeland Security Appropriations Act, 2018 (division F of Public Law 115–141).

FEDERAL ASSISTANCE

(INCLUDING TRANSFER OF FUNDS)

| | |
|---|---|
| Appropriation, fiscal year 2021 .......................................................... | $25,000,000 |
| Budget request, fiscal year 2022 ...................................................... | 25,000,000 |
| Recommended in the bill ................................................................. | 35,000,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 ................................................. | +10,000,000 |
|     Budget request, fiscal year 2022 ............................................... | +10,000,000 |

The recommendation includes $10,000,000 above the request for the Alternatives to Detention (ATD) Case Management Services Pilot (CMSP) program. The total amount of funding made available in this account, which funds both Targeted Violence and Terrorism Prevention grants and ATD CMSP grants, is transferred to FEMA for administration.

EXHIBIT C-18

19

### MANAGEMENT DIRECTORATE

| | |
|---|---:|
| Appropriation, fiscal year 2021 | $3,201,705,000 |
| Budget request, fiscal year 2022 | 3,674,924,000 |
| Recommended in the bill | 3,790,369,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +588,664,000 |
| Budget request, fiscal year 2022 | +115,445,000 |

*Note—the amounts for each fiscal year include appropriations for the Federal Protective Service that are entirely offset by fee collections from other federal agencies, which for fiscal year 2022 are estimated by the Congressional Budget Office at $1,625,000,000.

### Mission

The mission of the Management Directorate is to provide policy, guidance, operational oversight and support, and management solutions for the Department.

### OPERATIONS AND SUPPORT

| | |
|---|---:|
| Appropriation, fiscal year 2021 | $1,398,162,000 |
| Budget request, fiscal year 2022 | 1,653,553,000 |
| Recommended in the bill | 1,653,553,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +255,391,000 |
| Budget request, fiscal year 2022 | – – – |

*Cybersecurity Risks.*—Not later than 90 days after the date of enactment of this Act, the CIO shall brief the Committee on cyber security capability gaps and associated risks by component in prioritized order.The briefing, which may be provided in classified and unclassified formats, shall identify specific gaps and risks and include cost estimates and a schedule for remediating them.

*Facility Consolidations.*—Not later than 90 days after the date of enactment of this Act, CRSO shall brief the Committee on its ongoing efforts to consolidate DHS facilities and leverage partnerships with local governments, colleges, universities, and other federal agencies in South Texas. The briefing should include associated schedules, anticipated cost savings, and resource requirements, particularly for near term partnership opportunities and including potential agreements with community colleges to secure training space for CBP and ICE.

*Obligation Plans.*—The Department shall continue to submit obligation plans on a quarterly basis, as detailed in Public Law 114–113 and Public Law 115–31. The Office of the Chief Financial Officer (OCFO) shall require the use of a uniform obligation plan template to ensure consistency across components, which shall include quarterly spending targets for each account and PPA, including unobligated carryover balances. Each component shall be required to report to OCFO all actual obligations and expenditures within 20 days of the close of each quarter and OCFO shall provide the consolidated set of plans to the Committee within 30 days of the close of each quarter. OCFO will also be responsible for ensuring that components with major acquisition programs include the breakout of these programs within their quarterly plans and provide additional context to describe and justify any changes from the prior submission. During the period of any continuing resolution, OCFO shall provide a briefing on the corresponding obligation and budget execution plan, as directed in House Report 114–215.

*Strengthening Domestic Manufacturing and Supply Chains.*—The Committee is concerned about the nation's limited manufacturing

**EXHIBIT C-19**

20

base for essential products such as medical devices, medical equipment, pharmaceuticals, and personal protective equipment (PPE), which the early period of the coronavirus pandemic amply demonstrated. The Committee encourages the Secretary to work with other departments and agencies to ensure a long-term sustainable domestic supply chain for PPE and other items that may be in short supply in a future heath pandemic or catastrophic natural disaster.

*Small Unmanned Aerial Systems (sUAS) Procurement.*—Not later than 60 days after the date of enactment of this Act, the Department is directed to brief the Committee on the current guidance for the acquisition of sUAS, including preparedness grant guidance. The Committee is particularly interested in policies regarding foreign made sUAS and any risk assessments or certifications required for those procurements, as well as any review of domestically available products.

*Vehicles.*—Not later than 90 days after the date of the enactment of this Act, the CFO and CRSO shall brief the Committee on the types and numbers of vehicles purchased or leased by the Department, including its components, over the last three fiscal years and on planned vehicle purchases for fiscal year 2022.The Committee notes that limitations on the purchase or lease of vehicles is contained in multiple accounts in the bill.

### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---:|
| Appropriation, fiscal year 2021 | $214,795,000 |
| Budget request, fiscal year 2022 | 396,371,000 |
| Recommended in the bill | 511,816,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +297,021,000 |
| Budget request, fiscal year 2022 | +115,445,000 |

The recommendation includes a decrease from the request of $30,000,000 from financial systems modernization and $25,000,000 from the Homeland Advanced Recognition Technology system due to schedule delays in both programs. The recommendation includes an increase of $170,000,000 for the Chief Readiness Support Office (CSRO), as described below, and an increase of $445,000 to address an error in the request for Mission Support Assets and Infrastructure.

*Biometric Systems.*—The COVID–19 pandemic further illustrated the benefits of touchless technologies at domestic and international airports that improve the efficiency of security checkpoints while minimizing the potential spread of infections. The Committee supports the continued development of accurate biometric identity validation tools to improve security and make the journey from curb to gate at airports more seamless and safe, while also emphasizing that use of such technologies should be voluntary by passengers and that the protection of passenger privacy and minimizing the retention of personal data is paramount.

*Common Enterprise Data.*—The Committee is supportive of efforts across the Department to leverage data to make informed operational and policy decisions. The Committee is aware of similar efforts within the Department of Defense (DoD), which has achieved good results by bringing together disparate data systems to provide departmental leadership with improved visibility across the DoD enterprise. The Department is directed to explore the fea-

**EXHIBIT C-20**

21

sibility and possible utilization of such a system, as well as associated resource requirements, and report to the Committee on the results not later than 120 days after the date of enactment of this Act.

*Homeland Advanced Recognition Technology (HART) Program Breach.*—The recommendation includes a decrease of $25,000,000 in proposed funding for the HART program due to continued program delays.The funding baseline for HART was established in 2016. The program suffered an early schedule breach in 2017 and was removed from breach in May 2019. In January 2020, the program was again declared to be in abreach for both cost and schedule.As of the date of this report, the program has still not gained Acquisition Review Board approval for a revised program baseline detailing a new lifecycle cost and schedule for achieving program milestones. Nor has the program provided an obligation plan to the Committee for funding previously appropriated or that requested in the fiscal year 2022 budget proposal. In addition, it is the Committee's understanding that HART Increments 3 and 4 will now be labeled as "future capabilities."

Not later than 30 days after the date of enactment of this Act, the Under Secretary for Management (USM) shall brief the Committee on how DHS is addressing systemic delays in the HART program. The briefing shall address the program's development efforts; plans for program breach remediation and re-baselining; program schedule, cost, and affordability; risks; mission outcomes; and accomplishments. The USM shall also address how the Department plans to work with HART customers to address the impacts of the delayed capabilities on their programs and activities.

*Headquarters Consolidation.*—The Committee directs the Department to provide an update on headquarters consolidation not later than 30 days after the date of enactment of this Act.

*Joint Migrant Processing Centers.*—The Committee recommends $170,000,000 above the request for the CRSO for integrated, joint migrant processing centers (JMPC).The CRSO, in conjunction with CBP, ICE, and USCIS, shall work with the Office of Strategy, Policy, and Plans, the Office of the General Counsel, the Office of the Undersecretary for Management, the Office for Civil Rights and Civil Liberties; and the Office of the Immigration Detention Ombudsman, along with interagency partners such as HHS and the Department of Justice, to develop requirements for establishing JMPCs. CRSO shall act as the executive agent for the design and construction of such centers, which shall appropriately shelter unaccompanied children, family units, and single adults as they undergo processing required under the immigration laws, including adherence to *Flores* settlement requirements; enhance the coordination among federal agencies and between such agencies and nonprofit organizations or local jurisdictions that provide shelter and support to migrants following their release from DHS custody; and minimize the time migrants spend in DHS custody.

Not later than 90 days after the date of enactment of this Act, the USM shall brief the Committee on joint requirements and plans for the design and construction of JMPCs, including their planned locations, estimated costs, and schedule for becoming operational. The total amount provided includes the reappropriation of $90,000,000 rescinded in the bill from prior-year appropriations to

**EXHIBIT C-21**

22

CBP for joint processing centers in the Rio Grande Valley in Texas and Yuma, Arizona. The total also includes $30,000,000 that was proposed in the budget request through the CBP PC&I account for a new migrant processing center in Del Rio, Texas.

### FEDERAL PROTECTIVE SERVICE

| | |
|---|---|
| Appropriation, fiscal year 2021 ........................................................ | $1,588,748,000 |
| Budget request, fiscal year 2022 ..................................................... | 1,625,000,000 |
| Recommended in the bill ................................................................. | 1,625,000,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 ................................................. | +36,252,000 |
| Budget request, fiscal year 2022 ............................................... | – – – |

### Mission

The Federal Protective Service (FPS) delivers law enforcement and protective security services to federally owned, leased, or operated facilities.

The Committee recommends $1,625,000,000 for FPS, equal to the request, which is fully offset by fees collected from FPS customer agencies.

### INTELLIGENCE, ANALYSIS, AND OPERATIONS COORDINATION

| | |
|---|---|
| Appropriation, fiscal year 2021 ........................................................ | $298,500,000 |
| Budget request, fiscal year 2022 ..................................................... | 320,620,000 |
| Recommended in the bill ................................................................. | 320,620,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 ................................................. | +22,120,000 |
| Budget request, fiscal year 2022 ............................................... | – – – |

### Mission

The missions supported through Intelligence, Analysis, and Operations Coordination are twofold: to equip the Homeland Security Enterprise with timely intelligence and information to keep the homeland safe, secure, and resilient; and to provide operations coordination, information sharing, situational awareness, a common operating picture, and departmental continuity.

### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2021 ........................................................ | $298,500,000 |
| Budget request, fiscal year 2022 ..................................................... | 320,620,000 |
| Recommended in the bill ................................................................. | 320,620,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 ................................................. | +22,120,000 |
| Budget request, fiscal year 2022 ............................................... | – – – |

Recommended adjustments to classified programs and more detailed oversight of funding for the Office of Intelligence and Analysis are addressed in the classified annex accompanying this report.

*Civil Rights and Civil Liberties.*—The Committee expects Office of Intelligence and Analysis (I&A) to comply with applicable civil rights and civil liberties laws and regulations; continue to implement principles of diversity, equity, and inclusion; and require related training for personnel.

*Homeland Threats.*—The Committee directs I&A to appropriately align its resources against the most pertinent threats to the Homeland, including terrorism, cybersecurity, economic security, foreign

**EXHIBIT C-22**

23

influence, and transnational organized crime. The Committee also expects I&A to enhance its ability to rapidly and effectively share intelligence and other information on threats with state, local, tribal, territorial, and private sector partners. The Committee directs I&A to brief the Committee not later than 30 days after the date of enactment or this Act on a plan for the obligation of its fiscal year 2022 funding, categorized by threat and/or information sharing program.

*National Labs.*—The Committee encourages the Office of Operations Coordination to utilize the expertise of the national labs to help identify tactical and strategic risks that could disrupt National Essential Functions.

### OFFICE OF INSPECTOR GENERAL

| | |
|---|---|
| Appropriation, fiscal year 2021 | $190,186,000 |
| Budget request, fiscal year 2022 | 205,359,000 |
| Recommended in the bill | 205,359,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +15,173,000 |
| Budget request, fiscal year 2022 | – – – |

### Mission

The DHS Office of Inspector General (OIG) conducts and supervises independent audits, investigations, and inspections of DHS programs, projects, and activities; identifies fraud, abuse, mismanagement, and inefficiencies in the use of funds; and makes recommendations for improving the execution of DHS missions.

#### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2021 | $190,186,000 |
| Budget request, fiscal year 2022 | 205,359,000 |
| Recommended in the bill | 205,359,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +15,173,000 |
| Budget request, fiscal year 2022 | – – – |

*Border Security and Immigration Oversight.*—The Inspector General is directed to enhance oversight and investigations related to immigration and border security policies and activities, including: safeguards for the due process rights of asylum seekers and other migrants; unannounced inspections of ICE and CBP detention facilities; detention facility contracting; the 287(g) and Secure Communities programs; and enforcement activities at and near sensitive locations. The OIG is directed to provide a briefing to the Committee, not later than 30 days after the date of enactment of this Act, on its budget execution plan for fiscal year 2022. In addition, the OIG shall continue publishing the results of its inspections of immigration detention facilities and other reports related to custody operations on its public website.

*Equity in Disaster Assistance for Individuals and Households.*— The Committee is aware of concerns raised about inequities in the delivery of disaster assistance to disaster survivors, especially through FEMA's Individual and Household Program (IHP), including concerns expressed by constituents, media reports and a recent GAO Report, *Disaster Assistance Additional Actions Needed to Strengthen FEMA's Individuals and Households Program* GAO–20–503. Among these concerns are that FEMA's programs provide

**EXHIBIT C-23**

24

disproportionately less assistance to minority communities and those in urban and rural disadvantaged communities; and that FEMA's application process and procedures are too complicated, causing many to discontinue their applications or forego appeals due to a mistaken belief that they are not eligible. In addition, FEMA's attempts to prevent fraudulent applications may be so restrictive as to inadvertently screen out many who may appropriately qualify for assistance.

The OIG is directed to review FEMA's application process and procedures for IHP, including its methods to prevent fraudulent applications, and to brief the Committee on its findings within 120 days of the date of enactment of this Act. The briefing shall detail whether recommendations from oversight entities, including the OIG, may have inadvertently led FEMA to develop policies and procedures that are overly restrictive and, as a result, may be preventing disaster survivors who need IHP from receiving that assistance.

*FEMA Alternative Procedures.*—The Committee reminds the OIG of the requirement in House Report 116–180 to update the report required by section 5189(h) of title 42, United States Code related to FEMA's Alternative Procedures program for Public Assistance. Within 15 days of the date of enactment of this Act, the OIG shall brief the Committee on a plan to update that report.

*Government Accountability Office Report.*—The Committee is concerned about several longstanding issues facing the OIG. On April 21, 2021, GAO released a report outlining 21 recommendations to address these challenges, including (1) a lack of internal quality controls; (2) the absence of a strategic plan; and (3) the failure to examine and address the increased time it takes to complete reports. The Committee expects the OIG to implement all 21 of GAO's recommendations as soon as possible. Furthermore, the Committee is troubled that, beginning in 2020, the OIG stopped publishing reports that substantiate allegations of whistleblower retaliation or misconduct by senior DHS employees. The Committee expects the OIG to resume publishing these reports on its website.

*Homeland Advanced Recognition Technology System.*—The Committee is aware of concerns about the development and implementation of the Homeland Advanced Recognition Technology System (HART). The Committee directs the OIG to conduct a review of HART technologies, data collection mechanisms, sharing agreements, and privacy protections and determine if OBIM is complying with 28 C.F.R. 23, Criminal Intelligence Systems Operating Policies. Within 180 days of the date of enactment of this Act, the OIG shall brief the Committee on the results of the review.

### TITLE I—ADMINISTRATIVE PROVISIONS

Section 101. The Committee continues a provision requiring the Department to submit a report to the Inspector General regarding grants or contracts awarded by means other than full and open competition and requires the Inspector General to review such grants or contracts and report the results to the Committees.

Section 102. The Committee continues a provision requiring the Chief Financial Officer of the Department to provide monthly budget and staffing reports to the Committees.

EXHIBIT C-24

25

Section 103. The Committee continues a provision requiring the Secretary to link all contracts that provide award fees to successful acquisition outcomes.

Section 104. The Committee continues a provision requiring the Secretary to notify the Committees of any proposed transfer of funds from the Department of Treasury Forfeiture Fund to any DHS component.

Section 105. The Committee continues a provision related to costs associated with the use of government aircraft by DHS personnel in support of official travel of the Secretary and Deputy Secretary.

Section 106. The Committee includes a provision requiring the Under Secretary for Management to provide quarterly acquisition information to the Committees.

Section 107. The Committee includes a provision restricting the use of funding for any pilot program involving more than 5 full-time personnel equivalents or costing in excess of $1,000,000 unless the Secretary submits certain information to the Committees related to the program's goals, metrics, and implementation plan.

## TITLE II—SECURITY, ENFORCEMENT, AND INVESTIGATIONS

### U.S. CUSTOMS AND BORDER PROTECTION

| | |
|---|---:|
| Appropriation, fiscal year 2021 ......................................................... | $15,277,496,000 |
| Budget request, fiscal year 2022 [1] ................................................... | 14,773,589,000 |
| Recommended in the bill [1] ............................................................. | 14,317,589,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 ................................................ | −959,907,000 |
|     Budget request, fiscal year 2022 ............................................... | −456,000,000 |

\*Note—the amounts for each fiscal year include appropriations offset by discretionary fee collections, which for fiscal year 2022 total $206,000,000.

[1] Funding requested in the budget proposal for POE construction and modernization is provided in title V of this Act.

### Mission

The mission of U.S. Customs and Border Protection (CBP) is to enforce laws regarding the admission of non-resident persons into the United States and facilitate the flow of legitimate trade and travel.

#### OPERATIONS AND SUPPORT

##### (INCLUDING TRANSFER OF FUNDS)

| | |
|---|---:|
| Appropriation, fiscal year 2021 ......................................................... | $12,908,923,000 |
| Budget request, fiscal year 2022 ...................................................... | 13,426,809,000 |
| Recommended in the bill .................................................................. | 13,562,809,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 ................................................ | +653,886,000 |
|     Budget request, fiscal year 2022 ............................................... | +136,000,000 |

The recommendation includes increases above the request for the following: $25,000,000 for innovative technology; $500,000 for asylum processing analysis; $8,000,000 for a zero trust architecture pilot; $5,000,000 for tuition assistance; $5,000,000 for tribal roads; $15,000,000 for onsite mental health clinicians; $20,000,000 for processing improvements; $6,000,000 for caregivers and childcare services; $1,500,000 for rescue beacons and the missing migrant

**EXHIBIT C-25**

26

program, for a total of $3,000,000; $4,000,000 for Carrizo cane control, for a total of $6,000,000; $20,000,000 for incident driven video recording systems, including body worn cameras and requirements for Freedom of Information Act compliance and data storage; $10,000,000 for video device monitoring capabilities; $10,000,000 to maintain baseline programs for the Office of Trade; $10,000,000 for port of entry technology; and $4,000,000 for medical contract oversight. The recommendation reduces the amount proposed for transportation by $8,000,000.

The COVID–19 pandemic continues to have a significant impact on the collection of trade and travel fee revenue on which the Office of Field Operations depends for a significant portion of its operations. Because the impact on fiscal year 2022 collections is uncertain and is still being estimated by CBP, the recommendation is based on the budget proposal and fee revenue estimates provided in CBP's budget request, with the understanding that Congress may need to address potential funding shortfalls later in the appropriations process.

*Asylum Processing at Ports of Entry.*—The Committee directs the Commissioner to engage a federally funded research and development center (FFRDC) to conduct an analysis of the asylum processing capacity and capacity requirements at land ports of entry along the U.S.-Mexico Border. The analysis should address the infrastructure, staffing, and other resource requirements needed to ensure the safe, humane, and orderly processing of single adults and families who present at ports of entry and make a lawful claim of fear or asylum, along with the processing of unaccompanied children prior to transfer to HHS ORR. In carrying out its analysis, the FFRDC shall consult with federal agency stakeholders, including ORR; the Department of Justice Executive Office for Immigration Review, CBP, ICE, USCIS, and CRCL. In addition, the FFRDC shall consult with community stakeholders, including non-profit immigration and civil rights advocacy organizations. The Committee recommends $500,000 above the request to support this effort.

*Border Barrier Mitigation Activities.*—The Committee continues to be concerned about the impacts of border barrier construction on sensitive lands and wildlife along the southwest land border, including in national wildlife refuges, national forests, national monuments, wilderness areas, and on imperiled species. To address these concerns, the bill provides authority to use up to $100,000,000 of available prior-year funds appropriated for border barrier construction for mitigation activities, including land acquisition, related to the construction of border barriers on federal land. Authority is also provided to allow for the transfer of funds to the U.S. Fish and Wildlife Service, the Bureau of Land Management, the U.S. Forest Service, and the National Park Services for the same activities.

*Deaths in Custody.*—The Committee directs CBP to notify the applicable consulate, congressional committees with relevant jurisdiction, the Office of the Inspector General, and the Office for Civil Rights and Civil Liberties within 24 hours of the death of any individual in CBP custody or any individual not in custody if CBP personnel were involved in the death. The notification shall include the name of the individual and the circumstances of the death. For

EXHIBIT C-26

27

purposes of this requirement, CBP custody includes any individuals detained on CBP's behalf by another law enforcement agency or admitted to a medical facility while still in CBP's legal custody. The Committee also directs CBP to:

(1) for in-custody deaths, provide the same notifications to the public after the next-of-kin have been notified, or after reasonable efforts have been made to notify the next-of-kin;

(2) preserve all video recordings of such individuals during their time in custody until the completion of all related investigations;

(3) conduct interviews of relevant parties regarding the circumstances of the death;

(4) impress upon local and state authorities the need for an autopsy to be conducted as part of a review of the circumstances leading to an in-custody death; and

(5) for in-custody deaths where the decedent was in a CBP holding facility at the time of death or had been in a holding facility immediately prior to the time of death, conduct a prompt mortality review of each death, including a review of whether the individual's treatment in detention complied with CBP's standards on Transport, Escort, Detention, and Search (TEDS).

Not later than 30 days after the end of each fiscal year, CBP shall submit a report to the Committee detailing all such deaths, including summaries of mortality reviews and compliance with TEDS. In addition, the Office of Professional Responsibility (OPR) shall brief the Committee on its findings and associated recommendations for any deaths it investigates.

*Human Smuggling.*—The Committee is concerned about reports that transnational criminal organizations are smuggling migrants and narcotics into the United States in the same conveyance, such as a commercial vehicle, endangering the lives of the smuggled migrants. The Committee directs the Department to work with its federal law enforcement partners to ensure that the enforcement of anti-drug and anti-smuggling laws is carried out in a manner protective of human life and safety. In particular, DHS should work to prevent the passage of any vehicle through a checkpoint or port of entry for purposes of a controlled delivery by another law enforcement agency if the vehicle may contain individuals being smuggled under unsafe conditions, such as the smuggling of one or more individuals in a confined or non-air conditioned space.

*Incident-Driven Video Recording System.*—The Committee provides $20,000,000 to deploy the Incident-Driven Video Recording System (IDVRS), including body worn cameras, to additional Border Patrol Stations. The Committee is dismayed that the fiscal year 2022 budget request did not propose the continuation of funding provided in fiscal year 2021 for this critical effort. Not later than 90 days after the date of enactment of this Act and quarterly thereafter, CBP shall brief the Committee on the execution plan for IDVRS, to include an implementation schedule.

*Inland Ports.*—The Committee directs the Government Accountability Office to (1) review constraints affecting ports of entry for containers; (2) identify existing inland "dry" container ports of entry; (3) review the process for establishing a "dry" container port of entry, including factors used by pertinent federal agencies that

**EXHIBIT C-27**

28

must be met to enable locations to operate as such inland ports; and (4) provide a list of geographic locations that may be suitable to serve as dry container ports of entry. GAO shall report its findings and recommendations to the Committee not later than one year after the date of enactment of this Act.

*Innovative Technology.*—The Committee recommends a total of $45,000,000 for innovative technologies, to include $25,000,000 within Operations and Support (O&S) and $20,000,000 under Procurement, Construction, and Improvements (PC&I). CBP is directed to update the Committee on the planned obligation of these funds not fewer than 15 days prior to any obligation of funds. Funding shall not exceed $5,000,000 for any individual project.

*Mail Interdiction of Heroin and Opioids.*—Since 2018, the Committee has provided over $200,000,000 in support of INTERDICT Act activities, to include additional lab capacity and expanding the capabilities at international mail and consignment facilities. The Committee continues to support CBP's partnership with the United States Postal Service to better detect opioids at international processing centers and expects this collaboration to reach higher capture rates through the continued deployment of new detection technologies, including lab equipment, decontamination solutions, personal protective equipment, and other consumables. Additionally, CBP is encouraged to ensure that personnel are provided personal protective equipment capable of preventing secondary exposure and cross contamination.

The CBP Strategy to Combat Opioids, released in March 2019, serves as an action plan for CBP and its interagency partners in identifying and interrupting the opioid supply chain. Within 60 days of the date of enactment of this Act, CBP shall provide a briefing to the Committee on how the strategy has influenced actions already taken, the results of those actions, and a plan for updating the strategy. The briefing shall include the level of obligations for all activities associated with INTERDICT Act implementation.

*Mental Health Clinicians.*—The Committee recommends an additional $15,000,000, for a total of $17,100,000 for on-site clinicians to support employee resiliency and suicide prevention. The clinicians shall perform assessments; short-term counseling; referrals; consultations with managers, supervisors, peer support team members, or chaplains; in-person presentations/trainings; and immediate response to critical incidents.

*Migrant Care.*—To address deficiencies in CBP's guidance and associated implementation plans for ensuring the humane care of migrants in custody, not later than 90 days after the date of enactment of this Act, the Commissioner, in coordination with the CMO, shall modify the existing guidance to include the following:

(1) *Initial Health Screening.*—Health screening shall include an interview, questionnaire, and physical exam, including a measurement of vital signs and an age-appropriate assessment of signs, symptoms, or risks, including for communicable diseases, mental health conditions, or traumatic experiences.

(2) *High-Priority Populations.*—The initial health screening shall take place within six hours of being detained for individuals requiring prompt medical attention or who exhibit signs of acute or potentially severe physical or mental illness; have

**EXHIBIT C-28**

29

an acute or chronic physical or mental disability or illness; pregnant women; children; and elderly individuals.

(3) *Medical Equipment and Personnel.*—Each location to which detainees are first transported after an initial encounter shall have the necessary equipment and trained personnel to conduct the initial health screening, prevent the spread of communicable diseases, provide basic over-the-counter medications appropriate for all age groups, and provide basic mental health interventions for children or other vulnerable individuals. Detainees shall not be deprived of the use of any medication required to manage a chronic illness.

(4) *Access to Water and Food.*—CBP shall ensure that detainees have access to not less than one gallon of water per person per day; three meals per day totaling not fewer than 2,000 calories per day for adults; food with age-appropriate calorie content for children under the age of twelve; and accommodations for any dietary needs or restrictions. Additionally, protocols should be developed that guide the nutritional content of age-appropriate food made available to children under the age of 5, with a special emphasis on infants.

(5) *Holding Facility Standards.*—Within 60 days of the date of enactment of this Act, CBP shall ensure that each facility at which an individual is detained is well lit and well ventilated, with humidity and temperature kept at comfortable levels (between 68 and 74 degrees Fahrenheit); has noise levels that are safe and conducive for sleeping between the hours of 10:00 in the evening and 6:00 in the morning; provides each person clean, temperature-appropriate clothing and bedding; and places no detainee in a room, for any period of time, in which the number of individuals exceeds the maximum occupancy level as determined by the appropriate building code, fire marshal, or other appropriate authority.

(6) *Consumables.*—CBP shall maintain a sufficient supply of sleeping mats, toothbrushes, toothpaste, feminine hygiene products, other personal hygiene supplies, and diapers for holding facilities, and make each available upon request; ensure that showers are available to individuals held in custody for longer than 48 hours; and provide clean, age and gender-appropriate clothing to individuals with wet or soiled clothing.

(7) *Child Care.*—CBP is directed to ensure that children have access to a trusted adult by providing unlimited phone access for this purpose. CBP is also encouraged to provide repeated process information and orientation for children through videos and 24-hour accessibility to information.

*Migrants and Child Welfare Personnel.*—Within the funds provided, the Committee directs the CMO, in coordination with the Commissioner, to hire or otherwise obtain the services of, at minimum, two full-time, state-licensed child welfare professionals for each CBP sector along the southern land border. These professionals, who should be licensed clinical social workers or the equivalent, will provide culturally competent, trauma-informed, and developmentally appropriate expertise, and advise on building systems of care to prevent and mitigate emotional and psychological trauma among detained children. Additionally, the CMO shall coordinate with the Commissioner to hire an appropriate number of

EXHIBIT C-29

30

youth care personnel for each sector to implement the rec-ommended screening, intervention, recreational, and other elements of custodial care required to prevent and mitigate emotional and psychological trauma. Not later than 60 days after the date of enactment of this Act, CBP shall provide an execution plan for hiring child welfare professionals and youth care personnel, to include how to address hiring and on-boarding issues, how the personnel will be deployed in the field, and how translation services will be provided.

*Migrant Families in Custody.*—When considering whether a family unit should remain together while in custody, the Commissioner should consider the criminal history of the parent, safety and comfort of the child, and physical and mental health of all members of the family. When appropriate and feasible, CBP shall ensure that separated family units are reunited and transferred together prior to removal, release from CBP custody, or transfer to Immigration and Customs Enforcement custody. When CBP is responsible for the custody of unaccompanied children who are siblings, the Commissioner shall, to the extent practicable and when in the best interest of the children, place such siblings together in the same facility before HHS assumes custody pursuant to 8 U.S.C. 1232(b).

*Migrants and Personnel Training.*—The Committee continues to direct CBP to provide training on trauma-informed care for all personnel who interact with migrants. This training should include field personnel as well as mission support personnel. Not later than 60 days after the date of enactment of this Act, CBP shall provide an execution plan for such training, to include a timetable for full implementation.

*Migrant Property.*—The Committee directs CBP to provide a briefing, not later than 90 days after the date of enactment of this Act, on its policies and protocols regarding the storage and transfer or return of the personal property of migrants.

*National Guard Support on the Southern Border.*—Not later than 180 days after the date of enactment of this Act, CBP is directed to brief the Committee on its requirement for National Guard personnel support to its operations. The briefing shall address how the requirement was developed; the number of personnel currently deployed, by sector; and the specific tasks conducted by National Guard personnel.

*Migrant Safety.*—CBP shall continue its policies and activities that help protect people who travel on foot through dangerous terrain after having entered the United States between the ports of entry. CBP shall continue to prohibit its personnel from engaging in any activity that could damage water and food caches and also expand migrant safety efforts, including through the placement and maintenance of additional rescue beacons. The recommendation includes an additional $1,500,000, for additional rescue beacons and for the Missing Migrant Program, for a total of $3,000,000. Not later than 90 days after the date of enactment of this Act, CBP shall brief the Committee on planned obligations.

*Office of Professional Responsibility (OPR).*—The Committee provides $74,300,000, as requested, to increase OPR's investigative capabilities through an increase in criminal investigators and support staff. Funding provided shall also address facilities needs due to an increase in staffing. The Committee provides the funding with

**EXHIBIT C-30**

31

three years of availability to provide time for planning and to appropriately recruit and pace hiring. The Committee expects CBP to focus on high priority areas such as in-custody deaths, use of force, detention inspections, sexual assaults and, and fraud. Not later than 90 days after the date of enactment of this Act, CBP shall brief the Committee on a plan to execute the funding that includes a detailed hiring strategy, including a geographic breakout, and the anticipated priority focus areas for such funding.

*Processing Coordinators.*—The Committee includes $9,147,000, as requested, to increase the number of Border Patrol Processing Coordinators. Not later than 90 days after the date of enactment of this Act, CBP shall brief the Committee on the feasibility of using non-law enforcement personnel to provide assistance in processing, care, and transportation of migrants. The briefing shall address the legal limitations on using non-law enforcement personnel for processing.

*Prison Rape Elimination Act Compliance (PREA).*—The Committee directs CBP to brief the Committee, not later than 90 days after the date of enactment of this Act, on the results of completed PREA audits, including an assessment of whether the standards are effective in protecting vulnerable populations.

*Prosecution of Asylum Seekers.*—The Committee is concerned by reports of the prosecution for illegal entry and reentry of individuals who express a fear of return to their country of origin during processing by CBP. The Administration is reminded of the United States' obligation under the 1951 Refugee Convention to refrain from punishing asylum seekers for the way in which they enter the country.

*Reporting Requirements.*—CBP shall continue to follow the directives in the explanatory statement accompanying Public Law 116–6 related to the following, according to the previously directed timeframes unless otherwise specified:

(1) CBP-wide capability gaps;

(2) Border Patrol Workforce Staffing Model;

(3) Combined table of CBP interdictions of currency and major categories of drugs;

(4) The number of detainees held by CBP for more than 48 and 72 hours, respectively;

(5) Allegations related to employee corruption;

(6) Use of force abuses;

(7) Checkpoint, transportation check, and roving patrol stop operations, to include a timeline for full compliance with reporting directives;

(8) Search and rescue efforts for fiscal year 2021;

(9) Land Port of Entry Infrastructure Capital Investment Plan, to be provided to the Committee not later than 30 days after the submission of the President's budget request for fiscal year 2023; and

(10) Staffing gains and losses.

Additionally, CBP shall continue to follow the directives in House Report 116–180 related to the following, according to the previously directed timeframes unless otherwise specified:

(1) High Speed Pursuits, to include the use of immobilization devices beginning not later than 90 days after the date of enactment of this Act;

**EXHIBIT C-31**

32

(2) U.S. Citizens Held in CBP Custody;
(3) In-Custody Time for Unaccompanied Children; and
(4) Polygraph Waivers.

CBP shall follow the directives in the explanatory statement accompanying Public Law 116–260 related to the following:

(1) Body-worn cameras;
(2) Border searches and electronics;
(3) Expansion of Arizona and New Mexico border zone travel;
(4) Holding facility length of stay;
(5) LPOE hours of operations;
(6) Queue management at POEs and data on asylum seekers; and
(7) Recruitment, hiring and retention.

*Translation Services and Forms.*—The Committee directs CBP to provide a plan, within 120 days of the date of enactment of this Act, for ensuring access to appropriate translation services for all rare language speakers encountered by CBP, including an estimate of related resource requirements and the feasibility and potential benefit of these components jointly procuring such services. Additionally, the Committee directs CBP to provide all forms that are required to be signed by a detained person in the detainee's native language. CBP is directed to report to the Committee within 90 days of the date of enactment of this Act on a plan and timeline for achieving this goal, including an estimate of related resource requirements.

*Transparency.*—The Committee continues to direct CBP to reiterate its commitment to a policy of "maximum disclosure, minimum delay" in releasing information to the media and public; continue to post all policies and guidelines that may be of interest to the public on the agency's website; and continue—or expand as practicable—data collection that more effectively detects and deters abuse, strengthens accountability, and ensures effective use of limited resources.

*Tribal Travel Documents.*—While several Native American tribes do not have Enhanced Tribal Cards (ECT) that are Western Hemisphere Travel Initiative (WHTI) compliant, any member of a Federally recognized Indian tribe in the U.S. or Canada that holds valid identification issued by a tribe is be allowed to pass through U.S. land- and sea-ports of entry. CBP is encouraged to continue to work with tribal governments on interim solutions for those tribes that do not have secure ETCs to ensure member are not unnecessarily delayed or referred to secondary inspection based solely non-WHTI compliant documents. Not later than 90 days after the date of enactment of this Act, CBP shall brief the Committee on the impact of non-WHTI compliant documents on tribe members and how CBP is working with tribal governments to address identification challenges.

*Video Monitoring.*—The Committee provides $10,000,000 for video monitoring capabilities within Border Patrol facilities. The Committee continues the direction that any failure of cameras and associated storage equipment in excess of 120 hours at any CBP facility that detains migrants must be reported to the Office of Professional Responsibility. Such reporting shall be updated weekly until the system is back online.

**EXHIBIT C-32**

33

BORDER SECURITY OPERATIONS

*Carrizo Cane.*—The recommendation includes an increase of $4,000,000 for efforts to control the growth of Carrizo cane along the Rio Grande River in Texas, for a total of $6,000,000. CBP should continue to coordinate with the Texas State Soil and Water Conservation Board and other stakeholders on control efforts. Beginning not later than 30 days after the date of enactment of this Act, CBP shall provide quarterly updates to the Committee on the performance of this program with regard to increased visibility, biomass reduction, and miles of river treated.

*Collaboration with the Border Patrol.*—The Committee continues to encourage all state, local, tribal, and federal law enforcement agencies working in the southwest land border region to collaborate and operationally coordinate, when feasible, with sector chiefs in their respective geographical regions. CBP is directed to brief the Committee on these efforts not later than 60 dates of the date of enactment of this Act.

*Radios.*—The Committee continues to direct CBP to review the need to retrofit U.S. Border Patrol radios to allow agents to operate on the CBP system or transfer to either a commercial LTE carrier or the First Responder Network Authority (FirstNet) LTE Network.

TRADE AND TRAVEL OPERATIONS

*Agriculture Inspections—Invasive Species.*—The Committee reminds CBP of the report required in House Report 116–458 concerning the continued introduction of invasive species to Hawai'i and to non-contiguous U.S. territories.

*Biometric Exit.*—The Committee continues direction for CBP to provide a detailed expenditure plan for biometric exit activities within 90 days of the date of enactment of this Act, in the same manner as described for such plan in House Report 114–668.

*Cargo Processing.*—The Committee continues to direct CBP to provide a briefing on its efforts to improve automated commercial cargo processing, to include passive scanning at land POEs, not later than 60 days after the date of enactment of this Act.

*Forced Labor.*—The Committee provides $299,746,000, an increase of $10,000,000 above the request, for trade enforcement activities, including intellectual property rights. Within the total, not less than $9,203,000 is for Trade Agreement, Remedies, and Enforcement personnel to strengthen enforcement actions and processes that prevent the importation of products made with forced labor.

*Jones Act.*—The Committee recognizes the need for uniform application and enforcement of coastwise laws across the nation and directs CBP to devote not less than $1,000,000 to its Jones Act Division of Enforcement.

*Live Animal Imports.*—The Committee is aware that importation of live animals, particularly dogs, has increased substantially during the COVID–19 pandemic and is concerned that CBP lacks adequate facilities and procedures to respond. The Committee notes the priority of the safety and welfare of live animals under CBP control pending clearance, and urges the agency to collaborate with U.S. Department of Agriculture (USDA), Animal and Plant Health Inspection Service (APHIS) Animal Care to draft regulatory guid-

**EXHIBIT C-33**

34

ance clarifying standards of care for live animals in a properly cer-
tified animal care facility operating under a CBP-issued custodial
bond, citing 7 U.S.C. 2148 (and pertinent parts) as the controlling
statutory authority. This guidance shall also clarify the role of ani-
mal care facility owners in the sale, adoption, trade, or transfer
ownership of live animals as it pertains to the import of live ani-
mals.

This new regulatory standard shall be prescribed as a condition
in appropriate bonds issued by CBP to parties applying for a bond
in which the nature of the merchandise includes live animals pend-
ing release by CBP on behalf of the Centers for Disease Control
and Prevention (CDC) and/or USDA APHIS, or those pending ex-
port due to non-compliance with CDC regulations.

Further, the committee is concerned that that there is only one
such animal care facility with CBP-bonded status capable of safely
handling live animals throughout the duration of potential legally
required quarantines. The Committee directs CBP to issue a report
to Congress evaluating the necessity of additional facilities meeting
similar standards of animal care at other ports of entry and to pro-
vide the Committee with an accounting of the resources necessary
to establish such facilities in accordance with CBP, CDC and
USDA, APHIS Animal Care's recommendations within 90 days of
the date of enactment of this Act.

*Outbound Inspections.*—DHS is directed to enhance its focus on
interdicting the outbound flow of smuggled firearms and illicit cur-
rency that fund and facilitate transnational criminal organizations.
Not later than 90 days after the date of the enactment of this Act,
the Secretary shall brief the Committee on a plan to enhance such
efforts.

*Port Upgrades.*—The Committee urges CBP to immediately re-
view the baseline facility service levels for each POE and take
those service levels into consideration when acting on requests for
facility and security improvements. CBP should share information
on each POE's service levels with the port operator and provide the
aggregate information on levels of service to the Committee.

*Preclearance.*—The Committee supports the continued expansion
of the preclearance program and urges CBP to consider expansion
to eligible partners in the Indo-Pacific region. Within 90 days of the
date of enactment of this Act, CBP shall brief the Committee on
the status of preclearance expansion efforts, including a list of ex-
pansion candidate countries and challenges to expansion, such as
staffing, space, or other constraints.

*Resource Allocation Model.*—The Committee continues direction
concerning the CBP resource allocation model. Any modifications to
the model shall be described at the field and office level in future
budget submissions. Additionally, not later than 60 days after the
date of enactment of this Act, CBP shall brief the Committee on
resource staffing shortfalls on the northern and southern borders
compared to levels prescribed by the resource allocation model for
rail crossings and POEs in the land, air, and sea environments, in-
cluding cruise ship terminals. CBP is encouraged to continue to im-
prove the model by seeking external review.

*Secure Corridor Strategy.*—Collaboration between CBP, the Fed-
eral Railroad Administration (FRA), Servicio de Adminstración
Tributaria (SAT), and freight railroads has resulted in the imple-

**EXHIBIT C-34**

35

mentation of a Secure Corridor Strategy that has improved the safety, security, and efficiency of our nation's cross-border trade and freight movement. As part of this strategy, trains operated by certified crews are no longer required to stop for up to an hour on the Laredo International Rail Bridge in order to change crews, reducing the vulnerability of these trains to theft, vandalism, trespassing, and smuggling and decreasing the likelihood of potential delays that cause blocked highway-rail grade crossings on both sides of the border. Furthermore, by unifying cargo processing and enhancing technologies used during customs inspections, processing times have been greatly improved. The Committee encourages CBP to continue working with FRA, SAT, and freight railroads to further implement this strategy.

*Trade Remedy Enforcement.*—The Committee directs CBP to review whether duties on importers of recycled, scrap, and primary aluminum exempt from certain tariffs are being properly assessed, along with whether assessed tariffs have been remitted to the government. Not later than 120 days after the date of enactment of this Act, CBP shall submit a report to the Committee on the findings of this review and actions taken to address any inappropriate assessments.

*User Fee Airports.*—Consistent with House Report 114–668 and House Report 116–180, the Committee strongly encourages CBP to give priority consideration to an application for POE status to any user fee airport that served at least 75,000 deplaned international passengers in the previous calendar year.

*Visa Waiver Program (VWP).*—The Committee continues to direct CBP to better clarify which types of educational experiences are permitted under VWP travel, including what evidence or information is required to satisfy CBP that a traveler does not intend to overstay the 90-day VWP time limit.

## PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriation, fiscal year 2021 ........................................................ | $1,839,634,000 |
| Budget request, fiscal year 2022 ...................................................... | 925,780,000 |
| Recommended in the bill [1] .............................................................. | 333,780,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 ................................................ | −1,505,854,000 |
|     Budget request, fiscal year 2022 .............................................. | −592,000,000 |

[1] Funding requested in the budget proposal for POE construction and modernization is provided in title V of this Act.

The Committee recommends the following increases above the request: $50,000,000 for border technology procurement; $20,000,000 for innovation technology; $8,750,000 for small unmanned aircraft systems; $8,750,000 for team awareness kits; $5,000,000 for a border technology common operating picture (COP) pilot; $50,000,000 for non-intrusive inspection (NII) equipment; and $3,000,000 for electronic medical records. The recommendation provides no funding for additional border barriers.

The recommendation reduces the request by $35,000,000 proposed for end item procurement; $655,000,000 proposed for LPOE construction and modernization, which is instead funded through a provision in title V of the bill; $30,000,000 for construction of a central processing facility, which is funded instead in the Management Directorate's PC&I account; and $17,500,000 that was prematurely

**EXHIBIT C-35**

36

proposed for acquisition of an aircraft prior to the initiation of non-recurring engineering.

*Automated Commercial Environment.*—CBP is directed to review whether the automated commercial environment program should incorporate the U.S. Virgin Islands into the existing program.

*Border Security Technology Acquisitions.*—Over the last few years, the Committee has provided significant flexibility to CBP within the PC&I, Border Security Assets and Infrastructure (BSAI) PPA to prioritize the use of funds for its highest priority technology acquisitions. Unfortunately, the agency has in numerous cases abused this flexibility by obligating funds for acquisitions that have neither been justified to Congress through a budget request nor included in the detailed expenditure plans CBP provides to the Committee. In addition, some of these funds have been obligated for the acquisition of end items that fall below the threshold for what may be funded through a PC&I account or have been used to contract for services, which are required to be funded instead through CBP's O&S account. As a consequence, the bill rescinds funding for two programs from which funds were diverted for uses that were not justified to Congress through either a budget request or an obligation's plan. The Commissioner and the Under Secretary for Management are directed to review the management of procurement programs within the BSAI PPA to ensure funding is being executed according to congressional intent and the Department's financial management and acquisition policies.

*Border Technology Common Operating Picture.*—The Committee provides $5,000,000 only for a pilot or demonstration effort to develop a COP that integrates sensor feeds from platforms within the current DHS inventory. The effort shall comply with section 107 of this Act and shall be briefed to the Committee prior to approval of a new program start.

*Border Technology Procurement.*—The Committee recommends $50,000,000 for border security technology, which shall only be available for cross border tunnel threats, aerostats, autonomous surveillance, geospatial capabilities, mobile surveillance, search and rescue capabilities, and mesh networks. The Commissioner is directed to prioritize procurement of the most cost-effective technologies based on lifecycle costs, system availability, reduced requirements for personnel and physical infrastructure, and input from sector leadership. In addition, the Commissioner shall prioritize technologies that enhance search and rescue capabilities. CBP shall provide a briefing to the Committee on a plan for the obligation of these funds at least 15 days prior to any obligation. The plan shall require the direct approval of the CBP Commissioner and include:

(1) details about the process for prioritizing the use of funds;

(2) a summary of planned obligations for fiscal year 2022 delineated by technology type;

(3) metrics that will be used to assess the cost effectiveness of each type of technology for which funds will be obligated and a plan for collecting the data required for such metrics; and

(4) for continuing procurements, operational effectiveness data that supports continued investment, including evidence of support from sector leadership based on actual use of the technology.

**EXHIBIT C-36**

37

CBP shall notify the Committee at least 15 days prior to the obligation of any funds based on a change to the initial obligation plan.

*Electronic Health Records.*—The Committee includes $3,000,000 for the expansion and implementation of electronic health records. Prior to obligation, CBP, in coordination with the Department's Chief Medical Officer, is directed to brief the Committee an expenditure plan for this funding. Planned activities shall align with the Departments electronic health records program.

*Innovative Technology.*—The Committee recommends a total of $45,000,000 for innovative technologies, to include $25,000,000 within O&S and $20,000,000 under PC&I. CBP is encouraged to review the following technologies: geospatial search and rescue, remote sensing, mesh networking, satellite communications, and aerostats technology. CBP is directed to update the Committee on the planned obligation of these funds not fewer than 15 days prior to any obligation of such funds. Funding shall not exceed $5,000,000 for any individual project.

The Committee notes that Congress has for several years provided funding for testing and evaluation of innovative technologies that might not otherwise come timely to CBP's attention through the normal procurement process. Not later than 30 days after the date of enactment of this Act, CBP is directed to provide a briefing on the use of innovative technology funding over the last five fiscal years, including:

    (1) the technologies tested and evaluated;

    (2) the results of those evaluations in terms of meeting CBP requirements;

    (3) an analysis of the cost effectiveness of those technologies compared to alternatives;

    (4) CBP's process for determining whether to establish programs of record for cost effective innovative technologies; and

    (5) investments to date in such programs of record and planned investments in fiscal year 2022 and the two following fiscal years.

*Multi-Role Enforcement Aircraft.*—The Committee recommends $10,882,000 for a new land variant multirole enforcement aircraft program. The program has completed the current contract for the maritime variant and plans to issue a new request for proposals for a land variant in fiscal year 2022. The funding provided will support the award of a new contract for the non-recurring engineering associated with the first aircraft. Funds are not provided for the incremental purchase of an aircraft, sensors, or spares. The Committee strongly discourages this practice except in certain conditions such as long lead items involved in the Coast Guard shipbuilding programs. The Committee is particularly concerned with the assertion by CBP that it plans to structure a flexible contract that allows items to be incrementally funded, if beneficial. CBP shall fully fund in one fiscal year the total cost of an end item as defined by section 525 of this Act to ensure that the full cost of an acquisition program is transparent to Congress and the public when presented in the budget.

*Non-Intrusive Inspection (NII).*—The Committee recommends an additional $50,000,000 for NII technology at land and sea ports of entry. CBP shall continue to update the Committee on the obligation of funds for NII acquisition as a part of the required quarterly

**EXHIBIT C-37**

38

obligation plans directed in title I of this report. The Committee expects any procurement of technology to be competitively awarded. CBP is reminded of the reporting requirement in House Report 116–458 on 100 percent scanning.

## U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

| | |
|---|---|
| Appropriation, fiscal year 2021 ........................................................ | $7,973,529,000 |
| Budget request, fiscal year 2022 ..................................................... | 7,991,486,000 |
| Recommended in the bill .................................................................. | 7,971,975,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 ................................................. | −1,554,000 |
|     Budget request, fiscal year 2022 .............................................. | −19,511,000 |

### MISSION

U.S. Immigration and Customs Enforcement (ICE) enforces federal laws governing border control, customs, trade, and immigration to promote homeland security and public safety and helps facilitate the adjudication of legitimate claims of asylum and other claims for status to remain in the United States.

Homeland Security Investigations (HSI) is responsible for disrupting and dismantling transnational criminal threats facing the United States. HSI special agents also conduct national security investigations targeting violations of the nation's customs and immigration laws.

Enforcement and Removal Operations (ERO) enforces the nation's immigration laws by identifying and apprehending potentially removable noncitizens, detaining apprehended individuals when necessary, and depending on the outcome of immigration court proceedings, removing them from the United States in a manner consistent with legal processes and procedures. ERO also ensures that potentially removable individuals are afforded due process, treated humanely, and offered case management services.

### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2021 ........................................................ | $7,875,730,000 |
| Budget request, fiscal year 2022 ..................................................... | 7,939,786,000 |
| Recommended in the bill .................................................................. | 7,820,275,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 ................................................. | −55,455,000 |
|     Budget request, fiscal year 2022 .............................................. | −119,511,000 |

The recommendation includes a net reduction of $119,511,000 below the request, which includes the following adjustments: increases totaling $99,735,000 for Homeland Security Investigations (HSI); a net reduction of $279,165,000 for Civil Immigration Enforcement Operations, which replaces Enforcement and Removal Operations (ERO); and increases totaling $59,919,000 for mission support activities and investments to improve transparency, officer and agent safety, and oversight.

Within the total amount provided, the bill makes $46,696,000 available until September 30, 2023, of which $32,996,000 is for the wiretap program; and $13,700,000 is for the Visa Security Program.

ICE shall continue to provide detailed operational and spending plans, as described in the explanatory statements accompanying Public Laws 116–6, 116–93, and 116–260. While there have been improvements in the timeliness of providing this data and the level

**EXHIBIT C-38**

39

of detail submitted therein, the content of these plans is still insufficiently instructive for the Committee's oversight activities because it continues to lack answers to basic questions, such as the status of funds and projected costs for program areas like: ATD case management services provided by non-profit organizations; child exploitation investigation efforts; 287(g) agreement execution and oversight; enforcement of forced labor and intellectual property rights laws; and enterprise-wide costs associated with tactical communications and fleet management.

ICE shall develop a plan to configure its financial and reporting systems to better budget for and monitor the costs of programs and initiatives and to track obligations and expenditures against those programs and initiatives; such plan should be fully operational prior to the beginning of fiscal year 2023. The Committee expects that this will require increased standardization of financial data structures and processes across field and headquarters offices. Not later than 120 days after the date of enactment of this Act, ICE shall brief the Committee on the status of this effort, including a description of anticipated risks and a mitigation plan to address those risks.

### HOMELAND SECURITY INVESTIGATIONS

*Assessment of Transnational Criminal Organizations (TCOs).*—The Committee is concerned by reports of TCOs targeting legitimate businesses along drug trafficking routes. The destabilization of legitimate businesses in regions such as Central America forces increased reliance on TCOs to meet basic human needs that often also pose security and safety threats to the public. This environment, in turn, drives people to migrate to other countries, such as the United States, in order to protect and sustain themselves and their families. To better understand this problem, the Committee directs HSI to prepare an assessment, in consultation with other DHS components, federal agencies, international partners, and private sector stakeholders, on which TCOs engage in this activity and an analysis of options for dismantling their operations. Not later than 120 days after the date of enactment of this Act, ICE shall brief the Committee on the results of this assessment.

*Combating Human Smuggling.*—The Committee continues to be concerned about human smuggling activities, especially at the southwest border, as well as the criminal enterprises that support it. Accordingly, the recommendation provides an increase of $2,000,000 above the request to support operations at the recently established Center for Countering Human Trafficking. Further, the Committee supports the Secretary's new anti-smuggling effort, Operational Sentinel, and encourages HSI to expand its collaborative efforts to include coordination with the Financial Crimes Enforcement Network and appropriate Mexican and Central American federal partners. The Department is directed to report back to the Committee on these efforts within 60 days of the enactment of this Act.

*Environmental Forensic Science.*—The Committee encourages HSI, in consultation with the S&T, to evaluate opportunities to leverage international forensic science research to expand existing efforts with external academic partners in building wholistic ap-

EXHIBIT C-39

40

proaches to combating transnational crime, particularly regarding wildlife, narcotics, weapons, and human trafficking.

*International Megan's Law.*—The recommendation sustains prior-year investments to continue the implementation of International Megan's Law. ICE is directed to include details about these efforts in its monthly operational and spending plans and provide detailed staffing and budget assumptions about this program in future budget requests.

*Enhancing and Modernizing HSI's Capabilities.*—The Committee is concerned about the growing complexity and workload associated with executing HSI's missions—especially given the increase in online and dark web activity, such as growing reports of online child sex abuse; criminal activity related to illicit opioid/fentanyl smuggling; and increased commercial trade fraud and intellectual property rights infringement. The Committee recognizes the advanced investigative skillset of the HSI workforce, its unique compilation of legal authorities, and its critical role in investigating transnational criminal organizations involved in trafficking individuals into and within the United States. Therefore, the Committee provides a total increase of $99,735,000 above the request, including:

- $35,235,000 to restore proposed reductions intended to achieve undefined efficiencies;
- $10,000,000 to begin increasing HSI's investigative capacity to respond to projected increases in workload associated with the planned expansion of CBP's non-intrusive inspection detection technology (NII) along the southwest border;
- $2,200,000 to expand and enhance HSI's undercover activities, to include modernizing its certified undercover financial processes, systems, and other requirements;
- $8,600,000 to accelerate development of capabilities for the Repository for Analytics in a Virtualized Environment (RAVEn), which serves as HSI's curation point for data analytics and tools that improve and streamline investigative processes and capabilities;
- $2,000,000 for the Center for Countering Human Trafficking;
- $6,000,000 to increase data analysis staffing to support each Special Agent in Charge office's area of responsibility;
- $8,400,000 to increase HSI's cyber investigations, including the enhancement of covert computer networks, Dark Web platforms, undercover platforms, and the Network Intrusion Program;
- $16,300,000 to develop a cyber threat platform, update hardware and software for computer forensics, and provide targeted child exploitation investigations training;
- $6,500,000 to fund the training, equipment, travel, software, and analysts necessary to address the increase in child exploitation leads and investigations and increased victim assistance requirements, for a total amount of not less than $27,500,000 for Child Exploitation Investigation activities; and
- $4,500,000 for the training, equipping, and hiring of Human Exploitation Rescue Operative (HERO) Child-Rescue Corps program graduates.

**EXHIBIT C-40**

41

ICE is directed to update the Committee with details about the use of additional funding provided in the bill to expand these efforts in its monthly operational and spending plans, including both requested funding and the increases included by the Committee. Further, ICE shall provide detailed staffing and budget assumptions about these efforts in future budget requests.

Additionally, to improve its effectiveness against these threats, the bill includes a new provision (section 220) to focus HSI activities on functions that are not redundant to those of ERO. The Committee also encourages HSI to work with appropriate nonprofit organizations and victim service providers that can help identify human trafficking victims, ensuring they receive the proper care and access to victim service organizations.

*HERO Child-Rescue Corps.*—The Committee reminds ICE of the briefing on performance indicators for the HERO program required by House Report 116–180 and the briefing on the status of the HERO apprenticeship program required by the explanatory statement accompanying the Department of Homeland Security Appropriations Act, 2021, (Public Law 116–260), and looks forward to receiving these briefings as soon as possible.

CIVIL IMMIGRATION ENFORCEMENT OPERATIONS

The recommendation includes changes to the PPA structure by replacing the "Enforcement and Removal Operations" PPA heading with "Civil Immigration Enforcement Operations" (CIEO) to clarify its roles and responsibilities. CIEO funding supports the enforcement of the Nation's immigration and humanitarian laws through the identification and apprehension of removable noncitizens; immigration adjudication processing of potentially removable noncitizens; enrollment of such individuals into alternatives to detention programs; providing case management services; detaining apprehended individuals who pose a flight risk or are deemed a threat to public safety; removing noncitizens from the United States, consistent with legal processes and procedures, upon exhaustion of their legal claims to remain in the United States; and facilitating the departure of individuals who choose to return voluntarily. CIEO funding supports a range of programs and activities that focus on identifying and prioritizing the removal of recent border crossers and those individuals posing the most significant threats to national security or public safety, including noncitizens convicted of crimes who remain a credible threat to public safety or national security.

CIEO funding also supports ICE's work with other DHS components, states, counties, and localities across the United States to uphold U.S. immigration and humanitarian laws at, within, and beyond the borders.

The recommendation further modifies the CIEO sub-PPA structure by making the following changes:
- The Custody Operations PPA funds civil immigration custody requirements for potentially-removable single adults as they undergo initial processing for their immigration court proceedings, and continued detention for those who pose a threat to public safety or national security, who are deemed to be a flight risk, or who have materially violated the requirements of the Alternatives to Detention (ATD) program.

**EXHIBIT C-41**

42

- The Immigration Absconder Operations (IAO) PPA replaces the Fugitive Operations PPA. This funding supports efforts to identify, locate, and take into custody potentially removable noncitizens who present a heightened threat to national security and public safety.
- The Priority Immigration Enforcement Operations PPA replaces the Criminal Alien Program PPA and funds the transfer of custody of removable or potentially removable noncitizens who have been incarcerated within federal, state, or local prisons and jails.
- The Alternatives to Detention PPA funds the ATD program, a cooperative, noncustodial enforcement strategy that gives individuals a fair chance to comply with immigration court requirements while mitigating flight risk and noncompliance, which can include case management and, if needed, monitoring and check-in technology. The PPA also funds case management services, such as the facilitation of compliance with court hearings and final orders of removal; mental health services; human and sex trafficking screening; legal orientation programs; cultural orientation programs; connections to social services; and for individuals who will be removed, reintegration services. Such services may be made available to individuals released from DHS custody on parole, bond, or who are enrolled into an ATD program.
- The Transportation Operations PPA replaces the Transportation and Removal Program PPA. Transportation Operations provides for the safe and secure transportation of noncitizens who either are subject to final orders of removal, are being transported to a detention for processing or longer term detention, or require transfer to a nearby available municipal or non-profit shelter, another location within the local community, or a public transportation hub. The funding also supports custody determinations, travel document issuance, and removal processes for post final order cases, and coordinates the custodial transfer of Unaccompanied Children (UC) from CBP to HHS shelters.

*287(g) Program.*—The recommendation continues a provision in the bill that requires ICE to provide a report to the Committee and the public regarding 287(g) steering committee membership and activities; performance data; the number of individuals placed into removal proceedings by 287(g)-designated officers; and any plans for future expansion of or changes to the program. ICE, OIG, and CRCL are directed to provide rigorous oversight of the 287(g) program, and ICE is directed to notify the Committee prior to implementing any significant changes to the program, including any changes to training requirements, data collection, selection criteria, or the jurisdictions with which ICE has agreements. The Committee also reminds ICE that communities are not legally required to enter-into or continue participation in 287(g) agreements and that immigration enforcement should not be used either to induce communities to enter or deter them from discontinuing such agreements.

The bill continues and modifies a provision from prior years that prohibits the continued delegation of 287(g) authority to any local jurisdiction if the OIG determines that the jurisdiction has materi-

**EXHIBIT C-42**

43

ally violated the requirements of its 287(g) agreement. The modification requires ICE to also eliminate a delegation of 287(g) authority if the OIG or the ICE Office of Professional Responsibility determines that the participating jurisdiction violated the civil rights or liberties of an individual who was subsequently subject to that jurisdiction's use of 287(g) authority, unless the Secretary determines that the violation is not part of a pattern or practice or that the jurisdiction has taken appropriate steps to remediate the violation.

*Addressing Wrongful Deportations.*—ICE, USCIS, and other DHS agencies shall leverage all mechanisms provided by current law to facilitate the return to the United States of those whose removal was contrary to law or justice. Such mechanisms should include the use of humanitarian parole, the support of a respondent's motion to reopen, and stipulation to relief from removal. Efforts shall be taken to ensure that the individual is restored to prior lawful status, to the greatest extent possible, or the ability to adjust to lawful status. Not later than 60 days after the date of enactment of this Act, ICE shall brief the Committee on its efforts to comply with these directives.

*Age-Outs.*—ICE is again directed to prohibit the transfer or maintenance of custody by ICE of any person formerly designated as an unaccompanied child (UC) who reaches 18 years of age in the custody of ORR as described in 8 U.S.C. 1232(c)(2), unless the ICE juvenile coordinator provides written certification of compliance with the requirement in 8 U.S.C. 1232(c)(2)(B) to consider placement in the least restrictive setting. This written certification must document the specific factors demonstrating that any alternatives to detention, including but not limited to any recommended in ORR's post-18 plan, would be insufficient to mitigate any danger to self, threat to public safety, and/or risk of flight. The Committee notes that neither the lack of a sponsor nor the lack of an ORR-developed post-18 plan should be dispositive factors. This written certification shall be provided to the individual and the individual's attorney of record upon request.

In addition, the Committee directs ICE to ensure that training is provided to relevant personnel, including contract personnel, on policies and procedures to ensure compliance with 8 U.S.C. 1232(c)(2)(B). Such training shall be mandated annually for all officers who make custody decisions for children who turn 18 in ORR custody, including but not limited to deportation officers, field office juvenile coordinators, and supervisory detention and deportation officers.

Finally, beginning not later than 30 days after the date of enactment of this Act, ICE shall provide a monthly report to the Committee with the number of UC who turned 18 in ORR custody and were then transferred to ICE detention, including a breakdown by ICE area of responsibility and the UC's most recent type of ORR placement, the reason for detention, and whether ORR provided a post-18 plan.

*ATD and Case Management Services (CMS).*—The recommendation provides an increase of $34,524,000 above the request, for a total of $475,000,000 for the ATD PPA to fund increases in: enrollments into the ATD program; case management services and participation; transportation and information technology costs for ICE

EXHIBIT C-43

44

personnel travelling to shelters in support of remote processing and enrollments; and other incidental costs associated with operations at shelters.

ICE is directed to use the least onerous form of supervision necessary to ensure compliance with the terms of the program; conduct regular reviews of each participant's compliance obligations, with input from each participant's counsel and/or case manager; and de-escalate supervision requirements when warranted by such reviews. Further, any individual enrolled into ATD shall not be required to pay a bond for their release.

The Committee is concerned about the status of the independent review of the ATD program for which Congress appropriated $4,000,000 in fiscal year 2020. ICE is again reminded of the requirement that the review and analysis be informed by discussions with government officials, current program operators, nongovernmental immigration policy stakeholders, and current participants in the program, and by reviewing similar programs in other countries. The Committee is concerned that it has not yet been consulted as part of this review. Not later than 30 days after the date of enactment of this Act, ICE shall brief the Committee on the status of the review.

Additionally, DHS and ICE are reminded of the now overdue reporting and publishing requirements regarding the ATD program described in the explanatory statement accompanying the Department of Homeland Security Appropriations Act, 2021, (Public Law 116–260); the Committee reiterates the ATD-CMS briefing and operational directives described therein.

The recommendation also continues the case management services grant pilot program, which is funded in the "Office of the Secretary and Executive Management—Federal Assistance" account. The direction provided in the explanatory statement accompanying the Department of Homeland Security Appropriations Act, 2021, (Public Law 116–260) regarding this program shall again apply to funding provided in this Act.

*Bond Payments.*—The Committee reminds ICE of its requirements to provide the monthly bond statistics described in House Report 116–9 and directs ICE to continue providing such information in fiscal year 2022. Further, not later than 30 days after the date of enactment of this Act, ICE is directed to provide a briefing to update the Committee on the status of allowing the general public to post and pay bonds electronically.

*Detainee Access to Legal, Medical, and Mental Health Services.*—ICE should not enter into, expand, or renew a contract with any entity to operate an immigration detention facility unless it is located fewer than 100 miles from:

    (1) a Level IV (or lower) designated trauma center; and

    (2) at least one government-listed, legal aid resource on the Executive Office for Immigration Review (EOIR) "List of Pro Bono Legal Service Providers" from which the Director has received confirmation that it is able to provide legal services to detainees at the facility.

ICE is directed to continue adhering to the requirements in House Report 116–9 regarding legal resources available to detainees and shall ensure that such information is provided in both English and Spanish. The Committee reminds ICE of the report re-

**EXHIBIT C-44**

45

quired in the explanatory statement accompanying the Department of Homeland Security Appropriations Act, 2021, (Public Law 116–260) regarding access to due process. The recommendation includes a new provision (section 217) that strengthens opportunities for individuals in DHS custody to have meaningful access to counsel and ensure individuals are provided a Know Your Rights presentation, including prior to any asylum-based interview or proceeding for those placed into expedited removal.

The Committee again directs ICE to publish on a public facing website, not later than 30 days after the date of the close of the fiscal year, a description of the medical and mental health staffing—delineated by position and qualification—at each detention facility with a capacity to house at least 50 ICE detainees, along with the average daily population of each facility. The report should indicate the hours of availability of in-person, specialized medical service typically available during the week; whether any positions were unfilled for more than one month of the previous year; and the average detainee wait time for seeing a medical professional. ICE shall also include in the report the number of individuals taken into ICE custody with a serious medical or mental health condition, including pregnant women, and their average and median lengths of time in ICE custody. The Committee urges ICE to reinstate the policies in its August 2016 directive on the *Identification and Monitoring of Pregnant Detainees* that was superseded by its December 2017 update, except that such policies shall be updated to be harmonized with the requirements and legal flexibilities provided in section 219 of this Act.

*Detainee Forms.*—Consistent with direction provided in the explanatory statement accompanying the Department of Homeland Security Appropriations Act, 2021, (Public Law 116–260), ICE is directed to make every reasonable attempt to provide forms to detained persons in a language in which the person is conversant, beginning with the forms that detained persons must sign. The Committee looks forward to receiving the briefing required in such explanatory statement.

*Detention Capacity for Single Adults.*—The Committee expects that ICE will require fewer detention beds as it shifts from its historic reliance on a punitive enforcement model toward a more cooperative compliance enhancement model through the use of the ATD program and case management services. Additionally, as described further below, the recommendation includes a new provision that provides additional flexibility for releasing individuals from detention who do not pose a flight risk or public safety threat, which will further reduce the need for detention capacity.

The Committee also acknowledges that as the Administration winds down the Migrant Protection Protocols program and eventually moves towards ending the *Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists*, which was first issued by HHS on March 20, 2020, there will be an increase in single adult asylum seekers presenting at the border whose claims will be initially processed in ICE facilities according to title 8 laws and regulations. The Committee is therefore mindful that ICE must sustain adequate resources to support these operational changes and to prevent overcrowding that would create

**EXHIBIT C-45**

46

dangerous and inhumane conditions at CBP's short-term holding facilities.

To balance the anticipated impact of these policy changes, the recommendation supports an average daily population (ADP) of 28,500 for single adults for fiscal year 2022, a reduction of 1,500 from the request and 3,000 from the fiscal year 2021 level. Funding for single adult detention is reduced by $53,252,000 from the request, which also accounts for savings realized by a reduction in the number of guaranteed minimum detention beds under contract by ICE that occurred since enactment of fiscal year 2021 appropriation.

The Committee acknowledges recent efforts to avoid detaining individuals in ICE custody longer than necessary, but more progress is needed to better balance humanitarian, due process, and budget efficiency considerations with the national security and public safety mission set. Accordingly, the bill includes a new provision (section 219) that requires the Secretary to approve a segmented risk classification assessment process to determine whether a detained individual is a flight risk or public safety threat, and to ensure whether the individual is an immigration enforcement priority according to official guidance provided to the ICE's field offices. In contrast to the current risk classification process, this provision requires that custody determinations be made in an individualized, documented manner, and requires collaboration with CRCL and OIDO in developing the new process. Assessments must be conducted for each individual in custody for 14 or more days and must be completed within 20 days of entering custody, or 10 days for individuals who self-identify as transgender. If the assessment reveals that the individual is not a flight risk, public safety threat, the individual should be released. All other individuals shall have their cases reviewed each month by the OIDO.

*Immigration Detention Contract Transparency.*—Consistent with the direction provided in the explanatory statement accompanying the Department of Homeland Security Appropriations Act, 2021, (Public Law 116–260), ICE is directed to continue the monthly publishing of a consolidated compilation of contract documents for each of the facilities it uses for immigration detention purposes, including the most current and complete contract modification or addendum, any subcontracts, and all bid solicitation requests.

*Immigration Enforcement at Sensitive Locations.*—The Committee is encouraged by recent updated guidance regarding Civil Immigration Enforcement Actions in or near courthouses, which will help victims and witnesses feel safe in coming forward to testify against those who commit criminal acts. ICE is directed to follow its policy regarding enforcement actions at or near all other sensitive locations, and is encouraged to examine the impacts of expanding the policy to additional locations not currently included, such as school bus stops or other locations where children congregate; USCIS offices; mental health, emergency, and social services centers; and other locations where community impacts could be better balanced against ICE immigration enforcement interests.

ICE is again directed to provide its officers with guidance and training for engaging with victims and witnesses of crime, including victims of domestic violence, and to strengthen policy guidance on enforcement actions in or near sensitive locations in order to

**EXHIBIT C-46**

47

minimize any effect that immigration enforcement may have on the willingness and ability of victims and witnesses to pursue justice.

*Menstrual Hygiene Products in Immigration Detention Facilities.*—The Committee is concerned by reports of ICE detention facility operators failing to provide adequate menstrual hygiene products to detainees. ICE shall immediately address this deficiency to ensure that such products are available, as needed, at detention facilities. ICE, together with OIDO, shall brief the Committee not later than 30 days after the date of enactment of this Act regarding the status of ICE's compliance with this requirement.

*Migrant Shelter Grants.*—The Committee supports the Administration's recent operational shift away from the extended detention of families and notes that ICE's current short-term custody approach is intended to hold families for 72-hours or less for the purposes of transportation out of CBP short-term holding facilities; completion of any needed processing documentation; testing for COVID–19 or assessment for other health concerns; and enrollment into ATD and case management services. It is critical that those activities not occur in CBP holding facilities, which were designed for the short-term processing of single adults and are particularly inappropriate for families with children. The Committee notes, however, that the budget request did not propose new resources to fully support this alternative approach, instead proposing $271,062,000 to sustain detention capacity for families at existing family residential centers, consistent with prior years. Accordingly, the recommendation does not include this proposed funding.

The recommendation instead provides $100,000,000 under a new Federal Assistance account, to be transferred to FEMA for the award of grants to support noncustodial migrant processing and enrollment into ATD and case management services in nongovernmental shelters. Such funding shall be available for the incidental costs incurred by shelter operators in support of these operations, including space accommodations for personnel supporting ATD and case management enrollment. ICE is directed to ensure that, absent exigent circumstances, any personnel operating at shelters not wear law enforcement uniforms and shall work with shelter operators to ensure, to the greatest extent practical, that ICE's processes be performed in a setting segregated and out of plain site from the rest of the shelter.

Not later than 90 days after the date of enactment of this Act, ICE, in collaboration with FEMA, shall brief the Committees on its strategy for noncustodial operations associated with migrant processing at these shelters, along with an expenditure plan for ICE operational costs and for the use of the grant funding.

*Phone Access in Detention.*—The Committee is concerned that many migrants in ICE custody still do not have access to telephone services to contact legal and case support services. The Committee directs ICE to enable detainee phone use and produce an implementation plan to comply with both the *Lyon v. ICE, et al.* Settlement Agreement and section 221 of the bill at each ICE detention facility by not later than 90 days after the date of enactment of this Act. ICE shall ensure detainees are able to place direct, unmonitored calls from private phone booths to legal services and nonprofit service providers at no cost. Not later than 30 days after the date of enactment of this Act, ICE shall brief the Committee

**EXHIBIT C-47**

48

on the status of the plan, a schedule for achieving full compliance with these requirements, and any other efforts to improve detainee phone access.

*Religious Minorities.*—Congress and the Department of State have recognized that genocide has been committed by foreign terrorist organizations and their affiliates against religious and ethnic minorities in Iraq, including Yezidis and Christians. The Committee recommends that ICE refrain from prioritizing the deportation of people who will be subject to violent persecution and death in their countries of origin.

*Removal and Detention Reporting.*—The Department shall continue to submit data on the removal of parents of U.S.-born children semiannually, as in prior years, and shall also report semiannually on removals of members of the armed services who have either been discharged or separated from service other than for dishonorable or bad conduct.

Additionally, ICE is directed to provide a semi-annual report to the Committee detailing the number of individuals, by field office, who are detained by ICE for removal from the United States but are subsequently determined to be U.S. citizens, along with the average and median lengths of stay in detention for such individuals. The report should also describe ICE's process for adjudicating claims of U.S. citizenship by individuals it arrests for removal from the United States; major impediments to more quickly resolving such claims; and ICE's efforts to mitigate those impediments. The first report is due within 90 days of the date of enactment of this Act. The Committee notes this report was first required in the explanatory statement accompanying the Department of Homeland Security Appropriations Act, 2019, (Public Law 116–6), and ICE has failed to comply with that requirement. The Committee urges ICE to expedite the delivery of that report.

*Reporting on Criminality and Enforcement Priorities.*—ICE is directed to continue monthly reporting regarding criminality, as described in House Report 116–9. Further, ICE shall provide monthly reports on detention and removal actions by category delineated in the anticipated final guidance that will replace the current "Interim Guidance: Civil Immigration Enforcement and Removal Priorities", dated February 18, 2021. Both data sets shall differentiate individuals detained or removed as a result of interior enforcement efforts versus those from CBP border security operations.

*Voluntary Work Program.*—The recommendation includes a new provision (section 221) establishing that the allowances provided to detained individuals for work performed in detention facilities may not be less than the local prevailing minimum wage. The bill includes an increase of $10,000,000 above the request to begin implementing this requirement in fiscal year 2022.

#### OFFICE OF THE PRINCIPAL LEGAL ADVISOR (OPLA)

*Access to Counsel.*—The bill includes a new provision (section 217) requiring the Secretary and the CRCL Officer to each certify that the provision's increased requirements to improve access to counsel, prospective counsel, and Know Your Rights presentations are satisfied.

*Prosecutorial Discretion and OPLA Enhancements.*—The Committee is encouraged by the recent updated guidance issued by the

**EXHIBIT C-48**

49

Principal Legal Advisor on May 27, 2021, entitled, "Interim Guidance to OPLA Attorneys Regarding Civil Immigration Enforcement and Removal Policies and Priorities." Given this shift towards increasing the humane use of prosecutorial discretion and in support of efforts to address the significant immigration case backlog, the recommendation includes increases above fiscal year 2021 levels of $15,000,000 to hire additional OPLA attorneys and for related facility requirements; and $6,851,000 for OPLA's case management system, as requested. The Committee encourages OPLA, in collaboration with USCIS, CBP, the Executive Office for Immigration Review, and other stakeholders, as appropriate, to explore opportunities to share immigration case files and other relevant information more efficiently and securely between agencies in an online environment. Not later than 180 days after the date of the enactment of this Act, the Principal Legal Advisor and other stakeholders shall brief the Committee regarding the feasibility and cost-benefit analysis of using commercial off-the-shelf solutions capable of rapidly improving the efficiency and effectiveness of the immigration adjudication process through better sharing and presenting of case files, exhibits, multimedia materials, and other evidence among agencies, with respondents and detainees, and at hearings.

*Protecting Separated Families.*—OPLA attorneys shall, as appropriate, resolve removal proceedings for separated families through the use of stipulations and DHS shall expeditiously adjudicate humanitarian parole requests submitted by or on behalf of separated and removed family members seeking to enter the United States.

### MISSION SUPPORT

The recommendation breaks out Mission Support PPA funding into three new sub-PPAs: Enterprise Services; Office of Professional Responsibility; and Executive Leadership and Oversight; this approach is consistent with the Mission Support PPA structure for CBP. The Executive Leadership and Oversight PPA includes funding for the following offices: Office of the Director, including the Deputy Director and the Chief of Staff; Congressional Relations; Diversity and Civil Rights; Firearms and Tactical Programs; Partnership and Engagement; and Public Affairs.

*Body Worn Cameras.*—The Committee continues to believe that the use of body-worn cameras would be beneficial for the execution of many ICE operations and is disappointed that the agency has only recently begun efforts to design a pilot program. The Committee is concerned that under the current plan, the pilot would require 30 months to complete and is too limited in scope to evaluate camera use in disparate operational settings, which could lead to further delays in their full deployment to the field. The Committee is also disappointed with the lack of identified resources to execute the pilot program in the fiscal year 2022 request. Therefore, the recommendation includes an increase of $3,000,000 above the request for the Office of the Chief Information Officer, in collaboration with other agency stakeholders, to accelerate the pilot program and to ensure the pilot is appropriately scoped.

Not later than 30 days after the date of enactment of this Act, ICE and CRCL shall provide a joint briefing to the Committee on the updates to the plan for the pilot; the metrics for success; an expenditure plan for the $3,000,000 increase; any anticipated civil

**EXHIBIT C-49**

50

liberties or other concerns that may present challenges; how re-
corded footage will interface with Freedom of Information Act re-
quirements; specific activities/operations where the use of body-
worn cameras could compromise undercover criminal investiga-
tions; and activities where the use of body-worn cameras would be
of particular benefit to the safety and wellbeing of officers, agents,
detainees, and the public. The briefing shall identify opportunities
to significantly accelerate the pilot program and a plan to transi-
tion to the field the use of these cameras. It shall also identify any
risks in accelerating the pilot, along with mitigation strategies to
address those risks.

*Data Modernization Roadmap.*—The recommendation provides
an increase of $5,000,000 above the request to the Office of the
Chief Information Officer to improve the use of data to better in-
form ICE's planning, budgeting, and operations.

*Fleet.*—The recommendation includes an increase of $25,000,000
above the request for the ICE fleet replacement program to im-
prove the safety of ICE officers and agents.

*Office of Detention Oversight (ODO).*—The Committee is con-
cerned that gaps remain in the design and plans for inspections
and oversight at ICE's civil detention facilities. The recommenda-
tion includes an increase of $2,500,000 above the request to sup-
port additional, unannounced inspections; to review compliance
with each detention standard not less than once every three years
at each facility; to expand ODO's oversight to facilities that detain
individuals for 72-hours or less; and to conduct reviews and inspec-
tions of any special or emerging facilities and programs. Not later
than 120 days after the date of enactment of this Act, ODO is di-
rected to brief the Committee on Appropriations, the House Judici-
ary Committee, and the House Committee on Oversight and Gov-
ernment Reform on a detailed description of the process it will use
for detention facility inspections.

ICE is reminded that the detailed results of these inspections
shall be promptly published on a public-facing website, redacted as
needed to protect any personally identifiable information, along
with a plan of action and milestones to address any deficiencies
that were identified during the inspection. The status of addressing
such deficiencies shall be validated by OIDO and shall be updated
on the ICE website not less that quarterly.

Consistent with direction provided in prior years, the ICE Direc-
tor shall have sole authority to approve detention standard waivers
and shall notify the Committee of any such waiver within 3 busi-
ness days of approval. Additionally, ICE shall report publicly on a
quarterly basis on any waivers issued, including the justification
for each such waiver.

*Reliance on Gang Databases.*—The Committee is concerned that
ICE relies on inaccurate, incomplete, or otherwise flawed databases
in order to issue detainer requests, which often have the effect of
extending a person's period of criminal incarceration or civil immi-
gration detention. Not later than 90 days after the date of enact-
ment of this Act, the Director of ICE, in consultation with the
CRCL Officer, shall contract with an independent organization to
conduct a comprehensive evaluation of the accuracy of the data-
bases ICE uses to issue immigration detainer requests. ICE and
CRCL shall provide an update to the Committee not later than 180

EXHIBIT C-50

51

days after the date of enactment of this Act on the status of this effort.

### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriation, fiscal year 2021 ........................................................ | $97,799,000 |
| Budget request, fiscal year 2022 .................................................... | 51,700,000 |
| Recommended in the bill ................................................................ | 51,700,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 ................................................ | −46,099,000 |
| Budget request, fiscal year 2022 ............................................. | − − − |

The recommendation provides $51,700,000, as requested, including $5,479,000 for a new Technological Operations building at the Antilles HSI facility in San Juan, Puerto Rico. ICE is directed to include project- or investment-level details in its monthly operational and spending plans, which shall include any carryover balances of prior-year funding.

### FEDERAL ASSISTANCE

#### (INCLUDING TRANSFER OF FUNDS)

| | |
|---|---|
| Appropriation, fiscal year 2021 ........................................................ | − − − |
| Budget request, fiscal year 2022 .................................................... | − − − |
| Recommended in the bill ................................................................ | $100,000,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 ................................................ | +100,000,000 |
| Budget request, fiscal year 2022 ............................................. | +100,000,000 |

As described in detail above, the recommendation provides $100,000,000 above the request for a new, FEMA-administered grant program for jurisdictions and non-profit organizations to provide short-term, non-custodial shelter and transportation services for migrants while they are: completing their immigration processing; provided health screening; enrolled into Alternatives to Detention; and referred to case management services.

### TRANSPORTATION SECURITY ADMINISTRATION

| | |
|---|---|
| Appropriation, fiscal year 2021 ........................................................ | $8,311,695,000 |
| Budget request, fiscal year 2022 .................................................... | 8,615,561,000 |
| Recommended in the bill ................................................................ | 8,615,561,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 ................................................ | +303,866,000 |
| Budget request, fiscal year 2022 ............................................. | − − − |

*Note—the amounts for each fiscal year include appropriations offset by fee collections, which for fiscal year 2022 are estimated by CBO at $2,460,750,000, including $2,110,000,000 in passenger security fees and $350,750,000 in vetting fees.

### MISSION

The Transportation Security Administration (TSA) is charged with protecting U.S. transportation systems while facilitating the flow of travel and commerce.

### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2021 ........................................................ | $7,793,715,000 |
| Budget request, fiscal year 2022 .................................................... | 8,094,787,000 |
| Recommended in the bill ................................................................ | 8,072,443,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 ................................................ | +278,728,000 |
| Budget request, fiscal year 2022 ............................................. | −22,344,000 |

*Note—the amounts for each fiscal year include appropriations offset by passenger security fee collections, which for fiscal year 2022 are estimated by CBO at $2,110,000,000.

**EXHIBIT C-51**

52

*Credential Authentication.*—The recommendation includes $24,600,000, as requested, for the nationwide deployment of credential authentication technology (CAT). The Committee is aware of TSA's interest in deploying technology that will minimize physical contact between screeners and passengers, including CAT with Camera (CAT-C). Not later than 90 days after the date of enactment of this Act, TSA shall provide a briefing on technology in use, being deployed or being considered that would reduce physical contact with passengers including CAT-C. As part of this briefing, TSA shall address how this implementation will impact the Registered Traveler Program and any steps TSA is taking to mitigate such impact. The briefing shall also address steps being taken to safeguard passenger privacy.

*Exit Lane Staffing Report.*—The Committee encourages effective use of TSA staff resources and directs TSA to provide a briefing, within 90 days of the date of enactment of this Act, on the safety and efficiency impacts of utilizing local law enforcement partnerships to staff airport exit lanes under TSA oversight.

*Federal Flight Deck Officer (FFDO).*—The Committee recommends the requested $20,263,000 for the FFDO program to expand Federal Law Enforcement Training Centers (FLETC) training capacity to accommodate an increased volume of pilot candidates entering the program and to support required recurrent training. The Committee appreciates the value of the FFDO Recurrent Training Center in Atlanta, GA, in making training more convenient and efficient for FFDOs. While the Committee supports the shared opportunity to cross-purpose the training center for Federal Air Marshal (FAMS) training, the Committee recommends that the Center prioritize recurrent training for FFDOs as intended for the facility. Additionally, the Committee recommends that TSA consider locating a recurrent training facility in the western U.S. to support officers based on the West Coast. Finally, the Committee encourages TSA to facilitate access to firearms and recurrent training facilities per the 2018 FAA Reauthorization Act. The Committee directs TSA to provide a briefing not later than 60 days after the date of enactment of this Act on FFDO Program enrollment, utilization numbers for FFDO recurrent training, and FFDO firearms recertification training.

*Integrated Security Enterprise.*—The Committee continues to support TSA's efforts to develop open architecture requirements for transportation security equipment, which should include well defined requirements and standards. Similar to the open architecture enterprise utilized in the medical industry, the Committee urges TSA to fully define its proposed end state, including all workflows and interfaces across the aviation security domain.

*Modernization and Interoperable Gateway System (IGS) Communications Pilot Program.*—The Committee recognizes the need to expand TSA's existing framework of IGS technology currently deployed by TSA specialized programs and security operations throughout general airport operations. This system connects radio, voice, text, video, and data files in a secure environment available to the agencies and personnel that make up airport and law enforcement operations. The Committee encourages TSA to consider conducting a pilot project based on IGS technology solutions already in use by the agency at several airports in the Eastern

**EXHIBIT C-52**

53

United States to expand the existing framework and close any interoperability gaps. TSA is directed to brief the Committee within 120 days of the date of enactment of this Act on the feasibility, potential benefits, cost, and schedule for such a pilot program.

*REAL ID Act.*—The Committee notes that full implementation of REAL ID Act minimum document requirements and issuance standards for federal recognition has been postponed until May 3, 2023, due to the impact of the COVID–19 pandemic on the operations of state motor vehicle department operations. Not later than 180 days after the date of enactment of this Act, the Committee directs TSA to provide a briefing on: (1) alternative screening procedures (in accordance with section 7220(c) of Title VII, Public Law 108–458 (49 U.S.C. 44901 note)) widely available for passengers who do not have credentials that meet the requirements of section 202 of the REAL ID Act; and (2) TSA's efforts to prepare for enforcement of REAL ID requirements at TSA checkpoints.

*Real-Time Wait Time Information at Security Checkpoints.*—The Committee supports TSA's efforts to inform the traveling public about real-time wait times at TSA screening checkpoints, consistent with the requirements of the FAA Reauthorization Act of 2018 (Public Law 115–254). The Committee believes disseminating this information via websites, mobile device applications or on in-airport screens helps the traveling public appropriately plan their trips and helps alert TSA about wait time lags so they can be quickly addressed.

*Touchless Security Identification.*—TSA shall provide activity-level details in its budget justification materials for activities associated with the development and implementation of voluntary, accurate, reliable, and secure biometric identification options for passengers enrolled in PreCheck.

*Ultraviolet-C (UVC) Equipment for Screening Checkpoints.*—The Committee is aware that TSA has established a pilot program to install and deploy UVC technology, both standalone systems and systems for automated screening lanes, capable of extinguishing the presence of bacteria and viruses on trays at the security checkpoints. The Committee encourages further development of this initiative and directs TSA to provide a briefing, within 90 days of the date of enactment of this Act, on the potential benefits, feasibility, and funding requirements for future deployment of this technology at all Category X airports.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriation, fiscal year 2021 | $134,492,000 |
| Budget request, fiscal year 2022 | 134,492,000 |
| Recommended in the bill | 156,836,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +22,344,000 |
| Budget request, fiscal year 2022 | +22,344,000 |

*Computed Tomography Deployment.*—The Committee recommends $104,492,000, as requested, for the procurement and deployment of computed tomography (CT) equipment and encourages TSA to accelerate the program. Within 60 days of the date of enactment of this Act, TSA shall brief the Committee on a proposed procurement and deployment plan along with a funding and execution plan to complete the full deployment of CT machines across the nation's airports by not later than 2026.

**EXHIBIT C-53**

54

RESEARCH AND DEVELOPMENT

| | |
|---|---:|
| Appropriation, fiscal year 2021 ........................................................ | $29,524,000 |
| Budget request, fiscal year 2022 ..................................................... | 35,532,000 |
| Recommended in the bill ................................................................ | 35,532,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 ................................................. | +6,008,000 |
|     Budget request, fiscal year 2022 ............................................... | – – – |

## COAST GUARD

| | |
|---|---:|
| Appropriation, fiscal year 2021 ........................................................ | $12,844,954,000 |
| Budget request, fiscal year 2022 ..................................................... | 12,871,442,000 |
| Recommended in the bill ................................................................ | 13,172,742,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 ................................................. | +327,788,000 |
|     Budget request, fiscal year 2022 ............................................... | +301,300,000 |

*Note—the amounts for each fiscal year include mandatory appropriations for retired pay, permanent indefinite discretionary appropriations for health care, and housing fund appropriations offset by fee collections, which for fiscal year 2022 are estimated by CBO at $1,963,519,000; $240,577,000; and $4,000,000, respectively.

MISSION

The Coast Guard is the principal federal agency charged with maritime safety, security, and stewardship. It is a military, multi-mission, maritime service within the Department of Homeland Security and one of the nation's five armed services.

OPERATIONS & SUPPORT

| | |
|---|---:|
| Appropriation, fiscal year 2021 ........................................................ | $8,485,146,000 |
| Budget request, fiscal year 2022 ..................................................... | 9,020,770,000 |
| Recommended in the bill ................................................................ | 9,144,070,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 ................................................. | +658,924,000 |
|     Budget request, fiscal year 2022 ............................................... | +123,300,000 |

The recommendation continues and expands upon on the Committee's support for the Coast Guard, including the following increases above the request: $20,000,000 for tuition assistance parity; $7,150,000 for recruiting and supporting a diverse workforce; $5,500,000 for an accession competitiveness pilot program; $6,000,000 for cyber compliance upgrades to training center simulators and trainers; $2,800,000 to modernize Ready Learning and recapitalize training aids; $30,050,000 for operational command and control (C2) and domain awareness; $12,000,000 for MH-60T cutter deployability; $4,000,000 for surface short range communications modernization; $8,900,000 for Rescue 21 modernization; $10,000,000 to recapitalize operational safety and detection equipment; $11,900,000 for cyber readiness; and $5,000,000 for the National Coast Guard Museum.

The Committee acknowledges the Coast Guard is in a transition year with a new budget structure for this account. To lessen the risk of end of year vulnerabilities, the Committee includes more flexible reprogramming authority for this fiscal year, rather than the requested contingency funding. The Committee expects the Coast Guard to report end of fiscal year obligations in the sub-PPA structure provided with the fiscal year 2022 budget materials not later than 60 days after the end of the fiscal year. The Committee also expects the fiscal year 2023 budget justification materials to be provided with the same sub-PPA level of detail.

**EXHIBIT C-54**

55

The Committee continues a provision allowing for the movement among PPAs of funding identified by the Coast Guard as supporting the Department of Defense for enduring overseas missions. The Coast Guard shall notify the Committee not later than 15 days following any use of this authority.

*Coast Guard Museum.*—The recommendation includes $5,000,000 for the Coast Guard Museum, which may be used for the preservation and protection of Coast Guard artifacts, the design, fabrication, and installation of exhibits or displays in which these artifacts are included, or other authorized activities. The Coast Guard is directed to brief the Committee on a plan for the use of these funds prior to their obligation.

*Electronic Health Records.*—The Coast Guard is directed to brief the Committee not later than 120 days after the date of enactment of this Act on its ongoing activities related to the digital transition of Coast Guard legacy health records to the MHS Genesis system, including timelines and costs associated with the transition.

*Great Lakes Icebreaker Program.*—The Coast Guard is tasked by Executive Order to carry out icebreaking efforts in support of commerce. The Committee is concerned that in recent years, performance metrics for icebreaking on the Great Lakes has been redefined by the availability of assets, rather than mission requirements, often with severe economic impacts. As the Coast Guard begins to define its requirements for the recapitalization of ice breaking assets in the Great Lakes, the Committee directs the Coast Guard to incorporate historical measures of performance. Not later than 180 days after the date of enactment of this Act, the Coast Guard is directed to brief the Committee on such performance measures and other considerations for planning the recapitalization of assets in the Great Lakes.

*Illegal, Unreported, and Unregulated (IUU) Fishing.*—The Committee understands that IUU fishing is related to piracy, drug trafficking, human trafficking, and forced labor, and has accounted for billions of dollars in losses for the global fishing industry. The Coast Guard is directed, not later than 180 days after the date of enactment of this Act, to submit an international IUU strategy to preserve the integrity and free flow of commerce, protect natural resources and food security, and contribute to socioeconomic stability in the regions impacted by IUU. The strategy should identify resource requirements for increased monitoring; the collection of enforcement-quality data and intelligence; real-time response by surface-based enforcement assets; and IUU enforcement personnel and training.

*Interoperable Gateway System Technology (IGS).*—The Coast Guard is encouraged to explore the feasibility and value of incorporating IGS technology into its operations and brief the Committee on the results of its assessment not later than 120 days after the date of enactment of this Act.

*Leveraging Systems.*—The Committee is aware of systems the Coast Guard uses to communicate among its assets and with other agencies and encourages the Coast Guard to explore whether other mission needs could be met with the expanded capabilities being developed through these systems.

*Liquefied Natural Gas (LNG) Report.*—The Department is reminded of its obligation to meet the requirements of section 8254(b)

**EXHIBIT C-55**

56

of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, which required a National Academies of Sciences report and recommendations on the challenges in maintaining examination efficiency under the Certificate of Compliance inspection program as LNG export traffic increases at U.S. ports.

*Natural Disaster Resiliency.*—The Committee remains interested in the Coast Guard's efforts to complete its Shore Infrastructure Vulnerabilities Assessments (SIVA), which identify and document risks to Coast Guard facilities from natural hazards and recommend actions to mitigate those risks.The Coast Guard shall brief the Committee not later than 120 days after the date of enactment of this Act on the status of its SIVA efforts, to include the results and recommendations of assessments completed to date, the expected timeline to complete all remaining assessment phases, and any resource requirements for accelerating the pace of assessments. Additionally, not later than 90 days after the date of enactment of this Act, the Coast Guard shall brief the Committee on current natural hazard emergency preparedness and evacuation plans, to include the threat of tsunamis, as well as costs and options to improve those plans.

*Non-lethal Escalation of Force Capability.*—Not later than 120 days after the date of enactment of this Act, the Coast Guard shall brief the Committee on a comprehensive evaluation of commercially available technologies for the non-lethal escalation of force for hailing and warning small maritime craft or for land-based personnel. The assessment should include reviews of modern technologies, such as non-lethal, laser-based technologies, and should include products manufactured by small businesses.

*Powered Ascenders for Rotary-Wing Fleet.*—The Committee recognizes the importance of redundant systems for aviation rescue operations and encourages the Coast Guard to consider equipping its rotary-wing aircraft with light weight, portable, powered ascenders with lift capacity equivalent to conventional rescue hoists.

*Radio Frequency Satellite Technology.*—The Committee is aware of commercial, space-based radio frequency detection technologies that can be used to track maritime vessels even when those vessels turn off their Automatic Identification Systems. The Committee urges the Coast Guard to test and evaluate this technology and assess its value to intelligence gathering and law enforcement efforts to address illegal, unreported, and unregulated fishing, especially in remote maritime regions of economic, environmental, and national security significance in the Indo-Pacific and Arctic regions.

*Small Arms Simulation.*—The Committee understands the importance of ensuring the Coast Guard has appropriate training tools for personnel to meet cognitive decision-making demands and small arms readiness skills required for unique operational environments. The Committee encourages the Coast Guard to explore the use of performance based, small arms simulation training technologies to help improve cognitive skills, operator situational awareness, and judgement in high-risk operations.

*STARBASE Program.*—The Committee supports the Coast Guard's efforts to engage with the Department of Defense on the youth STARBASE program, which provides "hands-on, minds-on" opportunities for young students to interact with military personnel and explore real-world applications of science, technology,

**EXHIBIT C-56**

and math. As the Coast Guard expands these efforts, the Committee encourages an emphasis on oceanography and limnology programs and partnerships with minority-serving institutions.

*Towing Vessel Inspection Fee.*—The Frank LoBiondo Coast Guard Authorization Act of 2018 directed the Coast Guard to review and compare the costs to the government of towing vessel inspections performed directly by the Coast Guard and those performed through the Towing Safety Management System (TSMS). Based on that review, the Act requires the Coast Guard to revise user fee for each inspection option to reflect its actual cost. Not later than 60 days after the date of enactment of this Act, the Coast Guard is directed to brief the Committee on the progress of its assessment and rulemaking to distinguish between user fees charged to vessel owners using the Coast Guard and TSMS options.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriation, fiscal year 2021 | $2,264,041,000 |
| Budget request, fiscal year 2022 | 1,639,100,000 |
| Recommended in the bill | 1,817,100,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | −446,941,000 |
| Budget request, fiscal year 2022 | +178,000,000 |

The Coast Guard is directed to continue to brief the Committee quarterly on all major acquisitions, consistent with the direction in the explanatory statement accompanying Public Law 114–4.

Beginning with the budget request for fiscal year 2023, the Coast Guard shall include in its justification materials an estimate of the receipts to be deposited in the Housing Fund for the budget year, along with a plan for the expenditure of those funds. Any deviations from the plan shall be reported to the Committee not fewer than 15 days before the obligation of associated funds.

VESSELS

*Offshore Patrol Cutter (OPC).*—The recommendation provides the requested $597,000,000 to continue the program of record for these critical assets. The Committee directs the Coast Guard to continue briefings, as described in Public Law 116–93, on the metrics used to evaluate adherence to production timelines and costs, as well as progress towards or challenges experienced in meeting these metrics.

*National Security Cutter (NSC).*—The Committee provides $99,000,000, which is $21,000,000 above the request, for the NSC program. This funding will support Post Delivery Activities to missionize and operationalize NSCs 10 and 11. The shortfall for these activities is currently over $200,000,000. The $21,000,000 is funded in the bill as a rescission and re-appropriation of prior-year funds to extend their availability.

*Polar Security Cutter (PSC).*—The recommendation includes the requested $170,000,000 for a portion of the long lead time materials for a third PSC, which will keep the acquisition program on schedule. The Committee is committed to the importance of an expanded U.S. presence in the polar regions, especially the Arctic.

*Waterways Commerce Cutter (WCC).*—The recommendation includes the requested $67,000,000 to begin recapitalization of the nation's inland tenders and barges.

58

### AIRCRAFT

*HC–130J Acquisition/Conversion/Sustainment.*—The Committee recommends $148,000,000, which is $128,000,000 above the request. This funding which will support the production and missionization of the nineteenth HC–130J long range surveillance aircraft as part of an acquisition program goal of twenty-two aircraft.

### OTHER ACQUISITION PROGRAMS

The recommendation includes $29,000,000 above the request for the two priority information technology systems on the Coast Guard's Unfunded Priorities List (UPL): $20,000,000 for Coast Guard management system recapitalization; and $9,000,000 for VTS C2 modernization.

### RESEARCH AND DEVELOPMENT

| | |
|---|---|
| Appropriation, fiscal year 2021 ........................................................ | $10,276,000 |
| Budget request, fiscal year 2022 ..................................................... | 7,476,000 |
| Recommended in the bill ................................................................. | 7,476,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 ................................................. | −2,000,000 |
| Budget request, fiscal year 2022 .............................................. | − − − |

The Committee is particularly concerned with the threats posed by unmanned aerial systems technology and encourages the Coast Guard to partner with the Science and Technology Directorate on counter UAS research and development efforts, especially for operations in areas with challenging conditions, such as the Arctic.

*Blue Technology Center of Expertise.*—The Committee directs the Coast Guard to continue to report periodically on the successes of the Center and encourages the continuation and expansion of this partnership.

*Unmanned Surface Vehicles (USV).*—The Committee directs the Coast Guard to report on its plans for research and development activities related to USVs, including an evaluation of wind and solar powered vessels with surface and subsurface capabilities, not later than 90 days after the date of enactment of this Act. The Committee also expects to be updated on the findings of this research as they become available.

### HEALTH CARE FUND CONTRIBUTION

| | |
|---|---|
| Appropriation, fiscal year 2021 ........................................................ | $215,787,000 |
| Budget request, fiscal year 2022 ..................................................... | 240,577,000 |
| Recommended in the bill ................................................................. | 240,577,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 ................................................. | +24,790,000 |
| Budget request, fiscal year 2022 .............................................. | − − − |

*Note—This is a permanent indefinite discretionary appropriation.

The Health Care Fund Contribution accrues the Coast Guard's military, Medicare-eligible health benefit contribution to the DoD Medicare-Eligible Retiree Health Care Fund. Contributions are for future Medicare-eligible retirees, as well as retiree dependents and their potential survivors.

EXHIBIT C-58

59

### RETIRED PAY

| | |
|---|---|
| Appropriation, fiscal year 2021 | $1,869,704,000 |
| Budget request, fiscal year 2022 | 1,963,519,000 |
| Recommended in the bill | 1,963,519,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +93,815,000 |
| Budget request, fiscal year 2022 | – – – |

The Retired Pay mandatory appropriation provides payments as identified under the Retired Serviceman's Family Protection and Survivor Benefits Plans and other retired personnel entitlements identified under prior-year National Defense Authorization Acts. This appropriation also includes funding for medical care of retired personnel and their dependents.

## UNITED STATES SECRET SERVICE

| | |
|---|---|
| Appropriation, fiscal year 2021 | $2,438,001,000 |
| Budget request, fiscal year 2022 | 2,571,917,000 |
| Recommended in the bill | 2,575,817,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +137,816,000 |
| Budget request, fiscal year 2022 | +3,900,000 |

### MISSION

The United States Secret Service (USSS) protects and investigates threats against the President and Vice President, their families, visiting heads of state, and other designated individuals; protects the White House, the Vice President's Residence, foreign missions, and certain other facilities within Washington, D.C.; and coordinates the security at National Special Security Events (NSSE). The Secret Service also investigates violations of laws relating to counterfeiting of obligations and securities of the United States; financial crimes, including access device fraud, financial institution fraud, identity theft, and computer fraud; and computer-based attacks on financial, banking, and telecommunications infrastructure. In addition, the agency provides support for investigations related to missing and exploited children.

### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2021 | $2,373,109,000 |
| Budget request, fiscal year 2022 | 2,514,758,000 |
| Recommended in the bill | 2,518,658,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +145,549,000 |
| Budget request, fiscal year 2022 | +3,900,000 |

The recommendation includes increases above the request of $2,400,000 for Zero-Trust Architecture implementation and $1,500,000 for transitioning to Internet Protocol version 6.

Within the total amount provided, the bill makes $51,621,000 available until September 30, 2023, of which $12,880,000 is for the James J. Rowley Training Center; $15,241,000 is for Operational Mission Support (OMS); $4,500,000 is for NSSEs; $18,000,000 is for protective travel; and $1,000,000 is for an updated study of the White House Training Facility recommended by the USSS Protective Mission Panel. As directed in House Report 115–239, USSS should attempt to fully obligate its O&S funding during the fiscal year, including for OMS projects.

**EXHIBIT C-59**

60

*Financial Crimes.*—The Committee notes that the Secret Service is a lead federal agency in the effort to protect U.S. consumers, banks, and small businesses from complex, cyber-enabled financial crimes. This includes such crimes as Business Email Compromise scams, network intrusions, online identity theft, and the use of electronic "skimming" devices, typically at gas station pumps or ATM machines, that steal encoded information from debit and credit cards. The Committee recognizes the efforts of the Secret Service's Cyber Fraud Task Force (CFTF) to combat skimming across the United States, as well as the work of the National Computer Forensics Institute (NCFI) to train and equip state, local, and tribal law enforcement personnel to effectively investigate and prosecute electronic crimes, including skimming. The Committee strongly supports these efforts and fully funds the request for Field Operations of $748,551,000, through which CFTF and NCFI are funded.

*NSSE Designations.*—The Secret Service is the lead federal agency for planning, coordination and implementation of security operation for NSSEs, including Presidential inaugurations, Democratic and Republican National Conventions, state funerals, and certain widely attended events. Based on the growing threat of domestic terrorism and extremist violence in the United States, the Committee directs the Secret Service to provide a report, not later than 180 days after the date of enactment of this Act, assessing how decision making about NSSE designations should be updated to better account for such threats. The report should include an evaluation of the lessons learned in light of the attack on the U.S. Capitol on January 6, 2020, and an assessment of how future events at or in the vicinity of the Capitol building—and in particular the counting of electoral votes by Congress—should be more thoroughly evaluated for NSSE designation.

### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---:|
| Appropriation, fiscal year 2021 | $52,955,000 |
| Budget request, fiscal year 2022 | 54,849,000 |
| Recommended in the bill | 54,849,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 | +1,894,000 |
|     Budget request, fiscal year 2022 | – – – |

### RESEARCH AND DEVELOPMENT

| | |
|---|---:|
| Appropriation, fiscal year 2021 | $11,937,000 |
| Budget request, fiscal year 2022 | 2,310,000 |
| Recommended in the bill | 2,310,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 | −9,627,000 |
|     Budget request, fiscal year 2022 | – – – |

## TITLE II—ADMINISTRATIVE PROVISIONS

### (INCLUDING TRANSFER OF FUNDS)

Section 201. The Committee continues by reference a provision regarding overtime compensation.

Section 202. The Committee continues a provision allowing CBP to sustain or increase operations in Puerto Rico with appropriated funds.

**EXHIBIT C-60**

61

Section 203. The Committee continues a provision regarding the availability of fee revenue collected from certain arriving passengers.

Section 204. The Committee continues a provision allowing CBP access to certain reimbursements for preclearance activities.

Section 205. The Committee continues a provision regarding the importation of prescription drugs by an individual for personal use.

Section 206. The Committee continues a provision regarding waivers of the Jones Act.

Section 207. The Committee continues a provision prohibiting DHS from establishing a border crossing fee.

Section 208. The Committee continues a provision prohibiting the obligation of funds prior to the submission of an expenditure plan for funds made available for CBP Procurement, Construction, and Improvements.

Section 209. The Committee continues by reference a provision prohibiting the construction of border security barriers in specified areas.

Section 210. The Committee includes a new provision regarding reimbursement for COVID–19 testing and voluntary isolation.

Section 211. The Committee includes a provision regarding the use of prior-year appropriations for border barrier mitigation on federal lands, including authority to transfer funds.

Section 212. The Committee continues and modifies a provision regarding the 287(g) program.

Section 213. The Committee continues a provision prohibiting the use of funds provided under the heading "U.S. Immigration and Customs Enforcement—Operations and Support" to contract for detention services if the facility receives less than "adequate" ratings in two consecutive performance evaluations.

Section 214. The Committee continues by reference a provision that requires ICE to provide statistics about its detention population.

Section 215. The Committee continues by reference a provision related to information sharing and reporting under the 287(g) program.

Section 216. The Committee continues and modifies a provision related to information sharing between ICE and the Office Refugee Resettlement (ORR) that prohibits ICE from using information for removal purposes if it was provided by as part of a process of sponsoring an unaccompanied child or reuniting a child with a family member or if it is based on information gathered in therapy sessions for a child while in ORR.

Section 217. The Committee includes a new provision ensuring access to legal counsel for specified legal proceedings and requires the Secretary and the Director of the Office for Civil Rights and Civil Liberties to certify as to whether such requirements have been met.

Section 218. The Committee includes a new provision that prohibits ICE from detaining or removing individuals with a pending application or petition for specified humanitarian relief.

Section 219. The Committee includes a new provision that requires the Secretary to approve a segmented risk classification assessment process to determine whether a detained individual is a flight risk or a public safety or national security threat.

EXHIBIT C-61

62

Section 220. The Committee includes a new provision to focus Homeland Security Investigations activities on functions that are not redundant to those of Enforcement and Removal Operations.

Section 221. The Committee includes a new provision related to allowances for work performed by individuals in custody.

Section 222. The Committee continues a provision clarifying that certain elected and appointed officials are not exempt from federal passenger and baggage screening.

Section 223. The Committee continues a provision directing the deployment of explosive detection systems based on risk and other factors.

Section 224. The Committee continues a provision authorizing TSA to use funds from the Aviation Security Capital Fund for the procurement and installation of explosive detection systems or for other purposes authorized by law.

Section 225. The Committee continues a provision directing the Administrator of TSA to report to specified Committees about the agency's investment plans.

Section 226. The Committee continues a provision prohibiting funds made available by this Act under the heading "Coast Guard—Operations and Support" for recreational vessel expenses, except to the extent fees are collected from owners of yachts and credited to this appropriation.

Section 227. The Committee continues and modifies a provision allowing for reprogramming authority within "Coast Guard—Operations and Support".

Section 228. The Committee continues a provision requiring submission of a future-years capital investment plan for the Coast Guard.

Section 229. The Committee continues provision related to the reallocation of funds for certain overseas activities.

Section 230. The Committee continues a provision allowing for use of the Coast Guard Housing Fund.

Section 231. The Committee continues a provision allowing the Secret Service to obligate funds in anticipation of reimbursement for personnel receiving training.

Section 232. The Committee continues a provision prohibiting funds made available to the Secret Service from being used for the protection of the head of a federal agency other than the Secretary of Homeland Security, except when the Director has entered into a reimbursable agreement for such protection services.

Section 233. The Committee continues a provision allowing the reprogramming of funds within "United States Secret Service—Operations and Support".

Section 234. The Committee continues a provision allowing for funds made available for "United States Secret Service—Operations and Support" to be available for travel of employees on protective missions without regard to limitations on such expenditures in this or any other Act after notification to the Committees on Appropriation.

Section 235. The Committee includes a new provision allowing for the use of funds for family reunification purposes.

Section 236. The Committee includes a new provision related to towing vessel fees.

**EXHIBIT C-62**

63

## TITLE III—PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY

### CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY

| | |
|---|---|
| Appropriation, fiscal year 2021 | $2,024,976,000 |
| Budget request, fiscal year 2022 | 2,133,630,000 |
| Recommended in the bill | 2,422,348,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +397,372,000 |
| Budget request, fiscal year 2022 | +288,718,000 |

#### MISSION

The Cybersecurity and Infrastructure Security Agency (CISA) is responsible for enhancing the security of the nation's physical and cyber infrastructure and interoperable communications systems; safeguarding and securing cyberspace; and strengthening national preparedness and resilience.

#### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2021 | $1,662,066,000 |
| Budget request, fiscal year 2022 | 1,691,520,000 |
| Recommended in the bill | 1,927,750,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +265,684,000 |
| Budget request, fiscal year 2022 | +236,230,000 |

The recommendation includes increases above the request totaling $236,230,000, including $170,752,000 for the Cybersecurity Division; $21,137,000 for the Infrastructure Security Division; $1,000,000 for the Emergency Communications Division; $17,100,000 for integrated operations; $10,200,000 for Risk Management Operations; $13,014,000 for Stakeholder Engagements and Requirements; and $3,027,000 for Mission Support. Of the total amount provided for this account, $28,293,000 is available until September 20, 2023, for the National Infrastructure Simulation Analysis Center (NISAC).

The Committee is pleased with the progress towards providing more details in CISA's budget justification materials, specifically the details at the PPA level at which Congress allocates funding. However, more information is needed to better understand the full scope of the planned program activities, strategic outlook, and planning assumptions for CISA's acquisition programs, especially the Continuous Diagnostics and Mitigation (CDM) and the National Cybersecurity Protection System (NCPS) programs. Without such information, Congress lacks necessary information to make strategic funding decisions and understand the timelines associated with efforts to mitigate cybersecurity, infrastructure security, and emergency communications risks and vulnerabilities.

Additionally, CISA is directed to continue to provide the quarterly spend plan and hiring briefings required by the explanatory statement accompanying the Department of Homeland Security Appropriations Act, 2021, (Public Law 116–260), to be updated for the funding provided in the American Rescue Plan Act of 2021, (Public Law 117–2) (ARPA), and the new initiatives funded in this Act. Further, the Committee looks forward to receiving the briefings on the infrastructure security mission and the national critical functions required by the explanatory statement accompanying the

**EXHIBIT C-63**

64

Department of Homeland Security Appropriations Act, 2021, (Public Law 116–260).

CYBER SECURITY

*Capabilities to Nullify Cyber Attacks.*—Not later than 180 days after the date of enactment of this Act, CISA shall issue a Request for Information (RFI) from private sector providers, universities, and Department of Defense entities to identify existing software solutions for nullifying cybersecurity attacks before they infect systems and cause damage. Not later than 210 days after the date of enactment of this Act, CISA shall brief the Committee on the results of the RFI and the feasibility of using such programs to support CISA missions.

*Civilian CyberCorps.*—The Committee supports CISA's efforts to partner with the National Science Foundation (NSF), the Department of Defense, and the Office of Personnel Management to establish a plan to recruit, train, and educate personnel; shift military veterans into federal service upon discharge from active duty or engage reservists in civilian cyber workforce roles; manage digital careers; and set standards for digital workforce qualifications. This CyberCorps workforce model should build on the NSF's Scholarship for Service program. Not later than 120 days after the date of enactment of this Act, CISA shall brief the Committee on progress towards the development of this plan, to include anticipated resources needed to expand the ranks of federal civilian cyber professionals.

*Cyber Defense Education and Training Program (CDET).*—The Committee provides an increase above the request of $11,800,000 to support CDET, of which $5,000,000 is to further expand the Federal Cyber Reskilling Academy and $6,800,000 is for sustaining fiscal year 2021 investments in cybersecurity education programs targeting the Kindergarten through 12th grade (K–12) community, including the Cybersecurity Education and Training Assistance Program (CETAP). CISA is encouraged to support a mix of geographically diverse individual higher education institutions, including in non-contiguous states, that are focused on connecting K–12 learners and environments with post-secondary education and resources.

The Committee notes that once again, education and training programs for the non-federal workforce were not funded in the President's budget request. CISA is directed to work in collaboration with OMB and other agencies as needed to develop a strategy for addressing these requirements in future budget requests and to brief the Committee not later than 15 days after the date of submission of the fiscal year 2023 budget request regarding such strategy.

*Cyber Directives Management.*—In support of requirements and anticipated workload in executing the Executive Order on Improving the Nation's Cybersecurity, May 12, 2021 (EO 14028), the recommendation includes an increase of $1,850,000 above the request to expand CISA's capacity for directives development and enforcement.

*Cyber Workforce Support from the Department of Defense.*—The Committee recognizes the dramatic increase in cybersecurity engagements, intrusions, and demands requested of America's federal cybersecurity professionals and is concerned about the nation's vul-

**EXHIBIT C-64**

nerability to future and more widespread and damaging breaches. CISA is encouraged to maximize the use of its statutory hiring authorities, including section 1650 of the fiscal year 2019 National Defense Authorization Act, to help address its growing mission space, particularly with regard to intrusions involving foreign adversaries.

*Cybersecurity Briefings.*—The Committee directs CISA to continue providing semiannual briefing on the NCPS and CDM programs, as described in House Report 116–180.

*Cybersecurity Information Sharing and Coordination in Ports.*— In division J of Public Law 115–254, Congress directed DHS to develop and implement a maritime cyber security risk model and make recommendations on enhancing the sharing of cybersecurity information. The Committee directs the CISA and the Coast Guard to brief the Committee, not later than 90 days after the date of enactment of this Act, on the steps taken to fulfill these requirements and on current risks and challenges for port security.

*Cybersecurity Shared Services Office.*—Through the Cybersecurity Shared Services Office, CISA serves as the Quality Services Management Office for federal cybersecurity. To continue to support efforts to make strategic cybersecurity services available to federal agencies through this office, the recommendation includes $17,672,000, as requested.

*Data Security Resilience.*—The Committee is increasingly concerned with the ability of adversaries to circumvent and use existing cybersecurity solutions to gain access to critical systems and data. The Committee directs the Secretary to submit a report to the Committee, not later than 180 days after the date of enactment of this Act, that examines existing security vulnerabilities of government IT systems. The report shall include an examination of emerging technologies that could improve the government's data security and protection, such as data shielding and immutable logging of suspect activity, instant threat and anomaly detection mechanisms, and user behavior analytics.

*Joint Cyber Planning Office (JCPO).*—The recommendation includes not less than $36,723,000 for the JCPO, $26,153,000 above the fiscal year 2021 enacted level and $16,153,000 above the request. This additional investment is intended to help support the development and exercise of defensive cybersecurity campaign plans in conjunction with interagency partners and critical infrastructure owners and operators, consistent with subtitle A of title XXII of the Homeland Security Act of 2002 as amended by section 1715 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (FY21 NDAA). Funding will be used to hire personnel; reimburse the cost of personnel detailed to the JCPO from other federal agencies; and support cyber defense collaboration among federal, SLTT, and private sector partners through the development of a common operating picture. In coordination with the Cyber Safety Review Board called for by EO 14028, the funding is also intended to establish a robust analytic capability for examining current plans and prior cyber incidents for lessons learned and best practices that can inform future cyber defense plans.

The JCPO shall also develop incident response playbooks, in coordination with the National Cyber Director and in furtherance of

**EXHIBIT C-65**

66

EO 14028. Key lessons learned from CISA's work coordinating protection of health care assets tied to vaccine development and distribution should inform work on priority areas of defensive campaign planning, such as election security and ransomware. The Committee expects CISA to collaborate with industry partners and interagency components, including the FBI and Department of Justice; Sector Risk Management Agencies; the National Security Agency Cybersecurity Directorate; the National Institute of Standards and Technology; and the State Department in developing campaign plans tailored to areas of high cybersecurity risk.

Further, as directed by section 1731 of the FY21 NDAA, the Secretary is required to submit a report on "Federal cybersecurity centers and the potential for better coordination of Federal cybersecurity efforts at an integrated cybersecurity center within the Cybersecurity and Infrastructure Security Agency." CISA is directed to provide this report to the Committee, along with the details of any plans regarding the establishment of such a center.

*Monitoring Internet-facing Attack Surfaces.*—Department of Defense (DoD) internet operations management capabilities, as outlined in the "Department of Defense network external visibility" report required by the FY21 NDAA, enable continuous discovery, monitoring, and management of DoD Internet-facing systems and assets. Unlike DoD, CISA remains heavily-dependent on manual self-reporting for situational awareness of internet-facing attack surfaces, creating a fractured and inaccurate snapshot of vulnerabilities in the Federal civilian cybersecurity ecosystem. Therefore, not later than 180 days after the date of enactment of this Act, CISA shall brief the Committee on its existing attack surface management capabilities and its plan to enhance the visibility of department and agency network activity and vulnerabilities with state-of-the-art technologies, including assessments of both government-developed technologies and commercially-available solutions.

*Multi-State Information Sharing and Analysis Center (MS–ISAC).*—The recommendation includes $37,714,000, an increase of $10,700,00 above the request, to sustain and expand the program's capabilities and expertise, to include SLTT election security support via the Election Infrastructure Information Sharing and Analysis Center; endpoint detection and response; malicious domain activity blocking and reporting; expansion of the MS–ISAC cyber incident response team and its capabilities; a National Prevention Pilot to provide an unclassified Unified Threat Management service for election and SLTT partners; and improving threat intelligence and data retention and storage capabilities. Not later than 90 days after the date of enactment of this Act, and quarterly thereafter, CISA and the MS–ISAC shall brief the Committee on an obligation and expenditure plan for fiscal year 2022, including a schedule of planned obligations; hiring actions; anticipated milestones; and the use of carryover balances.

*Strengthening Federal Networks.*—The recommendation includes an increase of $700,000 to support activities authorized by section 1705 of the fiscal year 2021 NDAA to assist federal agencies with post-incident containment, eradication, and recovery activities. The federal response to the SolarWinds campaign reflected areas for needed maturation in the civilian enterprise's ability to thoroughly respond to incidents through remediation. This need was further

**EXHIBIT C-66**

67

supported by EO 14028, which directed CISA to assume a more active role ensuring agencies' progress and completion through all phases of an incident response.

*Threat Hunting.*—The recommendation includes an increase of $24,000,000 above the request to increase cyber defensive operations in support of federal civilian agencies and non-federal networks, including SLTT governments and other critical infrastructure operators. CISA is encouraged to establish emulation capabilities to better understand complex adversaries, identify breaches earlier in a campaign, and otherwise disrupt malign activity more quickly once a compromise is uncovered. This additional funding is also intended to bolster CISA's capacity to quickly issue proactive guidance based on intelligence and learned behaviors after the positive identification of a compromise.

*Voluntary Threat Detection Programs.*—The recommendation includes an increase above the request of $95,549,000 for CyberSentry and other efforts focused on voluntary threat detection by critical infrastructure operators through the placement of sensors at the boundary between operational technology and information technology systems. Funds will be used for additional personnel; the procurement and installation of sensors; system integration support; and contractor support for coordinating with participating organizations.

*Vulnerability Management Infrastructure.*—The Committee recognizes that as the number of networked devices across cyberspace has increased exponentially, so has the number of identified and reported vulnerabilities in the software and hardware that operates critical infrastructure globally. The Committee provides an increase of $10,000,000 above the request for the underlying infrastructure and support functions that enable better identification, analysis, and publication of known vulnerabilities and common attack patterns, including through the National Vulnerability Database, and to expand the coordinated responsible disclosure of vulnerabilities.

### INFRASTRUCTURE SECURITY

*Bombing Prevention.*—The Committee is encouraged by the efforts of the Office for Bombing Prevention (OBP) to address the proliferation and use of Improvised Explosive Devices and recommends $7,526,000 above the request to expand those efforts and continue the services provided through the Bomb-making Materials Awareness Program. OBP activities include critical Counter-Improvised Explosive Device training; information sharing; capability analysis; technical assistance; and coordination initiatives for federal, SLTT, and private sector partners. The Committee directs DHS to provide a plan within 90-days of the enactment of this Act for the obligation and expenditure of these funds.

*JCPO Exercises.*—In furtherance of section 1715 of the FY21 NDAA, the recommendation includes an increase of $2,244,000 above the request to support JCPO-organized cyber defense exercises that improve public and private sector awareness of JCPO planning guidance and playbooks and improve operational coordination to protect, detect, respond to, and recover from cybersecurity risks or incidents. Such exercises also provide a venue for increasing the collective understanding of adversary threats to critical infrastructure and other national targets of interest, along with the

**EXHIBIT C-67**

68

vulnerability of such infrastructure and the potential consequences of disrupting it.

*National Cyber Exercises.*—In furtherance of section 1744 of the FY21 NDAA, the recommendation includes $3,367,000 for the planning and execution of national cyber exercises. These exercises shall involve the executive branch, state governments, the private sector, and international partners, and shall include members of Congress and congressional staff as observers.

*Soft Targets & Crowded Places.*—The Committee recognizes the evolving nature of terrorist threats and commends the Department's prioritization of defending soft targets and crowded places, which are at particular risk for terrorist attacks and targeted violence, and recommends $8,000,000 to continue CISA's efforts in this area. The Committee instructs S&T to test and evaluate existing, commercially available technologies that will enhance security for public gathering venues in a way that is scalable and cost-effective. DHS shall focus on integrated hardware and software solutions that enhance the security posture of these venues through monitoring, early-warning and alerting, and advanced analytics. DHS is also encouraged to focus on solutions that enhance the security posture of soft targets and crowded places in a way that minimizes the need for physical changes to these spaces and protects individual privacy.

### EMERGENCY COMMUNICATIONS

*First Responder Emergency Medical Communications.*—The Committee is aware of CISA support for merit-based demonstration projects for the benefit of SLTT governments and implementation of the National Emergency Communications Plan. The Committee encourages continued pursuit and nationwide expansion of these efforts to identify innovations in the forms of enhanced governance, curriculum development, training and exercises, and supplies for improving rural medical care through emergency communications.

*Next Generation Networks (NGN) Priority Services (PS).*—The Committee provides an increase of $1,000,000 above the request for additional support staff required to accelerate development and deployment of NGN–PS Phase 2 video, data, and information services.

### INTEGRATED OPERATIONS

*Security Advisors (SA).*—The recommendation includes an increase of $17,100,000 above the request to increase the number of SAs and other regional staff needed to help support CISA's regional operations. The Committee recognizes the workload in this critical area is expanding and additional resourcing is required to expand regional capacity to provide security and risk mitigation services.

Not later than 90 days after the date of enactment of this Act, CISA shall report on the strategy and implementation plan for expanding regional capacity, to include a workload staffing model detailing the resourcing for Cyber Security Advisors , Physical Security Advisors, Chemical Inspectors, and other regional support staff. As part of the model, CISA shall consider whether the regional staffing requirements would benefit from introducing or increasing discipline-specific specialists.

**EXHIBIT C-68**

69

RISK MANAGEMENT OPERATIONS

*Continuity of the Economy Plan.*—The recommendation provides an increase of $200,000 above the request for activities in furtherance of section 9603 of the FY21 NDAA related to the development of a Continuity of the Economy Plan.

*Cybersecurity Insurance and Data Analysis Working Group.*—CISA is directed to create a public-private working group to help develop frameworks and models for understanding and pricing cyber risk and to identify areas of interest for pooling public and private sector data that can inform better, more accurate risk models to be used for national security and critical infrastructure risk governance purposes.

*Critical Infrastructure Risk Analysis.*—The Committee encourages the NISAC, in coordination with other parts of DHS, to develop methodologies, models, analytic tools, and simulations for characterizing risk to critical infrastructure and the associated National Critical Functions and informing the prioritization efforts of the federal preparedness enterprise. This will lay the foundation for the development of a Risk Architecture, which is a network of functional and physical systems and elements that enable the identification of cascading consequences from all relevant cyber and physical threats and hazards, including pandemics, natural disasters, extreme weather exacerbated by climate change, and cyber-attacks. The Committee directs the Department, not later than 180 days after the date of enactment of this Act, to provide a briefing on the modeling and simulation tools NISAC develops to inform critical infrastructure risk analysis and any recommendations of how modeling, and simulation capabilities could be further improved.

*Election Security.*—Recognizing the important role CISA plays in election security, the Committee encourages the agency to continue strengthening its partnerships within the election infrastructure subsector. To address the persistent problem of election-related misinformation, disinformation, and malinformation targeting Black voters and other communities of color, the Committee urges CISA to engage the expertise of relevant civil rights organizations in developing resources and strategies for increasing the resilience of communities of color, non-English speakers, and other targeted communities against such attempts at manipulation.

*National Critical Functions (NCFs) Analytic Capability.*—The recommendation includes an increase of $10,000,000 above fiscal year 2021 levels to develop a long-term analytic capability to evaluate evolving strategic risks to NCFs from the compromise of critical infrastructure over a 5- to 25-year timespan. The National Risk Management Center is directed to brief the Committee not later than 120 days after the date of enactment of this Act on a plan of action and milestones for the increased investment in this capability, including a budget and hiring plan.

*National Risk Management Center (NRMC).*—The NRMC has the potential to provide critical analysis of cross sector risks and interdependencies to inform more strategic security investments by both the public and the private sectors. When the NRMC was established in 2018, its work was driven by a targeted series of "sprints," many of which are ongoing. Some, such as the Pipeline

**EXHIBIT C-69**

70

Security Initiative and the Election Security Initiative, have derivatives which are operational in nature, but unfortunately have not been transitioned to an operational division within CISA. The Committee is also concerned that the retention of operational programs at the NRMC is blurring its mission and stifling its ability to take on new analytic projects. CISA is therefore directed to submit an NRMC strategy, not later than 180 days after the date of enactment of this Act, for transitioning analytic models with operational uses to other CISA divisions and for identifying new analytic priorities. The strategy shall include any budget considerations affecting the transition of these capabilities out of the NRMC.

*Small Manufacturing Cybersecurity Support.*—The Committee encourages CISA to explore opportunities to partner with the Under Secretary of Defense for Acquisition and Sustainment, the National Institute for Standards and Technology, and the Manufacturing Extension Partnership (MEP) Centers—particularly MEPs designated as Defense Manufacturing Communities—to leverage expertise and help small manufacturers enhance the protection of controlled unclassified information within the supply chain, respond quickly to crippling cyber-attacks and theft of intellectual property, and prepare small manufacturing clients for Cybersecurity Maturity Model Certification. The Committee also encourages CISA to assist MEPs in establishing priorities for their cybersecurity risk management initiatives.

*Supply Chain Security.*—The Committee is concerned about recent cyber-attacks on critical industries and related infrastructure, which threaten critical U.S. supply chains and directs CISA, through the NRMC, to continue engaging in public-private partnerships and collaborate directly with industry partners on supply chain risk management projects. Such projects should include developing Supply Chain Risk Management templates that enhance vendor and customer entity trust, transparency, and assurance practices, as well as assist in informed decision-making about acceptable risk exposure.

CISA should continue investing in capabilities that enable it to assess vital supply chains on a real-time basis for potential bottlenecks and chokepoints that could potentially impede supply delivery. Such activities will help both CISA and industry partners identify and understand systemic vulnerabilities and weaknesses in order to reduce the impact of cyber-attacks. In addition, building on the work that CISA has developed around the National Critical Functions and their corresponding supply chains, the agency can further develop its end-to-end mapping of these functions and the interdependencies that exist between each function, in order to build resilience.

*Threats of Extreme Weather Events to Cybersecurity Infrastructure.*—The Committee understands that extreme weather events present an ever-growing challenge to protecting cybersecurity infrastructure systems, most prominently information and communications technology systems. In a 2015 best practices and procedures report, the Interagency Security Committee prioritized necessary enhancements and protections of federal facilities against weather related threats but noted that more localized information was needed to accurately assess regional nonmilitary federal facilities. The

**EXHIBIT C-70**

71

Committee directs CISA to provide regular briefings on the implementation of an overall strategy to address extreme weather risks to cybersecurity infrastructure, including a focus on regional challenges and strategies for engagement with private industry and state local government to balance security and resiliency.

STAKEHOLDER ENGAGEMENT AND REQUIREMENTS

*Cyber Safety Review Board (CSRB).*—In support of EO 14028, the recommendation includes an increase of $2,893,000 to establish the CSRB. Not later than 120 days after the date of enactment of this Act, CISA shall brief the Committee on its progress toward establishing the board in accordance with the executive order, including the details about the composition of its membership; the recommendations required by subsection 5(d) of the order; and an update on any incidents it is reviewing and assessing.

*Cybersecurity Advisory Committee.*—The recommendation includes an increase of $1,450,000 to support the establishment of the Cybersecurity Advisory Committee, pursuant to section 1718 of the FY21 NDAA.

*Enhanced Awareness Campaigns.*—The recommendation includes an increase of $4,125,000 above the request to expand and evolve existing outreach and awareness effort that increase the public's understanding of critical infrastructure issues, risks, and threats, and to drive meaningful, demonstrable change in safety and security behaviors.

*Sector Risk Management Agencies.*—CISA is the Sector Risk Management Agency (SRMA) for the Chemical; Commercial Facilities; Communications; Critical Manufacturing; Dams; Emergency Services; Information Technology; and Nuclear Reactors, Materials, and Waste sectors. Accordingly, the recommendation includes an increase of $4,546,000 above the request for activities carried out in furtherance of the authorities and added requirements established in section 9002 of the FY21 NDAA for the management of these eight sectors. In order to better support coordination of SRMAs across the federal government, the Committee urges CISA to consider personnel increases to support the cultivation of sector-specific expertise within the agency, including and extending beyond the eight sectors for which CISA serves as the SRMA. These may include temporary and advisory positions, additional full-time employees, and reimbursement for personnel on detail from other departments and agencies, where authorized.

*SLTT Resilience Technical Assistance.*—The Committee continues to be concerned by the increasing prevalence of cyber-attacks on SLTT governments, including ransomware attacks. The recommendation supports the requested increase of $4,000,000 above fiscal year 2021 funding levels to establish a capability to advise and support FEMA's preparedness grant programs, as well as provide guidance and support to SLTT partners. The Committee strongly supports the Secretary's decision to increase the percentage of preparedness grant funding focused on cybersecurity from 5% to 7.5% in fiscal year 2021. The Committee directs CISA to continue to work with appropriate stakeholders on the development and promotion of cybersecurity plans that could be adopted or modified for adoption by SLTT governments. Not later than 15 days after the date of submission of the fiscal year 2023 budget re-

**EXHIBIT C-71**

72

quest, CISA is directed to brief the Committee on its SLTT technical assistance efforts, as well as its current understanding of the threats to SLTT cybersecurity, known vulnerabilities, and an assessment of SLTT capability gaps.

MISSION SUPPORT

*Mission Support Requirements.*—Due to concerns about operational impacts to CISA's management and oversight functions, many of which were previously administered by DHS headquarters offices, the Committee rejects the proposed $2,177,000 reduction intended to achieve undefined administrative efficiencies. In addition, the recommendation includes $850,000 above the request to accelerate the development and implementation of policies and procedures necessary for CISA to assume responsibility for personnel security and suitability vetting of potential CISA personnel and contracted personnel. A smooth and timely transfer of this responsibility from the Department's Office of the Chief Security Officer will position CISA to fill existing vacancies and build the robust trusted workforce necessary to support its expanding roles and operations more efficiently. However, the Committee encourages to CISA to review its processes and use of resources throughout the entire organization to identify any overlapping capabilities and other opportunities to streamline operations and to identify such efficiencies in future requests, with a clear articulation of how such efficiencies will be achieved without impacting operational needs.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---:|
| Appropriation, fiscal year 2021 ......................................................... | $353,479,000 |
| Budget request, fiscal year 2022 ...................................................... | 418,179,000 |
| Recommended in the bill ................................................................... | 467,167,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 .................................................. | +113,688,000 |
| Budget request, fiscal year 2022 ............................................... | +48,988,000 |

CYBER SECURITY

*Continuous Diagnostics and Mitigation Program (CDM).*—The recommendation includes an increase of $15,988,000 above the request for enterprise mobility management investments to continue development and deployment of management and security tools to address the mobile device landscape across the Federal Civilian Executive Branch (FCEB) agencies.

The Committee notes that part of the funding provided to CISA in the American Rescue Plan Act of 2021 (ARPA) will be used to establish a Federal Enterprise Improvement Team (FEIT) to provide tailored improvement planning and assistance to FCEB agencies regarding their cybersecurity posture and in support of efforts to implement specific policy requirements and cybersecurity programs and capabilities.

While the Committee recognizes that significant work remains to increase the FCEB's cybersecurity posture, it lacks detailed, agency-specific plans outlining the full scope of known CDM-related requirements that the program is aiming to address. Without this full picture of the desired cybersecurity end-state, Congress lacks the visibility it needs to oversee the management of cybersecurity risks and vulnerabilities across FCEB and determine the level of

**EXHIBIT C-72**

73

required resources. A new administrative provision is included in the bill that directs CISA to provide such information to the Committee, including the Subcommittee on Homeland Security and the subcommittees with funding jurisdiction over each federal agency. The bill also includes a withholding of funds until the plan is submitted.

### EMERGENCY COMMUNICATIONS

*NGN–PS.*—The Committee recognizes the urgent need to accelerate development and deployment of communications capabilities to keep pace with commercial carriers as they upgrade their networks and services and recommends an increase of $33,000,000 above the request to accelerate development and deployment of NGN–PS Phase 2 video, data, and information services. This enhancement will support the addition of priority voice capabilities to support all levels of decision making, from senior leadership to first responders, with real-time information to prevent, protect, and preserve human life, critical infrastructures, and property from acts of terrorism and natural disasters.

The Committee is aware that a more rapid deployment of communications upgrades may introduce risk into the acquisitions process, which was designed to ensure effective and efficient program management. Not later than 90 days after the date of enactment of this Act, CISA is directed to provide a briefing to the Committee on an updated NGN–PS acquisition plan and deployment schedule that includes a risk mitigation strategy for an accelerated acquisition pace.

### INFRASTRUCTURE SECURITY

*CISA Gateway Enterprise Data Platform.*—The Committee directs CISA to provide a briefing on the modernization of the CISA Gateway system not later than 120 days after the date of enactment of this Act. The briefing shall address how system modernization will optimize the efficient use of data, available tools, and technology; and how modernization efforts will result in enhanced interoperability and data integration, optimized collection and use of data, development of mission-specific technology solutions, and promotion of closer collaboration with CISA stakeholders and partners. The briefing shall also include a description of the desired end-state of the acquisition program and a projected schedule for the development and deployment of those requirements.

### RESEARCH AND DEVELOPMENT

| | |
|---|---:|
| Appropriation, fiscal year 2021 .......................................................... | $9,431,000 |
| Budget request, fiscal year 2022 ...................................................... | 3,931,000 |
| Recommended in the bill .................................................................. | 7,431,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 .................................................. | −2,000,000 |
|     Budget request, fiscal year 2022 ................................................ | +3,500,000 |

### INTEGRATED OPERATIONS

*Technology Development and Deployment Program.*—The recommendation includes $3,500,000 above the request for the Technology Development and Deployment Program.

**EXHIBIT C-73**

74

### CYBER RESPONSE AND RECOVERY FUND

| | |
|---|---|
| Appropriation, fiscal year 2021 ......................................................... | – – – |
| Budget request, fiscal year 2022 ..................................................... | $20,000,000 |
| Recommended in the bill ................................................................. | 20,000,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 ................................................. | +20,000,000 |
|     Budget request, fiscal year 2022 ............................................... | – – – |

The recommendation includes $20,000,000 for the establishment of a Cyber Response and Recovery Fund (CRRF), as requested. Funds shall be used to augment or scale up government asset response efforts, including through reimbursement to federal agencies for services provided in support of non-federal public and private critical infrastructure in response to a significant cyber incident when the President has determined additional resources are needed. Funded asset response activities may include:

(1) furnishing technical and advisory assistance, technology, or capabilities to entities affected by a cyber incident to protect their assets, mitigate vulnerabilities, and reduce the related impacts;

(2) identifying other entities that may be at risk from the significant cyber incident and assessing their risk from the same or similar vulnerabilities where necessary to respond to or recover from the significant cyber incident; assessing potential risks to the sector or region, including potential cascading effects, and developing courses of action to mitigate these risks where necessary to respond to or recover from the significant cyber incident;

(3) facilitating information sharing and operational coordination with threat response where necessary to respond to or recover from the significant cyber incident; and

(4) providing guidance on how best to utilize federal resources and capabilities in a timely, effective manner to speed recovery.

An administrative provision is included in the bill requiring frequent reporting of the activities funded by this account. Further, the Committee reminds CISA of the requirement for DHS pilot programs established in section 107 of the bill and looks forward to receiving the required information prior to the obligation of any funds. CISA is also directed to work with FEMA to ensure that each agency's separate response and recovery roles are clearly defined and to provide the Committee a briefing on such roles by not later than 60 days after the date of enactment of this Act, including any legislative recommendations needed to clarify respective roles, potential impacts on current activities, and any other operational considerations about which the Committee should be aware in assessing the value of the CRRF funding mechanism. Such briefing shall also address strategies for assisting public versus non-public entities, and any unique considerations for assisting non-profit versus for-profit entities.

**EXHIBIT C-74**

75

## FEDERAL EMERGENCY MANAGEMENT AGENCY

| | |
|---|---|
| Appropriation, fiscal year 2021 ........................................................ | $21,910,571,000 |
| Budget request, fiscal year 2022 ...................................................... | 24,270,180,000 |
| Recommended in the bill ................................................................... | 24,023,531,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 ................................................. | +2,112,960,000 |
| Budget request, fiscal year 2022 .............................................. | −246,649,000 |

ᵃNote—the amounts for each fiscal year include appropriations for the Radiological Emergency Preparedness program that are entirely offset by fee collections, which for fiscal year 2022 are estimated by CBO at $33,630,000.

### MISSION

The Federal Emergency Management Agency (FEMA) helps build, sustain, and improve the nation's capability to prepare for, protect against, respond to, recover from, and mitigate all hazards through disaster response, recovery, and grant programs supporting first responders, emergency management, mitigation activities, and preparedness.

### OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2021 ........................................................ | $1,129,282,000 |
| Budget request, fiscal year 2022 ...................................................... | 1,232,162,000 |
| Recommended in the bill ................................................................... | 1,262,966,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 ................................................. | +133,684,000 |
| Budget request, fiscal year 2022 .............................................. | +30,804,000 |

The recommendation includes the following increases above the request: $20,000,000 for the Next Generation Warning System as part of the Integrated Public Alert and Warning System; $350,000 to administer the Alternatives to Detention Case Management Services Pilot grant program; $7,500,000 for homeland security preparedness grant evaluations; $2,350,000 to administer the ICE Noncustodial Migrant Shelter Grants program. The recommendation does not include the proposed realignment of $604,000 for the Office for Faith and Neighborhood Partnerships from FEMA to the Office of Partnership and Engagement (OPE).

### MITIGATION

*Chief Resilience Officer.*—The Committee is aware that six states have designated a Chief Resilience Officer (CRO) to coordinate planning and response activities associated with flooding, sea level rise, and severe storm risk. The Committee expects FEMA to continue to coordinate with the existing state CROs in addition to all of FEMA's SLTT partners to identify opportunities for collaboration, create new efficiencies in federal-state relations, and identify how new or existing federal funding and other resources, including non-federal resources, may be used to develop state-wide resilience master plans. FEMA should also work with other states that are beginning to take the lead on resilience by creating agencies, offices, or positions specifically tasked with overseeing large adaptation projects, proactively incorporating resilience into old and new infrastructure, and coordinating across agencies. To the extent possible, existing programs and initiatives should be leveraged to include resilience and adaptation in lieu of creating entirely new programs or initiatives that would run in parallel with but be disconnected from existing state programs.

**EXHIBIT C-75**

76

*Hazard Mitigation Natural Infrastructure.*—The Committee is aware that rehabilitation or establishment of natural infrastructure, including marshes, wetlands, mangroves, and dunes can improve resiliency, reducing damage from flooding and coastal storm surges and leading to more effective floodplain management. Such natural infrastructure can also have long-term beneficial impacts on topography and soils, water quality, wetland health, floodplains, coastal resources, aquatic resources, environmental justice, and public health and safety in coastal areas. In addition environmental mitigation measures offer both aesthetic and recreational value.

The Committee urges FEMA to continue to coordinate with the Department of Agriculture, Environmental Protection Agency (EPA), National Oceanic and Atmospheric Administration, and U.S. Army Corps of Engineers, as well as state, local, and tribal governments and business and non-profit stakeholders, on developing and supporting conservation and environment-based flood mitigation measures to reduce the impact of floods on communities, lives, and livelihoods, and utilize mitigation grant funds for natural infrastructure projects that will mitigate future damage.

*Increased Resilience in Energy Infrastructure Disaster Recovery.*—The Committee expects FEMA to work with states to integrate energy efficiency and renewable energy into pre-disaster mitigation projects that receive federal funding. In addition, FEMA's Mitigation Leadership Framework Group (MitFLG) and other interagency collaborations are effective existing mechanisms for sharing information and aligning efforts to integrate energy efficiency, renewable energy, and energy storage strategies, with results that should also benefit state and local stakeholders. State and local collaborations are key to leveraging various federal funding to integrate energy efficiency, renewable and energy storage into mitigation and resilience projects. To support effective utilization of federal resources, the Committee urges the development and sharing of actionable recommendations and best practices by MitFLG member departments and agencies and their planning components to the greatest extent possible to inform planning by state and local stakeholders.

*Mississippi River Resilience.*—The Committee encourages FEMA to continue its role as an essential federal stakeholder with the EPA's development of the Mississippi River Restoration and Resiliency Strategy, as directed in House Report 116–458. FEMA is also directed to engage with the U.S. Geological Service as it hosts the Mississippi River Science Forum and to contribute to the proceedings as a federal agency with relevant scientific expertise.

*Urban Area Flooding.*—In fiscal year 2020, FEMA was provided funding for a pilot grant program to help local government grants enhance the mapping of urban flooding. Within 30 days of the date of enactment of this Act, FEMA is directed to brief the Committee on the results of that pilot and whether a more permanent program should be established.

PREPAREDNESS AND PROTECTION

The recommendation includes $20,000,000 for the Next Generation Warning System as part of the Integrated Public Alert and Warning System, including up to three percent for administration.

**EXHIBIT C-76**

The Committee expects FEMA to work with the Corporation for Public Broadcasting to implement this program for public broadcasting entities, as defined in 47 U.S.C. 397(11).

*OneResponder.*—The Committee appreciates FEMA's continued efforts to catalog personnel capabilities within the National Qualification System and OneResponder. Prior to establishing a requirement for SLTT officials to participate in this system as a condition of receiving federal grant funding, FEMA shall brief the Committee on the rationale for adopting such a policy, including a description of how the agency received and adjudicated stakeholder input.

In addition, because SLTT governments have the primary responsibility to respond to disasters and emergencies and their response efforts are generally more cost effective, FEMA is encouraged to use federal deployments through OneResponder as a backup resource for when Emergency Management Assistance Compact (EMAC) deployments will not be sufficient to fully respond to a disaster. FEMA shall brief the Committee on plans and procedures for federal deployments through OneResponder prior to implementing this new capability.

REGIONAL OPERATIONS

The Committee recommends the requested funding for a pilot for Regional Assessment Teams in two regions consistent with the findings from FEMA's COVID–19 Initial Assessment Report.

RESPONSE AND RECOVERY

*Urban Search and Rescue.*—The Committee recommends the requested funding level for the Urban Search and Rescue Response System (USAR) to fully support the 28 USAR Task Forces, including resources to recapitalize critical communications equipment necessary to conduct life-saving search and rescue operations and to sustain swift water and chemical, biological, radiological, and nuclear rescue operations.

MISSION SUPPORT

*Faith and Neighborhood Partnerships.*—The Committee rejects the proposed realignment of funding for the Office of Faith and Neighborhood Partnerships from FEMA to the DHS Office of Public Engagement, which would require explicit statutory authority. The requirement for such authority comes from the Post Katrina Emergency Management Reform Act of 2006 (Title VI of Public Law 109–295) and section 506 of the Homeland Security Act (6 U.S.C. 316), which were enacted as a result of previous efforts to remove FEMA functions.

*Information Technology (IT) Systems.*—The Committee recognizes the vital function of independent verification and validation (IV&V) of IT systems and processes by third party experts to eliminate waste, fraud, and abuse and directs the Chief Information Officer (CIO) to prioritize IV&V in complying with the intent of Congress in the Federal Information Technology Acquisition Act. In addition, acquisition program baselines should include appropriate funding to support IV&V work. The Committee further directs the CIO to establish effective, independent IT oversight, such as through independent government personnel or through a contractor

**EXHIBIT C-77**

78

to validate whether contract requirements are met. Within 120 days of the date of enactment of this Act, FEMA shall brief the Committee on its IV&V approach and any implementation shortfalls.

*Preparedness Grant Evaluations.*—The request proposed a new administrative provision that would have authorized FEMA to transfer up to one percent of State Homeland Security Program (SHSP) and Urban Area Security Initiative (UASI) grant funding to O&S to conduct evaluations of grants awarded through those programs. The Committee rejects the proposed transfer of funds and instead recommends a direct appropriation through O&S of $7,500,000 for such evaluations. FEMA shall brief the Committee, within 45 days of the date of enactment of this Act, on a plan for the use of these funds.

In addition, the plan shall include requirements for FEMA to report on authorized equipment and a requirement for grant recipients to report whether any deaths or injuries have resulted from the use of any grant funded equipment, supplies or materials as well as surveillance technology is acquired or used with grant funds and how grant recipients are providing appropriate safeguards for the protection of privacy and civil liberties.

*Tribal Mutual Aid.*—The nation's emergency management system should ensure a level of disaster response support to tribes at least at the level provided to states, territories and local governments. Within 90 days of the date of enactment of this Act, FEMA shall brief the Committee on existing mutual aid resources available to tribes; how those resources are currently utilized; and suggestions for improvements or necessary changes, including changes to procedures, policies or laws. The briefing should be informed by consultation with tribes and address how current systems and agreements, such as EMAC and existing tribal-state agreements are currently providing such assistance or can be modified to do so.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---:|
| Appropriation, fiscal year 2021 | $105,985,000 |
| Budget request, fiscal year 2022 | 188,212,000 |
| Recommended in the bill | 188,212,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 | +82,227,000 |
|     Budget request, fiscal year 2022 | – – – |

*Financial Systems Modernization (FSM).*—The current FEMA financial management system utilizes an older IT application that is unable to accommodate many new and emerging requirements. This raises risks of non-compliance with requirements and audit findings, introduces security vulnerabilities, requires significant manual processes, and perpetuates poor reporting functionality. These shortcomings also lead to increased costs, capability gaps from unmet requirements, technical obsolescence, risks not adequately addressed through internal controls, and reduced responsiveness. FEMA's FSM project is intended to eliminate these legacy deficiencies and system gaps by replacing Web IFMIS, the agency's core financial system, and the supporting Payment and Reporting System (PARS) with a modern Enterprise Resource Planning (ERP) solution.

A good example of the current problem is the process for reimbursing state and local governments and utilities, which can

EXHIBIT C-78

79

produce multiple, inconsistent estimates over time due to high turnover of personnel, inconsistent guidelines, inconsistent staff advice, in combination with the inefficiency of the legacy financial management system. The Committee is aware of concerns that such deficiencies may be leading to the potentially inaccurate claw back of reimbursements, leading some private sector contractors involved in rebuilding efforts on behalf of public entities to question whether FEMA can be a good disaster recovery partner. During the development and implementation of the FSM, the Committee urges FEMA to ensure the new reimbursement system has the capability to fairly and more efficiently manage reimbursements for disaster recovery projects and activities.

FEDERAL ASSISTANCE

(INCLUDING TRANSFER OF FUNDS)

| | |
|---|---|
| Appropriation, fiscal year 2021 ........................................................... | $3,294,892,000 |
| Budget request, fiscal year 2022 ........................................................ | 3,302,470,000 |
| Recommended in the bill ...................................................................... | 3,525,017,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 .................................................. | +230,125,000 |
|     Budget request, fiscal year 2022 ............................................... | +222,547,000 |

A comparison of the budget request to the Committee recommended level by budget activity is as follows:

| | Budget Request | Recommendation |
|---|---|---|
| Federal Assistance: | | |
|   Grants: | | |
|     State Homeland Security Grant Program ................................ | $594,686,000 | $610,000,000 |
|     (Operation Stonegarden) ......................................................... | – – – | (90,000,000) |
|     (Nonprofit Security) ................................................................. | – – – | (90,000,000) |
|     (Tribal Homeland Security Grant Program) ........................... | – – – | (15,000,000) |
|     Urban Area Security Initiative ................................................ | 689,684,000 | 705,000,000 |
|     (Nonprofit Security) ................................................................. | – – – | (90,000,000) |
|     Public Transportation Security Assistance ............................. | 100,000,000 | 110,000,000 |
|     (Amtrak Security) .................................................................... | – – – | (10,000,000) |
|     (Other-the Road Bus Security) ............................................... | – – – | (3,000,000) |
|     Port Security Grants ................................................................ | 100,000,000 | 110,000,000 |
|     Assistance to Firefighter Grants ............................................. | 370,000,000 | 370,000,000 |
|     Staffing for Adequate Fire and Emergency Response ............ | 370,000,000 | 370,000,000 |
|     Emergency Management Performance Grants .......................... | 355,000,000 | 365,000,000 |
|     Flood Hazard Mapping and Risk Analysis Program ............... | 275,500,000 | 275,500,000 |
|     Regional Catastrophic Preparedness Grants .......................... | 12,000,000 | 12,000,000 |
|     High Hazard Potential Dams ................................................... | 12,000,000 | 12,000,000 |
|     Emergency Food and Shelter .................................................. | 130,000,000 | 140,000,000 |
|     Community Project Funding .................................................... | – – – | 151,916,686 |
|     Subtotal, Grants ...................................................................... | 3,008,870,000 | 3,231,417,000 |
|   Terrorism and Targeted Violence Prevention Grants (by transfer) .......... | 20,000,000 | 20,000,000 |
|   Alternatives to Detention Case Management (by transfer) ..................... | 5,000,000 | 15,000,000 |
|   Non-custodial Migrant Shelter Grants (by transfer) ............................. | – – – | 100,000,00 |
|     Subtotal, Grants (including transfers) ................................... | 3,033,870,000 | 3,366,417,000 |
| Education, Training, and Exercises: | | |
|     Center for Domestic Preparedness .......................................... | 67,538,000 | 67,538,000 |
|     Center for Homeland Defense and Security ........................... | 18,000,000 | 18,000,000 |
|     Emergency Management Institute ........................................... | 22,030,000 | 22,030,000 |
|     U.S. Fire Administration ......................................................... | 53,212,000 | 53,212,000 |
|     National Domestic Preparedness Consortium ........................ | 101,000,000 | 101,000,000 |
|     Continuing Training Grants .................................................... | 12,000,000 | 12,000,000 |
|     National Exercise Program ...................................................... | 19,820,000 | 19,820,000 |
|     Subtotal, Education, Training, and Exercises ...................... | 293,600,000 | 293,600,000 |

**EXHIBIT C-79**

80

| | Budget Request | Recommendation |
|---|---|---|
| Total, Federal Assistance ........................................................ | 3,302,470,000 | 3,525,016,686 |
| Total, Federal Assistance (including transfers) ........................ | $3,327,470,000 | $3,660,016,686 |

GRANTS

*Aging Fire and Emergency Response Vehicles.*—The Committee is aware that, due to funding shortfalls and the rising cost of firefighting vehicles, communities around the country continue to operate equipment well beyond their recommended replacement dates. In the city of Chicago, for example, 40 percent of firefighting engines and ladder trucks have exceeded their useful lifespan. Although the average fire engine in Baltimore is at the end of its 8-year recommended lifespan, the current replacement cycle there is 16 years. As new technologies are introduced and safety standards evolve, it is critical that fire companies and emergency response teams have modern vehicles to help them protect the health and safety of the public from fire and other hazards. The Committee encourages FEMA to consider the replacement of fire and emergency response vehicles as a priority in establishing criteria for awards under the Assistance to Firefighter Grants program.

*Assistance to Firefighter Grants.*—Recognizing the economic and operational hardships caused by the current pandemic, an administrative provision is included the bill to allow FEMA to waive the matching and maintenance of expenditure provisions for the Assistance to Firefighter Grants program. The Committee expects that the Administrator will use the discretion granted in section 313 of the bill as much of possible to relieve the economic and operational hardships caused by the pandemic.

*Continuing Training Grants.*—The total under this heading includes $12,000,000 for Continuing Training Grants to support competitively awarded training programs to address specific national preparedness gaps such as cybersecurity, economic recovery, housing, and rural and tribal preparedness. Of this amount, not less than $3,000,000 shall be prioritized to be competitively awarded for FEMA-certified rural and tribal training.

*Countering Domestic Violent Extremism.*—The Committee supports the designation of domestic violent extremism as a National Priority Area for the fiscal year 2021 SHSP and UASI Grant programs, end encourages its continued designation as a priority for fiscal year 2022.

*Crude Oil by Rail.*—FEMA is encouraged to give high priority consideration to grants for planning, training, and equipment to firefighters who are responsible for crude oil by rail and ethanol by rail derailment and incident response to help meet the needs of our most vulnerable communities and first responders.

*Domestic Sourcing of Personal Protective Equipment.*—When issuing a Notice of Funding Opportunity or updating the Preparedness Grants Manual for the State Homeland Security Grant Program or the Urban Area Security Initiative, the Committee directs FEMA to encourage entities receiving these funds to give procurement preference to and purchase directly from domestic manufacturers of PPE or PPE raw materials to the maximum practicable and allowable by law.

EXHIBIT C-80

81

*High Hazard Dams.*—The National Inventory of Dams lists 91,457 dams, of which approximately 2,380 are classified as high hazard potential dams in poor or unsatisfactory condition. Recent catastrophic failures, like that of the Oroville Dam spillway in California in 2017 and the Edenville and Sanford dams in Michigan in 2020 serve as a warning about the potential consequences of ignoring infrastructure that no longer meets safety standards. The Committee recognizes that dams are critical infrastructure that provide water retention and control services, as well as ecological, economic, and energy benefits to nearby communities and provides $12,000,000 in continued funding for the High Hazard Potential Dam grant for technical, planning, design, and construction assistance for eligible dams. Within 120 days of the date of enactment of this Act, FEMA shall provide a briefing to the Committee on the effectiveness and cost-benefits of the program, as well recommendations for making it more effective.

*Preparedness Grant Reporting.*—The Committee is aware of concerns that FEMA preparedness grant funding, which is intended to help communities prepare for and respond to terrorist attacks and for the dual use of those capabilities in responding to natural disasters,—not routine law enforcement activities—may also have supported controversial law enforcement responses to mass gathering and protest events. Among the eligible uses of SHSP and UASI funding are:

(1) school hardening measures to protect against active shooters;

(2) development of preparedness plans;

(3) emergency preparedness training, including training related to under-represented, diverse populations that may be more impacted by disasters;

(4) support for state and urban area terrorism-related fusion centers;

(5) Improving the physical security of critical infrastructure or at-risk nonprofit organizations;

(6) building and sustaining radiological and nuclear detection capabilities;

(7) acquisition and sustainment of critical emergency supplies, including food, water, and medical equipment;

(8) construction of communications towers;

(9) emergency management accreditation of local jurisdictions;

(10) activities in support of achieving FEMA's National Incident Management System objectives;

(11) addressing emerging threats, such as cybersecurity breaches and attacks and combatting domestic extremist violence;

(12) preparedness for community-based organizations that provide a safety net for individuals disproportionately impacted by disasters, including food banks, homeless shelters, job training centers, and cultural centers; and

(13) Citizen Corps Whole Community Councils and Community Emergency Response Teams.

The Committee notes that the purchase of weapons, weapons accessories (including ammunition), and weaponized vehicles are not eligible costs under SHSP and UASI and directs FEMA to adhere

**EXHIBIT C-81**

82

to the recommendations issued pursuant to Executive Order 13688 to help ensure SHSP and UASI funding remains focused on its intended purposes.

To improve transparency and public awareness regarding the use of these grants, FEMA is directed to brief the Committee, within 45 days from the date of enactment of this Act, on recommendations for how reporting by grant recipients could be appropriately expanded to include death or injury reporting related to the use of equipment, supplies, or materials acquired with FEMA grant funds, along with additional reporting on the use of surveillance technology acquired or operated with grant funds and the safeguards put in place by the recipient to protect privacy and civil liberties.

*School Safety.*—School hardening measures are eligible activities under the UASI and SHSG programs. Funds may be used for bullet resistant doors and glass; hinge-locking mechanisms; immediate notification to emergency 911 systems; mechanisms that provide real time actionable intelligence directly to law enforcement and first responders; installation of distraction devices or other countermeasures administered by law enforcement; and other measures determined to provide significant improvement to schools physical security. The Committee encourages FEMA to work with states and school districts to increase awareness of these funding opportunities.

*Staffing for Adequate Fire and Emergency Response (SAFER).*— The bill continues a provision from prior years to allow FEMA to waive the matching and maintenance of expenditure provisions for the SAFER program. The Committee expects that the Administrator will use the discretion granted in section 310 as much of possible to relieve the economic and operational hardships caused by the current pandemic.

*Transit Security Grant Program (TSGP).*—The Committee is aware that many TSGP applicants have been unsuccessful in getting grant awards to address transit security risks, while other grantees have at times received awards in recurring years to continue operational activities. The Committee encourages FEMA to consider whether recurring grants for ongoing operational activities is the best investment of limited federal grant funding, and to consider giving priority to applicants that have not received an award within the previous three years. FEMA is directed to brief the Committee on the current risk assessment and grant award prioritization criteria for the current program not later than 60 days after the date of enactment of this Act. An increase of $10,000,000 is recommended for TSGP in the bill to allow FEMA to make awards to additional applicants.

*Urban Area Security Initiative (UASI).*—The Implementing Recommendations of the 9/11 Commission Act of 2007 requires the FEMA Administrator to conduct an annual assessment of the relative threat, vulnerabilities, and consequences from acts of terrorism faced by each of the 100 most populous metropolitan statistical areas (MSA) in the United States Based on this assessment, the Administrator designates high-risk urban areas that are eligible for UASI grants. While the factors included in this assessment are defined in statute, the specific criteria that inform these factors and the methodology used to carry out the assessment are at the

**EXHIBIT C-82**

83

discretion of the Secretary and the Administrator, who review them on an annual basis. The Committee directs the Secretary to make UASI awards consistent with the prioritization instructions in the explanatory statement accompanying Public Law 116–260.

The Committee is aware that the Secretary withdrew a major change to the distribution of UASI funding for FY 2021 that had been proposed by the prior administration without sufficient stakeholder consultation. Prior to considering any such changes in the future, the Committee expects FEMA to seek stakeholder input; provide significant lead time for jurisdictions to plan and adjust; and brief the Committee on the proposed changes and the plan for consulting stakeholders early in the process.

The Committee is aware that some urban area boundaries under UASI cross state borders. FEMA is encouraged to work with states to ensure that such urban areas take an inclusive, regional approach to the development and implementation of their UASI programs that includes all components of urban areas under threat.

### Community Project Funding Grants

| Recipient | Project | Amount | Type |
|---|---|---|---|
| Town of North Attleborough .. | Ten-Mile River Dredging Project to Mitigate Flooding. | $1,500,000 | Pre-Disaster Mitigation |
| Town of Somerset ................. | Somerset Emergency Dam Improvements ... | 975,000 | Pre-Disaster Mitigation |
| Port of Portland .................... | Port of Portland Seismically Resilient Runway. | 3,750,000 | Pre-Disaster Mitigation |
| City of Astoria ...................... | Astoria Pre-Disaster Landslide Storm Drainage Project. | 676,875 | Pre-Disaster Mitigation |
| City of Alton ........................ | Alton, Illinois Flood Relief and Recovery .... | 2,456,370 | Pre-Disaster Mitigation |
| Town of Longboat Key .......... | Town of Longboat Key Flooding Mitigation Request. | 350,000 | Pre-Disaster Mitigation |
| The City of Cedar Park .......... | The City of Cedar Park s Rachettes Sections 2 and 3, Phase II Stormwater Mitigation Project. | 750,000 | Pre-Disaster Mitigation |
| Glynn County Board of Commissioners. | Johnson Rocks Revetment Project ............... | 2,925,000 | Pre-Disaster Mitigation |
| Town of Arlington .................. | Mystic and Charles Regional Coastal Flood Interventions Project. | 562,500 | Pre-Disaster Mitigation |
| City of Woburn ...................... | Hurld Park Green Infrastructure Project ..... | 196,875 | Pre-Disaster Mitigation |
| Prince William County Government. | Community Climate Change Impact Analysis. | 950,000 | Pre-Disaster Mitigation |
| Harris County Flood Control District. | Westador Stormwater Detention Basin ....... | 8,250,000 | Pre-Disaster Mitigation |
| Harris County Flood Control District. | TC Jester Storm water Detention Basin Project. | 9,950,000 | Pre-Disaster Mitigation |
| WaterOne ............................. | Backup Engine Generator for WaterOne ..... | 4,837,500 | Pre-Disaster Mitigation |
| Harris County Flood Control District. | Meyergrove Detention Basin ..................... | 9,950,000 | Pre-Disaster Mitigation |
| Monroe County ...................... | Twin Lakes Subdivision Pre-Disaster Mitigation project. | 5,484,300 | Pre-Disaster Mitigation |
| Hidalgo County Drainage District No. 1. | North Main Drain Expansion Project ........... | 3,706,267 | Pre-Disaster Mitigation |
| Vermilion Parish .................... | Vermillion Safe Room ................................ | 5,250,000 | Pre-Disaster Mitigation |
| Harris County Texas .............. | Stormwater Detention Basin and Culvert Improvement. | 9,950,000 | Pre-Disaster Mitigation |
| New York State Department of Homeland Security and Emergency Services. | Fresh Creek Tide Gates, Brooklyn, NY ......... | 800,000 | Pre-Disaster Mitigation |
| The Hoh Tribe ....................... | Hoh Tribe Relocation Development ............. | 1,650,000 | Pre-Disaster Mitigation |
| City of Hoquiam .................... | Aberdeen-Hoquiam Flood Protection Project | 9,950,000 | Pre-Disaster Mitigation |
| City of Chino Hills ................. | Citywide Fuel Reduction ........................... | 565,000 | Pre-Disaster Mitigation |
| City of Elroy .......................... | City of Elroy Electrical Substation Renovation. | 525,000 | Pre-Disaster Mitigation |

EXHIBIT C-83

84

Community Project Funding Grants—Continued

| Recipient | Project | Amount | Type |
|---|---|---|---|
| Gadsden County | Gadsden County W.S. Stevens High School Disaster Shelter. | 4,669,171 | Pre-Disaster Mitigation |
| City of Alameda | Veteran's Court Seawall | 1,500,000 | Pre-Disaster Mitigation |
| City of St. Clair Shores | St. Clair Shores Pump Station | 248,625 | Pre-Disaster Mitigation |
| City of Boston | Design & Permitting for Open Space and Resiliency Improvements Project in Joe Moakley Park. | 1,650,000 | Pre-Disaster Mitigation |
| City of Hopewell | Cattail Creek Crossing Improvements Project. | 750,000 | Pre-Disaster Mitigation |
| City of Newburyport | City of Newburyport Bulkhead Renovation Project. | 2,250,000 | Pre-Disaster Mitigation |
| Town of Nederland | Big Springs Emergency Egress | 525,000 | Pre-Disaster Mitigation |
| Pinal County | Pinal County Christensen Road and Lower Magma Drainage improvements. | 506,250 | Pre-Disaster Mitigation |
| Borough of Keyport | Firemans Park Bulkhead Improvement Project. | 450,000 | Pre-Disaster Mitigation |
| City of Poway, Public Works Department. | Hazardous Tree Removal Mitigation Project | 187,500 | Pre-Disaster Mitigation |
| City of Chelsea Department of Housing and Community Development. | Island End River Area Flood Resilience Project—City of Everett, City of Chelsea. | 750,000 | Pre-Disaster Mitigation |
| Town of Wake Forest | Wake Forest Reservoir Dam Repairs | 2,175,000 | Pre-Disaster Mitigation |
| Mount Sinai Medical Center | Mount Sinai Medical Center Infrastructure Hardening and Resiliency Project. | 7,650,580 | Pre-Disaster Mitigation |
| Village of Arlington Heights | Village of Arlington Heights—Race & Chicago Avenue Storm Water Detention. | 600,000 | Pre-Disaster Mitigation |
| Lake County Stormwater Management Commission. | Dady Slough Flood Storage and Wetland Enhancement Project. | 3,000,000 | Pre-Disaster Mitigation |
| City of Zion | Zion Stormwater Management Project | 720,435 | Pre-Disaster Mitigation |
| City of North Chicago | North Chicago Storm Sewer | 7,796,558 | Pre-Disaster Mitigation |
| City of Frederick | City of Frederick Motter Avenue Area Community Flood Mitigation Project. | 534,977 | Pre-Disaster Mitigation |
| Lake County Stormwater Management Commission. | Sylvan Lake Dam Modifications | 1,342,500 | Pre-Disaster Mitigation |
| Atlantic County Improvement Authority. | Lake Lenape Dam Flood Mitigation | 4,600,000 | Pre-Disaster Mitigation |
| Beth Medrash Govoha of America. | Beth Medrash Govoha Nonprofit Security Grant. | 150,000 | Non-Profit Security |
| City of Redlands | City of Redlands Emergency Operations Center Improvement Project. | 712,500 | Emergency Operations Center |
| Chestnuthill Township | Shared West End Emergency Services Facility. | 1,000,000 | Emergency Operations Center |
| Hawai'i Emergency Management Agency. | Hawaii State Emergency Operations Center in Mililani First Responder Tech Campus. | 1,000,000 | Emergency Operations Center |
| Yancey County | Yancey County—EOC | 150,000 | Emergency Operations Center |
| Cherokee County | Cherokee County—EOC | 131,250 | Emergency Operations Center |
| Zapata County | Zapata County Emergency Operations Center. | 1,000,000 | Emergency Operations Center |
| Town of North Branford Connecticut. | North Branford Emergency Operations Center. | 1,000,000 | Emergency Operations Center |
| Franklin County Florida Board of Commissioners. | Franklin County Emergency Operations Center. | 1,000,000 | Emergency Operations Center |
| Noxubee County Board of Supervisors. | Noxubee County Emergency Operations Center. | 1,000,000 | Emergency Operations Center |
| Jackson County Board of Supervisors. | Jackson County Emergency Operations Center. | 262,500 | Emergency Operations Center |
| Lake County Board of Commissioners. | Lake County Emergency Operations Center | 1,000,000 | Emergency Operations Center |
| Onondaga County—Department of Emergency Management. | Onondaga County Emergency Operations Center. | 1,000,000 | Emergency Operations Center |

**EXHIBIT C-84**

85

Community Project Funding Grants—Continued

| Recipient | Project | Amount | Type |
|---|---|---|---|
| Cayuga County Office of Emergency Services. | Cayuga County Emergency Operations Center. | 75,000 | Emergency Operations Center |
| Western Illinois University ..... | Western Illinois Emergency Operations Center. | 1,000,000 | Emergency Operations Center |
| City of Roswell ..................... | City of Roswell–911 Emergency Communications Call Center. | 1,000,000 | Emergency Operations Center |
| Gerald R. Ford International Airport. | Gerald R. Ford International Airport Emergency Operations Center (EOC). | 1,000,000 | Emergency Operations Center |
| Gilpin County Office of Emergency Management. | Gilpin County Emergency Operations Center | 138,557 | Emergency Operations Center |
| City of Walla Walla .............. | Walla Walla Relocate E911 Emergency Telecom. | 1,000,000 | Emergency Operations Center |
| Pinal County ......................... | Pinal County Emergency Operations Center | 187,500 | Emergency Operations Center |
| Wake County ......................... | Wake County Emergency Operations Center | 1,000,000 | Emergency Operations Center |
| City of Huntington Park ........ | City of Huntington Park, Emergency Operations System. | 1,000,000 | Emergency Operations Center |
| Lake County .......................... | Lake County Combined EOC ...................... | 1,000,000 | Emergency Operations Center |
| Haines City, Florida .............. | Haines City Fire Department Services ........ | 750,000 | Emergency Operations Center |
| City of Santa Rosa ............... | City of Santa Rosa—Permanent Emergency Operations Center. | 1,000,000 | Emergency Operations Center |
| City of Rialto ....................... | City of Rialto Emergency Operations Center | 862,500 | Emergency Operations Center |
| The Resilience, Education, Training, and Innovation (RETI) Center. | East 132nd Street Pier Park Waterfront Plan. | 1,000,000 | Emergency Operations Center |
| City of Brownsville ............... | Brownsville Emergency Operations Center .. | 1,000,000 | Emergency Operations Center |
| City of Allentown .................. | City of Allentown Fire Department Emergency Operations Center. | 129,596 | Emergency Operations Center |
| Wauconda Fire Department ... | Emergency Operations Center Generator Replacement. | 36,000 | Emergency Operations Center |

DISASTER RELIEF FUND

| | |
|---|---|
| Appropriation, fiscal year 2021 .................................................... | $17,142,000,000 |
| Budget request, fiscal year 2022 ................................................. | 19,299,000,000 |
| Recommended in the bill ............................................................... | 18,799,000,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 ............................................. | +1,657,000,000 |
| Budget request, fiscal year 2022 ........................................... | −500,000,000 |

In lieu of providing of new funding proposed under this heading for climate mitigation grants, the Committee recommends funding for that activity through a repurposing of funds in section 311 of the bill.

*2017 Hurricane Recovery.*—The Committee remains concerned about the overall pace of recovery from the 2017 Hurricanes in Puerto Rico and the U.S. Virgin Islands. Congress provided FEMA with additional authority to expedite and expand the scope of disaster recovery in the Balanced Budget Act of 2018 (Public Law 115–123), the Disaster Recovery Reform Act of 2018 (division D of Public Law 115–254) and the Additional Supplemental Appropriations for Disaster Relief Act, 2019 (Public Law 116–20); House Report 116–458 reminded FEMA to make full use of this authority. Unfortunately, the Committee has received reports that FEMA is not using this authority to the extent permitted by law and intended by Congress, including for determinations of eligibility for

EXHIBIT C-85

86

repairs or replacement of facilities. The Committee again reminds FEMA of the authority provided and directs FEMA to use such authority to provide the maximum assistance allowable.

The Committee appreciates the quarterly interagency briefings provided on recovery from these 2017 Hurricanes and directs that future briefings address the impact of the pandemic on disaster recovery efforts and how FEMA intends to fully use its authority in support of those efforts.

*Breastfeeding.*—The Committee recognizes that breastfeeding confers meaningful clinical benefits for babies and mothers while reducing healthcare costs and continues to urge FEMA to ensure that breastfeeding mothers impacted by disasters have access to breastfeeding services and supplies through its Critical Needs Assistance, Other Needs Assistance, and other programs. In the aftermath of a disaster, FEMA is directed to support families with young children by giving them priority consideration for immediate access to a shelter (temporary community shelter, hotel room, temporary housing, etc.) with a clean, safe, and private non-bathroom stall, space available for expressing breast milk, sanitary drinking water, a power supply, and access to a refrigerator for safe storage of food and/or expressed breastmilk. Breast pumps and related supplies should also be listed as eligible items under both Critical Needs Assistance and Other Needs Assistance programs

*Bilingual and Multi-lingual Staff.*—The Committee encourages FEMA to continue hiring bilingual and multi-lingual staff to meet the language needs of disaster survivors.

*Community Disaster Loans.*—The explanatory statement accompanying Public Law 116–260 directed FEMA to brief the Committee on its plans for implementing the loan cancellation provisions in the Additional Supplemental Appropriations for Disaster Relief Requirements Act, 2017, Public Law 115–72; FEMA recently acknowledged this plan has not yet been developed. Within 15 days of the date of enactment of this Act, FEMA is directed to brief the Committee on a plan for implementing this provision. The Committee expects that plan to provide for using the maximum discretion permitted for cancellation of these loans.

*Debris Removal.*—The Committee is aware of concerns from disaster survivors about eligibility for debris removal on private property in FEMA's disaster programs, particularly for circumstances in which trees that have fallen on private property in the aftermath of storms or wildfires. The Committee reminds FEMA that under the Stafford Act, it has wide discretion on eligibility for debris removal that is determined to be in the public interest. Within 90 days of the date of enactment of this Act, FEMA shall brief the Committee on eligibility for private property debris removal in both the Public Assistance program and the Individuals and Households Program (IHP), including a discussion of FEMA's statutory authority and whether FEMA is fully using such authority.

*De-Energization.*—The Committee is aware that the increasing severity and frequency of extreme weather events has prompted efforts to reduce the risks of catastrophic wildfires by adopting "deenergization" protocols, under which electrical power is temporarily shut off for businesses, schools, healthcare facilities, and residences. The Committee encourages FEMA to reimburse the cost of generators for individuals who are affected by de-energization pro-

**EXHIBIT C-86**

87

tocols implemented as a result of a presidentially declared major disaster.

*Direct Federal Assistance (DFA).*—By regulation and consistent with the Stafford Act, FEMA will only provide DFA when disaster response requirements exceed the capability of SLTT. In some cases under current FEMA policy, however, the agency will not reimburse SLTT governments that contract for or carry out a response activity or seek assistance through mutual aid. Within 60 days of the date of enactment of this Act, FEMA shall brief the Committee on the provision of assistance through various mechanisms, including DFA, mutual aid, and SLTT governments directly performing or contracting for services. The briefing shall include a discussion of the law, regulations, and policies governing the different mechanisms; the costs for each; and how each support the federal policy codified in the Stafford Act to increase SLTT capacity and coordination.

*Disaster Contractor and Subcontractor Payments.*—The explanatory statement accompanying Public Law 116–260 directed FEMA to brief the Committee on the backlog of unpaid contractor and subcontractor invoices for recovery activities in the U.S. Virgin Islands and Puerto Rico from 2017 hurricanes. FEMA is directed to continue those briefings until the backlog is eliminated.

*Disaster Recovery Reform Act Implementation.*—The Committee recognizes the efforts FEMA has made to implement the Disaster Recovery Reform Act of 2018 (division D of Public Law 115–254) and the positive impact that has made for states, communities, and disaster survivors. However, in House Report 116–458 the Committee noted there are a number of unimplemented provisions that were immediately effective or have overdue statutory deadlines; unfortunately, this is still the case.

While the Committee recognizes that this was likely due to the operational burdens imposed on FEMA during its response to the pandemic, the Committee urges FEMA to implement these requirements expeditiously. Previously, FEMA had been providing quarterly briefings on the status of the implementation of the Disaster Recovery Reform Act; the Committee directs FEMA to resume those briefings until all requirements have been implemented. In addition, within 15 days of the date of enactment of this Act, FEMA is directed to brief the Committee on the rulemaking under section 1235 of that Act, which would define "resilient" and "resiliency," including an update on the status of the rulemaking and the process going forward, including the expected timeline for issuing a final rule.

*Disaster Survivors Experiencing Homelessness.*—Some of the most vulnerable survivors during and in the aftermath of a disaster are individuals and families who face homelessness. Traditionally FEMA disaster assistance in the immediate aftermath of a disaster has been generally limited to short term sheltering and other immediate needs because longer-term housing needs were deemed not to be caused by the disaster.

During the pandemic, FEMA worked with states, communities, and non-profit organizations to provide innovative assistance to reduce the risk for those experiencing homelessness, including the use of non-congregant sheltering. The Committee believes that FEMA should use this experience to reassess the services that can

EXHIBIT C-87

88

be provided to individuals and families that experience homelessness.

Within 60 days of the date of enactment of this Act, FEMA shall brief the Committee on the lessons learned from the response to the pandemic on how assistance can be provided to those experiencing homelessness before, during and after disasters and on assessment of how policies, programs, and procedures can be changed to assist those who are most vulnerable. The assessment should consider how such assistance could be provided through collaboration with other federal agencies, SLTT governments, and non-profit organizations, including those that are not traditionally active in disaster response.

*Disaster Workforce.*—The Committee recognizes the difficulty that FEMA faces in maintaining a workforce that is ready to deploy before, during and after disasters while also being as judicious as possible with the use of funding and other resources. In order to help FEMA address this challenge, Congress provided specific hiring authority in section 306 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5149), which was most recently amended by section 1222 of the Disaster Recovery Reform Act of 2018 (Division D of Public Law 115–254). Those recent amendments included provisions to allow FEMA's Stafford Act workforce to become eligible for positions in the competitive service.

The Committee has been made aware of concerns about workplace conditions especially for its Stafford Act workforce. In addition, the Agency has not been completely responsive to information requests about its new authority, especially as it relates to reservists. Within 60 days of the date of enactment of this Act, FEMA shall brief the Committee on current protections for all categories of its Stafford Act workforce, including reservists, and any plans to increase or change those protections. In addition, the briefing shall describe FEMA's implementation of section 306(c) of the Stafford Act and include the following information for each of the last three fiscal years: the different categories of Stafford Act personnel (i.e. type of appointment), including reservists; the number in each category; the number in each category who were or would be eligible for appointment under section 306(c); and the number in each category who accepted an appointment under section 306(c).

*Electric Grid Resiliency.*—The Committee reminds FEMA of the requirement in House Report 116–458 to brief the Committee on alternative methods to repair, rebuild, and fortify disaster damaged electric grids, which is overdue. FEMA is directed to expeditiously provide the briefing, which shall include a cost/benefit analysis of various alternatives, such as traditional wood poles, composite utility poles, and underground cables; take into account such considerations as geography, availability of materials, ease of storage, delivery and installation logistics of replacement materials, annual maintenance, and the effects of climate change; and address the potential impacts related to equipment maintenance costs and vegetation management over the life of the project.

*Equity in Disaster Assistance under IHP.*—The Committee is aware of concerns raised about inequities in the delivery of disaster assistance to disaster survivors, especially through IHP, from a number of sources including concerns from constituents, media reports and a recent GAO report, *Disaster Assistance Additional Ac-*

**EXHIBIT C-88**

89

*tions Needed to Strengthen FEMA's Individuals and Households Program* GAO–20–503. Among the concerns that have been raised are: that FEMA's programs provide disproportionately less assistance to minority communities and those in urban and rural disadvantaged communities; and the application process and procedures are too complicated, causing many to discontinue their applications due to these difficulties or due to a mistaken belief that they are not eligible. In addition, FEMA's attempts to prevent fraudulent applications may be so restrictive as to inadvertently screen out many who may appropriately qualify for assistance. The Committee encourages FEMA to allow disaster survivors to provide alternative documentation for establishing property ownership, including self-certification, as appropriate, beyond the jurisdictions where it is currently allowed.

The Committee understands that FEMA is currently taking steps to review and address equity issues in the delivery of its programs, including the chartering of an Equity Enterprise Steering Group and launching an equity analysis of the delivery of IHP assistance, efforts that the Committee strongly supports. Within 90 days of the date of enactment of this Act, FEMA shall brief the Committee on these efforts and on how FEMA is implementing the recommendations in the GAO report. The briefing shall also describe FEMA's procedures for reducing fraudulent disaster applications and the results of an analysis on how those procedures may be inappropriately discouraging disaster victims from seeking or receiving assistance.

*Modular Housing.*—The Committee recognizes the vital support FEMA provides to communities and disaster survivors in the aftermath of major disasters, including housing assistance for individuals and families displaced from their homes. Within 90 days of the date of enactment of this Act, FEMA shall brief the Committee on the feasibility and benefits of using modular housing under current FEMA authorities and programs as a more efficient and effective temporary housing solution.

*Public Assistance Briefings.*—In House Report 116–180, the Committee directed FEMA to brief the Committee on reducing duplicative and conflicting administrative requirements in the Public Assistance program, as well as a briefing on project worksheet development. In House Report 116–458, the Committee noted that these briefings were overdue, while recognizing the operational constraints caused by the pandemic. With those constraints waning, the Committee expects FEMA to provide the briefings in an expeditious manner.

*STEM Education After Disasters.*—The Committee encourages FEMA to continue working with SLTT governments and eligible private, nonprofit educational institutions to ensure that disaster recovery planning includes the establishment of temporary facilities to provide continuity in STEM education, as appropriate.

NATIONAL FLOOD INSURANCE FUND

| | |
|---|---|
| Appropriation, fiscal year 2021 | $204,412,000 |
| Budget request, fiscal year 2022 | 214,706,000 |
| Recommended in the bill | 214,706,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +10,294,000 |
| Budget request, fiscal year 2022 | – – – |

**EXHIBIT C-89**

90

## TITLE III—ADMINISTRATIVE PROVISIONS

### (INCLUDING TRANSFER OF FUNDS)

Section 301. The Committee continues a provision making "Cybersecurity and Infrastructure Security Agency—Operations and Support" funding available for a cybersecurity competition established by Executive Order No. 13870.

Section 302. The Committee includes a new provision requiring reporting on unfunded CISA priorities.

Section 303. The Committee includes a provision requiring reporting of obligations under "Cybersecurity and Infrastructure Security Agency—Cyber Response and Recovery Fund".

Section 304. The Committee includes a provision requiring a plan describing federal civilian department and agency cybersecurity investment requirements.

Section 305. The Committee continues a provision limiting expenses for the administration of grants.

Section 306. The Committee continues a provision specifying timeframes for grant applications and awards.

Section 307. The Committee continues a provision requiring a five-day advance notification for certain grant awards under "Federal Emergency Management Agency—Federal Assistance."

Section 308. The Committee continues a provision addressing the availability of certain grant funds for the installation of communications towers.

Section 309. The Committee continues a provision requiring the submission of a monthly Disaster Relief Fund report.

Section 310. The Committee continues a provision permitting the FEMA Administrator to grant waivers from specified requirements of section 34 of the Federal Fire Prevention and Control Act of 1974.

Section 311. The Committee includes a provision allowing prior-year appropriations to be used for certain purposes.

Section 312. The Committee continues a provision providing for the receipt and expenditure of fees collected for the Radiological Emergency Preparedness Program, as authorized by Public Law 105–276.

Section 313. The Committee continues a provision permitting waivers for certain requirements pertaining to the granting of Assistance to Firefighter Grants.

Section 314. The Committee includes a provision adjusting the cost share for major disasters and emergencies that occurred or were declared in 2020.

Section 315. The Committee includes a provision to cancel the remaining balances of certain loans issued by FEMA.

## TITLE IV—RESEARCH, DEVELOPMENT, TRAINING, AND SERVICES

### U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| | |
|---|---:|
| Appropriation, fiscal year 2021 | $127,790,000 |
| Budget request, fiscal year 2022 | 469,504,000 |
| Recommended in the bill | 474,504,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +346,714,000 |
| Budget request, fiscal year 2022 | +5,000,000 |

**EXHIBIT C-90**

91

MISSION

U.S. Citizenship and Immigration Services (USCIS) adjudicates and grants immigration and citizenship benefits, confirms eligibility for employment and public services, and promotes an awareness and understanding of citizenship in support of immigrant integration. USCIS activities are primarily funded through fees collected from applicants for immigration benefits.

OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2021 ........................................................ | $117,790,000 |
| Budget request, fiscal year 2022 ..................................................... | 459,504,000 |
| Recommended in the bill ................................................................... | 459,504,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 ................................................. | +341,714,000 |
|     Budget request, fiscal year 2022 .............................................. | – – – |

The Committee supports the Administration's request of $345,000,000 to address the USCIS backlog by hiring 1,316 additional personnel, including 301 refugee officers; increasing overtime; investing in case file management support; provisioning equipment for increased video interviewing capability; purchasing information technology equipment and supplies; training; travel; and other related costs. However, the Committee notes that the budget request assumes all newly hired positions would be on board at the beginning of the fiscal year, which is not feasible. Further, the request did not include funding to increase asylum officer positions, despite the significant backlog in asylum processing. Accordingly, the recommendation adjusts the hiring for the 1,316 requested positions to assume even hiring throughout the fiscal year, resulting in a projected reduced requirement of $88,975,000 in fiscal year 2022. The recommendation reinvests these savings for an additional 501 asylum officers and for increased overtime to accelerate addressing the backlog. Within the total amount provided, the bill makes $87,619,000 available until September 30, 2023, to provide flexibility for potential hiring delays associated with these initiatives.

The Committee is encouraged by recent improvements in USCIS transparency and compliance with oversight requirements related to its policies, operations, and overall fiscal health and looks forward to continued progress on these matters. However, the Committee remains concerned about the lack of transparency in USCIS budget justification materials and reiterates direction that future budget justifications provide more detailed information and accounting level data to ensure transparency and executability. Such details shall include additional information regarding each adjustment to base and program change from the prior year for each PPA, including the PPAs within the Immigration Examinations Fee Account (IEFA), and shall provide such information at the office-level for the Administration PPA.

*Application Processing.*—USCIS is directed to prioritize the timely processing of citizenship and other applications, with a goal of adjudicating all requests within six months of submission. Further, if USCIS publishes a Notice of Proposed Rulemaking or Final Rule that proposes or adopts any amendment to 8 C.F.R. 103.7(b), (October 1, 2020), that would impact fee levels, USCIS shall include the

**EXHIBIT C-91**

92

following information in its associated publications in the Federal Register:

(1) a detailed plan for reducing the aggregate median processing time for all applications at least 25 percent by not later than one year from the date of publication of the notice and each year thereafter until median processing times are fewer than six months; and

(2) a detailed estimate of any discretionary funding requirement for enabling USCIS to limit future fee increases to not more than the rate of inflation.

Not later than 90 days after the date of enactment of this Act, USCIS is directed to make available, on a publicly accessible website, an interactive dashboard detailing the number of forms received, processed, approved, denied, and pending by month, along with the average processing time and the number of forms pending for more than six months, for each of the following:

(1) form I–130 (Petition for Alien Relative);

(2) form I–360 (Petition for Amerasian, Widow(er), or Special Immigrant);

(3) form I–485 (Application to Register Permanent Residence or Adjust Status), delineated by application type or filing category;

(4) form I–751 (Petition to Remove Conditions on Residence);

(5) form N–400 (Application for Naturalization); and

(6) form I–765 (Employment Authorization Document).

The dashboard shall include historical data beginning not later fiscal year 2016; be updated monthly by not later than the tenth business day following the end of each month; and permit the downloading of the underlying data in a searchable and sortable spreadsheet format. USCIS shall make every effort to continuously expand the dataset on this website to eventually include all forms.

*Asylum Seeker Access to Employment Authorization.*—The Committee recognizes the importance of employment authorization for asylum seekers awaiting the outcome of their cases, including individuals with positive Credible Fear or Reasonable Fear determinations or who have expressed a fear of return to their home countries and intend to apply for asylum or withholding of removal. The Committee directs DHS to establish a centralized mechanism for asylum seekers to apply for employment authorization online and to brief the Committee not later than 60 days after the date of enactment of this Act on its plan to meet this objective, including a projected schedule for meeting anticipated milestones. Further, the Committee directs USCIS to reduce printing and reproduction costs related to the cumbersome Form I–765 and to brief the Committee not later than 60 days after the date of enactment of this Act on a plan for achieving this goal, including any anticipated resource savings and timeliness metrics.

*B–1 Visa Holders.*—The Committee directs the Secretary to submit a report not later than 180 days after the date of enactment of this Act on B–1 personal or domestic workers, including the visa holder's year of birth; gender; country of citizenship and birth; date of visa issuance and expiration; and the city, state, and zip code where the visa holder will be working. The report shall also be made available to the public.

**EXHIBIT C-92**

93

*Citizenship Promotion.*—The Committee encourages CBP and USCIS to continue exploring the most effective methods to ensure that Legal Permanent Residents arriving at ports of entry are aware of the benefits of citizenship and the process of becoming a U.S. citizen, to include self-service kiosks, signage, videos, and verbal scripts.

*Domestic and Sexual Violence Training.*—The Committee looks forward to the briefing required in House Report 116–458, which was incorporated by reference into the explanatory statement accompanying the Department of Homeland Security Appropriations Act, 2021, (Public Law 116–260), regarding annual training for asylum officers and supervisors on how the dynamics of domestic and sexual violence impact asylum seekers and their applications.

*E-Verify.*—While E-Verify database errors have been reduced as system functionality has evolved, challenges remain regarding the accuracy of information input by employers that is used for determining employment eligibility and there is still no formal process for reviewing a final non-confirmation determination. By not later than 90 days after the date of enactment of this Act, USCIS is directed to brief the Committee on a proposed review process for E-Verify final non-confirmations, as well as improvements in outreach efforts and training tools to assist employers in improving the accuracy of information they submit into the system.

*Fee Waivers.*—USCIS is directed to continue the use of full fee waivers for applicants who demonstrate an inability to pay immigration and naturalization benefit application fees, and to provide partial fee waivers for applicants who can demonstrate earnings or income between 150 percent and 200 percent of the federal poverty guidelines and are otherwise ineligible for full fee waivers. The Committee directs USCIS to accept any one of the following items as proof of inability to pay an immigration or naturalization benefit application fee:

(1) documentation of receipt of a means-tested public benefit;

(2) documentation of income that is at or below 200 percent of the Federal Poverty Guidelines at the time of filing; or

(3) documentation of financial hardship based on extraordinary expenses or other circumstances.

Further, USCIS is directed to maintain naturalization fees at an affordable level; reduce the backlog of applicants; and reduce the costs of obtaining replacement certificates of naturalization and certificates of citizenship, including by cooperating with the Department of State on the screening of derivative citizens.

*H–2B Visa Program Oversight.*—Not later than 60 days after the date of enactment of this Act, the Department shall brief the Committee on the administrative remedies the Department of Labor has issued in each of the last three fiscal years against entities or persons who violate H–2B requirements. The report should contain, but not be limited to:

(1) a list of entities or persons cited, by industry and violation;

(2) the number of H–2B workers impacted and the nature of those impacts;

(3) the effects on the domestic workforce;

(4) the number of entities or persons debarred from the H–2B program due to violations;

**EXHIBIT C-93**

94

(5) a description of the criteria and methodology for debarment decisions; and

(6) a justification for why any repeat offenders have been allowed to continue to participate in the program.

*H–2B Visa Program Reporting.*—Not later than 60 days after the date of enactment of this Act, the Department shall report to the Committee on the distribution of visas granted through the H–2B program, including a tabulation of the percentage of overall visas issued to the top 15 employers. Also, not later than 90 days after the date of enactment of this Act, the Department, in consultation with the Department of Labor, shall brief the Committee on the impacts of the current H–2B visa semiannual distribution on employers, employees, and agency operations.

*Humanitarian Petitions.*—The Committee reminds USCIS of the directives related to humanitarian petitions required in House Report 116–458, which were incorporated by reference into the explanatory statement accompanying the Department of Homeland Security Appropriations Act, 2021, (Public Law 116–260).

*International Operations Division.*—The Committee remains concerned by USCIS's lack of planning and transparency about the closure of the International Operations Division and any plans to continue closing its international offices. The Committee directs USCIS to continue to operate the remaining seven international offices until the reporting and briefing requirements directed in the explanatory statement accompanying the Department of Homeland Security Appropriations Act, 2021, (Public Law 116–260), have been provided. Further, the Committee urges USCIS to reconsider its international footprint requirements to optimize its ability to meet its mission needs in a cost-effective manner.

*Military Naturalization Applications.*—Absent exigent circumstances or additional time applicants may need to respond to Requests for Evidence or Notices of Intent to Deny, USCIS shall ensure that military naturalization applications are processed within six months, as required by the Military Personnel Citizenship Processing Act of 2008 (Public Law 110–382). USCIS is directed to continue to build upon its military naturalization promotion program, in conjunction with the Department of Defense, to ensure all military service members and their families learn about and consider their eligibility to apply for naturalization before the military service member's separation from the military, and to help military families navigate the naturalization process. Not later than 90 days after the date of enactment of this Act, USCIS shall brief the Committee on the status of meeting these goals, including any efforts to streamline processes and improve the overall experience for service members and their families.

*Refugee Security Vetting.*—The Committee looks forward to receiving the report required in House Report 116–458 that was incorporated by reference into the explanatory statement accompanying the Department of Homeland Security Appropriations Act, 2021, (Public Law 116–260) regarding enhanced security-vetting.

*Spouse Petitions.*—With respect to fiancé(e) or spouse petitions involving a minor party, the Committee directs USCIS to document the age of the minor party at the time of the civil/legal marriage, along with the age difference between the parties, with ages given in months as well as years.

**EXHIBIT C-94**

95

*Systematic Alien Verification for Entitlements Program.*—USCIS is directed to update the report required in House Report 116–458, which was incorporated by reference into the explanatory statement accompanying the Department of Homeland Security Appropriations Act, 2021, (Public Law 116–260), to include information for fiscal year 2021.

*Resource Optimization Strategy.*—The Committee looks forward to the briefing required in the explanatory statement accompanying the Department of Homeland Security Appropriations Act, 2021, (Public Law 116–260), as well as the plan and subsequent briefings required in section 4103 of the Emergency Stopgap USCIS Stabilization Act (Public Law 116–159). USCIS is urged to expand its use of premium processing authorities, as provided for in and in accordance with that Act.

*Trauma-Informed Mental Health Care.*—USCIS is encouraged to assess the need for the following additional training requirements for the Refugee, Asylum, and International Operations Directorate's staff who engage regularly with potential trauma survivors:

(1) Training on recognizing signs of trauma exposure, understanding common behaviors of people exposed to trauma, and sensitive or trauma-informed principles for interacting; and

(2) Secondary trauma and resilience training and support.

*Virtual Processes and Ceremonies.*—Not later than 90 days after the date of enactment of this Act, USCIS shall provide the Committee with an analysis of the feasibility of leveraging video and audio teleconferencing capabilities to:

(1) support remote refugee interviews; and

(2) remotely administer the oath of citizenship during circumstances that impede the regular administration of naturalization ceremonies.

*Voter Registration of New U.S. Citizens.*—The Committee urges USCIS to facilitate the voter registration of new U.S. citizens upon their successful completion of oath ceremonies, including through Memoranda of Understanding and other agreements with state and local agencies responsible for election administration that permit USCIS to electronically transfer voter registration information of new citizens.

*Website Data.*—The Committee is disappointed that the briefing requirement in House Report 116–180 on the feasibility of posting DHS-administered visa data on its website has not been met. Accordingly, USCIS is now directed to publish on its website, beginning lot later than 120 days after the date of enactment of this Act and semiannually thereafter, I–129 data on employers, worksites, occupations, gender, and wages, for petitions in the E, H, L, O, P, and TN visa classifications. Additionally, the website shall include data on key visa and work programs administered by ICE through the Student and Exchange Visitor Information System, such as the J–1 program and the F–1 Optional Practical Training program, including employment, wage, and gender data for all visas and programs categories. Data for the J–1 visa should be reported according to each J–1 sub-program. The data reported according to this directive shall not include personally identifiable information.

**EXHIBIT C-95**

96

FEDERAL ASSISTANCE

| | |
|---|---|
| Appropriation, fiscal year 2021 | $10,000,000 |
| Budget request, fiscal year 2022 | 10,000,000 |
| Recommended in the bill | 15,000,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +5,000,000 |
| Budget request, fiscal year 2022 | +5,000,000 |

The recommendation includes $15,000,000 to support the Citizenship and Integration Grant Program, an increase of $5,000,000 above the request to expand the number of grant awards for meritorious proposals and to support projects that will test or bring to scale innovative methods of English and civics education and citizenship preparation that will help set new Americans up for economic and social success in the United States.

The Committee appreciates steps taken by USCIS to address its concerns regarding the guidelines set forth in USCIS's Notice of Funding Opportunity (NOFO) for fiscal year 2019 that imposed unnecessary and overly restrictive conditions on prospective grant recipient organizations and looks forward to working with USCIS on any further improvements to grant program.

USCIS continues to have the authority to accept private donations to support the Citizenship and Integration Grant Program. The Committee directs USCIS to provide an update on its planned use of this authority not later than 30 days after the date of enactment of this Act, to include efforts undertaken to solicit private donations.

FEDERAL LAW ENFORCEMENT TRAINING CENTERS

| | |
|---|---|
| Appropriation, fiscal year 2021 | $340,348,000 |
| Budget request, fiscal year 2022 | 355,636,000 |
| Recommended in the bill | 355,636,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +15,288,000 |
| Budget request, fiscal year 2022 | – – – |

MISSION

The Federal Law Enforcement Training Centers (FLETC) provide or facilitate basic and advanced law enforcement training for over 90 federal agencies and numerous state, local, tribal, and international law enforcement organizations.

OPERATIONS AND SUPPORT

| | |
|---|---|
| Appropriation, fiscal year 2021 | $314,348,000 |
| Budget request, fiscal year 2022 | 322,436,000 |
| Recommended in the bill | 322,436,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2022 | +8,088,000 |
| Budget request, fiscal year 2021 | – – – |

The recommendation funds the budget request, including $1,700,000 for improved flood mitigation efforts for the FLETC campus in Glynco, GA.

*Community College Partnerships.*—The Committee encourages FLETC to partner with community colleges to develop pre-academy and other law enforcement training programs, including along the southwest border where it is particularly important to improve the Department's hiring pipeline for law enforcement positions. The

EXHIBIT C-96

97

Department is directed to report back to the Committee on these efforts within 60 days of the date of enactment of this Act.

*Human Trafficking Training.*—The Committee supports the establishment of FLETC's Human Trafficking Awareness Training and encourages FLETC to continue increasing opportunities for this training for federal, state, local, and tribal law enforcement officers and agents.

*Interagency Training Centers.*—The Committee is aware of efforts by the Department and the National Guard to establish interagency domestic operation training centers and notes the success of the Muscatatuck Urban Training Facility in supporting a wide range of training requirements for Active Duty service members, the National Guard, other federal agencies, and domestic law enforcement agencies. The Committee encourages the Department to continue working with the National Guard, as well as state and local leaders, to identify opportunities for expanding domestic training on federal or state property, particularly in regions that lack facilities for training related to active shooters, dense urban terrain, and cyber and electromagnetic response.

*International Partnerships.*—The Committee supports international law enforcement capacity building programs, which develop new partnerships with other countries that build shared values around the rule of law and good governance. The Committee encourages FLETC to expand its capacity to enroll and provide training for law enforcement officers of foreign partners, especially as part of its international capacity building programs. The Committee directs FLETC to provide an annual report to the Committee, beginning not later than 90 days after the date of enactment of this Act, on the status of its international programs, including the number of international students trained; their countries of origin; programs administered; and plans to expand existing partnerships and develop new ones.

*Use of Training Facilities.*—The Director shall schedule basic or advanced law enforcement training, or both, at all four training facilities to ensure they are operated at the highest capacity before entering new leases or establishing new partnerships with training organizations. FLETC is also directed to provide a cost analysis detailing, at a minimum, each training center's maximum instructional capacity by course and measured against its annual student occupancy. The Department is directed to report back to the Committee on these efforts within 60 days of the date of enactment of this Act.

### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---:|
| Appropriation, fiscal year 2021 | $26,000,000 |
| Budget request, fiscal year 2022 | 33,200,000 |
| Recommended in the bill | 33,200,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 | +7,200,000 |
|     Budget request, fiscal year 2022 | – – – |

The recommendation includes $13,000,000 for the purchase of a leased dormitory adjacent to the FLETC campus in Glynco, GA, as requested. Additionally, the recommendation provides $20,200,000 for construction costs of law enforcement training venues and support facilities at the Charleston Training Delivery Point.

**EXHIBIT C-97**

98

### SCIENCE AND TECHNOLOGY DIRECTORATE

| | |
|---|---:|
| Appropriation, fiscal year 2021 .......................................................... | $765,558,000 |
| Budget request, fiscal year 2022 ...................................................... | 822,903,000 |
| Recommended in the bill ................................................................. | 830,403,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 .................................................. | +64,845,000 |
|     Budget request, fiscal year 2022 ............................................... | +7,500,000 |

### MISSION

The mission of the Science and Technology Directorate (S&T) is to conduct and support research, development, developmental and operational testing and evaluation, and the timely transition of homeland security capabilities to operational end users at the federal, state, and local levels.

#### OPERATIONS AND SUPPORT

| | |
|---|---:|
| Appropriation, fiscal year 2021 .......................................................... | $302,703,000 |
| Budget request, fiscal year 2022 ...................................................... | 310,590,000 |
| Recommended in the bill ................................................................. | 310,590,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 .................................................. | +7,887,000 |
|     Budget request, fiscal year 2022 ............................................... | – – – |

The recommendation includes the requested amount of $310,590,000.

*Indirect Costs for Laboratories.*—The Committee understands that S&T has agreed that it is appropriate for the agency to pay laboratories for the indirect costs of their operations and that this will be S&T's policy going forward.

*Laboratory Facilities.*—The Committee reminds S&T of the directive to provide a report on unmet requirements for laboratory facilities, which was to have been submitted in conjunction with the President's fiscal year 2022 budget request, and expects the report to be delivered without further delay. The Committee also expects the Department to consider the unmet needs of these important assets when developing the fiscal year 2023 request.

#### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---:|
| Appropriation, fiscal year 2021 .......................................................... | $18,927,000 |
| Budget request, fiscal year 2022 ...................................................... | 8,859,000 |
| Recommended in the bill ................................................................. | 8,859,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 .................................................. | – 10,068,000 |
|     Budget request, fiscal year 2022 ............................................... | – – – |

### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The recommendation includes the requested amount to continue activities to close the Plum Island Animal Disease Center. S&T is directed to continue providing semi-annual briefings on the progress of these activities, as specified in the explanatory report accompanying Public Law 116–260.

**EXHIBIT C-98**

99

RESEARCH AND DEVELOPMENT

| | |
|---|---:|
| Appropriation, fiscal year 2021 ......................................................... | $443,928,000 |
| Budget request, fiscal year 2022 ..................................................... | 503,454,000 |
| Recommended in the bill ................................................................ | 510,954,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2021 ................................................. | +67,026,000 |
|     Budget request, fiscal year 2022 ............................................... | +7,500,000 |

RESEARCH, DEVELOPMENT, AND INNOVATION

The recommendation includes $5,000,000 above the request for Research, Development, and Innovation (RD&I). S&T is directed to brief the Committee not later than 30 days after the date of enactment of this Act on the proposed allocation of RD&I funds by project and to subsequently update the Committee on any changes from the planned allocations.

*Advanced Sensor Technology.*—The Committee supports a continued focus on the development and deployment of next generation first responder technologies that utilize advanced sensors and imaging.

*Bi-National Cooperation Pilot.*—The Committee supports the Bi-National Cooperation Pilot, which focuses on cooperative efforts related to border security, maritime security, biometrics, cybersecurity, and video analytics, and encourages continued funding for the pilot at its historical level of $2,000,000.

*Biosurveillance Systems.*—The Committee directs S&T and the Countering Weapons of Mass Destruction Office (CWMD) to provide a joint report to the Committee, within 60-days of the date of enactment of this Act, on the status of developing and testing a successor bio-threat detection system to BioWatch, along with plans to complete development and field the new capability. The report shall describe planned changes to bio-detection operations that improve upon the legacy program and how CWMD and S&T will coordinate their respective bio-detection roles and activities.

The report should also include information on the progress of the Homeland Security Advanced Research Projects Agency Chemical and Biological Defense Division in developing novel prototype sensors for real-time detection of aerosolized biological threat agents, using newer technologies such as matrix-assisted laser desorption ionization-time of flight mass spectrometry.

*Canine Sciences.*—The Committee is supportive of continued funding for a large-scale government and academic effort to advance innovation and technology in threat detection canine sciences through the Detective Canine, Science, Innovation, Technology and Education Program.

*Composite Shipping Containers.*—The Committee is aware that Presidential Determination No. 2017–09 identifies secure composite shipping containers as a critical item shortfall for industrial capacity and supports efforts to develop composite materials that reduce costs and improve intrusion sensor integration.

*Enabling Unmanned Aerial Systems (UAS).*—The Department's designated UAS test site is providing critical testing and technology evaluations across multiple DHS operational entities. The Committee urges the Department to continue funding this program at not less than the fiscal year 2021 level.

**EXHIBIT C-99**

100

*First Responder Interagency Working Group.*—The Committee recognizes the effectiveness of interagency working groups composed of first responders from local, state, and federal agencies in meeting the ever-changing needs of the nation's emergency preparedness and response plans. The Committee encourages S&T to continue and, if appropriate expand, its partnerships in this area, including with nonprofits that have a history of collaboration with inter-agency working groups.

*Levee and Dam Improvements.*—The Committee encourages S&T to continue the Educational Partnership Agreement between the U.S. Army Corps of Engineers Engineering Research Development Center and an academic sedimentation lab that has experience in cooperative research with the U.S. Department of Agriculture's Natural Resources Conservation Service to develop capabilities for maintaining and improving the integrity of our nation's existing levee and dam systems. The Committee also supports continued efforts on concrete dam design; performance evaluation, to include the effects of aging and the impacts from natural and man-made disasters; the development of sustainable solutions for infrastructure protection; research on viable alternative materials; and the development of guidance and standards for communities, emergency managers, public safety officials, and critical infrastructure operators.

*Maritime and Coastal Surveillance.*—The Committee encourages S&T to conduct maritime system and sensor studies for the research, development, testing, and evaluation of wind and solar powered unmanned maritime vessels with surface and subsurface capabilities. Such technologies could significantly contribute to DHS component missions such as counter-narcotics; search and rescue; aids to navigation; marine safety; marine environmental protection; illegal, unregulated and unreported fishing; enforcement of laws and treaties; oceanographic research; and defense readiness.

*Maritime and Port Resiliency and Security.*—The Committee recognizes the vast data security threat facing the U.S. Maritime/Port sector and the potential consequences of cyber intrusions on mission critical infrastructure and operations. The Committee urges S&T to continue support for a Maritime/Port Resiliency & Security research program to support the design and development of tactics, techniques, and procedures for effectively responding to critical maritime infrastructure threats.

*Research and Prototyping for IED Defeat Program (RAPID).*—The Committee encourages S&T to enhance support for the RAPID program, which is used to train bomb squads and technicians on critical render safe technologies.

*Semiconductor Technology.*—The Committee supports continued advanced research using high resolution magnification to improve the detection of potential structural defects in emerging semiconductor technologies (including microchips, light emitting diodes, batteries, and processors) that could allow the unintended manipulation of hardware.

*Voting Technology and Election Procedures.*—Within the resources provided above the request, S&T is highly encouraged to fund quality assurance and continuous evaluation research on voting technologies and election procedures in cooperation with an or-

**EXHIBIT C-100**

101

ganization that has not less than a decade of experience performing technical audits of statewide elections systems. In consultation and coordination with the Elections Assistance Commission and CISA, this investment should include the development of new tools and training modules to enable states and localities to ensure that their election systems are secure.

*Water Security Test Bed.*—The Committee encourages S&T to work with research universities to develop a national testing capacity to assess vulnerabilities and mitigate biological risks, including COVID–19, in building air and water handling systems, multi-building facilities, and waste water systems. The Committee supports the development of improved standard methods, processes, and protocols for field testing and evaluation, as well as operational use guidelines or concepts of operation for technologies that rapidly assess indoor environments for pathogenic contamination.

*Wildfire Management.*—The Committee encourages S&T to apply predictive analytics to study wildfire ignition, including the application of advanced artificial intelligence and machine learning, and to develop new data collection methodologies, such as crowd sourcing, as indicators for pinpointing high-risk ignition locations in the wildland urban interface.

UNIVERSITY PROGRAMS

The recommendation includes $53,537,000 for University Programs, $2,500,000 above the request.

The Committee underscores the importance of minority serving institutions in supporting homeland security related science, technology, engineering, and mathematics research, and includes $7,657,000, an increase of $2,500,000 above the requested level, for the Minority Serving Institutions Program.

S&T shall notify the Committee of any plan or proposal to reduce funding for, diminish the role of,or eliminate Centers of Excellence (COEs) prior to taking any action to do so.S&T is encouraged to prioritize collaborations with qualified research universities to support critical research topics in priority areas, including coastal resilience, maritime security, cross-border threat screening, unmanned systems, counterterrorism, emerging analytics, cybersecurity, first responder safety, disaster-driven displacement, and critical infrastructure.

The Committee supports the valuable research providing a scientific basis to address the operationally demanding, and logistically straining challenges faced by the Coast Guard and other DHS missions in the Arctic and its and encourages S&T to continue to prioritize work in this region.

S&T is encouraged to consider expanding the capacity of the existing Center of Excellence on Cross-Border Threat Screening and Supply Chain Defense to conduct research and analysis needed to assess current and emerging risks to U.S. and global food systems, and to examine risk mitigating investments by firms with global supply chains and the impact of those investments on the resilience of food and agricultural supply chains.

The Committee underscores that Emeritus COEs remain valuable resources for homeland security science and technology solutions and training the next generation of homeland security experts. S&T shall report to the Committee not later than 60 days

**EXHIBIT C-101**

102

after the date of enactment of this Act on how DHS is leveraging Emeritus COEs to address homeland security challenges.

## COUNTERING WEAPONS OF MASS DESTRUCTION OFFICE

| | |
|---|---:|
| Appropriation, fiscal year 2021 | $402,277,000 |
| Budget request, fiscal year 2022 | 427,461,000 |
| Recommended in the bill | 437,461,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +35,184,000 |
| Budget request, fiscal year 2022 | +10,000,000 |

### MISSION

The Countering Weapons of Mass Destruction Office (CWMD) leads DHS efforts to develop and enhance programs and capabilities that defend against WMD and combat bio-threats and pandemics.

### OPERATIONS AND SUPPORT

| | |
|---|---:|
| Appropriation, fiscal year 2021 | $179,892,000 |
| Budget request, fiscal year 2022 | 157,200,000 |
| Recommended in the bill | 162,200,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | −17,692,000 |
| Budget request, fiscal year 2022 | +5,000,000 |

The recommendation includes $5,000,000 above the request for Medical Information Exchange (MIX) personnel.

*Chief Medical Officer (CMO).*—As the primary DHS medical authority, the CMO has oversight responsibility for the Department's medical and public health policies and operations. As such, and consistent with direction in the Explanatory Statement accompanying Public Law 116–93, DHS is directed to ensure that the CMO reviews all contracts, requests for information and proposals, and reviews of bids and offers that broadly impact how the Department delivers healthcare services to individuals in its custody and to departmental personnel. In coordination with operational components, the CMO shall also develop departmental requirements for medical services, to include professional healthcare system administration; disease surveillance, reporting, and outbreak response; and measurable performance standards for current and future healthcare record systems. The CMO, in conjunction with CBP and ICE leadership, is directed to brief the Committee within 90 days of the date of enactment of this Act on these efforts.

It is increasingly clear that a more cohesive strategy is necessary to address emergent medical conditions of detainees, as well as the health of the Department's workforce. Based on lessons learned during the 2019 rise in CBP apprehensions as well as the COVID–19 pandemic, the Explanatory Statement accompanying Public Law 116–93 directed the Secretary to develop a Department-wide medical response strategy for emergent circumstances, a responsibility that the Secretary has appropriately delegated to the CMO. The Committee notes that a provision in title V of the bill is amended to allow the Secretary to establish a new executive management office led by the CMO to better lead and coordinate the Department's medical and public health policies and operations.

**EXHIBIT C-102**

103

*Technical Forensics.*—The Committee notes that the bill realigns CWMD's technical forensics functions from the O&S account to the R&D account, as proposed.

*Visualization Tool.*—The Committee encourages CWMD to continue its engagement in support of a visualization tool that incorporates data from state and local entities to inform emergency response, emergency management, and law enforcement at all levels of government.

### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriation, fiscal year 2021 | $87,413,000 |
| Budget request, fiscal year 2022 | 71,604,000 |
| Recommended in the bill | 76,604,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | −10,809,000 |
| Budget request, fiscal year 2022 | +5,000,000 |

The recommendation includes $5,000,000 above the request for Medical Information Exchange (MIX) expansion and development efforts.

*MIX.*—The Committee commends the Department on its progress toward implementing an electronic health records system. The Department is strongly encouraged to expand its electronic health records implementation to other components, in addition to ICE and CBP. To address the expansion of health records systems to components, the Committee recommends $3,000,000 for CBP in title II to address improvements to its health records system.

### RESEARCH AND DEVELOPMENT

| | |
|---|---|
| Appropriation, fiscal year 2021 | $65,309,000 |
| Budget request, fiscal year 2022 | 65,709,000 |
| Recommended in the bill | 65,709,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +400,000 |
| Budget request, fiscal year 2022 | − − − |

### FEDERAL ASSISTANCE

| | |
|---|---|
| Appropriation, fiscal year 2021 | $69,663,000 |
| Budget request, fiscal year 2022 | 132,948,000 |
| Recommended in the bill | 132,948,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2021 | +63,285,000 |
| Budget request, fiscal year 2022 | − − − |

The recommendation supports the consolidation of BioWatch operations into Federal Assistance.

### TITLE IV—ADMINISTRATIVE PROVISIONS

Section 401. The Committee continues a provision allowing USCIS to acquire, operate, equip, and dispose of up to five vehicles under certain scenarios.

Section 402. The Committee continues a provision limiting the use of A–76 competitions by USCIS.

Section 403. The Committee continues a provision by reference requiring USCIS to provide data about its credible and reasonable fear processes.

Section 404. The Committee includes a provision related to the collection and use of biometrics.

**EXHIBIT C-103**

104

Section 405. The Committee continues a provision authorizing FLETC to distribute funds for incurred training expenses.

Section 406. The Committee continues a provision directing the FLETC Accreditation Board to lead the federal law enforcement training accreditation process to measure and assess federal law enforcement training programs, facilities, and instructors.

Section 407. The Committee continues a provision allowing for the acceptance of funding transfers from other government agencies for construction of special use facilities.

Section 408. The Committee continues a provision classifying FLETC instructor staff as inherently governmental for certain purposes.

Section 409. The Committee includes a new provision that permits unused fiscal year 2020 and 2021 diversity visas, employment visas, and family-based visas to remain available in fiscal year 2022 and beyond, until they are used.

Section 410. The Committee includes a new provision that permits issuance of diversity visas to immigrants who would have otherwise been issued diversity visas and permitted entry into the United States but for executive policies of the prior Administration.

Section 411. The Committee includes a new provision that provides the Secretary of Homeland Security with authority to make available additional H–2B visas.

Section 412. The Committee includes a provision authorizing the use of the H–2A program for agricultural jobs that are not temporary or seasonal in nature.

## TITLE V—GENERAL PROVISIONS

### (INCLUDING RESCISSIONS AND TRANSFERS OF FUNDS)

Section 501. The Committee continues a provision limiting the availability of appropriations to one year unless otherwise expressly provided.

Section 502. The Committee continues a provision providing that unexpended balances of prior-year appropriations may be merged with new appropriation accounts and used for the same purpose, subject to reprogramming guidelines.

Section 503. The Committee continues and modifies a provision limiting authority to reprogram funds within an appropriation above a specified threshold unless the Department provides notification to the Committees on Appropriations at least 15 days in advance; and providing authority to transfer not more than 5 percent out of an appropriation and to augment an appropriation by not more than 10 percent, with a requirement for a 30-day advance notification. A detailed funding table identifying each congressional control level for reprogramming purposes is included at the end of this report.

All DHS components shall comply with these reprogramming and transfer requirements. In addition, the Department shall submit reprogramming and transfer notifications on a timely basis and provide complete explanations of the proposed reprogramming and transfer actions, including detailed justifications for the increases and offsets, and any specific impacts the proposed changes will have on the budget request for the following fiscal year and future-year appropriations requirements. Each notification submitted to

**EXHIBIT C-104**

105

the Committees shall include a detailed table showing the proposed revisions at the account, program, project, and activity level to the funding and full-time equivalent levels for the fiscal year funded by this Act and the levels requested in the President's budget for the following fiscal year.

The Department shall manage its programs and activities within the levels appropriated and should only submit reprogramming or transfer notifications in cases of unforeseeable and compelling circumstances that could not have been predicted by the Department when formulating the budget request for the budget year or foreseen by Congress when appropriating funds. When the Department submits a reprogramming or transfer notification and does not receive identical responses from the House and the Senate Committees, it is expected to reconcile the House and the Senate differences before proceeding.

The Department is not to submit a notification for a reprogramming or transfer of funds after June 30 except in extraordinary circumstances that imminently threaten the safety of human life or the protection of property.

De-obligated funds are also subject to the reprogramming and transfer guidelines and requirements set forth in this section.

Section 504. The Committee continues by reference a provision prohibiting funds appropriated or otherwise made available to the Department to make payment to the Working Capital Fund (WCF), except for activities and amounts proposed in the President's fiscal year 2022 budget request. Funds provided to the WCF are available until expended. The Department may only charge components for services directly provided through the WCF and may only use such funds for purposes intended by the contributing component. Any funds paid in advance or for reimbursement must reflect the full cost of each service. The Department shall submit a notification to the Committees prior to adding a new activity to the fund or eliminating an existing activity from the fund. For activities added to the fund, such notifications shall detail the source of funds by account, program, project, and activity level. In addition, the Department shall submit quarterly WCF execution reports to the Committees that include activity-level detail.

Section 505. The Committee continues and modifies a provision providing that not to exceed 75 percent of unobligated balances from prior-year appropriations for each Operations and Support appropriation, of which 67 percent shall have two fiscal years of availability for the purpose for which it was appropriated and 33 percent can be transferred to the "Information Technology Modernization Fund".

Section 506. The Committee continues and modifies a provision that deems intelligence activities to be specifically authorized during the current fiscal year until the enactment of an Act authorizing intelligence activities for the current fiscal year.

Section 507. The Committee continues a provision requiring notification to the Committees at least three days before DHS executes or announces grant allocations, grant awards, contract awards (including contracts covered by the Federal Acquisition Regulation), other transaction agreements, letters of intent, or a task or delivery order on multiple award contracts totaling more than $1,000,000; a task or delivery order greater than $10,000,000 from multi-year

**EXHIBIT C-105**

106

funds; or sole-source grant awards. Notifications shall include a description of projects or activities to be funded and their location, including city, county, and state.

Section 508. The Committee continues a provision prohibiting all agencies from purchasing, constructing, or leasing additional facilities for federal law enforcement training without advance notification to the Committees.

Section 509. The Committee continues a provision prohibiting the use of funds for any construction, repair, alteration, or acquisition project for which a prospectus, if required under chapter 33 of title 40, United States Code, has not been approved.

Section 510. The Committee continues a provision that consolidates by reference prior-year statutory provisions related to a contracting officer's technical representative training and the use of funds in conformance with section 303 of the Energy Policy Act of 1992.

Section 511. The Committee continues a provision prohibiting the use of funds in contravention of the Buy American Act.

Section 512. The Committee continues a provision regarding the oath of allegiance required by section 337 of the Immigration and Nationality Act.

Section 513. The Committee continues and modifies a provision prohibiting DHS from using funds in this Act to use reorganization authority, with a specified exception.

Section 514. The Committee continues a provision prohibiting funds for planning, testing, piloting, or developing a national identification card.

Section 515. The Committee continues a provision directing that any official required by this Act to report or certify to the Committees on Appropriations may not delegate such authority unless expressly authorized to do so in this Act.

Section 516. The Committee continues a provision prohibiting funds in this Act to be used for first-class travel.

Section 517. The Committee continues a provision prohibiting funds appropriated or otherwise made available by this Act to pay for award or incentive fees for contractors with below satisfactory performance or performance that fails to meet the basic requirements of the contract.

Section 518. The Committee continues a provision prohibiting the use of funds to enter into a federal contract that does not meet the requirements of the Federal Property and Administrative Services Act of 1949 or chapter 137 of title 10 U.S.C.; and the Federal Acquisition Regulation unless the contract is otherwise authorized by statute without regard to this section.

Section 519. The Committee continues a provision requiring DHS computer systems to block electronic access to pornography, except for law enforcement purposes.

Section 520. The Committee continues a provision regarding the transfer of firearms by federal law enforcement personnel.

Section 521. The Committee continues and modifies a provision regarding funding restrictions and reporting requirements related to conferences occurring outside of the United States.

Section 522. The Committee continues a provision prohibiting funds to reimburse any federal department or agency for its participation in a National Special Security Event.

**EXHIBIT C-106**

Section 523. The Committee continues and modifies a provision requiring a notification, including justification materials, prior to implementing any structural pay reform that affects more than 100 full-time positions or costs more than $5,000,000.

Section 524. The Committee continues a provision directing the Department to post reports required by the Committees on Appropriations on a public website unless public posting compromises homeland or national security or contains proprietary information.

Section 525. The Committee continues a provision authorizing minor procurement, construction, and improvements under "Operations and Support" appropriations, as specified.

Section 526. The Committee continues by reference a provision to authorize DHS to fund out of existing discretionary appropriations the expenses of primary and secondary schooling of eligible dependents in areas of U.S. territories that meet certain criteria.

Section 527. The Committee continues a provision extending other transaction authority for the Department through the fiscal year funded by this Act.

Section 528. The Committee continues a provision regarding access to detention facilities by members of Congress and their designated staff.

Section 529. The Committee continues a provision prohibiting the use of funds to use restraints on pregnant detainees in DHS custody except in certain circumstances.

Section 530. The Committee continues and modifies a provision prohibiting the use of funds for the destruction of records related to detainees in custody and requires that such records be provided to detainees, as specified.

Section 531. The Committee continues a provision prohibiting funds for a Principal Federal Official during a declared disaster or emergency under the Stafford Act, with certain exceptions.

Section 532. The Committee includes a new provision related to requests for law enforcement support.

Section 533. The Committee includes a new provision that prohibits the denial of immigration benefits when solely based on grounds related to cannabis use.

Section 534. The Committee includes a new provision providing additional amounts for the construction of land ports of entry.

Section 535. The Committee includes a provision rescinding unobligated balances from specified sources.

APPROPRIATIONS CAN BE USED ONLY FOR THE PURPOSES FOR WHICH MADE

Title 31 of the United States Code makes clear that appropriations can be used only for the purposes for which they were appropriated as follows:

Section 1301. Application.

(a) Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.

HOUSE OF REPRESENTATIVES REPORT REQUIREMENTS

The following items are included in accordance with various requirements of the Rules of the House of Representatives.

EXHIBIT C-107

108

**FULL COMMITTEE VOTES**

Pursuant to the provisions of clause 3(b) of rule XIII of the House of Representatives, the results of each roll call vote on an amendment or on the motion to report, together with the names of those voting for and those voting against, are printed below:

Roll Call 1

Date: July 13, 2021
Measure: Homeland Bill, FY 2022
Motion by: Mr. Fleischmann
Description of Motion: To strike paragraph 25 of section 535 of the bill, pertaining to a rescission of prior year funds from the U.S. Customs and Border Protection—Procurement, Construction, and Improvements account.
Results: Not Adopted 23 yeas to 33 nays

| *Members Voting Yea* | *Members Voting Nay* |
|---|---|
| Mr. Calvert | Mr. Aguilar |
| Mr. Carter | Mr. Bishop |
| Mr. Cline | Mrs. Bustos |
| Mr. Cole | Mr. Cartwright |
| Mr. Diaz-Balart | Mr. Case |
| Mr. Fleischmann | Ms. Clark |
| Mr. Fortenberry | Mr. Crist |
| Mr. Garcia | Mr. Cuellar |
| Mr. Gonzales | Ms. DeLauro |
| Ms. Granger | Mr. Espaillat |
| Dr. Harris | Ms. Frankel |
| Ms. Herrera Beutler | Mr. Harder |
| Mrs. Hinson | Ms. Kaptur |
| Mr. Moolenaar | Mr. Kilmer |
| Mr. Newhouse | Mrs. Kirkpatrick |
| Mr. Palazzo | Mrs. Lawrence |
| Mr. Reschenthaler | Ms. Lee of California |
| Mr. Rogers | Mrs. Lee of Nevada |
| Mr. Rutherford | Ms. McCollum |
| Mr. Simpson | Ms. Meng |
| Mr. Stewart | Ms. Pingree |
| Mr. Valadao | Mr. Pocan |
| Mr. Womack | Mr. Price |
| | Mr. Quigley |
| | Ms. Roybal-Allard |
| | Mr. Ruppersberger |
| | Mr. Ryan |
| | Mrs. Torres |
| | Mr. Trone |
| | Ms. Underwood |
| | Ms. Wasserman Schultz |
| | Mrs. Watson Coleman |
| | Ms. Wexton |

**EXHIBIT C-108**

109

**FULL COMMITTEE VOTES**

        Pursuant to the provisions of clause 3(b) of rule XIII of the House of Representatives, the results of each roll call vote on an amendment or on the motion to report, together with the names of those voting for and those voting against, are printed below:

Roll Call 2

Date: July 13, 2021
Measure: Homeland Bill, FY 2022
Motion by: Mr. Calvert
Description of Motion: To make permanent the authorization for the E-Verify program.
Results: Not Adopted 23 yeas to 33 nays

| *Members Voting Yea* | *Members Voting Nay* |
|---|---|
| Mr. Calvert | Mr. Aguilar |
| Mr. Carter | Mr. Bishop |
| Mr. Cline | Mrs. Bustos |
| Mr. Cole | Mr. Cartwright |
| Mr. Diaz-Balart | Mr. Case |
| Mr. Fleischmann | Ms. Clark |
| Mr. Garcia | Mr. Crist |
| Mr. Gonzales | Mr. Cuellar |
| Ms. Granger | Ms. DeLauro |
| Dr. Harris | Mr. Espaillat |
| Ms. Herrera Beutler | Ms. Frankel |
| Mrs. Hinson | Mr. Harder |
| Mr. Joyce | Ms. Kaptur |
| Mr. Moolenaar | Mr. Kilmer |
| Mr. Newhouse | Mrs. Kirkpatrick |
| Mr. Palazzo | Mrs. Lawrence |
| Mr. Reschenthaler | Ms. Lee of California |
| Mr. Rogers | Mrs. Lee of Nevada |
| Mr. Rutherford | Ms. McCollum |
| Mr. Simpson | Ms. Meng |
| Mr. Stewart | Ms. Pingree |
| Mr. Valadao | Mr. Pocan |
| Mr. Womack | Mr. Price |
| | Mr. Quigley |
| | Ms. Roybal-Allard |
| | Mr. Ruppersberger |
| | Mr. Ryan |
| | Mrs. Torres |
| | Mr. Trone |
| | Ms. Underwood |
| | Ms. Wasserman Schultz |
| | Mrs. Watson Coleman |
| | Ms. Wexton |

**EXHIBIT C-109**

110

**FULL COMMITTEE VOTES**

Pursuant to the provisions of clause 3(b) of rule XIII of the House of Representatives, the results of each roll call vote on an amendment or on the motion to report, together with the names of those voting for and those voting against, are printed below:

Roll Call 3

Date: July 13, 2021
Measure: Homeland Bill, FY 2022
Motion by: Mrs. Hinson
Description of Motion: To strike section 211 of the bill, which allows up to $100 million in prior year appropriations for U.S. Customs and Border Protection—Procurement, Construction, and Improvements to be repurposed for environmental mitigation and authorizes the transfer of such funds to certain other federal agencies.

Results: Not Adopted 23 yeas to 33 nays

| *Members Voting Yea* | *Members Voting Nay* |
|---|---|
| Mr. Calvert | Mr. Aguilar |
| Mr. Carter | Mr. Bishop |
| Mr. Cline | Mrs. Bustos |
| Mr. Cole | Mr. Cartwright |
| Mr. Diaz-Balart | Mr. Case |
| Mr. Fleischmann | Ms. Clark |
| Mr. Fortenberry | Mr. Crist |
| Mr. Garcia | Mr. Cuellar |
| Mr. Gonzales | Ms. DeLauro |
| Ms. Granger | Mr. Espaillat |
| Dr. Harris | Ms. Frankel |
| Ms. Herrera Beutler | Mr. Harder |
| Mrs. Hinson | Ms. Kaptur |
| Mr. Joyce | Mr. Kilmer |
| Mr. Moolenaar | Mrs. Kirkpatrick |
| Mr. Palazzo | Mrs. Lawrence |
| Mr. Reschenthaler | Ms. Lee of California |
| Mr. Rogers | Mrs. Lee of Nevada |
| Mr. Rutherford | Ms. McCollum |
| Mr. Simpson | Ms. Meng |
| Mr. Stewart | Ms. Pingree |
| Mr. Valadao | Mr. Pocan |
| Mr. Womack | Mr. Price |
| | Mr. Quigley |
| | Ms. Roybal-Allard |
| | Mr. Ruppersberger |
| | Mr. Ryan |
| | Mrs. Torres |
| | Mr. Trone |
| | Ms. Underwood |
| | Ms. Wasserman Schultz |
| | Mrs. Watson Coleman |
| | Ms. Wexton |

**EXHIBIT C-110**

111

**FULL COMMITTEE VOTES**

Pursuant to the provisions of clause 3(b) of rule XIII of the House of Representatives, the results of each roll call vote on an amendment or on the motion to report, together with the names of those voting for and those voting against, are printed below:

Roll Call 4

Date: July 13, 2021
Measure: Homeland Bill, FY 2022
Motion by: Ms. Kaptur
Description of Motion: To report the Department of Homeland Security Appropriations Act, 2022, to the House, as amended.
Results: Adopted 33 yeas to 24 nays

| Members Voting Yea | Members Voting Nay |
|---|---|
| Mr. Aguilar | Mr. Calvert |
| Mr. Bishop | Mr. Carter |
| Mrs. Bustos | Mr. Cline |
| Mr. Cartwright | Mr. Cole |
| Mr. Case | Mr. Diaz-Balart |
| Ms. Clark | Mr. Fleischmann |
| Mr. Crist | Mr. Fortenberry |
| Mr. Cuellar | Mr. Garcia |
| Ms. DeLauro | Mr. Gonzales |
| Mr. Espaillat | Ms. Granger |
| Ms. Frankel | Dr. Harris |
| Mr. Harder | Ms. Herrera Beutler |
| Ms. Kaptur | Mrs. Hinson |
| Mr. Kilmer | Mr. Joyce |
| Mrs. Kirkpatrick | Mr. Moolenaar |
| Mrs. Lawrence | Mr. Newhouse |
| Ms. Lee of California | Mr. Palazzo |
| Mrs. Lee of Nevada | Mr. Reschenthaler |
| Ms. McCollum | Mr. Rogers |
| Ms. Meng | Mr. Rutherford |
| Ms. Pingree | Mr. Simpson |
| Mr. Pocan | Mr. Stewart |
| Mr. Price | Mr. Valadao |
| Mr. Quigley | Mr. Womack |
| Ms. Roybal-Allard | |
| Mr. Ruppersberger | |
| Mr. Ryan | |
| Mrs. Torres | |
| Mr. Trone | |
| Ms. Underwood | |
| Ms. Wasserman Schultz | |
| Mrs. Watson Coleman | |
| Ms. Wexton | |

**EXHIBIT C-111**

112

STATEMENT OF GENERAL PERFORMANCE GOALS AND OBJECTIVES

Pursuant to clause 3(c)(4) of rule XIII off the Rules of the House of Representatives, the following is a statement of general performance goals and objectives for which this measure authorizes funding:

The Committee on Appropriations considers program performance, including a program's success in developing and attaining outcome-related goals and objectives, in developing funding recommendations.

RESCISSION OF FUNDS

Pursuant to clause 3(f)(2) of rule XIII of the Rules of the House of Representatives, the following table is submitted describing the rescissions recommended in the accompanying bill:

| Account/Activity | Rescissions |
|---|---|
| Office of the Secretary and Executive Secretary, Operations and Support (O&S) (70 X 0100) | 21,650 |
| Office of the Undersecretary for Management (70 X 0112) | 1,810 |
| Management Directorate, Office of the Chief Information Officer and Operations (70 X 0113) | 12,628,523 |
| Customs and Border Protection (CBP), Procurement, Construction, and Improvements (PC&I) | 2,168,776,000 |
| CBP, Border Security Fencing, Infrastructure, and Technology (70 X 0533) | 24,339,000 |
| CBP, PC&I (P.L. 116–260) (FY21) | 10,000,000 |
| CBP, PC&I (70 X 0532) | 6,161,000 |
| CBP, Construction and Facility Improvements (P.L. 115–141) | 4,500,000 |
| CBP, O&S (70 X 0530) | 6,999 |
| Immigration and Customs Enforcement (ICE), Border and Transportation Security, INS (70 X 0504) | 8,456 |
| ICE, Violent Crime Reduction Program (70 X 8598) | 503 |
| Transportation Security Agency (TSA), Expenses (70 X 0508) | 7,006 |
| TSA, Federal Air Marshals (70 X 0541) | 11,412 |
| TSA, Surface Transportation Security (70 X 0551) | 311 |
| TSA, Intelligence and Vetting (70 X 0557) | 5,308,328 |
| TSA, Research and Development (70 X 0553) | 41.41 |
| TSA, Transportation Security Support (70 X 0554) | 322,105 |
| Coast Guard, PC&I (P.L. 116–93) | 65,000,000 |
| Coast Guard, Acquisition, Construction, and Improvements (P.L. 115–141) | 21,000,000 |
| Cybersecurity and Infrastructure Security Agency, Operating Expenses (70 X 0900) | 457,920 |
| Federal Emergency Management Agency (FEMA), State and Local Programs (70 X 0560) | 199,690 |
| FEMA, Administrative and Regional Operations, Emergency Preparedness and Response (70 X 0712) | 1,670 |
| FEMA, Operations and Support (70 X 0700) | 115,138 |
| FEMA, Predisaster Mitigation Fund (70 X 0716) | 3,000,000 |
| U.S. Citizenship and Immigration Service, O&S (70 X 0300) | 1,243,822 |
| Countering Weapons of Mass Destruction Office, Research and Development (70 X 0860) | 350,656 |
| Management Directorate Office of Biometric Identity Management (70 X 0521) | 8,000 |

TRANSFER OF FUNDS

Pursuant to clause 3(f)(2) of rule XIII of the Rules of the House of Representatives, the following is submitted describing the transfer of funds recommended in the accompanying bill:

In title I, under "Office of the Secretary and Executive Management—Federal Assistance", language is included to transfer $35,000,000 to "Federal Emergency Management Agency—Federal Assistance".

In title II, under "U.S. Customs and Border Protection—Operations and Support", language is included allowing for the transfer of not to exceed $5,000,000 to the Bureau of Indian Affairs.

In title II, under "U.S. Immigration and Customs Enforcement—Federal Assistance", language is included to transfer $100,000,000 to "Federal Emergency Management Agency—Operations and Support".

**EXHIBIT C-112**

113

In title II, section 211 includes language permitting the transfer of up to $100,000,000 to specified components of the Department of the Interior and to the U.S. Forest Service of the Department of Agriculture.

In title III, under "Federal Emergency Management Agency—Federal Assistance", language is included to transfer $2,500,000 to "Federal Emergency Management Agency—Operations and Support".

In title III, section 311 includes language transferring $14,000,000 to the Office of Inspector General.

In title V, section 503 includes language permitting the transfer of up to 5 percent of each appropriation in the bill to one or more other appropriations in the bill, while limiting the augmentation of each appropriation to not more than 10 percent of the original amount appropriated.

In title V, section 505 includes language permitting up to 30 percent of "Operations and Support" appropriations that would otherwise expire at the end of the fiscal year funded by this Act to be transferred to the Department of Homeland Security Information Technology Modernization Fund, to remain available through the end of the third fiscal year following such transfer.

In title V, section 506 includes language permitting the transfer of funds appropriated for the activities of the Office of Intelligence and Analysis to "Management Directorate—Operations and Support" up to the amount by which such appropriations exceed the level authorized for such office by an Act authorizing intelligence activities for the fiscal year funded by this Act.

### DISCLOSURE OF EARMARKS AND CONGRESSIONALLY DIRECTED SPENDING ITEMS

The following table is submitted in compliance with clause 9 of rule XXI and lists the congressional earmarks (as defined in paragraph (e) of clause 9) contained in the bill or in this report. Neither the bill nor the report contain any limited tax benefits or limited tariff benefits as defined in paragraphs (f) or (g) of clause 9 of rule XXI.

**EXHIBIT C-113**

## HOMELAND SECURITY
[Community Project Funding Items]

| Agency | Account | Recipient | Project | Amount | Requestor |
|---|---|---|---|---|---|
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Town of North Attleborough | Ten-Mile River Dredging Project to Mitigate Flooding | $1,500,000 | Auchincloss |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Town of Somerset | Somerset Emergency Dam Improvements | $975,000 | Auchincloss |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Port of Portland | Port of Portland Seismically Resilient Runway | $3,750,000 | Blumenauer |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | City of Astoria | Astoria Pre-Disaster Landslide Storm Drainage Project | $676,875 | Bonamici |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | City of Alton | Alton, Illinois Flood Relief and Recovery | $2,456,370 | Bost |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Town of Longboat Key | Town of Longboat Key Flooding Mitigation Request | $350,000 | Buchanan |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | The City of Cedar Park | The City of Cedar Park's Rachettes Sections 2 and 3, Phase II Stormwater Mitigation Project. | $750,000 | Carter (TX) |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Glynn County Board of Commissioners | Johnson Rocks Revetment Project | $2,925,000 | Carter (GA) |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Town of Arlington | Mystic and Charles Regional Coastal Flood Interventions Project. | $562,500 | Clark (MA) |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | City of Woburn | Hurld Park Green Infrastructure Project | $196,875 | Clark (MA) |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Prince William County Government. | Community Climate Change Impact Analysis | $950,000 | Connolly |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Harris County Flood Control District. | Westador Stormwater Detention Basin | $8,250,000 | Crenshaw |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Harris County Flood Control District. | TC Jester Storm water Detention Basin Project | $9,950,000 | Crenshaw |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | WaterOne | Backup Engine Generator for WaterOne | $4,837,500 | Davids (KS) |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Harris County Flood Control District. | Meyergrove Detention Basin | $9,950,000 | Fletcher |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Monroe County | Twin Lakes Subdivision Pre-Disaster Mitigation project | $5,484,300 | Gimenez |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Hidalgo County Drainage District No. 1. | North Main Drain Expansion Project | $3,706,267 | Gonzalez, Vicente |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Vermilion Parish | Vermilion Safe Room | $5,250,000 | Higgins (LA) |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Harris County Texas | Stormwater Detention Basin and Culvert Improvement | $9,950,000 | Jackson Lee |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | New York State Department of Homeland Security and Emergency Services. | Fresh Creek Tide Gates, Brooklyn, NY | $800,000 | Jeffries |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | The Hoh Tribe | Hoh Tribe Relocation Development | $1,650,000 | Kilmer |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | City of Hoquiam | Aberdeen-Hoquiam Flood Protection Project | $9,950,000 | Kilmer |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | City of Chino Hills | Citywide Fuel Reduction | $565,000 | Kim (CA) |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | City of Eloy | City of Eloy Electrical Substation Renovation | $525,000 | Kind |

EXHIBIT C-114

| Agency | Program | Recipient | Project | Amount | Member |
|---|---|---|---|---|---|
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Gadsen County | Gadsden County W.S. Stevens High School Disaster Shelter | $4,669,171 | Lawson (FL) |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | City of Alameda | Veteran's Court Seawall | $1,500,000 | Lee (CA) |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | City of St. Clair Shores | St. Clair Shores Pump Station | $248,625 | Levin (MI) |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | City of Boston | Design & Permitting for Open Space and Resiliency Improvements Project in Joe Moakley Park. | $1,650,000 | Lynch |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | City of Hopewell | Cattail Creek Crossing Improvements Project | $750,000 | McEachin |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | City of Newburyport | City of Newburyport Bulkhead Renovation Project | $2,250,000 | Moulton |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Town of Nederland | Big Springs Emergency Egress | $525,000 | Neguse |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Pinal County | Pinal County Christensen Road and Lower Magma Drainage improvements. | $506,250 | O'Halleran |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Borough of Keyport | Firemans Park Bulkhead Improvement Project | $450,000 | Pallone |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | City of Poway, Public Works Department. | Hazardous Tree Removal Mitigation Project | $187,500 | Peters |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | City of Chelsea Department of Housing and Community Development. | Island End River Area Flood Resilience Project—City of Everett, City of Chelsea. | $750,000 | Pressley |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Town of Wake Forest | Wake Forest Reservoir Dam Repairs | $2,175,000 | Price (NC) |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Mount Sinai Medical Center | Mount Sinai Medical Center Infrastructure Hardening and Resiliency Project. | $7,650,580 | Salazar |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Village of Arlington Heights | Village of Arlington Heights—Race & Chicago Avenue Storm Water Detention. | $600,000 | Schakowsky |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Lake County Stormwater Management Commission. | Dady Slough Flood Storage and Wetland Enhancement Project. | $3,000,000 | Schneider |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | City of Zion | Zion Stormwater Management Project | $720,435 | Schneider |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | City of North Chicago | North Chicago Storm Sewer | $7,796,558 | Schneider |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | City of Frederick | City of Frederick Motter Avenue Area Community Flood Mitigation Project. | $534,977 | Trone |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Lake County Stormwater Management Commission. | Sylvan Lake Dam Modifications | $1,342,500 | Underwood |
| FEMA | Federal Assistance: Pre-Disaster Mitigation | Atlantic County Improvement Authority. | Lake Lenape Dam Flood Mitigation | $4,600,000 | Van Drew |
| FEMA | Federal Assistance: Nonprofit Security Grants | Beth Medrash Govoha of America. | Beth Medrash Govoha Nonprofit Security Grant | $150,000 | Smith (NJ) |
| FEMA | Federal Assistance: Emergency Operations Center Grants | City of Redlands | City of Redlands Emergency Operations Center Improvement Project. | $712,500 | Aguilar |
| FEMA | Federal Assistance: Emergency Operations Center Grants | Chestnuthill Township | Shared West End Emergency Services Facility | $1,000,000 | Cartwright |
| FEMA | Federal Assistance: Emergency Operations Center Grants | Hawaii Emergency Management Agency. | Hawaii State Emergency Operations Center in Mililani First Responder Tech Campus. | $1,000,000 | Case |
| FEMA | Federal Assistance: Emergency Operations Center Grants | Yancey County | Yancey County—EOC | $150,000 | Cawthorn |
| FEMA | Federal Assistance: Emergency Operations Center Grants | Cherokee County | Cherokee County—EOC | $131,250 | Cawthorn |

**EXHIBIT C-115**

116

HOMELAND SECURITY—Continued

[Community Project Funding Items]

| Agency | Account | Recipient | Project | Amount | Requestor |
|---|---|---|---|---|---|
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | Zapata County ................... | Zapata County Emergency Operations Center ................... | $1,000,000 | Cuellar |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | Town of North Branford Connecticut. | North Branford Emergency Operations Center ................... | $1,000,000 | DeLauro |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | Franklin County Florida Board of Commissioners. | Franklin County Emergency Operations Center ................... | $1,000,000 | Dunn |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | Noxubee County Board of Supervisors. | Noxubee County Emergency Operations Center ................... | $1,000,000 | Guest |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | Jackson County Board of Supervisors. | Jackson County Emergency Operations Center ................... | $262,500 | Hinson |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | Lake County Board of Commissioners. | Lake County Emergency Operations Center ................... | $1,000,000 | Joyce (OH) |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | Onondaga County—Department of Emergency Management. | Onondaga County Emergency Operations Center ................... | $1,000,000 | Katko |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | Cayuga County Office of Emergency Services. | Cayuga County Emergency Operations Center ................... | $75,000 | Katko |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | Western Illinois University ... | Western Illinois Emergency Operations Center ................... | $1,000,000 | LaHood |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | City of Roswell ................... | City of Roswell—911 Emergency Communications Call Center. | $1,000,000 | McBath |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | Gerald R Ford International Airport. | Gerald R. Ford International Airport Emergency Operations Center (EOC). | $1,000,000 | Meijer |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | Gilpin County Office of Emergency Management. | Gilpin County Emergency Operations Center ................... | $138,557 | Neguse |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | City of Walla Walla ................... | Walla Walla Relocate E911 Emergency Telecom ................... | $1,000,000 | Newhouse |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | Pinal County ................... | Pinal County Emergency Operations Center ................... | $187,500 | O'Halleran |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | Wake County ................... | Wake County Emergency Operations Center ................... | $1,000,000 | Ross |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | City of Huntington Park ................... | City of Huntington Park, Emergency Operations System ................... | $1,000,000 | Roybal-Allard |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | Lake County ................... | Lake County Combined EOC ................... | $1,000,000 | Schneider |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | Haines City, Florida ................... | Haines City Fire Department Services ................... | $750,000 | Soto |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | City of Santa Rosa ................... | City of Santa Rosa—Permanent Emergency Operations Center. | $1,000,000 | Thompson (CA) |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ... | City of Rialto ................... | City of Rialto Emergency Operations Center ................... | $862,500 | Torres (CA) |

EXHIBIT C-116

117

| | | | | | |
|---|---|---|---|---|---|
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ...... | The Resilience, Education, Training, and Innovation (RETI) Center. | East 132nd Street Pier Park Waterfront Plan ...... | $1,000,000 | Torres (NY) |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ...... | City of Brownsville ...... | Brownsville Emergency Operations Center ...... | $1,000,000 | Vela |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ...... | City of Allentown ...... | City of Allentown Fire Department Emergency Operations Center. | $129,596 | Wild |
| FEMA ... | Federal Assistance: Emergency Operations Center Grants ...... | Wauconda Fire Department ...... | Emergency Operations Center Generator Replacement ...... | $36,000 | Underwood |

**EXHIBIT C-117**

118

### Compliance With Rule XIII, Cl. 3(e) (Ramseyer Rule)

In compliance with clause 3(e) of rule XIII of the Rules of the House of Representatives, the Committee notes that the accompanying bill does not propose to repeal or amend a statute or part thereof.

### Compliance With Rule XIII, Clause 3(f)(1) (Changes in the Application of Existing Law)

Pursuant to clause 3(f)(1)(A) of rule XIII of the Rules of the House of Representatives, the Committee has inserted at the appropriate place in the report a description of the effects of provisions proposed in the accompanying bill which may be considered, under certain circumstances, to change the application of existing law, either directly or indirectly.

The bill provides, in some instances, funding of agencies and activities where legislation has not yet been finalized. In addition, the bill carries language, in some instances, permitting activities not authorized by law. Additionally, the Committee includes a number of administrative and general provisions.

## TITLE I—DEPARTMENTAL MANAGEMENT, OPERATIONS, INTELLIGENCE, AND OVERSIGHT

### Office of the Secretary and Executive Management

#### OPERATIONS AND SUPPORT

The Committee includes language providing funds for the operations and support of the Office of the Secretary and for the executive management offices, including for official reception and representation expenses.

#### FEDERAL ASSISTANCE

#### (INCLUDING TRANSFERS OF FUNDS)

The Committee includes language providing funds for federal assistance and language to transfer those funds to the Federal Emergency Management Agency for administration. The Committee provides two-year availability of funds for certain activities; direction on how the funds should be awarded; and direction on how services provided with the funds should be delivered.

### Management Directorate

#### OPERATIONS AND SUPPORT

The Committee includes language providing funds for operations and support, including funds for electric vehicles and official reception and representation expenses.

#### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds, with availability for three or five years, for procurement, construction, and improvements.

**EXHIBIT C-118**

119

FEDERAL PROTECTIVE SERVICE

The Committee includes language making funds available until expended for the operations of the Federal Protective Service.

INTELLIGENCE, ANALYSIS, AND OPERATIONS COORDINATION

OPERATIONS AND SUPPORT

The Committee includes language providing funds for the Office of Intelligence and Analysis and the Office of Operations Coordination, including funding for official reception and representation expenses, as well as funds for facility needs associated with secure space at fusion centers. The Committee provides two-year availability of funds for certain activities.

OFFICE OF INSPECTOR GENERAL

OPERATIONS AND SUPPORT

The Committee includes language providing funds for the Office of Inspector General, including certain confidential operational expenses such as the payment of informants.

ADMINISTRATIVE PROVISIONS

Language requiring a report on grants or contracts awarded by means other than full and open competition and requiring the Inspector General to review such grants or contracts and report the results to the Committees.

Language requiring the Chief Financial Officer to submit monthly budget and staffing reports.

Language requiring the Secretary to link all contracts that provide award fees to successful acquisition outcomes.

Language requiring the Secretary to notify the Committees of any proposed transfers from the Department of Treasury Forfeiture Fund.

Language related to official costs of the Secretary and Deputy Secretary for official travel.

Language requiring the Under Secretary for Management to submit quarterly acquisition reports containing specified information.

Language prohibiting the use of funds to implement certain pilot programs unless the Secretary fulfills certain requirements and reports to the Committees on the results of such pilots upon their conclusions.

TITLE II—SECURITY, ENFORCEMENT, AND INVESTIGATIONS

U.S. CUSTOMS AND BORDER PROTECTION

OPERATIONS AND SUPPORT

(INCLUDING TRANSFER OF FUNDS)

The Committee includes language making funds available for operations and support, including funds for the transportation of unaccompanied minor aliens; air and marine assistance to other law enforcement agencies and humanitarian efforts; purchase or lease of vehicles; maintenance, and procurement of marine vessels, air-

EXHIBIT C-119

120

craft, and unmanned aircraft systems; contracting with individuals for personal services abroad; Harbor Maintenance Fee collections; customs officers; official reception and representation expenses; Customs User Fee collections; payment of rental space in connection with preclearance operations; and compensation of informants. Provides the authority to transfer funds to the Bureau of Indian Affair. Committee provides two-year availability of funds for certain activities.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for procurement, construction, and improvements, to include procurements to buy, maintain, or operate aircraft and unmanned aircraft systems. The Committee provides three-year and five-year availability of funds for these activities.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

OPERATIONS AND SUPPORT

The Committee includes language providing funds for operations and support, including funds for official reception and representation expenses, overseas vetted units, and the operation and maintenance necessary to sustain the daily effectiveness of equipment and facilities. The Committee includes language making funds available for special operations; compensation to informants; the reimbursement of other federal agencies for certain costs; the purchase or lease of vehicles; maintenance, minor construction, and minor improvements of owned and leased facilities; the enforcement of child labor laws; paid apprenticeships for the Human Exploitation Rescue Operations Corps; and the investigation of intellectual property rights violations. The Committee specifies a funding level for civil immigration enforcement, detention, transportation of unaccompanied minor aliens, and to effectuate the safe return of aliens or their release to nonprofit organizations with capacity to provide shelter and other services, and for case management services. The Committee includes language making funds available for official reception and representation expenses; conducting special undercover investigative operations; awards for compensation to informants; and to reimburse other Federal agencies for the costs associated with the care, maintenance, and repatriation of aliens. Committee provides two-year availability of funds for certain activities.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for procurement, construction, renovation, and improvements to include funds for facilities repair and maintenance projects. The Committee provides three-year and five-year availability of funds for these activities.

FEDERAL ASSISTANCE

(INCLUDING TRANSFER OF FUNDS)

The Committee includes language providing funds for federal assistance and language to transfer those funds to the Federal Emergency Management Agency for administration. The Committee pro-

**EXHIBIT C-120**

121

vides three-year availability of funds; direction on how the funds should be awarded; and direction on how services provided with the funds should be delivered.

### TRANSPORTATION SECURITY ADMINISTRATION

#### OPERATIONS AND SUPPORT

The Committee includes language providing funds for operations and support, including funds for official reception and representation expenses, and establishes conditions under which security fees are collected and credited. The Committee provides two-year availability of funds for these activities.

#### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for procurement, construction, and improvements. The Committee provides three-year availability of funds for these activities.

#### RESEARCH AND DEVELOPMENT

The Committee includes language providing funds for research and development. The Committee provides two-year availability of funds for these activities.

### COAST GUARD

#### OPERATIONS AND SUPPORT

The Committee includes language providing funds for the operations and support of the Coast Guard, including funds for official reception and representation expenses; passenger motor vehicles; purchase and lease of small boats; repairs and service life-replacements; purchase, lease, or improvement of boats for overseas deployments; special pay allowances; recreation and welfare; environmental compliance and restoration; museum artifacts; and defense-related activities. The Committee includes language authorizing funds to be derived from the Oil Spill Liability Trust Fund. The Committee provides two-year, three-year, and five-year availability of funds for certain activities.

#### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for the procurement, construction, and improvements, including of aids to navigation, shore facilities, vessels, and aircraft. The Committee includes language authorizing funds to be derived from the Oil Spill Liability Trust Fund and the Coast Guard Housing Fund. The Committee provides five-year availability of funds for these purposes.

#### RESEARCH AND DEVELOPMENT

The Committee includes language providing funds for research and development, and for maintenance, rehabilitation, lease, and operation of related facilities and equipment. The Committee includes language authorizing funds to be derived from the Oil Spill Liability Trust Fund, and authorizing funds received from state and local governments, other public authorities, private sources,

**EXHIBIT C-121**

122

and foreign countries to be credited to this account and used for certain purposes. The Committee provides three-year availability of funds for these purposes.

### RETIRED PAY

The Committee includes language providing funds for retired pay and medical care for the Coast Guard's retired personnel and their dependents and makes these funds available until expended.

## UNITED STATES SECRET SERVICE

### OPERATIONS AND SUPPORT

The Committee includes language that provides funds for operations and support, to include funds for the purchase and replacement of vehicles; hire of passenger motor vehicles and aircraft; purchase of motorcycles; rental of certain buildings; improvements to buildings as may be necessary for protective missions; firearms matches; presentation of awards; behavioral research; advance payment for commercial accommodations; per diem and subsistence allowances; official reception and representation expenses; grant activities related to missing and exploited children investigations; premium pay; and technical assistance and equipment provided to foreign law enforcement organizations. The Committee provides for two-year availability of funds for certain activities.

### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for procurement, construction, and improvements. The Committee provides three-year availability of funds for these purposes.

### RESEARCH AND DEVELOPMENT

The Committee includes language providing funds for research and development. The Committee provides two-year availability of funds for these purposes.

## ADMINISTRATIVE PROVISIONS

Language regarding overtime compensation.

Language allowing CBP to sustain or increase operations in Puerto Rico and the U.S. Virgin Island with appropriated funds.

Language regarding the availability of fee revenue collected from certain arriving passengers.

Language allowing CBP access to certain reimbursements for preclearance activities.

Language regarding the importation of prescription drugs by an individual for personal use.

Language regarding waivers of the Jones Act.

Language prohibiting DHS from establishing a border crossing fee.

Language prohibiting the obligation of funds prior to the submission of an expenditure plan for funds made available for "U.S. Customs and Border Protection—Procurement, Construction, and Improvements".

Language prohibiting the construction of physical barriers in certain areas.

**EXHIBIT C-122**

123

Language providing the authority to use certain funds for COVID–19 testing and sheltering.

Language prohibiting the use of funds for the 287(g) task force model and for agreements with law enforcement agencies if there is a determination they have violated the civil rights or liberties of an individual who was subsequently the subject of 287(g) immigration enforcement activity, unless the Secretary determines the violation is not part of a pattern or practice or that remediation steps have been taken.

Language prohibiting the use of funds provided under the heading "U.S. Immigration and Customs Enforcement—Operations and Support" to contract for detention services if the facility receives less than "adequate" ratings in two consecutive performance evaluations.

Language requiring ICE to provide statistics about its detention population.

Language requiring ICE to provide information and statistics about the 287(g) program.

Language related to information sharing between ICE and the Office Refugee Resettlement (ORR) that prohibits ICE from using information for removal purposes if it was provided by as part of a process of sponsoring an unaccompanied alien child or reuniting a child with a family member or if it is based on information gathered in therapy sessions for child while in ORR.

Language ensuring aliens' access to legal counsel and know your rights presentations for specified legal proceedings and requiring the Secretary and the Officer for Civil Rights and Civil Liberties to certify that such requirements have been met.

Language that prohibits ICE from removing individuals with a pending Violence Against Women Act (VAWA), U-visa, T-visa, or juvenile special immigration visa application or a pending appeal of a denial related to such visas.

Language requiring the Secretary to approve a risk classification assessment process to determine whether a detained individual is a flight risk or a threat to public safety or national security.

Language focusing Homeland Security Investigations activities on functions that are not redundant to ICE's civil immigration enforcement operations.

Language establishing that the allowance paid to detained individuals for work performed in detention facilities may not be less than the local prevailing minimum wage.

Language clarifying that certain elected and appointed officials are not exempt from federal passenger and baggage screening.

Language directing the deployment of explosives detection systems based on risk and other factors.

Language authorizing TSA to use funds from the Aviation Security Capital Fund for the procurement and installation of explosives detection systems or for other purposes authorized by law.

Language requiring a report from TSA on capital investments, technology investment and integrated passenger screening technology.

Language prohibiting funds made available by this Act under the heading "Coast Guard—Operations and Support" for recreational vessel expenses, except to the extent fees are collected from owners of yachts and credited to this appropriation.

**EXHIBIT C-123**

124

Language allowing up to $10,000,000 to be reprogrammed to or from Military Pay and Allowances within "Coast Guard—Operations and Support" and $10,000,000 between other categories in "Coast Guard—Operations and Support".

Language requiring submission a future-years capital investment plan.

Language allowing for allocation of enduring overseas mission funds.

Language allowing for the use of the Coast Guard Housing Fund.

Language allowing the Secret Service to obligate funds in anticipation of reimbursement for personnel receiving training.

Language prohibiting funds made available to the Secret Service for the protection of the head of a federal agency other than the Secretary of Homeland Security, except when the Director has entered into a reimbursable agreement for such protection services.

Language regarding the reprogramming of funds within "United States Secret Service—Operations and Support".

Language allowing for funds made available for "United States Secret Service—Operations and Support" to be available for travel of employees on protective missions without regard to limitations on such expenditures in this or any other Act after notification to the Committees on Appropriations.

Language allowing for the use of funds for family reunification purposes.

Language prohibiting the collection of certain towing vessel fees.

## TITLE III—PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY

### CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY

#### OPERATIONS AND SUPPORT

The Committee includes language providing funds for operations and support, including funds for official reception and representation expenses. The Committee provides for two-year availability of funds for certain activities.

#### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for procurement, construction, and improvements. The Committee provides three-year availability of funds for these purposes and withholds funding pending submission of a plan.

#### RESEARCH AND DEVELOPMENT

The Committee includes language providing funds for research and development. The Committee provides two-year availability of funds for these purposes.

#### CYBERSECURITY RESPONSE AND RECOVERY FUND

The Committee includes language providing funds for cyber response and recovery. The Committee makes funding available until expended. The Committee provides direction on eligible expenses of the funds; the conditions upon which funding may become available; and that the funding is available in addition to any other amounts for such purposes.

**EXHIBIT C-124**

FEDERAL EMERGENCY MANAGEMENT AGENCY

OPERATIONS AND SUPPORT

The Committee includes language providing funds for operations and support, including funds for official reception and representation expenses.

PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for procurement, construction, and improvements. The Committee provides three- and five -year availability of funds for these purposes including allowing for funds to be used to purchase land adjacent to the Center for Domestic Preparedness.

FEDERAL ASSISTANCE

The Committee includes language providing funds for grants, contracts, cooperative agreements, and other activities, including for terrorism prevention; public transportation and railroad security; port security; firefighter assistance; emergency management; flood hazard mapping and risk analysis; emergency food and shelter; regional catastrophic planning; rehabilitation of high hazard dams; community project funding; education, training, exercises, and technical assistance; and other programs. The Committee provides two-year availability of funds for certain purposes.

DISASTER RELIEF FUND

The Committee includes language making funds available until expended for the Disaster Relief Fund.

NATIONAL FLOOD INSURANCE FUND

The Committee includes language making funds available for mission support associated with flood management and programs and activities under the National Flood Insurance Fund, including flood plain management and flood mapping. The Committee includes provisions making funds available for interest on Treasury borrowings and limiting amounts available for operating expenses, commissions and taxes of agents, and flood mitigation activities associated with the National Flood Insurance Act of 1968. The Committee includes language permitting additional fees collected to be credited as an offsetting collection and available for floodplain management; providing that not to exceed four percent of the total appropriation is available for administrative cost; and making funds available for the Flood Insurance Advocate.

ADMINISTRATIVE PROVISIONS

Language making "Cybersecurity and Infrastructure Security Agency—Operations and Support" funding available for a cybersecurity competition.

Language requiring reporting on unfunded CISA priorities.

Language requiring reporting of obligations under "Cybersecurity and Infrastructure Security Agency—Cyber Response and Recovery Fund".

Language requiring a plan describing federal civilian department and agency cybersecurity investment requirements.

EXHIBIT C-125

126

Language limiting expenses for the administration of grants.

Language specifying timeframes for certain grant applications and awards.

Language requiring a five-day advance notification for certain grant awards under "Federal Emergency Management Agency—Federal Assistance".

Language authorizing the use of certain grant funds for the installation of communications towers.

Language requiring the submission of a monthly Disaster Relief Fund report.

Language allowing the Administrator of FEMA to grant waivers from specified requirements of section 34 of the Federal Fire Prevention and Control Act of 1974

Language providing for amounts from the Disaster Relief Fund to be available for the Building Resilient Infrastructure and Communities grant program and to the OIG.

Language providing for the receipt and expenditure of fees collected for the Radiological Emergency Preparedness Program, as authorized by Public Law 105–276.

Language allowing the Administrator of FEMA to grant waivers from specified requirements of section 33 of the Federal Fire Prevention and Control Act of 1974.

Language adjusting the cost share for major disasters declared in 2020.

Language cancelling remaining balances of certain FEMA loans.

## TITLE IV—RESEARCH, DEVELOPMENT, TRAINING, AND SERVICES

### U.S. CITIZENSHIP AND IMMIGRATION SERVICES

#### OPERATIONS AND SUPPORT

The Committee includes language making funds available for operations and support for the E Verify program; application processing; the refugee program; and official reception and representation expenses. The Committee provides two-year availability of funds for certain activities and includes language that funds are in addition to fee funding that is available for the same purposes.

#### FEDERAL ASSISTANCE

The Committee includes language making funds available for the Citizenship and Integration Grant Program.

### FEDERAL LAW ENFORCEMENT TRAINING CENTERS

#### OPERATIONS AND SUPPORT

The Committee includes language making funds available for operations and support, including for official reception and representation expenses and purchase of police-type vehicles. The Committee provides two-year availability of funds for certain activities.

#### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for procurement, construction, and improvements to include acquisition of necessary additional real property and facilities, construction and on-

**EXHIBIT C-126**

going maintenance, facility improvements and related expenses The Committee provides five-year availability of funds for these activities.

### SCIENCE AND TECHNOLOGY DIRECTORATE

#### OPERATIONS AND SUPPORT

The Committee includes language providing funds for operations and support, including the purchase or lease of vehicles and official reception and representation expenses. The Committee provides two-year availability of funds for certain activities.

#### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for procurement, construction, and improvements. The Committee provides five-year availability of funds for these activities.

#### RESEARCH AND DEVELOPMENT

The Committee includes language providing funds for research and development. The Committee provides three-year availability of funds for these activities.

### COUNTERING WEAPONS OF MASS DESTRUCTION OFFICE

#### OPERATIONS AND SUPPORT

The Committee includes language providing funds for operations and support, including official reception and representation expenses. The Committee provides two-year availability of funds for certain activities.

#### PROCUREMENT, CONSTRUCTION, AND IMPROVEMENTS

The Committee includes language providing funds for procurement, construction, and improvements. The Committee provides three-year availability of funds for these activities.

#### RESEARCH AND DEVELOPMENT

The Committee includes language providing funds for research and development. The Committee provides three-year availability of funds for these activities.

#### FEDERAL ASSISTANCE

The Committee includes language providing funds for federal assistance through grants, contracts, cooperative agreements, and other activities. The Committee provides three-year availability of funds for these activities.

### ADMINISTRATIVE PROVISIONS

Language allowing USCIS to acquire, operate, equip, and dispose of up to five vehicles under certain scenarios.

Language limiting the use of A-76 competitions by USCIS.

Language requiring USCIS to provide data about its credible and reasonable fear processes.

Language related to the collection and use of biometrics.

EXHIBIT C-127

128

Language authorizing FLETC to distribute funds to federal law enforcement agencies for incurred training expenses.

Language directing the FLETC Accreditation Board to lead the federal law enforcement training accreditation process for measuring and assessing federal law enforcement training programs, facilities, and instructors.

Language allowing for the acceptance of funding transfers from other government agencies for the construction of special use facilities.

Language classifying FLETC instructor staff as inherently governmental for purposes of the Federal Activities Inventory Reform Act of 1998.

Language permitting certain unused visas from fiscal years 2020 and 2021 to remain available in fiscal year 2022 and beyond.

Language permitting the issuance of diversity visas to certain immigrants.

Language making available additional H–2B visas.

Language making available H–2A visas for certain agricultural jobs.

## TITLE V—GENERAL PROVISIONS

Language limiting the availability of appropriations to one year unless otherwise expressly provided.

Language providing authority to merge unexpended balances of prior year appropriations with new appropriations accounts for the same purpose.

Language limiting the authority to reprogram funds within an appropriation above a specified threshold unless the Committees are notified in advance and language authorizing limited transfers of funds among appropriations accounts.

Language prohibiting funds appropriated or otherwise made available to the Department to make payments to the Working Capital Fund (WCF), except for activities and amounts allowed in the President's budget request; making funds provided to the WCF available until expended; restricting the Department from charging components for services not directly provided through the WCF, or for the purposes intended by the contributing component; requiring funds paid by components in advance or for reimbursement to reflect the full cost of each service; requiring the submission of a notification prior to adding a new activity to the fund detailing the source of funds by account, program, project, and activity level; requiring the submission of a notification prior to eliminating an existing activity from the fund; and requiring the Department to submit quarterly WCF execution reports to the Committees that include activity-level detail.

Language providing authority regarding the availability and uses for prior year balances for O&S accounts.

Language deeming intelligence activities to be specifically authorized during the budget year until the enactment of an Act authorizing intelligence activities for that year.

Language requiring a specified notification to the Committees at least three days before DHS executes or announces grant allocations; grant awards; contract awards, including contracts covered by the Federal Acquisition Regulation; other transaction agreements; letters of intent; a task or delivery order on multiple award

**EXHIBIT C-128**

129

contracts totaling $1,000,000 or more; a task or delivery order greater than $10,000,000 from multi-year funds; or sole-source grant awards.

Language prohibiting all agencies from purchasing, constructing, or leasing additional facilities for federal law enforcement training without advance notification to the Committees.

Language prohibiting the use of funds for any construction, repair, alteration, or acquisition project for which a prospectus, if required under chapter 33 of title 40, United States Code, has not been approved.

Language continuing by reference prior-year statutory provisions related to a contracting officer's technical representative training, sensitive security information, and the use of funds in conformance with section 303 of the Energy Policy Act of 1992.

Language prohibiting the use of funds in contravention of the Buy American Act.

Language prohibiting the use of funds to amend the oath of allegiance required by section 337 of the Immigration and Nationality Act.

Language prohibiting DHS from using funds to carry out reorganization authority, with exception.

Language prohibiting the use of funds for planning, testing, piloting, or developing a national identification card.

Language prohibiting any official required by this Act to provide a report or make a certification to the Committees on Appropriations from delegating such authority unless expressly authorized to do so in this Act.

Language prohibiting funds in this Act from being used for first-class travel.

Language prohibiting the use of funds appropriated or otherwise made available in this Act to pay award or incentive fees for contractors with a below satisfactory performance or a performance that fails to meet the basic requirements of the contract.

Language prohibiting the use of funds to enter into a federal contract unless the contract meets the requirements of the Federal Property and Administrative Services Act of 1949 or chapter 137 of title 10 U.S.C., and the Federal Acquisition Regulation, unless the contract is otherwise authorized by statute without regard to this section.

Language requiring that DHS computer systems block electronic access to pornography, except for law enforcement purposes.

Language prohibiting the use of funds by federal law enforcement personnel to transfer operable firearms to certain individuals except under certain conditions.

Language restricting funds for travel and requiring reporting related to conferences occurring outside of the United States.

Language prohibiting funds to reimburse any federal department or agency for its participation in a National Special Security Event.

Language requiring a notification, including justification materials, prior to implementing any structural pay reform that affects more than 100 full-time positions or costs more than $5,000,000.

Language directing the Department to post on a public website reports required by the Committees on Appropriations unless public posting compromises homeland or national security or contains proprietary information.

EXHIBIT C-129

130

Language authorizing minor procurement, construction, and improvements using Operations and Support appropriations, as specified.

Language authorizing DHS to use existing discretionary appropriations for the primary and secondary schooling expense of eligible dependents in areas and territories that meet certain criteria.

Language continuing the availability of other transaction authority.

Language prohibiting the use of funds to limit access to detention facilities by members of Congress and their designated staff.

Language prohibiting the use of funds to use restraints on pregnant detainees in DHS custody except in certain circumstances.

Language prohibiting the use of funds for the destruction of records related to detainees in custody and requires that such records be provided to detainees, as specified.

Language continuing by reference and modifying a prohibition on the use of funds for a Principal Federal Official during a declared disaster or emergency under the Stafford Act, with certain exceptions.

Language related to requests for law enforcement support.

Language protecting against the denial of immigration benefits solely based on grounds related to cannabis.

Language providing funds for construction and modernization of land ports of entry.

Language rescinding unobligated balances from specified sources.

APPROPRIATIONS NOT AUTHORIZED BY LAW

Pursuant to clause 3(f)(1) of rule XIII of the House of Representatives, the following table lists the appropriations in the accompanying bill that are not authorized by law:

**EXHIBIT C-130**

131

## FY 2022 Schedule of Unauthorized Appropriations
[Gross Discretionary—Dollars in thousands]

| Agency/Program | Last Year of Authorization | Authorized Level | Appropriation in Last Year of Authorization | Appropriations in this bill |
|---|---|---|---|---|
| Customs and Border Protection, Operations and Support | [1]2004 | $3,083,259 | $4,396,750 | $13,562,809 |
| Customs and Border Protection, International Cargo Screening | [5]2010 | 153,300 | 162,000 | [6]3,482,925 |
| Customs and Border Protection, Customs-Trade Partnership Against Terrorism (C TPAT) | [7]2010/2012 | 75,600/21,000 | [8]62,612/44,979 | [9]3,329,836 |
| Customs and Border Protection, Automated Targeting Systems | [10]2010 | 37,485 | 34,560 | [11]1,273,932 |
| Customs and Border Protection, Automated Commercial Environment | [12]2018 | 153,736 | N/A | [13]1,299,746 |
| Customs and Border Protection, Air and Marine Interdiction, Operations, Maintenance, and Procurement | [14]2004 | 175,000 | 240,200 | [15]327,464 |
| Immigration and Customs Enforcement, Operations and Support | [16]2003/[17]2004 | 4,131,817/1,399,592 | [18]3,032,094/[19]N/A | [20]7,820,275 |
| Immigration and Customs Enforcement, Procurement, Construction, and Improvements | [16]2003 | N/A | 693,969 | 51,700 |
| Transportation Security Administration, Operations and Support | [21]2020 | 7,888,494 | N/A | [22]8,072,443 |
| Transportation Security Administration, ETSD Systems | [23]2007 | 400,000 | 110,100 | [24]137,492 |
| Transportation Security Administration, Surface Transportation Security, National Explosives Detection Canine Team Program | [25]2020 | Such sums | 169,513 | 170,186 |
| Transportation Security Administration, Transportation Threat Assessment and Credentialing | [26]2005 | Such sums | [27]115,000 | [28]123,606 |
| Transportation Security Administration, Federal Air Marshal Service | [29]2007 | 83,000 | 764,643 | [30]754,069 |
| Transportation Security Administration Law Enforcement Officer Reimbursement Program | [31]2020 | 55,000 | 46,392 | 46,392 |
| United States Coast Guard, Operations and Support | [32]2021 | 8,396,169,475 | 8,485,146 | 9,144,070 |
| United States Coast Guard, Procurement, Construction, and Improvements | [32]2021 | 3,312,114 | 2,264,041 | 1,817,100 |
| United States Coast Guard, Research and Development | [32]2021 | 14,000 | 10,278 | 12,476 |
| Cybersecurity and Infrastructure Security Agency, Operations and Support | [33]2012 | Such sums | [34]888,243 | [35]2,336,500 |
| FEMA, Salaries and Expenses | [36]2010 | 375,342 | 797,650 | [37]1,262,966 |
| FEMA, Integrated Public Alert and Warning System (IPAWS) | [38]2018 | Such sums | N/A | 11,670 |
| FEMA, State and Local Programs | | | | |
| Port Security Grants | [39]2013 | 400,000 | 250,000 | 110,000 |
| Public Transportation Security Grants | [40]2011 | 1,108,000 | 250,000 | 110,000 |
| Amtrak Security | [41]2011 | 175,000 | 20,000 | 10,000 |
| Over the Road Bus Security | [42]2011 | 25,000 | 5,000 | 3,000 |
| National Domestic Preparedness Consortium | [43]2011 | 25,500 | N/A | 101,000 |
| Center for Domestic Preparedness | [46]2011 | 66,000 | N/A | 67,538 |
| FEMA, Urban Search and Rescue Response System | [44]2008 | 45,000 | 36,700 | 37,832 |
| FEMA, Emergency Management Performance Grants | [45]2022 | 950,000 | 355,000 | 365,000 |
| FEMA, Emergency Food and Shelter | [46]1994 | 188,000 | N/A | 140,000 |

[1] P.L. 107-210, Sec. 311
[2] P.L. 107-210 authorized what was formerly U. S. Customs Service (does not include Border Patrol).

**EXHIBIT C-131**

132

[1] U.S. Customs Service operations only (does not include Border Patrol).

[2] Funding recommended for fiscal year 2022 is for the U.S. Customs and Border Protection, Operations and Support appropriation. This is not a true comparison to the legacy "Salaries and Expenses" appropriation.

[3] P.L. 109-347, Sec. 205(m)

[4] Funding recommended for fiscal year 2022 is for the "Domestic Operations" and "International Operations" sub-PPAs within the "Trade and Travel Operations" PPA. This is not a true comparison to the legacy "International Cargo Screening" PPA.

[5] P.L. 109-347, Sec. 223(a) authorized operations for fiscal year 2010 and personnel through fiscal year 2012.

[6] Funding provided for fiscal year 2010 and for fiscal year 2012 include personnel and operations.

[7] This is not a true comparison to the legacy "Customs-Trade Partnership Against Terrorism (C-TPAT)" PPA. These funds have been realigned to the "Domestic Operations" sub-PPA within the "Trade and Travel Operations" PPA.

[8] P.L. 109-347, Sec. 203(g)

[9] This is not a true comparison to the legacy "Automated Targeting Systems" PPA. These funds have been realigned to the "Targeting Operations" sub-PPA within the "Trade and Travel Operations" PPA.

[10] P.L. 114-125, Sec. 106 requires that funding shall not be less than this amount.

[11] This is not a true comparison to the legacy "Automated Commercial Environment" PPA, however, the preponderance of these funds were realigned into the "Office of Trade" sub-PPA within the "Trade and Travel Operations" PPA.

[12] P.L. 107-210, Sec. 311

[13] These funds have been realigned to the "Air and Marine Operations" sub-PPA that exists both within the "Integrated Operations" PPAs.

[14] Immigration and Naturalization Service—some investigations, and detention and removals only. P.L. 107-210, Sec. 102(12)

[15] Captures 36 non-commercial operations. P.L. 107-210, Sec. 311(a) (19 U.S.C. 2075(b)(1))

[16] Includes $2,862,094,000 from fiscal year 2003 Immigration and Naturalization Service—Salaries and Expenses, P.L. 108-7, and $170,000,000 included in the fiscal year 2003 Wartime Supplemental Appropriations Act, P.L. 108-11.

[17] There was no fiscal year 2004 appropriation for the U.S. Customs Service.

[18] Funding recommended for fiscal year 2022 is for U. S. Immigration and Customs Enforcement, Operations and Support. This is not a true comparison to the legacy "Salaries and Expenses" appropriation.

[19] P.L. 114-5,154-Sec. 1903 Reauthorized TSA Activities for "salaries, operations and maintenance", but did not specifically authorize the current account structure, construction and improvements.

[20] Recommended funding is the total for TSA "Operations and Support" appropriation.

[21] P.L. 108-458, Sec. 4019

[22] These funds have been realigned to the "Aviation Screening Infrastructure" PPA within the "Procurement, Construction, and Improvements" appropriation.

[23] P.L. 115-254, Sec. 1971

[24] These funds have been realigned to the "Procurement, Construction, and Improvements" appropriation and to the "Research and Development" appropriation.

[25] P.L. 115-254, Sec. 1971

[26] P.L. 107-71, Sec. 101

[27] Includes the Maritime and Land Security PPA and Credentialing Activities PPA.

[28] Funding recommended for fiscal year 2022 is for the "Other Operations and Enforcement, Vetting Programs" and "Other Operations and Enforcement, Intelligence and TSOC" sub-PPAs within the "Operations and Support" appropriation, and the "Infrastructure for Other Operations, Vetting Programs" sub-PPA within the Procurement, Construction, and Improvements appropriation.

[29] P.L. 108-458, Sec. 4016

[30] Funding for the Federal Air Marshals Service is in the "Other Operations and Enforcement, In-Flight Security" sub-PPA. The recommended funding level is for that sub-PPA.

[31] P.L. 115-254, Sec. 1935

[32] P.L. 16-283, Sec. 3001, Sec. 202

[33] Critical infrastructure protection, cybersecurity, and other related programs, P.L. 110-53, Sec. 541 (note, the "National Protection and Programs Directorate" is now known as the "Cybersecurity and Infrastructure Security Agency", as authorized in P.L. 115-278, Sec. 2, (6 U.S.C. 651 et. seq.)).

[34] Infrastructure Protection and Information Security activities in P.L. 112-74.

[35] Represents funding that would traditionally be categorized as defense that is recommended for the Cybersecurity and Infrastructure Security Agency.

[36] P.L. 109-295, Sec. 699

[37] Funding recommended for fiscal year 2022 is for Federal Emergency Management Agency, Operations and Support. This is not a true comparison to the legacy "Salaries and Expenses" appropriation.

[38] P.L. 114-143, Sec. 2(c)

[39] P.L. 109-347, Sec. 112

[40] P.L. 110-53

[41] P.L. 110-53, Sec. 1514(d)

[42] 6 U.S.C. 1182

[43] P.L. 110-53, Sec. 1204, 6 U.S.C. 762

[44] P.L. 109-295, Sec. 634, 6 U.S.C. 722

[45] P.L. 110-53, Sec. 201, 6 U.S.C. 763

[46] P.L. 102-550, Sec. 1431

EXHIBIT C-132

133

**COMPARISON WITH BUDGET RESOLUTION**

Section 308(a)(1)(A) of the Congressional Budget Act of 1974 requires the report accompanying a bill providing new budget authority to contain a statement comparing the levels in the bill to the suballocations submitted under section 302(b) of the Act for the most recently agreed to concurrent resolution on the budget for the applicable fiscal year.

[In millions of dollars]

| | 302 (b) Allocation | | This Bill | |
|---|---|---|---|---|
| | Budget Authority | Outlays | Budget Authority | Outlays |
| Comparison of amounts in the bill with Committee allocations to its subcommittees: Subcommittee on Homeland Security | | | | |
| Discretionary | 52,811 | 70,000 | 71,610 1/ | 71,444 |
| Mandatory | 1,964 | 1,955 | 1,964 1/ | 1,955 |

1/ Includes outlays from prior-year budget authority.

NOTE.—Consistent with the funding recommended in the bill for disaster relief, in accordance with the Congressional Budget Act of 1974, and section 1(g) of House Resolution 467 of the 117th Congress, and after the bill is reported to the House, the Chairman of the Committee on the Budget will provide a revised section 302(a) allocation reflecting an additional $18,799 million in discretionary budget authority and $595 million in associated outlays for amounts provided for disaster relief. That new allocation will eliminate the technical difference prior to floor consideration.

**Five-Year Outlay Projections**

In compliance with section 308(a)(1)(B) of the Congressional Budget Act of 1974, the following table contains five-year projections associated with the budget authority provided in the accompanying bill.

[In millions of dollars]

| | | Outlays |
|---|---|---|
| Projection of outlays associated with the recommendation: | | |
| 2022 | 1/ | 38,168 |
| 2023 | | 11,363 |
| 2024 | | 7,202 |
| 2025 | | 3,384 |
| 2026 and future years | | 7,050 |

1/ Excludes outlays from prior-year budget authority.

**Financial Assistance to State and Local Governments**

In accordance with section 308(a)(1)(C) of the Congressional Budget Act of 1974, the Congressional Budget Office has provided the following estimates of new budget authority and outlays provided by the accompanying bill for financial assistance to State and local governments.

[In millions of dollars]

| | Budget Authority | Outlays |
|---|---|---|
| Financial assistance to State and local governments for 2022 | 12,882 1/ | 454 |

1/ Excludes outlays from prior-year budget authority.

**EXHIBIT C-133**

134

PROGRAM DUPLICATION

Pursuant to clause 3(c)(5) of rule XIII of the Rules of the House of Representatives, no provision of this bill establishes or reauthorizes a program of the Federal Government known to be duplicative of another federal program, a program that was included in any report from the Government Accountability Office to Congress pursuant to section 21 of Public Law 111–139, or a program identified in the most recent Catalog of Federal Domestic Assistance.

COMMITTEE HEARINGS

For the purposes of clause 3(c)(6) of rule XIII of the 117th Congress—

The following hearings were used to develop or consider the Department of Homeland Security Appropriations Act, 2022:

The Subcommittee on Homeland Security held an oversight hearing on May 20, 2021, entitled "Department of Homeland Security Resource Management and Operational Priorities." The Subcommittee received testimony from:

The Honorable Alejandro Mayorkas, Secretary, Department of Homeland Security.

The Subcommittee on Homeland Security held an oversight hearing on May 20, 2021, entitled "Member Day." The Subcommittee received testimony from:

The Honorable Jeff Van Drew, Member of Congress.
The Honorable Pat Fallon, Member of Congress.
The Honorable Sheila Jackson Lee, Member of Congress.

The Subcommittee on Homeland Security held an oversight hearing on May 19, 2021, entitled "U.S. Customs and Border Protection Resource Management and Operational Priorities." The Subcommittee received testimony from:

Troy Miller, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection.

The Subcommittee on Homeland Security held an oversight hearing on May 13, 2021, entitled "U.S. Immigration and Customs Enforcement Resource Management and Operational Priorities." The Subcommittee received testimony from:

Tae D. Johnson, Acting Director, U.S. Immigration and Customs Enforcement.

The Subcommittee on Homeland Security held an oversight hearing on May 6, 2021, entitled "United States Secret Service." The Subcommittee received testimony from:

James Murray, Director, United States Secret Service.

The Subcommittee on Homeland Security held an oversight hearing on May 5, 2021, entitled "TSA: Pandemic and Post-Pandemic Implications for Budget and Operations." The Subcommittee received testimony from:

Darby Lajoye, Senior Official Performing the Duties of Administrator, Transportation Security Administration.

The Subcommittee on Homeland Security held an oversight hearing on April 28, 2021, entitled "Coast Guard Readiness." The Subcommittee received testimony from:

Admiral Karl L. Schultz, Commandant of the United States Coast Guard.

**EXHIBIT C-134**

135

The Subcommittee on Homeland Security held an oversight hearing on March 24, 2021, entitled "Targeted Violence and Terrorism Prevention." The Subcommittee received testimony from:

John Cohen, Assistant Secretary for Counterterrorism and Emerging Threats, Department of Homeland Security.

John Picarelli, Director of the Office of Targeted Violence and Terrorism Prevention, Department of Homeland Security.

Richard Aborn, President, Citizens Crime Commission of New York City.

Tyler Cote, Director and Co-Founder, Operation250.

Sammy Rangel, Executive Director and Co-Founder, Life After Hate.

The Subcommittee on Homeland Security held an oversight hearing on March 17, 2021, entitled "DHS Management Challenges." The Subcommittee received testimony from:

Michael Chertoff, Former Secretary, Department of Homeland Security.

Jeh Johnson, Former Secretary, Department of Homeland Security.

The Subcommittee on Homeland Security held an oversight hearing on March 16, 2021, entitled "The Role of FEMA and Emergency Management in COVID–19 Response." The Subcommittee received testimony from:

Bob Fenton, Senior Official Performing the Duties of FEMA Administrator, Federal Emergency Management Agency.

Curtis Brown, State Coordinator and Co-Founder, Virginia Department of Emergency Management and Institute for Diversity and Inclusion in Emergency Management.

Mark Ghilarducci, Director, California Governor's Office of Emergency Services.

Kevin McGowan, Director, Los Angeles County Office of Emergency Management.

Patrick Sheehan, Director, Tennessee Emergency Management Agency.

The Subcommittee on Homeland Security held an oversight hearing on March 10, 2021, entitled "Modernizing the Federal Civilian Approach to Cybersecurity." The Subcommittee received testimony from:

Brandon Wales, Acting Director, Cybersecurity and Infrastructure Security Agency.

Eric Goldstein, Executive Assistant Director, Cybersecurity Division, Cybersecurity and Infrastructure Security Agency.

DETAILED EXPLANATIONS IN REPORT

The following table contains detailed funding recommendations at the program, project, and activity (PPA) level.

EXHIBIT C-135

136

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| **DEPARTMENT OF HOMELAND SECURITY** | | | | | |
| **TITLE I - DEPARTMENTAL MANAGEMENT, OPERATIONS, INTELLIGENCE, & OVERSIGHT** | | | | | |
| Office of the Secretary and Executive Management | | | | | |
| Operations and Support: | | | | | |
| Management and Oversight........................ | 54,932 | 75,650 | 75,650 | +20,718 | --- |
| Office of Strategy, Policy and Plans........... | 50,939 | 68,341 | 73,041 | +22,102 | +4,700 |
| Operations and Engagement...................... | 74,948 | 80,756 | 84,462 | +9,514 | +3,706 |
| Subtotal, Operations and Support............ | 180,819 | 224,747 | 233,153 | +52,334 | +8,406 |
| Federal Assistance: | | | | | |
| Office of Strategy, Policy, and Plans: | | | | | |
| Targeted Violence and Terrorism Prevention | | | | | |
| Grants..................................... | 20,000 | 20,000 | 20,000 | --- | --- |
| Operations and Engagement: | | | | | |
| ATD Case Management Pilot Grant Program...... | 5,000 | 5,000 | 15,000 | +10,000 | +10,000 |
| Subtotal, Federal Assistance................ | 25,000 | 25,000 | 35,000 | +10,000 | +10,000 |

**EXHIBIT C-136**

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| FEMA Assistance Grants (transfer out)........... | (-25,000) | (-25,000) | (-35,000) | (-10,000) | (-10,000) |
| Total, Office of the Secretary and Executive | | | | | |
| Management................. | 205,819 | 249,747 | 288,153 | +82,334 | +18,406 |
| (transfer out)............ | -25,000 | -25,000 | -35,000 | -10,000 | -10,000 |
| Total Gross, Office of the Secretary and | | | | | |
| Executive Management............ | 180,819 | 224,747 | 233,153 | +52,334 | +8,406 |
| Management Directorate | | | | | |
| Operations and Support: | | | | | |
| Immediate Office of the Under Secretary for | | | | | |
| Management.......... | 4,536 | 4,582 | 4,582 | +46 | --- |
| Office of the Chief Readiness Support Officer...... | 179,036 | 293,137 | 293,137 | +114,101 | --- |
| Office of the Chief Human Capital Officer...... | 129,198 | 136,911 | 136,911 | +7,713 | --- |
| Office of the Chief Security Officer...... | 134,752 | 153,726 | 153,726 | +18,974 | --- |
| Office of the Chief Procurement Officer...... | 106,554 | 93,945 | 93,945 | -12,609 | --- |
| Office of the Chief Financial Officer...... | 89,101 | 102,932 | 102,932 | +13,831 | --- |
| Office of the Chief Information Officer...... | 501,424 | 645,909 | 645,909 | +144,485 | --- |
| Office of Program Accountability and Risk | | | | | |
| Management............. | --- | 16,174 | 16,174 | +16,174 | --- |
| Office of Biometric Identity Management: | | | | | |
| Identity and Screening Program Operations...... | 76,500 | 206,237 | 206,237 | +129,737 | --- |
| IDENT/Homeland Advanced Recognition Technology.. | 177,061 | --- | --- | -177,061 | --- |
| Subtotal, Operations and Support........ | 1,398,162 | 1,653,553 | 1,653,553 | +255,391 | --- |
| (Defense)................ | --- | (9,000) | (9,000) | (+9,000) | --- |
| (Nondefense)............. | (1,398,162) | (1,644,553) | (1,644,553) | (+246,391) | --- |

**EXHIBIT C-137**

138

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Procurement, Construction, and Improvements: | | | | | |
| Construction and Facility Improvements............ | 55,184 | 209,700 | 379,700 | +324,516 | +170,000 |
| Mission Support Assets and Infrastructure......... | 129,941 | 140,719 | 111,164 | -18,777 | -29,555 |
| IDENT/Homeland Advanced Recognition Technology..... | 29,670 | 45,952 | 20,952 | -8,718 | -25,000 |
| Subtotal, Procurement, Construction, and | | | | | |
| Improvements.................................. | 214,795 | 396,371 | 511,816 | +297,021 | +115,445 |
| Federal Protective Service: | | | | | |
| FPS Operations | | | | | |
| Operating Expenses............................... | 387,500 | 393,333 | 393,333 | +5,833 | --- |
| Countermeasures | | | | | |
| Protective Security Officers................... | 1,177,100 | 1,234,696 | 1,234,696 | +57,596 | --- |
| Technical Countermeasures...................... | 24,148 | 25,355 | 25,355 | +1,207 | --- |
| Unallocated reduction based on CBO estimate of | | | | | |
| receipts....................................... | --- | -28,384 | -28,384 | -28,384 | --- |
| Subtotal, Federal Protective Service (Gross) | 1,588,748 | 1,625,000 | 1,625,000 | +36,252 | --- |
| Offsetting Collections........................... | -1,588,748 | -1,625,000 | -1,625,000 | -36,252 | --- |
| Subtotal, Federal Protective Service (Net)....... | --- | --- | --- | --- | --- |
| Total, Management Directorate.................... | 1,612,957 | 2,049,924 | 2,165,369 | +552,412 | +115,445 |
| (Discretionary Appropriations)................. | (3,201,705) | (3,674,924) | (3,790,369) | (+588,664) | (+115,445) |
| (Offsetting Collections)....................... | (-1,588,748) | (-1,625,000) | (-1,625,000) | (-36,252) | --- |

**EXHIBIT C-138**

139

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Intelligence, Analysis, and Operations Coordination | | | | | |
| Operations and Support................................. | 298,500 | 320,620 | 320,620 | +22,120 | --- |
| Office of Inspector General | | | | | |
| Operations and Support................................. | 190,186 | 205,359 | 205,359 | +15,173 | --- |
| Total, Title I, Departmental Management,<br>Operations, Intelligence, and Oversight...... | 2,307,462 | 2,825,660 | 2,959,501 | +652,039 | +133,851 |
| (Discretionary Appropriations)............... | (3,896,210) | (4,460,660) | (4,584,501) | (+688,291) | (+133,851) |
| (Defense)................................... | --- | (9,000) | (9,000) | (+9,000) | --- |
| (Non-Defense)............................... | (3,896,210) | (4,441,660) | (4,575,501) | (+679,291) | (+133,851) |
| (Offsetting Collections).................... | (-1,588,748) | (-1,625,000) | (-1,625,000) | (-36,252) | --- |
| (Transfer out)............................. | (-25,000) | (-25,000) | (-35,000) | (-10,000) | (-10,000) |

TITLE II - SECURITY, ENFORCEMENT, AND INVESTIGATIONS

U.S. Customs and Border Protection

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Operations and Support:<br>Border Security Operations<br>U.S. Border Patrol | | | | | |
| Operations................................... | 4,090,553 | 4,428,901 | 4,436,401 | +345,848 | +7,500 |
| Assets and Support........................... | 716,734 | 689,752 | 695,752 | -20,982 | +26,000 |

**EXHIBIT C-139**

140

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Office of Training and Development............... | 62,146 | 69,225 | 69,225 | +7,079 | --- |
| Subtotal, Border and Security Operations....... | 4,869,433 | 5,167,878 | 5,201,378 | +331,945 | +33,500 |
| Trade and Travel Operations: | | | | | |
| Office of Field Operations | | | | | |
| Domestic Operations............................ | 3,198,271 | 3,329,836 | 3,329,836 | +131,565 | --- |
| International Operations........................ | 148,389 | 153,089 | 153,089 | +4,700 | --- |
| Targeting Operations............................ | 257,648 | 273,932 | 273,932 | +16,284 | --- |
| Assets and Support............................. | 1,009,916 | 1,017,029 | 1,027,029 | +17,113 | +10,000 |
| Office of Trade................................. | 289,387 | 289,746 | 289,746 | +10,359 | +10,000 |
| Office of Training and Development............. | 65,445 | 71,023 | 71,023 | +5,578 | --- |
| Subtotal, Trade and Travel Operations.......... | 4,969,056 | 5,134,655 | 5,154,655 | +185,599 | +20,000 |
| Integrated Operations: | | | | | |
| Air and Marine Operations | | | | | |
| Operations.................................... | 317,965 | 327,464 | 327,464 | +9,499 | --- |
| Assets and Support............................. | 565,554 | 564,886 | 564,886 | -668 | --- |
| Air and Marine Operations Center.............. | 40,789 | 38,820 | 38,820 | -1,969 | --- |
| Office of International Affairs................. | 43,099 | 45,668 | 45,668 | +2,569 | --- |
| Office of Intelligence.......................... | 62,447 | 66,937 | 66,937 | +4,490 | --- |
| Office of Training and Development.............. | 9,210 | 12,523 | 12,523 | +3,313 | --- |
| Operations Support............................. | 152,333 | 144,261 | 148,261 | -4,072 | +4,000 |
| Subtotal, Integrated Operations................ | 1,191,397 | 1,200,559 | 1,204,559 | +13,162 | +4,000 |

**EXHIBIT C-140**

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Mission Support: | | | | | |
| Enterprise Services.................. | 1,472,264 | 1,431,212 | 1,509,712 | +37,448 | +78,500 |
| (Harbor Maintenance Trust Fund)..... | (3,274) | (3,274) | (3,274) | --- | --- |
| | | | | | |
| Office of Professional Responsibility........... | 212,693 | 281,380 | 281,380 | +78,687 | --- |
| Executive Leadership and Oversight........... | 194,080 | 201,125 | 201,125 | +7,045 | --- |
| | | | | | |
| Subtotal, Mission Support.................. | 1,879,037 | 1,923,717 | 2,002,217 | +123,180 | +78,500 |
| | | | | | |
| Subtotal, Operations and Support........... | 12,908,923 | 13,426,809 | 13,562,809 | +653,886 | +136,000 |
| | | | | | |
| Procurement, Construction, and Improvements: | | | | | |
| Border Security Assets and Infrastructure........... | 1,513,000 | 54,315 | 111,815 | -1,401,185 | +57,500 |
| Trade and Travel Assets and Infrastructure........... | 22,530 | 44,653 | 94,653 | +72,123 | +50,000 |
| Integrated Operations Assets and Infrastructure | | | | | |
| Airframes and Sensors........... | 119,076 | 41,977 | 24,477 | -94,599 | -17,500 |
| | | | | | |
| Construction and Facility Improvements........... | 142,399 | 757,225 | 72,225 | -70,174 | -685,000 |
| Mission Support Assets and Infrastructure........... | 42,629 | 27,610 | 30,610 | -12,019 | +3,000 |
| | | | | | |
| Subtotal, Procurement, Construction, and | | | | | |
| Improvements.............. | 1,839,634 | 925,780 | 333,780 | -1,505,854 | -592,000 |
| | | | | | |
| CBP Services at User Fee Facilities (Small Airport) | | | | | |
| (Permanent Indefinite Discretionary)........... | 9,000 | 9,000 | 9,000 | --- | --- |

EXHIBIT C-141

142

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Global Entry Program (International Registered Traveler (Permanent Indefinite Discretionary)....... | 199,939 | 167,000 | 167,000 | -32,939 | --- |
| Offsetting Collections................ | -199,939 | -167,000 | -167,000 | +32,939 | --- |
| Total, Global Entry Program........... | --- | --- | --- | --- | --- |
| Fee Funded Programs: | | | | | |
| Immigration Inspection User Fee........ | (793,876) | (394,772) | (394,772) | (-399,104) | --- |
| Immigration Enforcement Fines.......... | (227) | (209) | (209) | (-18) | --- |
| Electronic System for Travel Authorization (ESTA) Fee................... | (63,417) | (11,084) | (11,084) | (-52,333) | --- |
| Land Border Inspection Fee............. | (59,364) | (36,018) | (36,018) | (-23,346) | --- |
| COBRA Passenger Inspection Fee......... | (681,412) | (359,380) | (359,380) | (-322,032) | --- |
| Agricultural Quarantine Inspection Fee. | (582,187) | (533,104) | (533,104) | (-49,083) | --- |
| Puerto Rico Trust Fund................. | (152,291) | (224,818) | (224,818) | (+72,527) | --- |
| Virgin Island Deposit Fund............. | (11,442) | (10,415) | (10,415) | (-1,027) | --- |
| Customs Unclaimed Goods................ | (3,690) | (1,671) | (1,671) | (-2,019) | --- |
| 9-11 Response and Biometric Exit Account....... | (61,000) | (29,563) | (29,563) | (-31,437) | --- |
| Subtotal, Fee Funded Programs.......... | 2,408,906 | 1,601,034 | 1,601,034 | -807,872 | --- |
| Administrative Provisions | | | | | |
| Colombia Free Trade Act Collections.... | 281,000 | 206,000 | 206,000 | -75,000 | --- |
| Reimbursable Preclearance.............. | 39,000 | 39,000 | 39,000 | --- | --- |
| U.S. Customs and Border Protection obligation of funds (Sec. 233)............. | --- | 50,000 | --- | --- | -50,000 |

**EXHIBIT C-142**

143

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Reimbursable Preclearance (Offsetting Collections).... | -39,000 | -39,000 | -39,000 | --- | --- |
| Total, Administrative Provisions.... | 281,000 | 256,000 | 206,000 | -75,000 | -50,000 |
| Total, U.S. Customs and Border Protection....... | 15,038,557 | 14,617,589 | 14,111,589 | -926,968 | -506,000 |
| (Discretionary Appropriations).... | (15,277,496) | (14,823,589) | (14,317,589) | (-959,907) | (-506,000) |
| (Offsetting Collections).... | (-238,939) | (-206,000) | (-206,000) | (+32,939) | --- |
| Fee Funded Programs.... | 2,408,906 | 1,601,034 | 1,601,034 | -807,872 | --- |
| U.S. Immigration and Customs Enforcement | | | | | |
| Operations and Support: | | | | | |
| Homeland Security Investigations | | | | | |
| Domestic Investigations.... | 1,853,933 | 1,875,754 | 1,972,062 | +118,129 | +96,308 |
| International Investigations.... | 186,626 | 192,384 | 193,991 | +7,365 | +1,607 |
| Intelligence.... | 98,171 | 99,587 | 101,407 | +3,236 | +1,820 |
| Subtotal, Homeland Security Investigations.. | 2,138,730 | 2,167,725 | 2,267,460 | +128,730 | +99,735 |
| Civil Immigration Enforcement Operations: | | | | | |
| Custody Operations.... | 2,836,128 | 2,775,100 | 2,460,786 | -375,342 | -314,314 |
| Immigration Absconder Operations.... | 145,141 | 146,660 | 146,660 | +1,519 | --- |
| Priority Immigration Enforcement Operations.... | 278,422 | 284,161 | 284,161 | +5,739 | --- |
| Alternatives to Detention.... | 440,122 | 440,476 | 475,000 | +34,878 | +34,524 |
| Transportation Operations.... | 419,089 | 420,031 | 420,656 | +1,567 | +625 |
| Subtotal, Enforcement and Removal Operations.. | 4,118,902 | 4,066,428 | 3,787,263 | -331,639 | -279,165 |

**EXHIBIT C-143**

144

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Mission Support: | | | | | |
| Mission Support............................. | 1,304,434 | 1,364,419 | --- | -1,304,434 | -1,364,419 |
| Enterprise Services......................... | --- | --- | 1,164,895 | +1,164,895 | +1,164,895 |
| Office of Professional Responsibility....... | --- | --- | 199,391 | +199,391 | +199,391 |
| Executive Leadership and Oversight.......... | --- | --- | 60,052 | +60,052 | +60,052 |
| Subtotal, Mission Support................... | 1,304,434 | 1,364,419 | 1,424,338 | +119,904 | +59,919 |
| Office of the Principal Legal Advisor....... | 313,664 | 341,214 | 341,214 | +27,550 | --- |
| Subtotal, Operations and Support............ | 7,875,730 | 7,939,786 | 7,820,275 | -55,455 | -119,511 |
| Procurement, Construction, and Improvements: | | | | | |
| Operational Communications/Information Technology... | 21,478 | 21,000 | 21,000 | -478 | --- |
| Construction and Facility Improvements...... | 73,261 | 17,379 | 17,379 | -55,882 | --- |
| Mission Support Assets and Infrastructure... | 3,060 | 13,321 | 13,321 | +10,261 | --- |
| Subtotal, Procurement, Construction, and Improvements... | 97,799 | 51,700 | 51,700 | -46,099 | --- |

**EXHIBIT C-144**

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Federal Assistance: | | | | | |
| Non-custodial Migrant Shelter Grants........... | --- | --- | 100,000 | +100,000 | +100,000 |
| FEMA Federal Assistance Grants (transfer out)..... | --- | --- | (-100,000) | (-100,000) | (-100,000) |
| Fee Funded Programs: | | | | | |
| Immigration Inspection User Fee............... | (135,000) | (135,000) | (135,000) | --- | --- |
| Breached Bond/Detention Fund.................. | (55,000) | (55,000) | (55,000) | --- | --- |
| Student and Exchange Visitor Program Fee........ | (186,610) | (186,610) | (186,610) | --- | --- |
| Detention and Removal Office Fee............... | --- | (3,000) | (3,000) | (+3,000) | --- |
| | | | | | |
| Subtotal, Fee Funded Programs.................. | 376,610 | 379,610 | 379,610 | +3,000 | --- |
| | | | | | |
| Total, U.S. Immigration and Customs Enforcement. | 7,973,529 | 7,991,486 | 7,871,975 | -101,554 | -119,511 |
| (Discretionary Appropriations)................ | (7,973,529) | (7,991,486) | (7,871,975) | (-1,554) | (-19,511) |
| (transfer out)............................... | --- | --- | (-100,000) | (-100,000) | (-100,000) |
| | | | | | |
| Fee Funded Programs........................... | 376,610 | 379,610 | 379,610 | +3,000 | --- |
| | | | | | |
| Transportation Security Administration | | | | | |
| | | | | | |
| Operations and Support: | | | | | |
| Aviation Screening Operations | | | | | |
| Screening Workforce | | | | | |
| Screening Partnership Program................. | 226,406 | 231,068 | 231,068 | +4,662 | --- |
| Screener Personnel, Compensation, and Benefits.. | 3,620,403 | 3,680,701 | 3,680,701 | +60,298 | --- |
| Screener Training and Other................... | 235,859 | 247,053 | 247,053 | +11,194 | --- |

EXHIBIT C-145

146

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Airport Management | 651,622 | 721,038 | 721,038 | +69,416 | --- |
| Canines | 169,513 | 170,186 | 170,186 | +673 | --- |
| Screening Technology Maintenance | 477,711 | 532,300 | 509,966 | +32,245 | -22,344 |
| Secure Flight | 116,333 | 127,085 | 127,085 | +10,752 | --- |
| Subtotal, Aviation Screening Operations | 5,497,847 | 5,709,431 | 5,687,087 | +189,240 | -22,344 |
| Other Operations and Enforcement: | | | | | |
| Inflight Security | | | | | |
| Federal Air Marshals | 764,643 | 754,069 | 754,069 | -10,574 | --- |
| Federal Flight Deck Officer and Crew Training | 20,012 | 20,263 | 20,263 | +251 | --- |
| Aviation Regulation | 238,468 | 246,416 | 246,416 | +7,948 | --- |
| Air Cargo | 107,456 | 114,242 | 114,242 | +6,786 | --- |
| Intelligence and TSOC | 76,497 | 83,554 | 83,554 | +7,057 | --- |
| Surface programs | 142,203 | 146,723 | 146,723 | +4,520 | --- |
| Vetting Programs | 44,917 | 40,052 | 40,052 | -4,865 | --- |
| Subtotal, Other Operations and Enforcement | 1,394,196 | 1,405,319 | 1,405,319 | +11,123 | --- |
| Mission Support | 901,672 | 980,037 | 980,037 | +78,365 | --- |
| Aviation Passenger Security Fees (offsetting collections) | -2,940,000 | -2,110,000 | -2,110,000 | +830,000 | --- |
| Subtotal, Operations and Support | 4,853,715 | 5,984,787 | 5,962,443 | +1,108,728 | -22,344 |
| (Discretionary Appropriations) | (7,793,715) | (8,094,787) | (8,072,443) | (+278,728) | (-22,344) |
| (Offsetting Collections) | (-2,940,000) | (-2,110,000) | (-2,110,000) | (+830,000) | --- |

**EXHIBIT C-146**

147

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Vetting Fee Programs: | | | | | |
| Transportation Worker Indentification Card...... | 69,500 | 66,200 | 66,200 | -3,300 | --- |
| Hazardous Materials Endorsement Fee............ | 19,200 | 19,200 | 19,200 | --- | --- |
| General Aviation at DCA Fee.................... | 600 | 600 | 600 | --- | --- |
| Commercial Aviation and Airports Fee........... | 9,000 | 10,200 | 10,200 | +1,200 | --- |
| Other Security Threat Assessments Fee.......... | 50 | 50 | 50 | --- | --- |
| Air Cargo/Certified Cargo Screening Program Fee. | 5,000 | 5,000 | 5,000 | --- | --- |
| TSA PreCheck Fee............................... | 250,614 | 249,500 | 249,500 | -1,114 | --- |
| Unallocated reduction based on CBO estimate of | | | | | |
| receipts.................................... | --- | -150,750 | -150,750 | -150,750 | --- |
| Subtotal, Vetting Fee Program.................. | 353,964 | 200,000 | 200,000 | -153,964 | --- |
| Vetting Fees (offsetting collections).......... | -353,964 | -200,000 | -200,000 | +153,964 | --- |
| Procurement, Construction, and Improvements: | | | | | |
| Aviation Screening Infrastructure | | | | | |
| Checkpoint Support............................. | 100,000 | 104,492 | 126,836 | +26,836 | +22,344 |
| Checked Baggage................................ | 34,492 | 30,000 | 30,000 | -4,492 | --- |
| Subtotal, Procurement, Construction, and | | | | | |
| Improvements................................ | 134,492 | 134,492 | 156,836 | +22,344 | +22,344 |
| Research and Development....................... | 29,524 | 35,532 | 35,532 | +6,008 | --- |

**EXHIBIT C-147**

148

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Fee Funded Program: | | | | | |
| Alien Flight School Fee.................................. | (5,500) | (6,000) | (6,000) | (+500) | --- |
| | | | | | |
| Aviation Security Capital Fund (Mandatory)............. | (250,000) | (250,000) | (250,000) | --- | --- |
| | | | | | |
| Total, Transportation Security Administration... | 5,017,731 | 6,154,811 | 6,154,811 | +1,137,080 | --- |
| (Discretionary Appropriations)..................... | (8,311,695) | (8,464,811) | (8,464,811) | (+153,116) | --- |
| (Offsetting Collections)........................... | (-3,293,964) | (-2,310,000) | (-2,310,000) | (+983,964) | --- |
| | | | | | |
| Aviation Security Capital Fund (Mandatory)........ | 250,000 | 250,000 | 250,000 | --- | --- |
| Fee Funded Programs............................... | 5,500 | 6,000 | 6,000 | +500 | --- |
| | | | | | |
| **Coast Guard** | | | | | |
| | | | | | |
| Operations and Support: | | | | | |
| Military Pay and Allowances........................ | 4,166,873 | --- | --- | -4,166,873 | --- |
| Civilian Pay and Benefits.......................... | 1,090,590 | --- | --- | -1,090,590 | --- |
| Training and Recruiting............................ | 237,284 | --- | --- | -237,284 | --- |
| Operating Funds and Unit Level Maintenance......... | 993,465 | --- | --- | -993,465 | --- |
| Centrally Managed Accounts......................... | 104,451 | --- | --- | -104,451 | --- |
| Intermediate and Depot Level Maintenance........... | 1,740,704 | --- | --- | -1,740,704 | --- |
| Reserve Training................................... | 130,593 | --- | --- | -130,593 | --- |
| Environmental Compliance and Restoration........... | 21,186 | --- | --- | -21,186 | --- |
| Military Personnel................................. | --- | 4,760,155 | 4,801,605 | +4,801,605 | +41,450 |
| Mission Support.................................... | --- | 405,662 | 417,562 | +417,562 | +11,900 |

**EXHIBIT C-148**

149

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Field Operations: | | | | | |
| Surface, Air, and Shore Operations | --- | 2,792,954 | 2,846,954 | +2,846,954 | +54,000 |
| Command, Control, and Communications | --- | 1,061,999 | 1,077,949 | +1,077,949 | +15,950 |
| Subtotal, Field Operations | --- | 3,854,953 | 3,924,903 | +3,924,903 | +69,950 |
| Subtotal, Operations and Support | 8,485,146 | 9,020,770 | 9,144,070 | +658,924 | +123,300 |
| (Non-Defense) | (7,955,146) | (8,490,770) | (8,614,070) | (+658,924) | (+123,300) |
| (Defense) | (530,000) | (530,000) | (530,000) | --- | --- |
| Procurement, Construction, and Improvements: | | | | | |
| Vessels: | | | | | |
| Survey and Design-Vessels and Boats | 6,000 | 2,500 | 2,500 | -3,500 | --- |
| In-Service Vessel Sustainment | 82,600 | 87,750 | 87,750 | +5,150 | --- |
| National Security Cutter | 31,000 | 78,000 | 99,000 | +68,000 | +21,000 |
| Offshore Patrol Cutter | 546,000 | 597,000 | 597,000 | +51,000 | --- |
| Fast Response Cutter | 260,000 | 20,000 | 20,000 | -240,000 | --- |
| Cutter Boats | 9,300 | 7,000 | 7,000 | -2,300 | --- |
| Polar Security Cutter | 555,000 | 170,000 | 170,000 | -385,000 | --- |
| Waterways Commerce Cutter | 25,000 | 67,000 | 67,000 | +42,000 | --- |
| Polar Sustainment | 15,000 | 15,000 | 15,000 | --- | --- |
| Subtotal, Vessels | 1,529,900 | 1,044,250 | 1,065,250 | -464,650 | +21,000 |
| Aircraft: | | | | | |
| HC-144 Conversion/Sustainment | 14,000 | --- | --- | -14,000 | --- |
| HC-27J Conversion/Sustainment | 64,000 | --- | 66,500 | +2,500 | +66,500 |
| HC-130J Acquisition/Conversion/Sustainment | 120,000 | 20,000 | 148,000 | +28,000 | +128,000 |
| HH-65 Conversion/Sustainment Projects | 45,000 | 32,000 | 32,000 | -13,000 | --- |

**EXHIBIT C-149**

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| MH-60T Sustainment | 66,000 | 102,800 | 102,800 | +34,800 | --- |
| Small Unmanned Aircraft Systems | 600 | 500 | 500 | -100 | --- |
| Subtotal, Aircraft | 311,800 | 221,800 | 349,800 | +38,200 | +128,000 |
| Other Acquisition Programs: | | | | | |
| Other Equipment and Systems | 3,500 | 8,000 | 8,000 | +4,500 | --- |
| Program Oversight and Management | 20,000 | 20,000 | 20,000 | --- | --- |
| C4ISR | 15,260 | 18,000 | 23,000 | +7,740 | +5,000 |
| CG-Logistics Information Management System (CG-LIMS) | 1,100 | 25,900 | 25,900 | +24,800 | --- |
| Cyber and Enterprise Mission Platform | 19,500 | 21,500 | 45,500 | +26,000 | +24,000 |
| Subtotal, Other Acquisition Programs | 59,360 | 93,400 | 122,400 | +63,040 | +29,000 |
| Shore Facilities and Aids to Navigation: | | | | | |
| Major Construction; Housing; ATON; and Survey and Design | 266,350 | 199,650 | 199,650 | -66,700 | --- |
| Major Acquisition Systems Infrastructure | 91,831 | 75,000 | 75,000 | -16,831 | --- |
| Minor Shore | 5,000 | 5,000 | 5,000 | --- | --- |
| Subtotal, Shore Facilities and Aids to Navigation | 363,181 | 279,650 | 279,650 | -83,531 | --- |
| Subtotal, Procurement, Construction, and Improvements | 2,264,041 | 1,639,100 | 1,817,100 | -446,941 | +178,000 |
| Research and Development | 10,276 | 7,476 | 7,476 | -2,800 | --- |

**EXHIBIT C-150**

151

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Health Care Fund Contribution (Permanent Indefinite Discretionary)........... | 215,787 | 240,577 | 240,577 | +24,790 | --- |
| Retired Pay (Mandatory)........... | 1,869,704 | 1,963,519 | 1,963,519 | +93,815 | --- |
| Administrative Provisions | | | | | |
| Coast Guard Housing Fund (Sec. 230)........... | 4,000 | 4,000 | 4,000 | --- | --- |
| Coast Guard Housing Fund Offsetting Collections........... | -4,000 | -4,000 | -4,000 | --- | --- |
| Total, Coast Guard........... | 12,844,954 | 12,871,442 | 13,172,742 | +327,788 | +301,300 |
| (Discretionary Appropriations)........... | (10,979,250) | (10,911,923) | (11,213,223) | (+233,973) | (+301,300) |
| (Defense)........... | (530,000) | (530,000) | (530,000) | --- | --- |
| (Non-Defense)........... | (10,449,250) | (10,381,923) | (10,683,223) | (+233,973) | (+301,300) |
| (Offsetting Collections)........... | (-4,000) | (-4,000) | (-4,000) | --- | --- |
| (Mandatory Funding)........... | (1,869,704) | (1,963,519) | (1,963,519) | (+93,815) | --- |
| United States Secret Service | | | | | |
| Operations and Support: | | | | | |
| Protective Operations: | | | | | |
| Protection of Persons and Facilities........... | 818,795 | 848,996 | 848,996 | +30,201 | --- |
| Protective Countermeasures........... | 68,182 | 87,762 | 87,762 | +19,580 | --- |
| Protective Intelligence........... | 52,155 | 74,167 | 74,167 | +22,012 | --- |
| Presidential Campaigns and National Special Security Events........... | 83,725 | 19,000 | 19,000 | -64,725 | --- |
| Subtotal, Protective Operations........... | 1,022,857 | 1,029,925 | 1,029,925 | +7,068 | --- |

**EXHIBIT C-151**

152

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Field Operations: | | | | | |
| Domestic and International Field Operations....... | 686,583 | 705,391 | 705,391 | +18,808 | --- |
| Support for Missing and Exploited Children Investigations................................ | 6,000 | 6,000 | 6,000 | --- | --- |
| Support for Computer Forensics Training............ | 34,377 | 37,160 | 37,160 | +2,783 | --- |
| Subtotal, Field Operations.................... | 726,960 | 748,551 | 748,551 | +21,591 | --- |
| Basic and In-Service Training and Professional Development................................. | 114,733 | 137,731 | 137,731 | +22,998 | --- |
| Mission Support.................................. | 508,559 | 598,551 | 602,451 | +93,892 | +3,900 |
| Subtotal, Operations and Support............... | 2,373,109 | 2,514,758 | 2,518,658 | +145,549 | +3,900 |
| Procurement, Construction, and Improvements: | | | | | |
| Protection Assets and Infrastructure.............. | 51,955 | 41,791 | 41,791 | -10,164 | --- |
| Operational Communications/Information Technology. | --- | 3,158 | 3,158 | +3,158 | --- |
| Construction and Facility Improvements............ | 1,000 | 9,900 | 9,900 | +8,900 | --- |
| Subtotal, Procurement, Construction, and Improvements.................................. | 52,955 | 54,849 | 54,849 | +1,894 | --- |

**EXHIBIT C-152**

153

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Research and Development.......................... | 11,937 | 2,310 | 2,310 | -9,627 | --- |
| Total, United States Secret Service............. | 2,438,001 | 2,571,917 | 2,575,817 | +137,816 | +3,900 |
| Total, Title II, Security, Enforcement, and Investigations.......................... | 43,312,772 | 44,207,245 | 43,986,934 | +674,162 | -220,311 |
| (Discretionary Appropriations)................... | (44,979,971) | (44,763,726) | (44,543,415) | (-436,556) | (-220,311) |
| (Non-Defense).................................... | (44,449,971) | (44,233,726) | (44,013,415) | (-436,556) | (-220,311) |
| (Defense)........................................ | (530,000) | (530,000) | (530,000) | --- | --- |
| (Offsetting Collections)......................... | (-3,536,903) | (-2,520,000) | (-2,520,000) | (+1,016,903) | --- |
| (Mandatory Funding).............................. | (1,869,704) | (1,963,519) | (1,963,519) | (+93,815) | --- |
| Aviation Security Capital Fund (Mandatory)....... | 250,000 | 250,000 | 250,000 | --- | --- |
| Fee Funded Programs.............................. | 2,791,016 | 1,986,644 | 1,986,644 | -804,372 | --- |
| (Transfer out)................................... | --- | --- | (-100,000) | (-100,000) | (-100,000) |

**EXHIBIT C-153**

154

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

|  | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| TITLE III - PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY |  |  |  |  |  |
| Cybersecurity and Infrastructure Security Agency |  |  |  |  |  |
| Operations and Support: |  |  |  |  |  |
| Cybersecurity: |  |  |  |  |  |
| Cyber Operations: |  |  |  |  |  |
| Strategy and Performance............. | 3,295 | 14,972 | 14,972 | +11,677 | --- |
| Threat Hunting...................... | 160,451 | 158,883 | 278,432 | +117,981 | +119,549 |
| Vulnerability Management............ | 145,053 | 144,537 | 155,237 | +10,184 | +10,700 |
| Capacity Building................... | 121,744 | 124,951 | 138,601 | +16,857 | +13,650 |
| Operational Planning and Coordination.... | 69,746 | 79,899 | 106,752 | +37,006 | +26,853 |
| Subtotal, Cyber Operations.......... | 500,289 | 523,242 | 693,994 | +193,705 | +170,752 |
| Technology and Services: |  |  |  |  |  |
| Cybersecurity Services.............. | 7,790 | 7,069 | 7,069 | -721 | --- |
| Continuous Diagnostics and Mitigation........... | 110,647 | 65,360 | 65,360 | -45,287 | --- |
| National Cybersecurity Protection System....... | 300,188 | 317,370 | 317,370 | +17,182 | --- |
| Subtotal, Technology and Services.......... | 418,625 | 389,819 | 389,819 | -28,806 | --- |
| Subtotal, Cybersecurity............. | 918,914 | 913,061 | 1,083,813 | +164,899 | +170,752 |

**EXHIBIT C-154**

155

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Infrastructure Security: | | | | | |
| Infrastructure Assessments and Security: | | | | | |
| Strategy and Performance... | 4,353 | 8,459 | 8,459 | +4,106 | --- |
| Security Programs... | 24,634 | 26,068 | 34,068 | +9,434 | +8,000 |
| CISA Exercises... | 14,693 | 16,681 | 22,292 | +7,599 | +5,611 |
| Assessments and Infrastructure Information... | 45,294 | 44,658 | 44,658 | -636 | --- |
| Bombing Prevention... | 23,932 | 26,474 | 34,000 | +10,068 | +7,526 |
| Subtotal, Infrastructure Assessments and Security... | 112,906 | 122,340 | 143,477 | +30,571 | +21,137 |
| Chemical Security... | 44,304 | 44,907 | 44,907 | +603 | --- |
| Subtotal, Infrastructure Security... | 157,210 | 167,247 | 188,384 | +31,174 | +21,137 |
| Emergency Communications: | | | | | |
| Emergency Communications Preparedness... | 51,262 | 52,175 | 52,175 | +913 | --- |
| Priority Telecommunications Service: | | | | | |
| GETS/WPS/SRAS/TSP... | 56,313 | 56,443 | 56,443 | +130 | --- |
| Next Generation Networks Priority Services... | 8,482 | 8,581 | 9,581 | +1,099 | +1,000 |
| Subtotal, Priority Telecommunications Services... | 64,795 | 65,024 | 66,024 | +1,229 | +1,000 |
| Subtotal, Emergency Communications... | 116,057 | 117,199 | 118,199 | +2,142 | +1,000 |

EXHIBIT C-155

156

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Integrated Operations: | | | | | |
| Regional Operations: | | | | | |
| Coordination and Service Delivery................. | 7,434 | 16,457 | 16,457 | +9,023 | --- |
| Security Advisors................................. | 66,020 | 54,686 | 71,786 | +5,766 | +17,100 |
| Chemical Inspectors............................... | 30,445 | 31,746 | 31,746 | +1,301 | --- |
| Subtotal, Regional Operations................. | 103,899 | 102,889 | 119,989 | +16,090 | +17,100 |
| | | | | | |
| Operations Coordination and Planning: | | | | | |
| Intelligence..................................... | 4,577 | 4,751 | 4,751 | +174 | --- |
| Operations Center................................ | 59,835 | 61,707 | 61,707 | +1,872 | --- |
| Planning and Readiness........................... | 1,715 | 7,462 | 7,462 | +5,737 | --- |
| Business Continuity and Emergency Preparedness... | 6,278 | 3,531 | 3,531 | -2,747 | --- |
| Subtotal, Operations Coordination and Planning..................................... | 72,405 | 77,441 | 77,441 | +5,036 | --- |
| | | | | | |
| Subtotal, Integrated Operations.................. | 176,304 | 180,330 | 197,430 | +21,126 | +17,100 |
| | | | | | |
| Risk Management Operations: | | | | | |
| National Infrastructure Simulation Analysis Center | 22,793 | 28,293 | 28,293 | +5,500 | --- |
| Infrastructure Analysis........................... | 84,483 | 85,635 | 95,835 | +11,352 | +10,200 |
| Subtotal, Risk Management Operations.......... | 107,276 | 113,928 | 124,128 | +16,852 | +10,200 |

**EXHIBIT C-156**

157

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Stakeholder Engagement and Requirements: | | | | | |
| Sector Specific Agency Management.......... | 17,654 | 18,187 | 22,733 | +5,079 | +4,546 |
| Council Management......................... | 7,891 | 9,410 | 12,303 | +4,412 | +2,893 |
| Stakeholder Engagement..................... | 18,543 | 24,219 | 29,794 | +11,251 | +5,575 |
| International Affairs...................... | 1,637 | 6,364 | 6,364 | +4,727 | --- |
| (Defense).............................. | (1,080) | (4,200) | (4,200) | (+3,120) | --- |
| | | | | | |
| Subtotal, Stakeholder Engagement and Requirements......................... | 45,725 | 58,180 | 71,194 | +25,469 | +13,014 |
| | | | | | |
| Mission Support: | | | | | |
| Management and Business Activities........ | 107,515 | 103,899 | 106,926 | -589 | +3,027 |
| (Defense).............................. | (46,984) | (45,404) | (46,727) | (-257) | (+1,323) |
| External Affairs.......................... | 7,245 | 16,277 | 16,277 | +9,032 | --- |
| (Defense).............................. | (3,166) | (7,113) | (7,113) | (+3,947) | --- |
| Privacy................................... | 2,792 | 3,213 | 3,213 | +421 | --- |
| (Defense).............................. | (1,220) | (1,404) | (1,404) | (+184) | --- |
| Strategy, Policy, and Plans............... | 11,174 | 5,644 | 5,644 | -5,530 | --- |
| (Defense).............................. | (7,375) | (3,725) | (3,725) | (-3,650) | --- |

**EXHIBIT C-157**

158

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Chief Technology Officer.................... | 10,125 | 10,525 | 10,525 | +400 | --- |
| (Defense)........ | (4,425) | (4,599) | (4,599) | (+174) | --- |
| National Services Support Facility Management...... | 1,729 | 2,017 | 2,017 | +288 | --- |
| (Defense)........ | (756) | (881) | (881) | (+125) | --- |
| Subtotal, Mission Support................... | 140,580 | 141,575 | 144,602 | +4,022 | +3,027 |
| Subtotal, Operations and Support................... | 1,662,066 | 1,691,520 | 1,927,750 | +265,684 | +236,230 |
| Procurement, Construction, and Improvements: | | | | | |
| Cybersecurity | | | | | |
| Continuous Diagnostics and Mitigation.......... | 214,350 | 260,027 | 276,015 | +61,665 | +15,988 |
| National Cybersecurity Protection System........ | 91,170 | 90,193 | 90,193 | -977 | --- |
| Subtotal, Cybersecurity................... | 305,520 | 350,220 | 366,208 | +60,688 | +15,988 |
| Emergency Communications: | | | | | |
| Next Generation Networks Priority Services........ | 41,158 | 61,158 | 94,158 | +53,000 | +33,000 |
| Infrastructure Security: | | | | | |
| CISA Gateway.................. | 6,801 | 6,801 | 6,801 | --- | --- |
| Subtotal, Procurement, Construction, and Improvements................. | 353,479 | 418,179 | 467,167 | +113,688 | +48,988 |

**EXHIBIT C-158**

159

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Research and Development: | | | | | |
| Infrastructure Security............................... | 1,216 | 1,216 | 1,216 | --- | --- |
| Risk Management...................................... | 8,215 | 2,715 | 6,215 | -2,000 | +3,500 |
| Subtotal, Research and Development.................. | 9,431 | 3,931 | 7,431 | -2,000 | +3,500 |
| Cyber Response and Recovery Fund...................... | --- | 20,000 | 20,000 | +20,000 | --- |
| Total, Cybersecurity and Infrastructure Security | | | | | |
| Agency............................................... | 2,024,976 | 2,133,630 | 2,422,348 | +397,372 | +288,718 |
| (Defense)............................................ | (1,941,487) | (2,049,486) | (2,336,500) | (+395,013) | (+287,014) |
| (Non-Defense)........................................ | (83,489) | (84,144) | (85,848) | (+2,359) | (+1,704) |
| Federal Emergency Management Agency | | | | | |
| Operations and Support: | | | | | |
| Regional Operations.................................. | 174,804 | 187,881 | 187,881 | +13,077 | --- |
| Mitigation........................................... | 43,038 | 61,663 | 61,663 | +18,625 | --- |
| Preparedness and Protection.......................... | 155,213 | 187,036 | 207,036 | +51,823 | +20,000 |
| Response and Recovery: | | | | | |
| Response............................................. | 196,155 | 203,611 | 203,611 | +7,456 | --- |
| (Urban Search and Rescue)............................ | (37,832) | (37,832) | (37,832) | --- | --- |
| Recovery............................................. | 51,670 | 55,408 | 55,408 | +3,738 | --- |
| Mission Support...................................... | 508,402 | 538,563 | 547,367 | +38,965 | +10,804 |
| Subtotal, Operations and Support.................... | 1,129,282 | 1,232,162 | 1,282,966 | +133,684 | +50,804 |
| (Defense)............................................ | (55,348) | (55,810) | (76,810) | (+20,462) | (+20,000) |

**EXHIBIT C-159**

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Procurement, Construction, and Improvements: | | | | | |
| Operational Communications/Information Technology... | 11,862 | 16,785 | 16,785 | +4,923 | --- |
| Construction and Facility Improvements... | 47,598 | 111,210 | 111,210 | +63,612 | --- |
| Mission Support Assets and Infrastructure... | 46,525 | 60,217 | 60,217 | +13,692 | --- |
| Subtotal, Procurement, Construction, and Improvements... | 105,985 | 188,212 | 188,212 | +82,227 | --- |
| Federal Assistance: | | | | | |
| Grants: | | | | | |
| State Homeland Security Grant Program... | 610,000 | 594,686 | 610,000 | --- | +15,314 |
| (Operation Stonegarden)... | (90,000) | --- | (90,000) | --- | (90,000) |
| (Tribal Security)... | (15,000) | --- | (15,000) | --- | (15,000) |
| (Nonprofit Security)... | (90,000) | --- | (90,000) | --- | (90,000) |
| Urban Area Security Initiative... | 705,000 | 689,684 | 705,000 | --- | +15,316 |
| (Nonprofit Security)... | (90,000) | --- | (90,000) | --- | (90,000) |
| Public Transportation Security Assistance... | 100,000 | 100,000 | 100,000 | +10,000 | +10,000 |
| (Amtrak Security)... | (10,000) | --- | (10,000) | --- | (10,000) |
| (Over-the-Road Bus Security)... | (2,000) | --- | (3,000) | (+1,000) | (+3,000) |
| Port Security Grants... | 100,000 | 100,000 | 110,000 | +10,000 | +10,000 |
| Assistance to Firefighter Grants... | 360,000 | 370,000 | 370,000 | +10,000 | --- |
| Staffing for Adequate Fire and Emergency Response (SAFER) Grants... | 360,000 | 370,000 | 370,000 | +10,000 | --- |
| Emergency Management Performance Grants... | 355,000 | 355,000 | 365,000 | +10,000 | +10,000 |
| Flood Hazard Mapping and Risk Analysis Program... | 263,000 | 275,500 | 275,500 | +12,500 | --- |
| Regional Catastrophic Preparedness Grants... | 12,000 | 12,000 | 12,000 | --- | --- |
| High Hazard Potential Dams... | 12,000 | 12,000 | 12,000 | --- | --- |

**EXHIBIT C-160**

161

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Emergency Food and Shelter | 130,000 | 130,000 | 140,000 | +10,000 | +10,000 |
| Community Project Funding | --- | --- | 151,917 | +151,917 | +151,917 |
| Subtotal, Grants | 3,007,000 | 3,008,870 | 3,231,417 | +224,417 | +222,547 |
| | | | | | |
| Targeted Violence and Terrorism Prevention Grants (by transfer) | (20,000) | (20,000) | (20,000) | --- | --- |
| Alternatives to Detention Case Management Pilot Grants (by transfer) | (5,000) | (5,000) | (15,000) | (+10,000) | (+10,000) |
| Non-custodial Migrant Shelter Grants (by transfer) | --- | --- | (100,000) | (+100,000) | (+100,000) |
| | | | | | |
| Subtotal, Grants (with transfers) | 3,032,000 | 3,033,870 | 3,366,417 | +334,417 | +332,547 |
| | | | | | |
| Education, Training, and Exercises: | | | | | |
| Center for Domestic Preparedness | 67,019 | 67,538 | 67,538 | +519 | --- |
| Center for Homeland Defense and Security | 18,000 | 18,000 | 18,000 | --- | --- |
| Emergency Management Institute | 21,520 | 22,030 | 22,030 | +510 | --- |
| U.S. Fire Administration | 49,269 | 53,212 | 53,212 | +3,943 | --- |
| National Domestic Preparedness Consortium | 101,000 | 101,000 | 101,000 | --- | --- |
| Continuing Training Grants | 12,000 | 12,000 | 12,000 | --- | --- |
| National Exercise Program | 19,084 | 19,820 | 19,820 | +736 | --- |
| | | | | | |
| Subtotal, Education, Training, and Exercises | 287,892 | 293,600 | 293,600 | +5,708 | --- |
| | | | | | |
| Subtotal, Federal Assistance | 3,294,892 | 3,302,470 | 3,526,017 | +230,125 | +222,547 |
| (by transfer) | (25,000) | (25,000) | (135,000) | (+110,000) | (+110,000) |
| | | | | | |
| Subtotal, Federal Assistance (with transfer) | 3,319,892 | 3,327,470 | 3,660,017 | +340,125 | +332,547 |

**EXHIBIT C-161**

162

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Disaster Relief Fund: | | | | | |
| Disaster Relief Climate................................ | --- | 500,000 | --- | --- | -500,000 |
| Disaster Relief Category.............................. | 17,142,000 | 18,799,000 | 18,799,000 | +1,657,000 | --- |
| Subtotal, Disaster Relief Fund................... | 17,142,000 | 19,299,000 | 18,799,000 | +1,657,000 | -500,000 |
| National Flood Insurance Fund: | | | | | |
| Floodplain Management and Mapping.......... | 190,506 | 199,000 | 199,000 | +8,494 | --- |
| Unallocated reduction based on CBO estimate of receipts............................... | --- | -10,706 | -10,706 | -10,706 | --- |
| Mission Support........................................ | 13,906 | 15,706 | 15,706 | +1,800 | --- |
| Subtotal, National Flood Insurance Fund....... | 204,412 | 204,000 | 204,000 | -412 | --- |
| Offsetting Fee Collections........................ | -204,412 | -204,000 | -204,000 | +412 | --- |

**EXHIBIT C-162**

163

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Administrative Provision | | | | | |
| Radiological Emergency Preparedness Program: | | | | | |
| Operating Expenses........................ | 34,000 | 33,630 | 33,630 | -370 | --- |
| Offsetting Collections.................... | -34,000 | -33,630 | -33,630 | +370 | --- |
| Subtotal, Administrative Provision........ | --- | --- | --- | --- | --- |
| Total, Federal Emergency Management Agency.. | 21,672,159 | 24,021,844 | 23,775,195 | +2,103,036 | -246,649 |
| (Discretionary Appropriations)............ | (21,910,571) | (24,259,474) | (24,012,825) | (+2,102,254) | (-246,649) |
| (Defense)................................. | (81,088) | (107,095) | (127,095) | (+46,007) | (+20,000) |
| (Non-Defense)............................. | (21,829,483) | (24,152,379) | (23,885,730) | (+2,056,247) | (-266,649) |
| (Disaster Relief Category)................ | (17,142,000) | (18,799,000) | (18,799,000) | (+1,657,000) | --- |
| (Regular appropriations, not Disaster Relief)...... | (4,687,483) | (5,353,379) | (5,086,730) | (+399,247) | (-266,649) |
| (Offsetting Collections).................. | (-238,412) | (-237,630) | (-237,630) | (+782) | --- |
| (By transfer)............................. | (25,000) | (25,000) | (135,000) | (+110,000) | (+110,000) |
| Total, Title III, Protection, Preparedness, Response, and Recovery........... | 23,697,135 | 26,155,474 | 26,197,543 | +2,500,408 | +42,069 |
| (Discretionary Appropriations)............ | (23,935,547) | (26,393,104) | (26,435,173) | (+2,499,626) | (+42,069) |
| (Defense)................................. | (2,022,575) | (2,166,581) | (2,463,595) | (+441,020) | (+307,014) |
| (Non-Defense)............................. | (21,912,972) | (24,236,523) | (23,971,578) | (+2,058,606) | (-264,945) |
| (Disaster Relief Category)................ | (17,142,000) | (18,799,000) | (18,799,000) | (+1,657,000) | --- |
| (Regular Appropriations, not Disaster Relief)...... | (4,770,972) | (5,437,523) | (5,172,578) | (+401,808) | (-264,945) |
| (Offsetting Collections).................. | (-238,412) | (-237,630) | (-237,630) | (+782) | --- |
| (By transfer)............................. | (25,000) | (25,000) | (135,000) | (+110,000) | (+110,000) |

**EXHIBIT C-163**

164

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| **TITLE IV - RESEARCH, DEVELOPMENT, TRAINING, AND SERVICES** | | | | | |
| U.S. Citizenship and Immigration Services | | | | | |
| Operations and Support: | | | | | |
| Employment Status Verification | 117,790 | 114,504 | 114,504 | -3,286 | --- |
| Application Processing | --- | 345,000 | 345,000 | +345,000 | --- |
| Subtotal, Operations and Support | 117,790 | 459,504 | 459,504 | +341,714 | --- |
| Federal Assistance | 10,000 | 10,000 | 15,000 | +5,000 | +5,000 |
| Fee Funded Programs: | | | | | |
| Immigration Examinations Fee Account: | | | | | |
| Adjudication Services: | | | | | |
| District Operations | (2,044,162) | (1,616,237) | (1,616,237) | (-427,925) | --- |
| Service Center Operations | (826,737) | (625,778) | (625,778) | (-200,959) | --- |
| Asylum, Refugee, and International Operations | (372,392) | (278,594) | (278,594) | (-93,798) | --- |
| Records Operations | (157,271) | (115,518) | (115,518) | (-41,753) | --- |
| Premium Processing (Including Transformation) | (866,725) | (1,014,791) | (1,014,791) | (+348,066) | --- |
| Subtotal, Adjudication Services | (4,067,287) | (3,650,918) | (3,650,918) | (-416,369) | --- |
| Information and Customer Services: | | | | | |
| Operating Expenses | (125,452) | (75,131) | (75,131) | (-50,321) | --- |

**EXHIBIT C-164**

165

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
 - AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Administration: | | | | | |
| Operating Expenses................... | (632,106) | (462,782) | (462,782) | (-169,324) | --- |
| Systematic Alien Verification for Entitlements | | | | | |
| (SAVE)............................. | (37,139) | (30,913) | (30,913) | (-6,226) | --- |
| Subtotal, Immigration Examinations Fee Account.. | (4,861,984) | (4,219,744) | (4,219,744) | (-642,240) | --- |
| H-1B Non-Immigrant Petititioner Account: | | | | | |
| Adjudication Services: | | | | | |
| Service Center Operations................. | (20,000) | (20,309) | (20,309) | (+309) | --- |
| Fraud Prevention and Detection Account: | | | | | |
| Adjudication Services: | | | | | |
| District Operations................. | (28,703) | (38,975) | (38,975) | (+10,272) | --- |
| Service Center Operations........... | (20,878) | (12,132) | (12,132) | (-8,746) | --- |
| Asylum and Refugee Operating Expenses........... | (308) | (120) | (120) | (-188) | --- |
| Subtotal, Fraud Prevention and Detection Account | (49,889) | (51,227) | (51,227) | (+1,338) | --- |
| Subtotal, Fee Funded Programs................. | (4,931,873) | (4,291,280) | (4,291,280) | (-640,593) | --- |

**EXHIBIT C-165**

166

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| **Administrative Provisions** | | | | | |
| House full committee amendment (Pingree, et al) H-2B returning worker (Change in Mandatory Program)...... | --- | --- | 7,000 | +7,000 | +7,000 |
| Unused Visa Rollover Provision (Change in Mandatory Program)........ | --- | --- | 1,000 | +1,000 | +1,000 |
| Subtotal, Administrative Provisions............ | --- | --- | 8,000 | +8,000 | +8,000 |
| Total, U.S. Citizenship and Immigration Services | 127,790 | 469,504 | 482,504 | +354,714 | +13,000 |
| (Discretionary Appropriations)............ | (127,790) | (469,504) | (474,504) | (+346,714) | (+5,000) |
| (Changes in Mandatory Programs)............ | --- | --- | (8,000) | (+8,000) | (+8,000) |
| Fee Funded Programs........... | 4,931,873 | 4,291,280 | 4,291,280 | -640,593 | --- |
| **Federal Law Enforcement Training Centers** | | | | | |
| Operations and Support: | | | | | |
| Law Enforcement Training........ | 284,392 | 291,578 | 291,578 | +7,186 | --- |
| Mission Support............ | 29,956 | 30,858 | 30,858 | +902 | --- |
| Subtotal, Operations and Support............ | 314,348 | 322,436 | 322,436 | +8,088 | --- |
| Procurement, Construction, and Improvements: | | | | | |
| Construction and Facility Improvements............. | 26,000 | 33,200 | 33,200 | +7,200 | --- |
| Total, Federal Law Enforcement Training Centers. | 340,348 | 355,636 | 355,636 | +15,288 | --- |

**EXHIBIT C-166**

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| **Science and Technology** | | | | | |
| | | | | | |
| Operations and Support: | | | | | |
| Laboratory Facilities................ | 122,816 | 123,691 | 123,691 | +875 | --- |
| Acquisition and Operations Analysis... | 57,296 | 52,933 | 52,933 | -4,363 | --- |
| Mission Support...................... | 122,591 | 133,966 | 133,966 | +11,375 | --- |
| Subtotal, Operations and Support..... | 302,703 | 310,590 | 310,590 | +7,887 | --- |
| | | | | | |
| Procurement, Construction, and Improvements | | | | | |
| Laboratory Facilities................ | 18,927 | 8,859 | 8,859 | -10,068 | --- |
| | | | | | |
| Research and Development: | | | | | |
| Research, Development, and Innovation. | 399,417 | 452,417 | 457,417 | +58,000 | +5,000 |
| University Programs.................. | 44,511 | 51,037 | 53,537 | +9,026 | +2,500 |
| Subtotal, Research and Development... | 443,928 | 503,454 | 510,954 | +67,026 | +7,500 |
| | | | | | |
| Total, Science and Technology....... | 765,558 | 822,903 | 830,403 | +64,845 | +7,500 |
| | | | | | |
| **Countering Weapons of Mass Destruction Office** | | | | | |
| | | | | | |
| Operations and Support: | | | | | |
| Mission Support...................... | 82,927 | 85,316 | 85,316 | +2,389 | --- |
| Capability and Operations Support.... | 96,965 | 71,884 | 76,884 | -20,081 | +5,000 |
| Subtotal, Operations and Support..... | 179,892 | 157,200 | 162,200 | -17,692 | +5,000 |

EXHIBIT C-167

168

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Procurement, Construction, and Improvements: | | | | | |
| Large Scale Detection Systems.................. | 60,798 | 53,667 | 53,667 | -7,131 | --- |
| Portable Detection Systems..................... | 26,615 | 14,937 | 14,937 | -11,678 | --- |
| Assets and Infrastructure Acquisition.......... | --- | 3,000 | 8,000 | +8,000 | +5,000 |
| Subtotal, Procurement, Construction, and Improvements.................................. | 87,413 | 71,604 | 76,604 | -10,809 | +5,000 |
| Research and Development: | | | | | |
| Transformational R&D/Technical Forensics | | | | | |
| Transformational R&D........................... | 23,892 | 31,378 | 31,378 | +7,486 | --- |
| Technical Forensics............................ | 7,100 | 3,500 | 3,500 | -3,600 | --- |
| Subtotal, Transformational R&D/Technical Forensics.................................... | 30,992 | 34,878 | 34,878 | +3,886 | --- |
| Detection Capability Development and Rapid Capabilities: | | | | | |
| Detection Capability Development............... | 24,317 | 30,831 | 30,831 | +6,514 | --- |
| Rapid Capabilities............................. | 10,000 | --- | --- | -10,000 | --- |
| Subtotal, Detection Capability Development and Rapid Capabilities...................... | 34,317 | 30,831 | 30,831 | -3,486 | --- |
| Subtotal, Research and Development............. | 65,309 | 65,709 | 65,709 | +400 | --- |

**EXHIBIT C-168**

169

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Federal Assistance: | | | | | |
| Capability Building: | | | | | |
| Training, Exercises, and Readiness.......... | 14,470 | 19,251 | 19,251 | +4,781 | --- |
| Securing the Cities........................ | 24,640 | 30,040 | 30,040 | +5,400 | --- |
| Biological Support........................ | 30,553 | 83,657 | 83,657 | +53,104 | --- |
| Subtotal, Capability Building.......... | 69,663 | 132,948 | 132,948 | +63,285 | --- |
| Subtotal, Federal Assistance.............. | 69,663 | 132,948 | 132,948 | +63,285 | --- |
| Total, Countering Weapons of Mass Destruction... | 402,277 | 427,461 | 437,461 | +35,184 | +10,000 |
| | | | | | |
| Total, Title IV, Research and Development, Training, and Services.... | 1,635,973 | 2,075,504 | 2,106,004 | +470,031 | +30,500 |
| (Discretionary Appropriations)............. | (1,635,973) | (2,075,504) | (2,098,004) | (+462,031) | (+22,500) |
| (Changes in Mandatory Programs)........... | --- | --- | (8,000) | (+8,000) | (+8,000) |
| | | | | | |
| Fee Funded Programs..................... | 4,931,873 | 4,291,280 | 4,291,280 | -640,593 | --- |

TITLE V - GENERAL PROVISIONS

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Presidential Residence Protection Assistance (Sec. 520)..... | 12,700 | --- | --- | -12,700 | --- |
| GSA/CBP Land Port of Entry Construction/Modernization.... | --- | --- | 655,000 | +655,000 | +655,000 |
| Reappropriation (Sec. 535)................. | --- | 118,000 | --- | --- | -118,000 |
| Reappropriation (Sec. 535) (emergency)..... | --- | -2,000 | --- | --- | +2,000 |

**EXHIBIT C-169**

170

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| OSEM O&S (70 x 0100)(rescission) | --- | -22 | -22 | -22 | --- |
| MGMT (70 x 0112) (rescission) | --- | -2 | -2 | -2 | --- |
| MGMT (70 x 0113) (rescission) | --- | -12,629 | -12,629 | -12,629 | --- |
| OBIM (70 x 0521) (rescission) | --- | --- | -8,000 | -8,000 | -8,000 |
| Coast Guard RDT&E (P.L. 115-141) (FY18) (rescission) | -1,718 | --- | --- | +1,718 | --- |
| USCIS Procurement, Construction, and Improvements (P.L. 116-6) (rescission) | -8,200 | --- | --- | +8,200 | --- |
| CBP PC&I Electronic Health Records (P.L. 116-93) (FY20) (transfer out) (emergency) (Sec. 534) | (-20,000) | --- | --- | (+20,000) | --- |
| CBP PC&I (FY18) (P.L. 115-141) (rescission) | -27,036 | --- | --- | +27,036 | --- |
| CBP PC&I (rescission) | --- | -1,500,000 | -2,168,776 | -2,168,776 | -668,776 |
| CBP Construction (70 x 0532) (rescission) | -6,000 | --- | --- | +6,000 | --- |
| CBP (BSFIT (70 x 0533) (rescission) | -15,000 | -24,339 | -24,339 | -9,339 | --- |
| CBP PC&I (P.L. 116-260) (FY21) (rescission) | --- | -10,000 | -10,000 | -10,000 | --- |
| CBP PC&I (70 x 0532) (rescission) | --- | -6,161 | -6,161 | -6,161 | --- |
| CBP Construction and Facility Improvements (P.L. 115-141)(FY18) (rescission) | --- | --- | --- | --- | --- |
| CBP O&S (70 x 0530) (rescission) | --- | -4,500 | -4,500 | -4,500 | --- |
| ICE Construction and Facilities Management (070 X 0540)(rescission) | --- | -7 | -7 | -7 | --- |
| ICE Automation Modernization (070 X 0543) (rescission) | -3,098 | --- | --- | +3,098 | --- |
| ICE, Border and Transportation Security, INS (70 x 0504)(rescission) | -658 | --- | --- | +658 | --- |
| ICE, Violent Crime Reduction Program (70 x 8598) (rescission) | --- | -8 | -8 | -8 | --- |
| TSA, Expenses (70 x 8599) (rescission) | --- | -1 | -1 | -1 | --- |
| TSA, Federal Air Marshals (70 x 0541) (rescission) | --- | -7 | -7 | -7 | --- |
| TSA, Intelligence and Vetting (70 x 0557) (rescission) | --- | -11 | -11 | -11 | --- |
| | --- | -5,308 | -5,308 | -5,308 | --- |

**EXHIBIT C-170**

171

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| TSA, Transportation Security Support (70 x 0554) | | | | | |
| (rescission) | --- | -322 | -322 | -322 | --- |
| Coast Guard PC&I (P.L. 116-6) (rescission) | --- | -65,000 | -65,000 | -65,000 | --- |
| Coast Guard AC&I (P.L. 115-141) (rescission) | --- | --- | -21,000 | -21,000 | -21,000 |
| CISA, Operating Expenses (70 x 0900) (rescission) | --- | -458 | -458 | -458 | --- |
| FEMA State and Local Programs (70 x 0560) (rescission) | --- | -200 | -200 | -200 | --- |
| FEMA Administrative and Regional Operations, Emergency Preparedness and Response (70 x 0712) (rescission) | --- | -2 | -2 | -2 | --- |
| FEMA State and Local Programs (rescission) | --- | -115 | -115 | -115 | --- |
| FEMA Predisaster Mitigation Fund (70 x 0716) | | | | | |
| (rescission) | --- | -3,000 | -3,000 | -3,000 | --- |
| USCIS (rescission) | --- | -1,244 | -1,244 | -1,244 | --- |
| CWMD PC&I (by transfer) (emergency) (Sec. 534) | (20,000) | --- | --- | (-20,000) | --- |
| DHS Lapsed Balances (non-defense) (rescission) | -16,053 | --- | --- | +16,053 | --- |
| DHS Lapsed Balances (defense) (rescission) | -1,575 | --- | --- | +1,575 | --- |
| CBP OFO Fee Shortfall (emergency) (Sec 541) | 840,000 | --- | --- | -840,000 | --- |
| CWMD, Research and Development (70 x 0860) | | | | | |
| (rescission) | --- | -351 | -351 | -351 | --- |
| | | | | | |
| Total, Title V, General Provisions | 773,362 | -1,517,687 | -1,676,463 | -2,449,825 | -158,776 |
| (Discretionary Appropriations) | (12,700) | (118,000) | (655,000) | (+642,300) | (+537,000) |
| (Emergency Funding) | (840,000) | (-2,000) | --- | (-840,000) | (+2,000) |
| (Rescissions) | (-79,338) | (-1,633,687) | (-2,331,463) | (-2,252,125) | (-697,776) |
| (Defense) | (-1,575) | --- | --- | (+1,575) | --- |
| (Non-Defense) | (-77,763) | (-1,633,687) | (-2,331,463) | (-2,253,700) | (-697,776) |
| (By transfer) (Emergency) | 20,000 | --- | --- | -20,000 | --- |
| (Transfer out) (Emergency) | -20,000 | --- | --- | +20,000 | --- |

**EXHIBIT C-171**

172

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2021
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2022
(Amounts in thousands)

| | FY 2021 Enacted | FY 2022 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Grand Total.......................... | 71,726,704 | 73,746,186 | 73,573,519 | +1,846,815 | -172,667 |
| (Discretionary Appropriations).......... | (74,460,401) | (77,800,984) | (78,316,093) | (+3,855,692) | (+515,109) |
| (Defense)............................ | (2,552,575) | (2,695,581) | (3,002,595) | (+450,020) | (+307,014) |
| (Non-Defense)........................ | (71,907,826) | (75,105,403) | (75,313,498) | (+3,405,672) | (+208,095) |
| (Disaster Relief Category)........... | (17,142,000) | (18,799,000) | (18,799,000) | (+1,657,000) | --- |
| (Other Non-Defense)................. | (54,765,826) | (56,306,403) | (56,514,498) | (+1,748,672) | (+208,095) |
| (Rescissions)(Defense)............... | (-1,575) | --- | --- | (+1,575) | --- |
| (Rescissions)(Non-defense)........... | (-77,763) | (-1,633,687) | (-2,331,463) | (-2,253,700) | (-697,776) |
| (Offsetting Collections)............. | (-5,384,063) | (-4,382,630) | (-4,382,630) | (+981,433) | --- |
| (Emergency Appropriations)........... | (840,000) | (-2,000) | --- | (-840,000) | (+2,000) |
| (Mandatory Funding).................. | (1,869,704) | (1,983,519) | (1,963,519) | (+93,815) | --- |
| | | | | | |
| (By transfer)........................ | 25,000 | 25,000 | 135,000 | +110,000 | +110,000 |
| (By transfer) (emergency)............ | 20,000 | --- | --- | -20,000 | --- |
| (Transfer out)....................... | -25,000 | --- | -135,000 | -110,000 | -110,000 |
| (Transfer out) (emergency)........... | -20,000 | --- | --- | +20,000 | --- |
| Aviation Security Capital Fund........ | 250,000 | 250,000 | 250,000 | --- | --- |
| Fee Funded Programs................... | 7,722,889 | 6,277,924 | 6,277,924 | -1,444,965 | --- |

**EXHIBIT C-172**

## MINORITY VIEWS

We thank the Chairs of the Full Committee and Subcommittee for their continued and shared support for many of the programs critical to securing our nation. We endorse the funding levels that are proposed in this bill for the Cybersecurity and Infrastructure Security Agency, the Transportation Security Administration, the Secret Service, and the Federal Emergency Management Agency.

However, we have serious objections and concerns about the bill because of the insufficient allocation provided to the subcommittee and the many misguided policies supported by the current Administration. In its current form, we cannot support the bill.

With more than 180,000 people illegally crossing our southwest border monthly, we must address the immigration crisis. Unfortunately, this bill does not provide the resources for the men and women at the Department to effectively implement the law and fulfill their missions. In the absence of a strong Department of Homeland Security we fear the situation will only get worse. If this bill is enacted, the Department will be incapable of responding to the immigration crisis at the southwest border and protect the country.

The bill before us completely disregards the bicameral, bipartisan conference agreement signed just 7 months ago by rescinding all prior year border wall funds. We are perpetually taking one step forward and two steps back, and rescinding these funds puts into question every single agreement we craft in producing these bills every year.

Further, the policies of this administration and the provisions in this bill to prohibit the simple enforcement of our existing immigration laws is most certainly a cause of the illegal migration surge. We cannot continue to embolden the cartels and transnational criminal organizations by limiting immigration enforcement. These criminal networks will continue to take advantage of these misguided policies by perpetuating the myth that the border is open and will continue trafficking more and more drugs and people into the United States, increasing the profits for the cartels while posing a real danger to our communities.

In an effort to improve the bill to address our concerns, we offered amendments to preserve funds provided in enacted laws for constructing a wall along the Southwest Border; to increase funds for Operation Stonegarden to help law enforcement agencies in border communities work with Customs and Border Patrol to rescue and apprehend migrants abandoned by the cartels; to increase funds for the United States Coast Guard to recapitalize their cutter fleets to meet today's mission requirements; to make the E–Verify program authorization permanent; to allow Immigration and Customs Enforcement officers to enforce the basic immigration laws on the books; and to spare Customs and Border Protection from having to publish their border security surveillance technology infor-

**EXHIBIT C-173**

174

mation on a public website. None of these amendments were adopted.

We are committed to ensuring the Federal government and the Department of Homeland Security meet their responsibilities to the American people. We remain optimistic that we will be able to work together to address these issues and funding requirements in a bill that we can support.

KAY GRANGER.
CHUCK FLEISCHMANN.

**EXHIBIT C-174**