GAY CROSTHWAIT GRUNFELD – 121944
ERNEST GALVAN – 196065
MICHAEL FREEDMAN – 262850
JESSICA WINTER – 294237
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email:        ggrunfeld@rbgg.com
              egalvan@rbgg.com
              mfreedman@rbgg.com
              jwinter@rbgg.com
              bhattem@rbgg.com

PRIYA ARVIND PATEL – 295602
CENTRO LEGAL DE LA RAZA
3400 East 12th Street
Oakland, California  94601-3402
Telephone:   (510) 437-1554
Email:       ppatel@centrolegal.org

LISA V. KNOX – 279406
CALIFORNIA COLLABORATIVE
  FOR IMMIGRANT JUSTICE
1999 Harrison Street, Suite 1800
Oakland, California  94612-4700
Telephone:   (510) 230-6746
Email:       lisa@ccijustice.org

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| JOSE RUBEN HERNANDEZ GOMEZ; SALESH PRASAD; GUILLERMO MEDINA REYES; EDGAR SANCHEZ; ADAN CASTILLO MERINO; IVAN OLIVA SIERRA; FIDEL GARCIA, ISAAC CARDONA HERNANDEZ, and PEDRO JESUS FIGUEROA PADILLA, individually and on behalf of all others similarly situated, | Case No. 1:22-cv-00868-ABA-BAK/EPG<br><br>**FIRST AMENDED COMPLAINT**<br><br>Judge:       Hon. Ana de Alba<br>Magistrate:  Hon. Erica P. Grosjean<br><br>Trial Date:       None Set |
|        Plaintiffs, | |
|     v. | |
| THE GEO GROUP, INC.; and DOES 1 through 10, inclusive, | |
|        Defendants. | |

[4155542.4]

**INTRODUCTION**

1. This action arises from systematic and unlawful wage theft, unjust enrichment, and forced labor at two of Defendant GEO Group, Inc.'s ("GEO") civil immigration detention facilities in California—Mesa Verde ICE Processing Center ("Mesa Verde") and Golden State Annex ICE Processing Center ("Golden State Annex," and collectively "Facilities").

2. Mesa Verde is a civil, not criminal, immigration detention center that GEO owns and operates for profit in Bakersfield, California. It is a former prison with a 400-person capacity, and is used to detain people whose immigration status is contested. GEO has operated Mesa Verde as a civil immigration detention center since 2015.

3. Golden State Annex is a separate civil, not criminal, immigration detention center that GEO owns and operates for profit in McFarland, California. It is a former correctional facility and serves as an annex location to Mesa Verde. It has a 700-person capacity and is also used to detain people whose immigration status is contested. GEO has operated Golden State Annex as a civil immigration detention center since September 2020.

4. GEO is a multibillion-dollar corporation that owns and operates detention facilities around the world. GEO operates at least fourteen civil immigration detention centers in the United States, including the Facilities. GEO has made billions in revenue from its contracts with United States Immigrations and Customs Enforcement ("ICE") to operate these facilities.

5. Although it is contractually required to provide all essential detention services at the Facilities, GEO uses the free or nearly-free labor of civilly detained immigrants to perform those services to maximize profits.

6. GEO pays detained immigrants just $1 per day, or nothing at all, to maintain and operate the Facilities. Detained workers perform basic and necessary tasks, such as cleaning shared showers, sinks, and toilets; sweeping, mopping, and waxing floors; and cleaning surfaces like walls, dining and other tables, chairs, windows, and handrails.

[4155542.4]   1   Case No. 1:22-cv-00868-ABA-BAK/EPG

FIRST AMENDED COMPLAINT

Others work as painters in the facilities or assist detained people with disabilities to perform their daily activities.

7.    Detained workers are paid $1 per day, 5 days per week for their formally scheduled shifts.  Often, however, the same workers also work for no pay at all, on their days "off" and during unscheduled hours.  Other detained people who are not formally scheduled to work also perform job duties that are necessary for the basic functioning of the Facilities.

8.    This labor is not only unpaid and underpaid.  It is also not voluntary in any meaningful sense.  GEO maintains a corporate policy and uniform practice at the Facilities of depriving detained individuals of necessary cleaning services, personal hygiene supplies, and other services and items to ensure a ready supply of available labor needed to operate the Facilities.  Detained people are forced to submit to GEO's $1 per day scheme, the so-called "Voluntary" Activities Program ("Work Program"), to buy the basic necessities—including food, water, and hygiene products—that GEO systematically deprives them of.

9.    GEO also fails to staff the Facilities adequately to maintain minimum standards of cleanliness and sanitation.  At times GEO has no outside staff assigned to clean and sanitize the Mesa Verde and Golden State Annex dorms.  GEO also, at times, fails to hire any detained workers.  As a result, detained people must perform janitorial and custodial services both in the Work Program and informally, outside the Work Program.  They must do so or be forced to live in intolerably filthy conditions, with mold growing in the showers, a stench emanating from the restrooms, and pests running rampant.

10.    If and when detained immigrants fail to perform uncompensated or undercompensated labor, they must live in dirty and unsanitary conditions.  Such conditions were bad enough prior to the COVID-19 pandemic, but have been more harmful and even dangerous since the pandemic began.  The pandemic has rendered the basic cleaning and sanitation tasks unpaid and underpaid detained people perform even more critical and the pressure on detained people to perform these tasks has only

increased.

11.    In the Facilities, GEO also requires detained immigrants to perform uncompensated work under threat of or actual disciplinary action.  Disciplinary action can result in placement in segregated housing and criminal prosecution.  Both can interfere with detained individuals' ability to qualify for immigration relief.

12.    Detained immigrants also are threatened with the loss of recreation, chow, law library and telephone access, and lose their work assignments if they protest the inadequate pay.  GEO staff withhold access to ICE-mandated outdoor exercise from entire dormitories if individual detained workers do not work.

13.    Detained immigrants are charged fees to use ICE tablets to access email and video visit with their loved ones.  They also must use money in their accounts to call, text message, and retrieve voicemails from their loved ones, friends, and other contacts.  Many detained people do not have a source of income to access these services, other than earning $1 per day in the Work Program.

14.    Forced and underpaid labor is part of GEO's business model.  GEO significantly reduces its labor costs and expenses, and increases its already vast profits, by intentionally and unlawfully forcing and coercing detained immigrants to perform labor at subminimum wages, or without pay at all.

15.    The under- and uncompensated labor GEO extracts from immigrants detained in the Facilities is neither required nor permitted by ICE's Performance-Based National Detention Standards ("PBNDS") or GEO's contracts with ICE.  GEO's contracts with ICE do not require GEO to pay detained immigrants $1 per day, or nothing at all; GEO sets detained workers' pay rate within its discretion.

16.    GEO's policies and practices violate California minimum wage law, California common law, the California Unfair Competition Law, and the California and federal Trafficking Victims Protection Acts, which prohibit forced labor.

17.    Plaintiffs Jose Ruben Hernandez Gomez; Salesh Prasad; Guillermo Medina Reyes; Edgar Sanchez; Adan Castillo Merino; Ivan Oliva Sierra; Fidel Garcia; Isaac

Cardona Hernandez; and Pedro Jesus Figueroa Padilla, individually and on behalf of all others similarly situated, bring this class action lawsuit to stop the economic exploitation of detained immigrants in GEO's care, to recover unpaid wages, and to remedy the unjust enrichment resulting from GEO's unlawful failure to pay its detained workforce legal wages at the Facilities.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Trafficking Victims Protection Act, 18 U.S.C. §§ 1589 *et seq.*

19.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant; there are more than 100 class members; the aggregate amount in controversy exceeds $5,000,000; and minimal diversity exists.

20.     Plaintiffs request that this Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over their state law claims arising under the California Minimum Wage Law, California Labor Law, and the California Unfair Competition Law.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims occurred in this District.

22.     This Court has personal jurisdiction over GEO because the corporation regularly conducts business in California and has sufficient minimum contacts with California.

## PARTIES

23.     Plaintiff Jose Ruben Hernandez Gomez is an adult resident of Bakersfield, California.  From November 26, 2021 through January 4, 2022, Mr. Hernandez Gomez was detained at Golden State Annex.  From January 4, 2022 through the present, Mr. Hernandez Gomez has been detained at Mesa Verde.

24.     Plaintiff Salesh Prasad is an adult resident of McFarland, California.  From August 19, 2021 through the present, Mr. Prasad has been detained at Golden State Annex.

25.     Plaintiff Guillermo Medina Reyes is an adult resident of McFarland, California.  From December 9, 2021 through the present, Mr. Medina Reyes has been detained at Golden State Annex.

26.     Plaintiff Edgar Sanchez is an adult resident of Los Angeles, California.  From April 1, 2021 through February 24, 2022, Mr. Sanchez was detained at Golden State Annex.

27.     Plaintiff Adan Castillo Merino is an adult resident of Panoramic City, California.  From November 6, 2020 through September 8, 2022, Mr. Castillo Merino was detained at Golden State Annex.

28.     Plaintiff Ivan Oliva Sierra is an adult resident of Compton, California.  From January 12, 2021 through June 12, 2022, Mr. Oliva Sierra was detained at Golden State Annex.

29.     Plaintiff Fidel Garcia is an adult resident of McFarland, California.  From July 12, 2021 through the present, Mr. Garcia has been detained at Golden State Annex.

30.     Plaintiff Isaac Cardona Hernandez is an adult resident of Bakersfield, California.  From July 1, 2021 through October 2021, he was detained at Golden State Annex.  In October 2021, he was transferred to Mesa Verde, where he has been detained since.

31.     Plaintiff Pedro Jesus Figueroa Padilla is an adult resident of Bakersfield, California.  From October 29, 2021 through November 22, 2021 he was housed at Golden State Annex.  On November 22, 2021 he was transferred to Mesa Verde, where he continues to reside.

32.     Defendant GEO is a for-profit multinational corporation providing correctional, detention, and community reentry services.  GEO is a Florida corporation, with its principal office located at 624 NW 53rd Street, Suite 700, Boca Raton, Florida 33487.

33.     Defendants DOES 1-10 are sued herein under fictitious names because Plaintiffs do not presently know their true names and capacities.  Plaintiffs will seek leave

to amend this Complaint to allege their true names and capacities when such are discovered.  Plaintiffs allege that each of these Defendants was responsible in some capacity for the events alleged herein, or is a necessary party for obtaining appropriate relief.  Plaintiffs are informed and believe and thereon allege that in carrying out each of the acts and violations alleged in this Complaint, each Defendant acted as an agent, principal, and/or representative for each other Defendant.

**FACTUAL ALLEGATIONS**

**A.      Immigration Detention Is Civil—Not Criminal.**

34.      Each year, hundreds of thousands of individuals are detained in geographically isolated immigration detention facilities because their immigration status is contested.  These detained individuals include U.S. citizens, lawful permanent residents (green card holders) with longstanding family and community ties, survivors of torture, asylum seekers, victims of human trafficking, children, and pregnant women.

35.      Many of these detained individuals were brought to the United States as children.  Thousands ultimately have their United States citizenship or legal residency affirmed by an immigration court or federal judge.

36.      Immigration violations are civil violations, and immigration detention is civil in nature.[1]  Many individuals in immigration detention have no criminal history at all.

37.      Notwithstanding immigration detention's civil nature and purpose, detained individuals are often subjected to prison-like conditions.  According to the former head of ICE's Office of Detention Policy and Planning, most are held—systematically and unnecessarily—under circumstances inappropriate for immigration detention's noncriminal purposes.[2]  Detained immigrants are frequently subjected to punitive and

---

[1] *See Fong Yue Ting v. United States*, 149 U.S. 698, 728–30 (1893) (observing that deportation proceedings have "all the elements of a civil case" and are "in no proper sense a trial or sentence for a crime or offense").

[2] Dora Schriro, U.S. Dep't of Homeland Sec., Immigration Detention Overview and Recommendations 10, 15 (2009).

FIRST AMENDED COMPLAINT

long-term solitary confinement, inadequate medical care, sexual and physical assault, and other harsh conditions of confinement.[3]  In this case, Golden State Annex and Mesa Verde residents are housed in carceral facilities that recently have been repurposed for civil detention.

38.    Many detained immigrants submit to deportation simply to obtain release from these intolerable conditions, even when they have valid claims to remain in the United States, including claims to asylum or other discretionary relief.

**B.    The Privatization of Immigration Detention and GEO's Economic Windfall**

39.    Immigration detention in the United States expanded roughly eightfold over the past two decades, from a capacity of 5,532 detention beds in 1994[4] to a capacity of over 41,000 in 2017.[5]  Between February 2019 and January 2021, the total immigration detention bed capacity in California nearly doubled, from 4,160 to 7,408 beds.[6]  Private facilities, like GEO, accounted for 77% of the total immigration detention bed capacity in California in February 2019, increasing to 97% as of January 2021.[7]

40.    The California Legislature passed Assembly Bill 32 in 2019, which banned private detention centers in the State, with some limited exceptions.[8]  Due to AB 32's January 1, 2020 operative date, GEO and ICE scrambled to enter into new contracts allowing immigration detention centers, like the Facilities, to continue to operate in

---

[3] *See King v. Cty. of L.A.*, 885 F.3d 548 (9th Cir. 2018).

[4] Sharita Gruberg, How For-Profit Companies are Driving Immigration Detention Policies, Center for American Progress (Dec. 18, 2015), *available at* https://www.americanprogress.org/article/how-for-profit-companies-are-driving-immigration-detention-policies/.

[5] Jenny Jarvie, "This industry stands to benefit from Trump's crackdown on the border," Los Angeles Times (Feb. 14, 2017) *available at* http://www.latimes.com/nation/la-na-immigrant-detention-20170214-story.html.

[6] *Immigration Detention in California*, the California Department of Justice ("California DOJ"), at 5 (Jan. 2021).

[7] *Id.*

[8] *Id.* at i-ii.

California.[9]  As part of this scramble, GEO expanded Mesa Verde's capacity from 400 to 1,800 beds by contracting with ICE to add Golden State Annex and a second annex location, both of which are located approximately 30 miles from Mesa Verde.[10]

41.     As immigration detention has expanded, private prison corporations, particularly GEO, have gained an increasing share of the contracts for new detention beds.[11]

42.     GEO officials expect and rely on these lucrative ICE contracts to account for a significant percentage of the corporation's ongoing revenues.[12]  Contracts with ICE accounted for 28.2% of GEO's revenues in 2020 and 28.6% in 2019.[13]  GEO's contracts with ICE are essential to its profitability and business model.

43.     GEO's revenues in 2018, 2019, and 2020 were over $3 billion per year.  Its stock is publicly traded on the New York Stock Exchange.

44.     GEO's economic windfall, and the profitability of its immigration detention enterprise, arises from its policy of systemically understaffing and otherwise under-resourcing its facilities and thereby underserving detained immigrants.  The California Department of Justice reported in January 2021 that GEO's Adelanto Facility "is focused on providing detainees with the bare minimum of services required by ICE's detention standards."[14]  Detained people at the Facilities similarly reported in mass surveys in

---

[9] *Id.*

[10] *Id.* at 5.  The second annex to Mesa Verde does not currently house detained people.

[11] Bethany Carson & Eleana Diaz, Payoff: How Congress Ensures Private Prison Profit with an Immigrant Detention Quota, Grassroots Leadership (Apr. 2015) at 4, Chart 1-AA, *available at* https://grassrootsleadership.org/sites/default/files/reports/quota_report_final_digital.pdf.

[12] The GEO Group, Inc., 2021 Form 10-K at 31, *available at* https://sec.report/Document/0001564590-21-006003/geo-10k_20201231.htm#ITEM_16_FORM_10K_SUMMARY

[13] *Id.*

[14] *See Immigration Detention in California*, California DOJ, at ii (Jan. 2021).

October 2021 that GEO consistently provides inedible, unsanitary, and inadequate food and nutrition.[15]

45.     As a uniform policy and practice, GEO provides only the bare minimum to ensure a readily available, captive labor force that cleans, maintains, and operates the Facilities for subminimum wages under the threat of disciplinary action and solitary confinement; abuse of the legal process; loss of privileges, yard time, and work; inadequate amounts of necessary personal hygiene supplies, water, food, and other essentials; and unsanitary conditions.  Without this nearly free labor, GEO's windfall from immigrant detention would be substantially decreased.

**C.     GEO Controls Detained Immigrants' Work in the Work Program; that Work Is Necessary to Maintain and Operate Mesa Verde and Golden State Annex.**

46.     Through its so-called "voluntary" Work Program, GEO hires immigrants detained at the Facilities to perform work that directly contributes to basic institutional operations, at a rate of $1 per day.

47.     At all times, GEO controls detained workers' wages, hours, and working conditions.

48.     Detained people complete and submit an application to be hired into the Work Program.  After submitting an application, they are interviewed.  During the interview, they are asked, among other things, in what positions and shifts they are interested in working.  After workers complete the interview, they are hired into the program.

49.     Detained workers are provided safety and general training to perform their job duties.

50.     In the Work Program, detained immigrants are required to work according to an assigned work schedule.  Typical work shifts at the Facilities are either an 8-hour

---

[15] *See* California Collaborative for Immigrant Justice, *Starving for Justice: The Denial of Proper Nutrition in Immigration Detention*, *available at* https://www.ccijustice.org/starving-for-justice.

morning shift, or an 8-hour afternoon shift.

51. The handbooks for Mesa Verde and Golden State Annex state that GEO provides all personal protection equipment and work uniforms for those in the Work Program. For example, detained workers who clean the bathrooms and showers are provided with and directed to wear gloves and rubber boots. Other detained workers are trained and expected to wear goggles to perform their work duties.

52. In the Work Program, GEO tracks the hours detained immigrants work.

53. In the Work Program, GEO credits wages to detained workers' commissary accounts, typically on a daily basis, as reflected in line items on their accounts.

54. When they are hired, detained workers are assigned specific job titles and job duties.

55. GEO informs all detained immigrants entering the Facilities that the following work assignments may be available through the Work Program:

      (a)    Food Service Helper

      (b)    Dining Hall Cleaning

      (c)    Laundry Assistant

      (d)    Sanitation Cleaning

      (e)    Dorm Porter

      (f)    Haircutter/Barber

56. In the course of their labor and employment by GEO, detained immigrants employed in the Work Program perform a wide range of work, including but not limited to:

      (a)    Scrubbing bathrooms, showers, sinks, and toilets;

      (b)    Cleaning tables, eating areas, and telephones;

      (c)    Taking out the trash;

      (d)    Painting dormitories;

      (e)    Assisting individuals with disabilities as an ADA worker;

      (f)    Helping other detained immigrants access and use tablets;

(g)     Translating for detained immigrants and staff;

(h)     Sweeping, mopping, and waxing floors throughout the facility;

(i)     Washing laundry;

(j)     Washing dishes;

(k)     Cleaning the kitchen and cafeteria before and after meals;

(l)     Providing barber services to detained immigrants; and

(m)     Cleaning and maintaining hallways, walls, doors, windows, and living and recreational areas.

57.     GEO maintains the ability to hire and fire detained immigrant workers in the Work Program.

58.     GEO does not pay and has not paid detained immigrant workers the California minimum wage—currently $15 per hour—for the hours they work at Mesa Verde and Golden State Annex.

59.     No clause in GEO's contract with ICE or any rule or standard incorporated by reference into the contract requires GEO to maximize its profits by underpaying detained workers.  GEO's contracts with ICE do not require it to pay workers in the Work Program just $1 per day.[16]  ICE's standards set $1 per day as the floor, but do not limit GEO's discretion to pay detained workers more than that floor.[17]

60.     GEO refers to detained workers participating in the Work Program as "employees."

61.     Detained workers participating in the Work Program and those who perform uncompensated work are "employees" under California's minimum wage laws.

62.     GEO is an "employer" under California's minimum wage laws.

63.     GEO's contract with ICE requires GEO to comply with all federal, state, and

---

[16] *Novoa v. GEO Grp., Inc.*, No. EDCV 17-2514 JGB (SHKx), 2022 WL 2189626, at *15 (Jan. 25, 2022).

[17] *Id.*

local laws.

64.     GEO's policies and practices ensure that detained workers continue working for subminimum wages.  The Work Program allows GEO to reduce its operational costs and increase its own profits substantially.

**D.     Class Members Are Forced to Work or Be Subject to Discipline.**

65.     GEO punishes and threatens to punish detained people hired into the Work Program and those who do not have a formal work assignment, if they do not perform work in the Facilities.

66.     The Detainee Handbooks provided to each detained person during intake at Mesa Verde and Golden State Annex set forth a number of disciplinary infractions and associated punishments that are enforced against people detained at the Facilities.

67.     The Detainee Handbooks classify "[r]efusing to clean assigned living area and/or group activity areas" as a 300-level "High Moderate" offense punishable by, among other things, up to 72 hours in disciplinary restriction (also known as solitary confinement) or even criminal prosecution.  More than one high moderate or low moderate offense in a 90-day period "shall constitute a high offense," subject to more severe sanctions.

68.     "Failure to follow safety or sanitation regulations" and "Being unsanitary or untidy, failing to keep one's quarters in accordance with posted standards" are both 400-level "Low Moderate" offenses.  These offenses are punishable by, among other things, loss of privileges, property, job, or other program assignment, restriction to the person's housing unit, or a change in housing unit.

69.     The Detainee Handbooks also threaten solitary confinement for disobeying guards, conduct that disrupts the orderly operation of the Facilities, and refusing to comply with corporate facility policies, including GEO's housing sanitation policies, as discussed below.  These more general offenses can be classified as "Greatest," "High," "High Moderate," and "Low Moderate," depending on the circumstances.  Punishment for these offenses likewise varies with the particular circumstances.

70.     "High Offenses" at the 200-level, include offense number 213, "Engaging in,

or inciting a group demonstration," and offense number 214, "Encouraging others to refuse to work or to participate in a work stoppage." Punishments for these offenses include initiating criminal proceedings, disciplinary transfer, disciplinary detention (in solitary confinement) for up to 30 days, and the loss of privileges, property, or job or other program assignments.

71. Class representatives Adan Castillo Merino, Fidel Garcia, Pedro Jesus Figueroa Padilla, and Jose Ruben Hernandez Gomez, along with other detained workers, have recently initiated work stoppages to protest the conditions in which they are detained. The detained workers cited inadequate pay, lack of sufficient workers, unsanitary living conditions, and inadequate personal hygiene, clothing, bedding, food, water, nutrition, and other supplies and services as reasons for the stoppages.

72. As a result of the work stoppages, class representatives and other detained workers have been charged with disciplinary offenses and placed in solitary confinement.

**E.    Class Members Are Retaliated Against When They Assert Their Rights Under the Labor Code and to Be Free from Forced Labor.**

73. When class members assert their rights to a minimum wage, sanitary and hygienic living conditions, adequate food, water, and other supplies, and to be free from forced labor, GEO staff retaliate against them.

74. On July 15, two days after the initial complaint in this action was filed, Mr. Hernandez Gomez—whose name appears in the title of this case—was placed in quarantine and required to take multiple tests for COVID-19 despite showing no symptoms. He was told he had to take the tests and be placed in quarantine because GEO staff reported that he was coughing. These reports were false.

75. After receiving a negative rapid test while in quarantine, Mr. Hernandez Gomez was placed in solitary confinement overnight to await the result of a PCR test, despite still showing no symptoms of illness. GEO medical staff asked Mr. Hernandez Gomez to take another PCR test before he was released from solitary confinement. Mr. Hernandez Gomez was released from solitary confinement only after his outside counsel

intervened.

76.     The solitary confinement cell in which Mr. Hernandez Gomez was placed was dirty and had previously housed a detained person who had tested positive for COVID-19.  Mr. Hernandez Gomez had to clean the cell during the night he was housed there.

77.     Mr. Hernandez Gomez was singled out for placement in solitary confinement despite having no COVID symptoms, while other individuals who displayed COVID symptoms, like a cough, were not forced to take multiple COVID tests and placed in solitary confinement.

78.     GEO staff did not adequately explain or justify placing Mr. Hernandez Gomez in solitary confinement, rather than medical isolation.  When Mr. Hernandez Gomez asked why he had been placed in solitary confinement, rather than medical isolation, for purported COVID symptoms, two GEO staff members told him he was placed there because of a lawsuit.  Although Mesa Verde has been subject to a COVID-19-related lawsuit, that lawsuit did not require Mr. Hernandez Gomez to be tested multiple times for COVID after receiving a negative rapid test and did not require him to be placed in solitary confinement, rather than medical isolation, due to any purported COVID risk.

79.     Within a few days of Mr. Hernandez Gomez's placement in solitary confinement, Mr. Figueroa was similarly required to take multiple tests for COVID-19 and was threatened with solitary confinement despite having no new symptoms.

80.     Mr. Figueroa had previously contracted COVID-19 and had a lingering cough.  One afternoon on the same week the complaint in this suit was filed, GEO staff removed Mr. Figueroa from his dorm and told him he had to take a PCR test, even though he had taken a rapid test earlier that day, and tested negative.  He was told that he would spend three days in solitary confinement if he took the PCR test and 14 days if he did not.  At that point, Mr. Figueroa had been required to take approximately ten tests in a 14-day period, all of which were negative.

81.     Mr. Figueroa had also been placed in solitary confinement for eight days the

previous month. He was told by two GEO staff members that he was placed in solitary confinement because of his involvement in organizing a work stoppage.

82. On or around August 19, 2022, when Mr. Figueroa noticed that none of his grievances were being granted at the third and final level, he decided to approach the Mesa Verde Facility Administrator. The Facility Administrator is responsible for the third and final level of grievance review. On or around that date, Mr. Figueroa approached the Facility Administrator and asked why all of his grievances were being denied at the third level, even when there was video footage proving the conduct he challenged in one of his grievances. The Facility Administrator became hostile in tone. He responded to Mr. Figueroa by saying, roughly, "Do you think I am going to agree with your grievances, so you can make a copy and send it to your attorney and bring me in court?" Mr. Figueroa understood the Facility Administrator to be referencing this lawsuit and Plaintiffs' counsel in this case.

83. On August 16, a GEO staff member refused to assist Mr. Garcia when a baby cockroach was found in the food of a detained person at chow. A few days prior, the staff member who refused to help had told Mr. Garcia that he was aware of Mr. Garcia's involvement in this lawsuit and that he did not want to be left without a job. This staff member had never refused to help Mr. Garcia in the past, but was not willing to call the lieutenant to assist with the cockroach in the detained person's food.

84. Mr. Garcia was later charged with engaging in or inciting a group demonstration after being involved in a sitdown protest of the removal of video visitation rights. GEO had previously offered free video visits with detained peoples' families, but it stopped allowing these visits in September 2022. This requires detained people whose families are not close enough for in-person visits to pay for expensive calls with family, forcing them to continue working for less than minimum wage so that they can contact their loved ones. Although many detained people took part in the sitdown protest, only those involved in labor stoppages were charged in connection with the protest.

85. Rigoberto Hernandez Martinez, another detained person who has been

involved in the labor strikes, was also placed in solitary confinement shortly after this lawsuit was filed and was told that his placement was due to his participation in the work stoppages.  A GEO staff member offered to help Mr. Hernandez Martinez get released from solitary confinement, but only if he would agree to begin working again.

86.     Mr. Hernandez Gomez, Mr. Figueroa, Mr. Cardona Hernandez, Mr. Hernandez Martinez, and other class members were inexplicably transferred to new housing units after asserting their rights under the Labor Code.  Class members view these transfers as GEO's efforts to impede their ability to advocate for themselves and others in the Work Program, and to punish them for doing the same.

87.     Various GEO staff members stated, directly or indirectly, to Mr. Garcia, Mr. Prasad, Mr. Hernandez Gomez, and Mr. Figueroa that they were aware of this lawsuit.

88.     On information and belief, these charges, discipline, refusals to provide assistance, housing transfers, and placements in solitary confinement are retaliatory in nature, designed to force workers to continue to work for GEO at subminimum wages or for no pay at all.

**F.     GEO Uniformly Deprives Individuals Detained at the Facilities of Necessary Food, Water, Personal Hygiene, and Other Supplies, Forcing Detained Individuals to Work to Pay for Those Basic Supplies.**

89.     GEO maintains a corporate policy and uniform practice of withholding sufficient food, water, hygiene products, and other necessities from those detained at the Facilities.  As a result of this policy of deprivation, detained immigrants are forced either to purchase these daily necessities from the Facilities' commissaries or go without.

90.     In 2021, detained people at Golden State Annex reported unlivable and unsanitary housing conditions, including cockroaches and flies in their food, spoiled milk, walls covered in mold, and broken toilets that spit water out when flushed.[18]

91.     On or about September 1, 2022, detained people in Dorm C at Mesa Verde

---

[18] ACLU. "First Amendment Retaliation Against Individuals in Immigration Detention in California" (Aug. 2021). *available at* https://www.aclunc.org/sites/default/files/OCRCL%20complaint.08.26.21%20_0.pdf.

observed brown, contaminated water flowing from their showers and faucets. The water contained pieces of debris. People housed in Dorm C notified staff that the water available to them appeared unsafe to drink and asked that bottled water be provided until the contamination was remedied. GEO staff did not provide bottled water for a full day, or until approximately September 2, 2022. For a few days after that, staff provided non-tap water to detained people. After a few days, however, detained people in Dorm C noticed that the taste of the water being provided from coolers for drinking was off and that there was debris inside the coolers. Water in coolers provided to staff and detained people on the exercise yard did not have the same taste and did not contain debris. The change in water quality after a few days led detained people in Dorm C to believe that GEO staff had resumed using tap water to fill the coolers, in addition to prepackaged and noncontaminated ice.

92. GEO staff later mocked the detained people in Dorm C and their complaints about the contaminated water. Recently, one staff member poured the contaminated water into a styrofoam cup, then animatedly saluted a video camera and drank the cup of water for the camera.

93. GEO also fails to provide adequate cleaning supplies to its detained immigrant workers. It provides insufficient amounts of soap, solvents, and other cleaning solutions and materials for the amount of space that needs to be cleaned. At times, detained workers must use their own personal hygiene supplies, such as shampoo, to perform their Work Program cleaning tasks. GEO also provides watered down solutions that do not have a sufficient concentration of active ingredients to clean effectively or efficiently.

94. GEO staff have told detained people that they can receive extra food from the commissary, but that these rewards are only available to people who do not participate in work stoppages.

[4155542.4]

17

Case No. 1:22-cv-00868-ABA-BAK/EPG

FIRST AMENDED COMPLAINT

**G.   GEO Does Not Staff Its Facilities Sufficiently to Perform Necessary Cleaning and Sanitation Work.**

95.   GEO maintains a uniform practice of not hiring sufficient numbers of outside staff and detained workers to perform basic and necessary cleaning and sanitizing tasks.

96.   At times, GEO has no outside staff employed to perform these basic and necessary duties.  If detained immigrants choose not to clean shared living spaces, through the Work Program or on their own time without pay, they are forced to live in unsanitary conditions, and threatened with losing their jobs, yard time, and privileges, and with being subject to disciplinary action.

97.   Even with detained workers performing these tasks according to a regular schedule, the Facilities remain dirty and unsanitary because GEO intentionally understaffs the Facilities to maximize its profits.

**H.   GEO Has Not Provided Adequate COVID-19 Safety Prevention Measures at Mesa Verde and Golden State Annex.**

98.   The COVID-19 pandemic added a layer of urgency to detained individuals' preexisting need to live in a clean and hygienic setting.

99.   GEO failed to ensure COVID-19 safety prevention measures at Mesa Verde and further attempted to cover up its non-compliance with CDC COVID-19 guidelines.  In a December 3, 2020 order, Judge Vince Chhabria of the U.S. District Court for the Northern District of California noted GEO officials' "abominable performance" of running Mesa Verde during the pandemic, including that officers "deliberately avoided testing detainees and staff for fear that the results would require them to take expensive and logistically challenging safety measures."[19]  Other GEO officials "gave false testimony several times" during the proceedings, and the Mesa Verde facility administrator was "proven to exercise his discretion in a reckless and indifferent fashion" with respect to

---

[19] *Zepeda Rivas v. Jennings*, 504 F. Supp. 3d 1060, 1064 (N.D. Cal. 2020).

detained immigrants' health and safety.[20]  In sum, GEO officials "cannot be trusted on their own to provide reasonably safe conditions to detainees at Mesa Verde."[21]

100.    Dozens of detained immigrants at Mesa Verde went on hunger strikes from April to July 2020 in part to protest the facility's hazardous living conditions and absence of COVID-19 safety prevention measures.[22]  Officials claimed that detained strikers "were just not interested in eating their facility-provided meals."  *Id.*  Mesa Verde staff punished strikers for their protests.[23]  Staff threatened to remove their access to the commissary and computer tablets they use to call, text, and otherwise communicate with loved ones.[24]

101.    By maintaining these harsh conditions, punishing individuals for not working, failing to staff the Facilities at minimally adequate levels, and purposefully withholding basic necessities from those it detains, GEO ensures an available labor pool of detained immigrants who will work for only $1 per day, or no pay at all, thus allowing it to continue operating the Facilities at a significant profit.

**I.      GEO's Contracts with ICE Forbid GEO's Current Practices, But GEO Continues to Operate the Facilities Pursuant to Its Unlawful Policies.**

102.    At each civil immigration facility operated by GEO, GEO is contractually required to comply with some version of ICE's 2011 PBNDS, as updated in 2016.

103.    GEO's contracts with ICE to operate civil immigration detention facilities, including Mesa Verde and Golden State Annex, incorporate the PBNDS.

---

[20] *Id.* at 1064, 1070.

[21] *Id.* at 1070.

[22] Sam Morgen. "Hunger strike at Mesa Verde ends after four days" (Jun. 9, 2020). *available at* https://www.bakersfield.com/news/hunger-strike-at-mesa-verde-ends-after-four-days/article_490b6ee6-aa92-11ea-97a0-938736416877.html.

[23] *Id.*

[24] Sam Morgen. "Detainees at Mesa Verde, other immigrant detention centers allege violation of First Amendment in complaint" (Aug. 27, 2021). *available at* https://www.bakersfield.com/news/detainees-at-mesa-verde-other-immigrant-detention-centers-allege-violation-of-first-amendment-in-complaint/article_0d31b924-0785-11ec-a9cb-9bceb111c4c3.html.

104.   All applicable versions of the PBNDS require any labor performed by a detained immigrant to be voluntary:  "Work assignments are voluntary; however all detainees are responsible for personal housekeeping."  PBNDS § 5.8.V.C.[25]

105.   The Personal Housekeeping Requirement, PBNDS § 5.8.V.C,[26] provides:

> **C. Personal Housekeeping Required**
>
> Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.
>
> *Detainees are required to maintain their immediate living areas in a neat and orderly manner by:*
>
> *1. making their bunk beds daily;*
>
> *2. stacking loose papers;*
>
> *3. keeping the floor free of debris and dividers free of clutter; and*
>
> *4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.*

106.   Outside of the four personal housekeeping tasks enumerated in PBNDS § 5.8.V.C, GEO cannot force or compel individuals in immigration detention to work.

107.   In violation of the PBNDS, its contracts with ICE, and the California and federal forced labor statutes, GEO promulgates and enforces corporate policies known as Housing Unit Sanitation Policies ("HUSPs") at nearly all of its civil immigration detention facilities, including Mesa Verde and Golden State Annex.

108.   GEO's HUSPs require detained immigrants to perform a wide range of uncompensated work for the company's enrichment.

109.   Under the HUSPs, detained immigrants are forced to perform uncompensated labor, such as cleaning and maintaining areas of GEO facilities outside the scope of the Personal Housekeeping Requirement, PBNDS § 5.8.V.C.  For instance, the

---

[25] *See also id.* § 5.8.II.2 ("Detainees shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping.")

[26] *Available at* https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf (last visited Apr. 1, 2022).

HUSPs require detained immigrants to clean and sanitize walls, bathrooms, showers, toilets, microwaves, furniture, windows and floors—work well outside the four personal housekeeping tasks enumerated in PBNDS § 5.8.V.C.

110. Detained immigrants are not paid to perform labor under the HUSPs.

111. At Mesa Verde and Golden State Annex, GEO obtains compliance with its HUSPs by threatening detained immigrants with disciplinary write-ups and solitary confinement; deprivation of legally required services such as recreation, law library, and telephone time; understaffing its facilities; depriving detained individuals of food, water, basic hygiene, and other supplies; and abuse of legal process, including reporting misbehavior to ICE or to the immigration court and the threat of criminal prosecution.

112. Detained immigrants have no meaningful choice but to comply with a demand from a GEO official to perform free labor.

113. Detained immigrants are notified in the Detainee Handbooks when they enter the Facilities of GEO's requirement that they must perform uncompensated, non-personal cleaning and maintenance work, and that the consequence of refusal can be disciplinary action, including solitary confinement.

114. GEO's facility-specific Detainee Handbooks are intended to leave detained immigrants with the false impression that the company can compel them to perform work outside the four personal housekeeping tasks set forth in Section 5.8.V.C of the PBNDS.

115. No clause in GEO's contracts with ICE or any rule or standard incorporated by reference therein permits GEO to compel or force detained individuals to work for free at Mesa Verde or Golden State Annex.

116. GEO's contracts with ICE incorporating the PBNDS expressly prohibit the company from forcing, coercing, or mandating detained individuals to complete work assignments that fall outside the scope of the personal housekeeping requirement, PBNDS § 5.8.V.C.

117. The PBNDS requires detained workers in the Work Program "to work according to a schedule" and prohibits "work in excess of 8 hours daily and 40 hours

[4155542.4]

21

weekly." PBNDS § 5.8.H.

118. As a federal contractor, GEO is also prohibited by Executive Order, the Federal Acquisition Regulations, and Homeland Security Acquisition Regulations from using forced labor in the performance of its contracts with ICE.

119. GEO must promptly report allegations of forced labor made against the corporation to the federal government, regardless of whether it contests those allegations.

120. On information and belief, GEO has not complied with the requirement that it promptly report allegations of forced labor made by Plaintiffs in this action to the federal government.

121. By carrying out a scheme requiring detained immigrants to perform uncompensated janitorial and maintenance work pursuant to corporate HUSPs, GEO violates the federal and California forced labor statutes.[27]

**J.     At All Relevant Times, GEO Acted with Malice, Oppression, and Fraud by Forcing Detained Workers to Work and Intentionally and Illegally Reaping the Benefits of Detained Workers' Labor.**

122. GEO's despicable conduct in depriving detained workers of food, water, and essential supplies, and punishing and threatening to punish detained workers for asserting their rights to a minimum wage and to be free from forced labor evidences its malicious and oppressive conduct in promulgating and operating the Work Program.[28] GEO engaged in this malicious and oppressive conduct with a willful and conscious disregard of detained individuals' rights and safety, and in so doing subjected them to cruel and unjust hardship in disregard of their rights.

123. In its Detainee Handbooks and through GEO staff's oral and other representations GEO fraudulently and intentionally misrepresented to detained people that they are and were required to perform work outside the requirements of the PBNDS and pursuant to the HUSPs, and that GEO could lawfully force them to perform such work

---

[27] *See* 18 U.S.C. § 1589; Cal. Civ. Code § 52.5.

[28] *See* Cal. Civ. Code § 3294(a)-(c).

under threat of and actual discipline and other sanctions.  GEO knew it could not lawfully require detained individuals to perform this work, but it intentionally and unlawfully forced detained individuals to work.  In doing so, GEO intended to reap the economic benefit of this forced and undercompensated labor; its business model relies on these practices.

**K.     Plaintiff Jose Ruben Hernandez Gomez Was Forced to Work for Little or No Pay.**

124.    Mr. Hernandez Gomez is a citizen of Mexico and a lawful permanent resident of the United States since he was 8 years-old.  He previously lived in Lodi, California.

125.    Mr. Hernandez Gomez was detained at Golden State Annex from November 26, 2021 through January 4, 2022.  He has been detained at Mesa Verde since January 4, 2022.

126.    Mr. Hernandez Gomez performed work for GEO at both the Mesa Verde and Golden State Annex facilities and was not paid California's minimum wage for that work.  At times he was not paid at all for his work.

127.    When Mr. Hernandez Gomez was housed at Golden State Annex, between November 26, 2021 and January 4, 2022, he worked in the quarantine section.  Staff did not clean the quarantine section at all, and no individuals were assigned to the Work Program in the quarantine section.  The detained people housed there organized their own cleaning schedules that they followed so that they did not have to live in filth.  Among other things, the detained people in the quarantine section cleaned bathrooms and eating areas.

128.    At Mesa Verde, Mr. Hernandez Gomez worked as a porter in Dorm A for about one month, between January and February 2022.  He cleaned restrooms, hallways, and dayrooms.  He used cleaning supplies and equipment provided by GEO. Mr. Hernandez Gomez worked Monday through Friday from approximately 10:30 am until 11:20 am.  During that hour, Mr. Hernandez Gomez swept and mopped floors, and cleaned

showers and toilets.  In February 2022, Mr. Hernandez Gomez left Dorm A to live in Dorm C.  When he returned to Dorm A in March 2022 he again worked as a porter.  His work week after March 2022 ran from Tuesday through Saturday, and his hours varied, but generally started at 8 am and ended sometime between 9 am and 12 pm.  Again, he swept and mopped floors, and cleaned showers and toilets.  He also worked on his days off to prevent the dorm from becoming filthy.

129.    In return for his labor in the Work Program at Mesa Verde, GEO paid Mr. Hernandez $1 per day.  GEO credited these wages to Mr. Hernandez Gomez's commissary account.

130.    Mr. Hernandez Gomez used cleaning supplies and equipment provided by GEO, and is supervised by GEO employees.

131.    If Mr. Hernandez Gomez did not clean the bathrooms, eating areas, and other shared spaces, he would be forced to live in filth.

132.    If given a meaningful choice, Mr. Hernandez Gomez would not have worked for $1 per day.

133.    On June 29, 2022, Mr. Hernandez Gomez's dorm joined a work stoppage taking place at Mesa Verde that had already been ongoing in a different dorm since May 5, 2022.  The work stoppage is an effort to protest wages, working conditions, and worker treatment. Mr. Hernandez Gomez and 16 other individuals in his dorm signed a note informing GEO in writing of the work stoppage.

134.    GEO retained the value of Mr. Hernandez Gomez's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detained people at Mesa Verde and Golden State Annex.

**L.    Plaintiff Salesh Prasad Was Forced to Work for Little or No Pay.**

135.    Mr. Prasad is citizen of Fiji and has been a permanent resident of the United States since he was 6 years-old.  He is seeking humanitarian relief in the United States under the Convention Against Torture.

136.    Mr. Prasad has been detained at Golden State Annex since August 19, 2021.

He has been housed in Dorms B1, B2, A2, and A4, along with the Special Management Unit (SMU), GEO's solitary confinement unit at Golden State Annex.

137. Between approximately September 9 or 10, 2021 and January 14, 2022, and from June 6, 2022 to June 21, 2022, Mr. Prasad was employed by GEO as a porter.

138. Mr. Prasad performed work for GEO at Golden State Annex and was not paid California's minimum wage for that work. At times he was not paid at all for his work.

139. Mr. Prasad worked as a porter in the Work Program beginning in September 2021. As a porter, Mr. Prasad cleaned the showers, toilets, and sinks at Golden State Annex. He cleaned the floors and picked up trash. He also cleaned the dayroom, windows, and other parts of the bathroom when other detained workers did not perform these duties. Mr. Prasad was scheduled to work the morning shift, Monday through Friday.

140. Mr. Prasad used cleaning supplies and equipment provided by GEO, and was supervised by GEO employees.

141. Between September 2021 and January 2022, Mr. Prasad was paid $1 per day for his 8-hour shift as a porter.

142. Starting in September 2021, however, Mr. Prasad had to work for free on his days off and outside his regular work schedule because there were not enough workers to perform all necessary cleaning tasks.

143. Starting in January 2022, no porters at all were employed to work in Dorm B1. Mr. Prasad was unassigned from his porter position as well. As a result, Mr. Prasad had to mop the whole dorm—the television room, dayroom, bed area, and phone area—but was not paid, even $1 per day, for doing so.

144. In February 2022, when Mr. Prasad asked the B Dorm caseworker whether GEO could hire workers to clean the dorm, the caseworker deferred the question to the next week. The following week, when Mr. Prasad asked again, the caseworker informed Mr. Prasad that GEO would not be hiring more staff; they would be cutting positions.

[4155542.4]

25

Case No. 1:22-cv-00868-ABA-BAK/EPG

FIRST AMENDED COMPLAINT

When Mr. Prasad asked the caseworker whether GEO wanted detained individuals to work for free, the caseworker responded, "I don't know, I just work here."

145.    Mr. Prasad and one other detained person worked 7 days per week because no other workers were available to clean in Dorm B1.

146.    On April 22, 2022, Mr. Prasad was moved to Dorm B2.  Again, Mr. Prasad had to work for free because there were no workers to perform necessary cleaning tasks. No porters at all were employed to work in Dorm B2.  As a result, Mr. Prasad had to mop the whole dorm—the television room, dayroom, bed area, phone area, and bathrooms.

147.    Between January 2022 and June 6, 2022, GEO was able to compel Mr. Prasad to work for free because no one else was available or willing to do necessary sanitation and cleaning.

148.    Beginning on June 6, 2022, Mr. Prasad was again hired as a porter.  He is being paid $1 per day.  GEO credits these wages to Mr. Prasad's commissary account.

149.    If given a meaningful choice, Mr. Prasad would not work for $1 per day or nothing at all.

150.    If given a meaningful choice, Mr. Prasad would not work 7 days per week.

151.    GEO retained the value of Mr. Prasad's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detained people  at Mesa Verde and Golden State Annex.

**M.    Plaintiff Guillermo Medina Reyes Was Forced to Work for Little or No Pay.**

152.    Mr. Medina Reyes is a citizen of Mexico.  He is seeking humanitarian relief in the United States pursuant to the Convention Against Torture.

153.    Mr. Medina Reyes has been detained at Golden State Annex since December 9, 2021.

154.    Mr. Medina Reyes has performed work for GEO at Golden State Annex between January and March 2022, when he signed a Work Program contract to perform porter duties in Dorm A4.  Later in March he signed a new Work Program contract to perform the same job duties as a porter in Dorm A4.  In May 2022, he signed a new Work

Program contract for a barber position.

155. Mr. Medina Reyes asked GEO's case manager about becoming a porter because he noticed the dorms were not clean and were unsanitary. Only two or three individuals were employed to clean the dorms.

156. Mr. Medina Reyes has never been paid California minimum wage for the work he has performed.

157. As a porter, Mr. Medina Reyes mopped and swept the entire dorm, including the dayroom, television room, and in between bunks. After Mr. Medina Reyes began working as a porter, staff began adding duties to his job because there were not enough porters to complete necessary tasks. At first Mr. Medina Reyes was just sweeping and mopping, but later he became responsible for wiping tables and telephones. At times he had to clean bathrooms, including the toilets, sinks, floors, walls, mirrors, and showers.

158. He used cleaning supplies and equipment provided by GEO, and he was supervised by GEO employees.

159. Mr. Medina Reyes has been paid $1 per day for his labor as a porter and a barber. GEO credits these wages to Mr. Medina Reyes's commissary account.

160. As a porter, Mr. Medina Reyes performed other janitorial and maintenance work for GEO.

161. When Mr. Medina Reyes was housed in B Dorm for approximately 3 to 4 weeks in December 2021, no paid porters were assigned to clean and maintain the dorm. GEO staff in B Dorm told residents that no outside staff or detained workers would clean the dorm, meaning that they have to do it. As a result, the detained individuals in B Dorm organized and performed all cleaning duties. GEO staff provided cleaning supplies to the workers in B Dorm.

162. While Mr. Medina Reyes was housed in B Dorm he cleaned the bathroom and showers on a daily basis. He was not compensated for this work. Mr. Medina Reyes did not feel like he had a choice not to clean because if he and other detained individuals did not perform this work, no one would and their living spaces would become dirty and

unsanitary.

163.    As a barber, Mr. Medina Reyes is responsible for providing haircuts to all individuals in his dorm.  He conducts his work in a room assigned by GEO, during specific daily work hours assigned by GEO.  GEO provides the clippers, trimmers, and barbicide he uses for his work.

164.    If given a meaningful choice, Mr. Medina Reyes would not work for $1 per day or no money at all.

165.    GEO retained the value of Mr. Medina Reyes's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detained people at Mesa Verde and Golden State Annex.

**N.    Plaintiff Edgar Sanchez Was Forced to Work for Little or No Pay.**

166.    Mr. Sanchez is a citizen of Mexico and has lived in California since he was 1 year-old.  He has lawful status pursuant to the Convention Against Torture and currently lives and works in Whittier, California.

167.    Mr. Sanchez was detained at Golden State Annex between April 1, 2021 and February 24, 2022.

168.    Mr. Sanchez performed work for GEO at Golden State Annex starting in June 2021, when he signed a Work Program contract to perform porter duties.  He worked as a porter for approximately 6 months.

169.    He was not paid the California minimum wage for the work he performed.

170.    As a porter, Mr. Sanchez mopped and swept his dorm.  He also cleaned and sanitized surfaces in the dorm.

171.    Mr. Sanchez used cleaning supplies and equipment provided by GEO, and was supervised by GEO employees.

172.    Mr. Sanchez was paid $1 per day for his labor as a porter.  GEO credited these wages to Mr. Sanchez's commissary account.

173.    Mr. Sanchez was compelled to work as a porter.  Officers at Golden State Annex would tell him and other detained individuals that they were required to work, and

that it was mandatory to do so.

174. Officers would also tell detained individuals that they would not be permitted to go to yard if they did not work. If Mr. Sanchez did not perform tasks as ordered by GEO staff, officers stopped recreation time for his entire dorm and/or denied the entire dorm legal library and/or chow access.

175. Mr. Sanchez would work so that the people in his dorm would not lose access to these activities.

176. Mr. Sanchez performed his porter duties even on days he was not scheduled to work to keep the dorm clean and sanitary in hopes of preventing or reducing disease among the population.

177. Officers threatened Mr. Sanchez with discipline if he did not work. They told Mr. Sanchez that if they disciplined him, that would interfere with his immigration case and his ability to seek relief.

178. Mr. Sanchez performed work under threat of harm to himself and his fellow detained immigrants and abuse of the legal process.

179. If given a meaningful choice, Mr. Sanchez would not have worked for $1 per day or nothing at all.

180. GEO retained the value of Mr. Sanchez's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detained people at Mesa Verde and Golden State Annex.

**O.     Plaintiff Adan Castillo Merino Was Forced to Work for Little or No Pay.**

181. Mr. Castillo Merino is a citizen of Mexico and has lived in Southern California since he was 8 years-old. He has been detained at Golden State Annex during the pendency of his immigration case before the Immigration Court, the Board of Immigration Appeals and the Ninth Circuit Court of Appeals since November 6, 2020.

182. Mr. Castillo Merino has performed work for GEO at Golden State Annex since November or December 2020. Starting in November or December 2020 and through May 2021, Mr. Castillo Merino was assigned to work as a porter in the Work Program.

His duties included sweeping, mopping, and cleaning the dorm restrooms, furniture, windows, and doors.

183.    In May 2021, Mr. Castillo Merino was assigned to work as a painter in the Work Program for one week.  He and others were responsible for painting the dorms.  As a member of the paint crew, Mr. Castillo Merino was promised $1 per day in pay.  He was told that within one week of his employment, the painters would be able to meet with the warden to see if they could earn a small amount of additional pay.  Instead of raising the painters' pay, the GEO staff fired everyone on the paint crew.  Staff then hired other workers to constitute a new paint crew.

184.    Starting in May 2021 and through the present, Mr. Castillo Merino has once again been assigned to work as a porter in the Work Program.  He is assigned to work the afternoon shift, from 2 pm to 10 pm.  His responsibilities are similar to those he performed in his first porter position.  His duties include sweeping, mopping, and cleaning the dorm restrooms, furniture, windows, and doors.

185.    Mr. Castillo Merino has never been paid California minimum wage for the work he has performed.

186.    Mr. Castillo Merino uses cleaning supplies and equipment provided by GEO, and is supervised by GEO employees.

187.    Mr. Castillo Merino has been paid $1 per day for his labor as a porter and a painter.  GEO credits these wages to Mr. Castillo Merino's commissary account.

188.    Mr. Castillo Merino works on his putative days off and during hours when he is not scheduled because GEO has not hired sufficient outside staff and detained workers to perform necessary cleaning and sanitation tasks.

189.    Mr. Castillo Merino does not feel like he has a choice not to clean because if he and other detained immigrants do not perform under- and uncompensated work, no one will.  Their living spaces would become dirty and unsanitary.  When detained workers do not clean the dorms, mold grows in the showers, dust collects, and the toilets become dirty because GEO staff do not clean them properly.

190.    If given a meaningful choice, Mr. Castillo Merino would not work for $1 per day or no money at all.

191.    On June 6, 2022, Mr. Castillo Merino and other workers on his dorm began a labor stoppage in response to conditions, including an increase in commissary fees, inadequate medical care, inadequate amounts of food, and excessive telephone, video call, and texting fees that make it difficult for detained individuals to keep in contact with their loved ones.

192.    GEO retained the value of Mr. Castillo Merino's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detained people at Mesa Verde and Golden State Annex.

**P.      Plaintiff Ivan Oliva Sierra Was Forced to Work for Little or No Pay.**

193.    Mr. Oliva Sierra is a citizen of Mexico and has lived in Southern California since he was approximately 6 years-old.  He was detained at Golden State Annex from January 12, 2021 until on or about June 13, 2022.   Although an Immigration Judge ultimately found on April 27, 2022 that Mr. Oliva Sierra warrants legal status in the United States under the Convention Against Torture, ICE refused to release him from detention for nearly two additional months.

194.    Mr. Oliva Sierra currently resides in Compton, California.

195.    Mr. Oliva Sierra worked in several positions at Golden State Annex.

196.    At various times between April 2021 and May 2022, Mr. Oliva Sierra worked as porter, a barber, and an ADA assistant helping a person with disabilities with activities of daily living.  In both the porter and ADA assistant assignments, Mr. Oliva Sierra performed work outside his scheduled hours because GEO did not provide for enough free or detained staff to perform these functions.

197.    Mr. Oliva Sierra was never paid California minimum wage for the work he performed.

198.    Mr. Oliva Sierra used cleaning supplies and equipment provided by GEO, and is supervised by GEO employees.

199. When GEO paid Mr. Oliva Sierra for his work, GEO paid just $1 per day.

200. If given a meaningful choice, Mr. Oliva Sierra would not have worked for $1 per day or no money at all.

201. GEO retained the value of Mr. Oliva Sierra's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detained people at Mesa Verde and Golden State Annex.

**Q.     Plaintiff Fidel Garcia Was Forced to Work for Little or No Pay.**

202. Mr. Garcia is a citizen of Mexico and has lived in the United States since he was approximately 5 years-old. He has been detained at Golden State Annex during the pendency of his immigration case before the Immigration Court and the Board of Immigration Appeals.

203. Mr. Garcia has been detained at Golden State Annex since July 2021. Initially he was housed in B Dorm, but then was moved to the A1 Dorm after approximately two weeks.

204. Mr. Garcia has worked as a porter in the Work Program since approximately July 16, 2021. As a porter, he cleans the bathrooms, including sweeping the floors, taking out the trash, and cleaning the toilets and showers.

205. Mr. Garcia is assigned to work as a porter 5 days per week for 8 hours per day, but actually works 7 days a week because there are not enough porters to cover all shifts and there are not enough assigned workers to complete all the necessary work.

206. When Mr. Garcia works on his days off, he does not get paid for his work. Staff do not record his extra shifts, so he does not get paid for them.

207. Mr. Garcia has never been paid California minimum wage for the work he has performed.

208. Mr. Garcia has been paid $1 per day for his labor. GEO credits these wages to Mr. Garcia's commissary account. At times Mr. Garcia has been paid nothing at all.

209. Mr. Garcia uses cleaning supplies and equipment provided by GEO, and is supervised by GEO employees.

210.    Mr. Garcia feels like he has not had a choice not to work because if he and other detained people do not perform this uncompensated yet necessary work, no one will.

211.    If given a meaningful choice, Mr. Garcia would not work for $1 per day or no money at all.

212.    On June 6, 2022, Mr. Garcia and other workers on his dorm began a labor stoppage to protest GEO's exploitation of them, including increases of commissary fees at Golden State Annex.

213.    GEO retained the value of Mr. Garcia's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detained people at Mesa Verde and Golden State Annex.

**R.    Plaintiff Isaac Cardona Hernandez Was Forced to Work for Little or No Pay.**

214.    Mr. Cardona Hernandez is a citizen of Guatemala.  He is currently detained at Mesa Verde during the pendency of his immigration case before the Ninth Circuit Court of Appeals.

215.    Mr. Cardona Hernandez was detained at Golden State Annex starting July 6, 2021.  He was housed in A Dorm.  In early October 2021, Mr. Cardona Hernandez was transferred to Mesa Verde.  He spent his first two weeks at Mesa Verde in A Dorm, and then moved to C Dorm, where he resided until June 9, 2022.  Between June 9 and July 7, 2022, Mr. Cardona Hernandez was housed in segregation.

216.    At both Facilities, Mr. Cardona Hernandez worked as a porter in the Work Program.  He began working in the Work Program at Golden State Annex in early July 2021, and at Mesa Verde about a week after being transferred there in early October 2021.

217.    Mr. Cardona Hernandez began cleaning at Mesa Verde, without pay, shortly after his arrival and before he was hired into the Work Program.

218.    To be hired as a porter at both Facilities, Mr. Cardona Hernandez signed applications and then participated in short interviews.  During the interview at Mesa Verde, staff asked Mr. Cardona Hernandez what work he wanted to perform and whether he wanted to work a morning or afternoon shift.  Mesa Verde staff asked Mr. Cardona

Hernandez questions from a list during his interview for the Work Program.

219. During the interview at Golden State Annex, staff discussed safety practices with Mr. Cardona Hernandez, including how to wear goggles and use gloves properly.

220. As a porter, Mr. Cardona Hernandez cleaned the bathrooms completely, including sweeping the floors and cleaning the toilets and showers. At times, when needed, Mr. Cardona Hernandez has cleaned other areas of the Facilities as well.

221. Mr. Cardona Hernandez was assigned to work one 8-hour shift per day, five days per week. He was assigned to work Monday through Friday. Due to inadequate staffing, however, Mr. Cardona Hernandez typically worked six days per week and at times he would cover both the morning and afternoon shifts in a single day. He was not paid for this additional work. Mr. Cardona Hernandez understood that if he did not perform the work, there were not enough staff and detained workers to clean.

222. In approximately January 2022, the workers in Mr. Cardona Hernandez's dorm initiated a work stoppage because Mesa Verde cut the number of workers employed in the dorm from an average of 8 workers to no more than 6 workers. In early May 2022, GEO decided to cut the number of workers further, so that fewer than 6 workers were hired to clean the dorm.

223. When the work stoppage began, GEO hired two outside staff members to clean the dorm where Mr. Cardona Hernandez lives. The outside staff do not clean the dorms well, so Mr. Cardona Hernandez continues to clean.

224. In retaliation for the work stoppage, GEO removed popcorn and soda as items that detained workers could purchase from the commissary.

225. On May 5, 2022, Mr. Cardona Hernandez filed a grievance asking GEO to clean the living areas better. In response to his grievance, GEO stated if Mr. Cardona Hernandez wanted to his living space to be cleaner, he should clean it himself. Mr. Cardona Hernandez believes he will have to start cleaning common dorm areas again because he does not want to live in filth.

226. On June 9, 2022, when Mr. Cardona Hernandez was still participating in the

work stoppage, GEO staff placed him in segregation. He believes he was placed in segregation in retaliation for joining the work stoppage.

227. After being placed in segregation, Mr. Cardona Hernandez met two other people who also participated in work stoppages in other dorms and who were also moved out of their dorms and placed in segregation. Mr. Cardona Hernandez perceives these retaliatory moves as ways to separate the those participating in the work stoppages and break up the work stoppages.

228. Mr. Cardona Hernandez has never been paid California minimum wage for the work he has performed.

229. Mr. Cardona Hernandez has been paid $1 per day for his labor. GEO credits these wages to Mr. Cardona Hernandez's commissary account. At times Mr. Cardona Hernandez has been paid nothing at all.

230. Mr. Cardona Hernandez uses cleaning supplies and equipment provided by GEO, and is supervised by GEO employees.

231. Mr. Cardona Hernandez feels like he does not have a choice not to work because if he and other detained people do not perform this uncompensated yet necessary work, no one will.

232. If given a meaningful choice, Mr. Cardona Hernandez would not work for $1 per day or no money at all.

233. GEO retained the value of Mr. Cardona Hernandez's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detained people at Mesa Verde and Golden State Annex.

**S.    Plaintiff Pedro Jesus Figueroa Padilla Was Forced to Work for Little or No Pay.**

234. Mr. Figueroa is a citizen of Mexico. He has been detained at Golden State Annex and Mesa Verde during the pendency of his immigration proceedings.

235. Mr. Figueroa was detained at Golden State Annex from October 29, 2021 through November 22, 2021, in Dorm B1. On November 22, 2021, he was transferred to

Mesa Verde, where he lived in A Dorm for approximately one month.  He was transferred to D Dorm after his first month on A Dorm, and then transferred back to A Dorm on February 14, 2022.

236.    When Mr. Figueroa was at Golden State Annex, he would clean his dorm even though he had not been hired into the Work Program.  Mr. Figueroa felt he had no choice but to clean because no one was hired into the Work Program there.  While at Golden State Annex, Mr. Figueroa swept and mopped the entire dorm.  He shared these unofficial job duties with the other people in the dorm.

237.    Mr. Figueroa signed a Work Program contract to work as a porter at Mesa Verde in approximately December 2021, but was taken off the list due to medical issues. In approximately January 2022, when he was medically cleared to work again, he signed a new contract to work as a porter.  He worked as a porter at Mesa Verde from approximately February 2022 until June 28, 2022.

238.    He was assigned to an 8-hour shift, 5 days per week.

239.    His job duties as dorm porter included sweeping and mopping the dorm, cleaning the restrooms, and picking up trash, among other things.  On June 28, 2022, Mr. Figueroa's dorm joined the work stoppage taking place at Mesa Verde.  Mr. Figueroa and 16 other individuals in his dorm signed a note informing GEO in writing of the work stoppage.

240.    On June 29, 2022, Mr. Figueroa witnessed another individual who signed the note being taken out of the dorm and placed in segregation.  In the morning on June 30, 2022, Mr. Figueroa was approached by a lieutenant on the yard who told him he would be taken to medical for a segregation screening.  Mr. Figueroa asked the reason and was told it was for inciting a group demonstration.  Later that day, Mr. Figueroa received a paper stating the charge: engaging in or inciting a group demonstration and conduct that disrupts the operation of the facility.  On July 1, 2022, Mr. Figueroa received copies of incident reports stating the charges.  He believes that he and his dorm-mate were placed in segregation as retaliation for joining the work stoppage.

[4155542.4]

36

241. Mr. Figueroa has never been paid the California minimum wage for the work he has performed.

242. Mr. Figueroa has been paid $1 per day for his labor. GEO credits these wages to Mr. Figueroa's commissary account. At times Mr. Figueroa is paid nothing at all.

243. Mr. Figueroa used cleaning supplies and equipment provided by GEO, and was supervised by GEO employees.

244. Mr. Figueroa feels he has had no choice but to work because if he and other detained people do not perform this necessary work, no one will, and he could be issued a disciplinary write-up.

245. If given a meaningful choice, Mr. Figueroa would not work for $1 per day or no money at all.

246. GEO retained the value of Mr. Figueroa's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detained people at Mesa Verde and Golden State Annex.

## CLASS ACTION ALLEGATIONS

247. Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated under Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

**A.     Class Definitions**

248. **The California Wage and Hour Class.** For Plaintiffs' claims arising under the California Labor Code and Industrial Wage Commission ("IWC") Wage Orders, the California Unfair Competition Law, and the common law of unjust enrichment. Plaintiffs seek to certify the following class: All civilly detained immigrants who (i) were detained at the Facilities any time between July 13, 2019 and the date of final judgment in this matter, and either (ii) participated in the Work Program at any point during their detention, or (iii) performed work for no compensation as a result of GEO's policy not to hire

sufficient outside staff and detained workers to keep the Facilities clean and sanitary, and to deprive detained people of necessary food, water, and other supplies.

249. **The California Forced Labor Class.** For Plaintiffs' claim for forced labor arising under the California Trafficking Victims Protection Act, Plaintiffs seek to certify the following class:  All civil immigration detained individuals who (i) were detained at Mesa Verde and Golden State Annex any time between July 13, 2015 and the date of final judgment in this matter, and (ii) performed janitorial, maintenance, or other work at the Facilities above and beyond the four personal housekeeping tasks enumerated in PBNDS § 5.8.V.C ("California Forced Labor Class").

250. **The Federal Forced Labor Class.** For Plaintiffs' claim for forced labor arising under the federal Trafficking Victims Protection Act, Plaintiffs seek to certify the following class:  All civilly detained immigrants who (i) were detained at Mesa Verde and Golden State Annex any time between July 13, 2015 and the date of final judgment in this matter, and (ii) participated in the Work Program or (iii) performed work without compensation at any point during their detention ("Federal Forced Labor Class").

251. Excluded from each class definition are the defendants, their officers, directors, management, subsidiaries, and affiliates, and all federal governmental entities. Plaintiffs reserve the right to revise the class definitions based upon information learned through discovery.

**B.    Class Certification Requirements Under Rule 23**

252. **Numerosity: Rule 23(a)(1).** Each class is so numerous that joinder of all members is impracticable.  Plaintiffs do not know the exact size of the classes, since that information is within the control of GEO.  Mesa Verde and Golden State Annex can house up to 1,100 individuals at any one time.  Accordingly, Plaintiffs allege that the number of class members for each class is numbered in the thousands.  Membership in each class is readily ascertainable from GEO's detention and employment records.

253. **Commonality and Predominance: Rules 23(a)(2) and 23(b)(3).** There are numerous questions of law or fact common to each class, and those issues predominate

over any question affecting only individual class members.

254.    With respect to the California Wage and Hour Class, the common legal and factual issues include the following:

(a)    Whether GEO is an "employer" and the detained immigrant workers are "employees" under the California Minimum Wage Law;

(b)    Whether Plaintiffs and California Wage and Hour Class are entitled to the protections of the California Wage Orders;

(c)    Whether Plaintiffs and California and Hour Wage Class performed compensable work;

(d)    Whether Plaintiffs and California Wage and Hour Class were paid $1 per day for their labor;

(e)    Whether GEO was unjustly enriched by paying subminimum wages to its detained immigrant workers;

(f)    Whether GEO engaged in conduct that violated California law—including California Minimum Wage Law, the California Labor Code, associated California Wage Orders, and the California Unfair Competition Law;

(g)    Whether Plaintiffs and California Wage and Hour Class are entitled to equitable relief, including injunctive and declaratory relief; and

(h)    Whether Plaintiffs and California Wage Class are entitled to damages, penalties, and other monetary relief and, if so, in what amount.

255.    With respect to the California and Federal Forced Labor Classes, common legal and factual issues include the following:

(a)    Whether GEO unlawfully forces, coerces, or otherwise compels civilly detained immigrants at the Facilities to work for no compensation;

(b)    Whether GEO obtains detained immigrant labor through threats of withholding ICE-mandated yard and recreation time, library access, disciplinary infractions, and/or abuse of the legal process;

(c)    Whether GEO withholds basic living necessities from immigrants

detained at Mesa Verde and Golden State Annex;

(d)     Whether GEO systematically understaffs and under-resources the Facilities such that detained people must work so as not to be forced to live in intolerably filthy and unsanitary conditions;

(e)     Whether GEO disciplines detained workers for failing to perform work, both pursuant to the Work Program and to comply with the HUSPs, including by placing them in solitary confinement, subjecting them to disciplinary transfers, and initiating criminal proceedings;

(f)     Whether GEO staff threaten to or actually abuse the legal process by reporting unlawful disciplinary charges to immigration officials;

(g)     Whether GEO's HUSPs require detained immigrants to perform janitorial, maintenance, or other work above and beyond the four personal housekeeping tasks enumerated in the ICE PBNDS;

(h)     Whether a reasonable person would provide labor to GEO under the circumstances present here;

(i)     Whether GEO's conduct violates the California and federal Trafficking Victims Protection Act;

(j)     Whether Plaintiffs and the California and Federal Forced Labor Classes are entitled to equitable relief, including injunctive and declaratory relief; and

(k)     Whether Plaintiffs and the California and Federal Forced Labor Classes are entitled to damages and other monetary relief and, if so, in what amount.

256.     **Typicality: Rule 23(a)(3).**  The claims asserted by Plaintiffs are typical of the claims of the Classes, in that the representative plaintiffs, like all class members, were paid subminimum wages—or nothing at all—while employed by GEO at the Facilities. Each Plaintiff, like each class member, was subject to similar GEO policies and practices, including the HUSPs, the Work Program, and GEO's policy of deprivation, and each faced the threats described above if they refused to work and/or would be required to live in intolerably filthy and unsanitary conditions.  Each member of each proposed class has been

similarly injured by GEO's misconduct.

257.    **Adequacy: Rule 23(a)(4).**  Plaintiffs will fairly and adequately protect the interests of the classes.  Plaintiffs have retained attorneys experienced in class and complex litigation, including wage and hour class action litigation.  Plaintiffs intend to vigorously prosecute this litigation.  Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other class members.

258.    **Superiority: Rule 23(b)(3).**  Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of GEO's wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many members of the proposed classes who could not individually afford to litigate a claim such as is asserted in this complaint.  This class action likely presents no difficulties in management that would preclude maintenance as a class action.

259.    **Rule 23(b)(2).**  This action concerns GEO policies and practices that place every detained individual at Mesa Verde and Golden State Annex in peril of wage theft, forced labor, attempted forced labor, and serious harm.  All members of the California Wage and Hour Class and the California and Forced Labor Classes seek similar injunctive relief.  Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### (California Minimum Wage Law)
#### Cal. Labor Code §§ 1182.12, 1194, 1197, 1197.1

260.    Plaintiffs reallege and incorporate by reference herein all allegations above.

261.    The California Legislature set the following minimum wages for 2015

through 2022:[29]

| January 1, 2022 | $15.00 for employers with 26 employees or more |
| January 1, 2021 | $14.00 for employers with 26 employees or more |
| January 1, 2020 | $13.00 for employers with 26 employees or more |
| January 1, 2019 | $12.00 for employers with 26 employees or more |
| January 1, 2018 | $11.00 for employers with 26 employees or more |
| January 1, 2017 | $10.50 for employers with 26 employees or more |
| January 1, 2014 | $9.00 |

262.    The minimum wage is an obligation of the employer and cannot be waived by any agreement.

263.    Detained immigrants at the Facilities do not forfeit their rights to wage protections.

264.    Employees protected by California's minimum wage laws must be paid at least the set hourly minimum wage.

265.    Detained immigrants at the Facilities who participate in the Work Program qualify as GEO employees under California law.

266.    GEO qualifies as an employer under California law, including IWC Wage Orders 5 and 15.

267.    Labor in the immigration detention context is not intended as a punitive measure.

268.    GEO and Does 1-10 do not compensate detained immigrants at California's minimum wage for the work they perform or performed at the Facilities.  Instead, GEO pays detained workers $1 per day—or nothing at all—for work they perform at the Facilities.

269.    Plaintiffs and California Wage and Hour Class Members have suffered damages in an amount to be determined at trial.

270.    Plaintiffs and California Wage and Hour Class Members are entitled to recover unpaid minimum wages and other monetary damages, including liquidated

---

[29] *See* https://www.dir.ca.gov/dlse/faq_minimumwage.htm; Cal. Labor Code § 1182.12.

damages.

271.   Plaintiffs and California Wage and Hour Class Members are entitled to recover their reasonable attorneys' fees and costs.

272.   Plaintiffs and California Wage and Hour Class Members are entitled to equitable relief, including injunctive and declaratory relief.

## SECOND CLAIM FOR RELIEF
### (California Unfair Competition Law)
### Cal. Bus. & Prof. Code § 17200, *et seq.*

273.   Plaintiffs reallege and incorporate by reference herein all allegations above.

274.   California's Unfair Competition Law ("UCL") prohibits unfair competition, defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [California's False Advertising Law]."[30]

275.   GEO and Does 1-10 willfully violated, and continue to violate, the "unlawful" prong of the UCL by violating California law in its employment practices.

276.   The acts, omissions, and practices of GEO and Does 1-10 constitute unfair and unlawful business acts and practices under the UCL in that their conduct offends public policy against forced labor, and seeks to profit by violating Plaintiffs' rights under state and federal law.

277.   As a direct and proximate result of the unlawful and unfair business practices of GEO and Does 1-10, Plaintiffs and the California Wage and Hour Class have suffered economic injury.

278.   Plaintiffs and the California Wage and Hour Class have suffered damages in an amount to be determined at trial.

279.   Plaintiffs and the California Wage and Hour Class are entitled to recover their reasonable attorneys' fees and costs.

---

[30] Cal. Bus. & Prof. Code § 17200.

**THIRD CLAIM FOR RELIEF**
**(Unjust Enrichment)**
**California Common Law**

280.   Plaintiffs reallege and incorporate by reference herein all allegations above.

281.   GEO materially and significantly reduced its labor costs and expenses, and increased its profits, because Plaintiffs and California Wage and Hour Class Members perform under- and uncompensated labor.

282.   Plaintiffs and California Wage and Hour Class Members conferred non-gratuitous benefits upon GEO by performing work for $1 per day, or for no pay at all.  For the same work, GEO would otherwise have had to pay at least the applicable minimum wage or more, thereby significantly and materially increasing GEO's profits.  GEO was unjustly enriched at the expense of and detriment to Plaintiffs and California Wage and Hour Class Members.

283.   GEO's retention of any benefit collected directly and indirectly from this uncompensated labor violated principles of justice, equity, and good conscience.

284.   As a direct and proximate result of GEO's forced labor practices, Plaintiffs and California Wage and Hour Class Members have suffered concrete harm and injury, including physical and emotional injury, monetary loss, and the unlawful violation of their rights.

285.   Plaintiffs and California Wage and Hour Class Members have suffered damages in an amount to be determined at trial.

286.   Plaintiffs and California Wage and Hour Class Members are entitled to recover the benefits GEO has unjustly obtained through their under- and uncompensated labor.

287.   Plaintiffs and California Wage and Hour Class Members are entitled to recover their reasonable attorney's fees and costs.

**FOURTH CLAIM FOR RELIEF**
**(Forced Labor)**
**California Trafficking Victims Protection Act – Cal. Civ. Code § 52.5**

288.   Plaintiffs reallege and incorporate by reference herein all allegations above.

289. Plaintiffs and California Forced Labor Class Members are victims of forced labor as defined by California Civil Code § 52.5.

290. Pursuant to the California Trafficking Victims Protection Act, California Civil Code § 52.5, "a victim of human trafficking, as defined in Section 236.1 of the Penal Code, may bring a civil action for actual damages, compensatory damages, punitive damages, injunctive relief, any combination of those, or any other appropriate relief."

291. Human trafficking is defined as the deprivation or violation of the personal liberty of another "with the intent to obtain forced labor or services."[31]

292. Forced labor or services is defined as "labor or services that are performed or provided by a person and are obtained or maintained through force, fraud, duress, or coercion, or equivalent conduct that would reasonably overbear the will of the person."[32]

293. GEO and Does 1-10 violate California Civil Code § 52.5 by knowingly maintaining corporate policies and uniform practices at the Facilities aimed at obtaining free labor and services from detained workers by:

(a) Forcing or coercing Plaintiffs and the California Forced Labor Class to perform uncompensated janitorial, maintenance, and other work at the Facilities above and beyond the four personal housekeeping tasks enumerated in the ICE PBNDS pursuant to GEO's HUSP;

(b) Threatening Plaintiffs and the California Forced Labor Class with serious harm, including solitary confinement, referral to an ICE officer, disciplinary action, loss of privileges and ICE-mandated recreational activities, or even criminal prosecution, if they refuse to provide their under- or uncompensated labor; and

(c) Subjecting Plaintiffs and the California Forced Labor Class to serious harm, including disciplinary action leading to solitary confinement, referral to an ICE officer, disciplinary action, loss of privileges and ICE-mandated recreational activities, or

---

[31] Cal. Penal Code § 236.1(a).

[32] *Id.* § 236.1(h)(5).

even criminal prosecution, if they refuse to provide their uncompensated labor.

(d)     Withholding daily necessities from Plaintiffs and the California Forced Labor Class pursuant to the deprivation policy of GEO and Does 1-10, thereby forcing them to work for subminimum wages to buy those daily necessities for themselves and avoid serious harm, including, but not limited to, malnutrition, unsanitary living quarters, extreme isolation, and unhygienic conditions of confinement.

294.   In light of GEO's and Doe 1-10's coercive acts and threats of and actual imposition of serious harm, a reasonable person in Plaintiffs' and the California Forced Labor Class's shoes would feel compelled to perform work in the Work Program for $1 per day and to perform uncompensated work.

295.   GEO materially and significantly reduced its labor costs and expenses, and increased its profits, by unlawfully forcing and coercing Plaintiffs and the California Forced Labor Class to perform uncompensated labor.  To drive profits, GEO and Doe 1-10 acted with the intent to obtain forced labor or services from the people GEO detains.

296.   Plaintiffs and the California Forced Labor Class have suffered actual damages in an amount to be determined at trial.

297.   Plaintiffs and the California Forced Labor Class are entitled to recover from GEO and Does 1-10 all amounts that they have wrongfully and improperly obtained, and GEO and Does 1-10 should be required to disgorge to Plaintiffs and the California Forced Labor Class the benefits it has unjustly obtained.

298.   Plaintiffs and the California Forced Labor Class are also entitled to recover compensatory damages.[33]

299.   Plaintiffs and the California Forced Labor Class are also entitled to recover punitive damages.[34]  GEO and Does 1-10 acted with malice, oppression, fraud, and duress to coerce Plaintiffs and the California Forced Labor Class to participate in the Work

---

[33] *See* Cal. Civ. Code § 52.5(a).

[34] *See id.*

Program for $1 per day and to perform uncompensated labor.

300.   Plaintiffs and the California Forced Labor Class are also entitled to recover damages in the amount of three times their actual damages, or $10,000, whichever is greater.[35]

301.   Plaintiffs and the California Forced Labor Class are entitled to declaratory and injunctive relief.

302.   Plaintiffs and the California Forced Labor Class are entitled to recover their reasonable attorneys' fees and costs.

## FIFTH CLAIM FOR RELIEF
### (Forced Labor)
**Federal Trafficking Victims Protection Act – 8 U.S.C. §§ 1589(a) and 1594(a)**

303.   Plaintiffs and the Federal Forced Labor Class are victims of forced labor as defined by the federal Trafficking Victims Protection Act.

304.   18 U.S.C. §§ 1589(a) and 1594(a) prohibit any entity from knowingly providing or obtaining the labor of a person "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."[36]

305.   Serious harm is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."[37]

306.   GEO and Does 1-10 provide or obtain the labor or services of Plaintiffs and the Federal Forced Labor Class by means of serious harm and threats of serious harm to

---

[35] *See id.* § 52.5(b).

[36] 18 U.S.C. § 1589(a).

[37] *Id.* § 1589(c).

Plaintiffs and others.[38]

307.   GEO and Does 1-10 have provided or obtained the labor or services of Plaintiffs and the Federal Forced Labor Class by means of a scheme, plan, or pattern intended to cause them to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint, including solitary confinement.[39]

308.   GEO and Does 1-10 violate 18 U.S.C. §§ 1589(a) and 1594(a) by knowingly maintaining corporate policies and uniform practices at most of its civil immigration detention centers aimed at obtaining free labor and services from detained individuals by:

(a)   Forcing or coercing Plaintiffs and the Federal Forced Labor Class to perform uncompensated janitorial, maintenance, and other work at Mesa Verde and Golden State Annex above and beyond the four personal housekeeping tasks enumerated in the ICE PBNDS pursuant to GEO's HUSPs;

(b)   Threatening Plaintiffs and the Federal Forced Labor Class with serious harm, including solitary confinement, referral to an ICE officer, disciplinary action, loss of privileges and ICE-mandated recreational activities, or even criminal prosecution, if they refuse to provide their uncompensated labor, organize a work stoppage, or participate in a work stoppage;

(c)   Actually subjecting Plaintiffs and the Federal Forced Labor Class to serious harm, including disciplinary action leading to solitary confinement, referral to an ICE officer, loss of privileges and ICE-mandated recreational activities, or even criminal prosecution, if they refuse to provide their uncompensated labor, organize a work stoppage, or participate in a work stoppage; and

(d)   Depriving Plaintiffs and the Federal Forced Labor Class of daily necessities, thereby forcing them to work for subminimum wages to buy those daily necessities for themselves and avoid serious harm, including, but not limited to,

---

[38] *Id.* § 1589(a)(1), (a)(2).

[39] *Id.* § 1589(a)(4).

malnutrition, unsanitary living quarters, and unhygienic conditions of confinement.

309. GEO materially and significantly reduced its labor costs and expenses, and increased its profits, by unlawfully forcing and coercing Plaintiffs and the Federal Forced Labor Class to perform uncompensated labor. To drive profits, GEO and Does 1-10 acted with the intent to obtain forced labor or services from its detained workers.

310. Plaintiffs and the Federal Forced Labor Class have suffered damages in an amount to be determined at trial.

311. Plaintiffs and the Federal Forced Labor Class are entitled to recover from GEO and Does 1-10 all amounts that they have wrongfully and improperly obtained, and GEO and Does 1-10 should be required to disgorge to Plaintiffs and the Federal Forced Labor Class the benefits it has unjustly obtained.

312. Plaintiffs and the Federal Forced Labor Class are also entitled to recover compensatory and punitive damages.

313. Plaintiffs and the Federal Forced Labor Class are entitled to declaratory and injunctive relief.

314. Plaintiffs and the Federal Forced Labor Class are entitled to recover their reasonable attorneys' fees and costs.

**SIXTH CLAIM FOR RELIEF**
**(Representative Action Pursuant to Private Attorneys General Act of 2004)**
**Cal. Labor Code §§ 2698 *et seq*.**

315. Plaintiffs and the California Wage and Hour Class also bring a claim under California Labor Code §§ 2698 to 2699 in a representative capacity on behalf of all participants in the Work Program and/or who perform uncompensated work on the Facilities in the last four years.

316. The California Labor Code Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 *et seq.*, grants California employees the right to bring a civil action for the violation of any provision of the Labor Code on behalf of themselves and other current or former employees to recover civil penalties. PAGA is intended to assist in the achievement of maximum compliance with state labor laws by

empowering aggrieved employees to act as private attorneys general to recover civil penalties for Labor Code violations that the State would otherwise prosecute.[40]

317.    On July 13, 2022 pursuant to California Labor Code § 2699.3, Plaintiffs sent notice by certified mail to the Labor and Workforce Development Agency (LWDA) and Defendants of the specific provisions of the Labor Code that Plaintiffs allege Defendants violated, including the facts and theories to support the violations.  The LWDA received Plaintiffs' notice that same day: July 13, 2022.  A copy of Plaintiffs' PAGA complaint and LWDA's notification email, confirming receipt of the complaint on July 13, 2022, are appended hereto as **Exhibits A and B**, respectively.

318.    The 65-day time limit for the LWDA to respond to Plaintiffs' PAGA complaint expired on September 16, 2022.  The LWDA has not responded to the PAGA complaint.  Plaintiffs have exhausted their administrative remedies for their PAGA claims.

319.    PAGA permits an aggrieved employee to collect the civil penalty authorized by law and normally collectible by the LWDA.  To address violations for which no penalty has been established, § 2699(f) creates a private right of action for aggrieved employees and a default penalty of $100 for each aggrieved employee per pay period for the initial violation, and $200 for each aggrieved employee per pay period for each subsequent violation.[41]  Plaintiffs will seek to collect these civil penalties for Defendants' Labor Code violations under California Labor Code §§ 201, 202, 203, 226, 246, 558, 1174, 1182.12, 1194, 1197, 1197.1, and 1198.5, and IWC Wage Orders 5 and 15.

320.    The facts underlying Plaintiffs' allegations regarding their minimum wage penalties are described above, and Plaintiffs seek PAGA penalties for these claims.

321.    In addition to the foregoing allegations, Plaintiffs and class members seek PAGA penalties for the following violations:

        (a)    California Labor Code § 246 provides that California employees who

---

[40] *See Arias v. Super. Ct.*, 46 Cal. 4th 969, 980 (2009).

[41] *See* Cal. Labor Code § 2699(f).

work for an employer for more than thirty day shall accrue paid sick leave "at the rate of not less than one hour every 30 hours worked." GEO and Does 1-10 failed to provide Plaintiffs and the California Wage and Hour Class with any paid sick leave in violation of Labor Code § 246.

(b)     California Labor Code § 201 states that an employer is required to pay an employee who is terminated all accrued wages and compensation at the time of termination. California Labor Code § 202 states that an employer is required to provide an employee who resigns all unpaid wages within 72 hours of their resignation, or upon their resignation if the employee has provided at least 72 hours' notice. California Labor Code § 203 states that if an employer willfully fails to pay compensation promptly upon discharge, in violation of §§ 201 and 202, then the employer is liable for waiting time penalties equivalent to the employee's daily wage, for a maximum of 30 days. GEO and Does 1-10 failed to provide Plaintiffs and the California Wage and Hour Class with all accrued wages and compensation at the time of their terminations and/or resignations.

(c)     California Labor Code § 1198.5 requires GEO and Does 1-10 to provide detained workers the ability to inspect their personnel records and to receive copies of those records. GEO and Does 1-10 failed to provide Plaintiffs and the California Wage and Hour Class access to inspect their personnel files and copies of those files.

(d)     California Labor Code § 226(a) requires GEO and Does 1-10 to provide detained workers with an accurate itemized statement in writing showing, among other things: (1) total hours worked by the worker; (2) the name of the worker and only the last four digits of his or her social security number or an employee identification number other than a social security number, (3) the name and address of the worker; and (4) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the worker. GEO and Does 1-10 have violated and continue to violate California Labor Code § 226.3 by violating § 226(a) and failing to provide any wage statement to Plaintiffs and the California Wage and Hour Class.

(e)	California Labor Code § 558 provides that any employer who violates the Labor Code or any provision regulating hours and days of work in any IWC Wage Order will be subject to civil penalties.  Section 558 renders civil penalties available where an employer fails to pay employees the California minimum wage pursuant to Labor Code § 1194.[42]  Civil penalties awarded pursuant to § 558 are "in addition to an amount sufficient to recover underpaid wages."[43]  GEO and Does 1-10 are therefore subject to civil penalties pursuant to § 558 for their failure to pay a minimum wage to Plaintiffs and the California Wage and Hour Class.

322.	Plaintiffs are "aggrieved employees" as defined by PAGA and seek to represent all participants at the Facilities in California in the past four years who performed work and were paid less than the applicable California minimum wage as required by California law.

**SEVENTH CLAIM FOR RELIEF**
**(Retaliation)**
**Cal. Labor Code § 98.6**

323.	Plaintiffs Jose Ruben Hernandez Gomez, Pedro Jesus Figueroa Padilla, Fidel Garcia, and Isaac Cardona Hernandez are victims of retaliation as defined by California Labor Code § 98.6.

324.	Section 98.6 of the California Labor Code prohibits employers from retaliating "in any manner" against an employee who files a complaint or claim related to his or her rights under the Labor Code, makes "a written or oral complaint that he or she is owed unpaid wages," or exercises any rights afforded to the employee "on behalf of himself, herself, or others."  Cal. Lab. Code § 98.6(a).

325.	In addition to other remedies, an employer who violates § 98.6 "is liable for a civil penalty not exceeding ten thousand dollars ($10,000) per employee for each violation."  *Id.* § 98.6(b)(3).  This penalty is "to be awarded to the employee or employees

[42] *See also* Cal. Labor Code § 1182.12.

[43] *See* Cal. Labor Code § 558(a)(1), (2).

who suffered the violation." *Id.*

326.   GEO and Does 1-10 retaliated against Mr. Hernandez Gomez by placing him in solitary confinement as an alleged COVID-19 precaution despite his lack of symptoms and  negative COVID test.  GEO and Does 1-10 placed Mr. Hernandez Gomez in solitary confinement within days of the filing of this lawsuit.[44]

327.   GEO and Does 1-10 retaliated against Mr. Figueroa by requiring him to take an unnecessary COVID-19 test, after having tested negative a few hours earlier, under threat of solitary confinement and by placing him in solitary confinement.  These acts were retaliation for his involvement in this lawsuit and for his role in labor stoppages.

328.   A GEO Facility Administrator at Mesa Verde, with final authority for deciding grievances, informed Mr. Figueroa that he would not grant Mr. Figueroa's grievances because he did not want substantiated grievances to be used in this lawsuit. The Facility Administrator refused to find grievances in Mr. Figueroa's favor, even when video proof conclusively established that Mr. Figueroa's grievance should have been substantiated.

329.   GEO and Does 1-10 retaliated against Mr. Garcia by refusing to help when he requested assistance regarding a cockroach found in another detained person's food. GEO and Does 1-10 also retaliated against Plaintiff Garcia by charging him with engaging in or inciting a group demonstration because of his involvement in a protest.  These acts were retaliation for Mr. Garcia's involvement in this lawsuit and for his role in labor stoppages at the Golden State Annex where he lives.

330.   GEO transferred Mr. Hernandez Gomez, Mr. Figueroa, Mr. Cardona Hernandez, Mr. Hernandez Martinez, and other class members to new housing units to punish and retaliate against them for asserting their rights under the Labor Code and

---

[44] *See Garcia-Brower v. Premier Auto. Imports of CA, LLC*, 55 Cal. App. 5th 961, 978 (2020) ("[R]etaliatory motive is 'proved by showing that plaintiff engaged in protected activities, that his employer was aware of the protected activities, and that the adverse action followed within a relatively short time thereafter.'")

pursuant to this lawsuit.

331.    Multiple GEO staff made their knowledge of this lawsuit clear to Plaintiffs.

332.    Plaintiffs are entitled to compensatory and punitive damages for the retaliation against them, as well as civil penalties as described above.  They are also entitled to recovery of reasonable litigation expenses and attorneys' fees, as well as injunctive relief to prevent continued retaliation against them.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the classes they seek to represent, request that the Court:

1.    Certify this action as a class action, with the three classes as defined above;

2.    Find that Plaintiffs are proper representatives of the classes and appoint the undersigned as class counsel;

3.    Order GEO to pay for notifying class members of the pendency of this suit;

4.    Order disgorgement of GEO's unjustly-acquired revenue, profits, and other benefits resulting from its unlawful conduct;

5.    Award declaratory, restitution, and other equitable relief as is necessary to protect the interests of Plaintiffs and class members;

6.    Award injunctive relief as is necessary to protect the interests of Plaintiffs and class members, including enjoining GEO from continuing to conduct business through the unlawful and unfair practices alleged herein and from continuing to retaliate against Plaintiffs;

7.    Award Plaintiffs and class members compensatory damages in the amount of unpaid minimum wage compensation, including interest thereon subject to proof at trial;

8.    Award Plaintiffs and class members liquidated damages in an amount equal to minimum wages unlawfully unpaid, according to proof, pursuant to California Labor Code § 1194.2;

9.    Award Plaintiffs and class members civil penalties pursuant to California Labor Code §§ 98.6, 203, 226, 246, 558, and 1198.5, in an amount to be determined at

trial;

10.     Order Defendant to pay restitution of all amounts owed to Plaintiffs for unpaid minimum wages, and interest thereon, in an amount according to proof, pursuant to Business & Professions Code § 17203;

11.     Award Plaintiffs and class members punitive damages, subject to proof at trial;

12.     Award Plaintiffs and class members their reasonable litigation expenses and attorneys' fees;

13.     Award interest on all sums at the maximum legal rate; and

14.     Award any further relief that the Court deems just and equitable.

<b>DEMAND FOR JURY TRIAL</b>

Plaintiffs demand a trial by jury.

DATED:  October 4, 2022                    Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP


By:  */s/ Jessica Winter*
       Jessica Winter

Attorneys for Plaintiffs

# EXHIBIT A



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Jessica Winter
Email:  jwinter@rbgg.com

July 13, 2022

VIA ONLINE FILING SYSTEM AND CERTIFIED MAIL

California Labor and Workforce
Development Agency
Attn: PAGA Administrator
455 Golden Gate Avenue, 10th Floor
San Francisco, CA 94102

   Re: PAGA Notice Pursuant to California Labor Code §§ 2699 and 2699.3
     Our File No. 1785-01

Dear Sir/Madam:

  Pursuant to California Labor Code sections 2699 and 2699.3, and on behalf of our clients, Jose Ruben Hernandez Gomez, Salesh Prasad, Guillermo Medina Reyes, Edgar Sanchez, Adan Castillo Merino, Ivan Oliva Sierra, Fidel Garcia, Isaac Cardona Hernandez, and Pedro Jesus Figueroa Padilla ("the clients"), we submit to the Agency notice of certain violations of the California Labor Code by The GEO Group, Inc.  We intend to file a complaint that will include claims under the Private Attorneys General Act (PAGA) on behalf of the clients, and all other aggrieved employees.

  We write to provide notice of these statutory violations, including of California Labor Code §§ 201, 202, 203, 226, 226.3, 246, 558, 1182.12, 1194, 1194.2, 1197, 1197.1, 1198.5, and IWC Wage Orders 5 and 15.  We have set forth in the enclosed Complaint the Labor Code provisions at issue and the facts demonstrating the violations.

/ / /

/ / /

/ / /

/ / /

[4100306.2]

Ex. A - 2

California Labor and Workforce Development Agency
July 13, 2022
Page 2

Please contact me at your convenience if you require any additional information.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Jessica Winter*

By:  Jessica Winter

JW:aa

[4100306.2]

Ex. A - 3

GAY C. GRUNFELD – 121944
ERNEST GALVAN – 196065
MICHAEL FREEDMAN – 262850
JESSICA WINTER – 294237
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104
Email:       egalvan@rbgg.com
             mfreedman@rbgg.com
             jwinter@rbgg.com

PRIYA ARVIND PATEL – 295602
CENTRO LEGAL DE LA RAZA
3400 East 12th Street
Oakland, California  94601-3402
Telephone:   (510) 437-1554
Email:       ppatel;@centrolegal.org

LISA V. KNOX – 279406
CALIFORNIA COLLABORATIVE
   FOR IMMIGRANT JUSTICE
1999 Harrison Street, Suite 1800
Oakland, California  94612-4700
Telephone:   (510) 230-6746
Email:       lisa@ccijustice.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| JOSE RUBEN HERNANDEZ GOMEZ; SALESH PRASAD; GUILLERMO MEDINA REYES; EDGAR SANCHEZ; ADAN CASTILLO MERINO; IVAN OLIVA SIERRA; FIDEL GARCIA, ISAAC CARDONA HERNANDEZ, and PEDRO JESUS FIGUEROA PADILLA, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>   v.<br><br>THE GEO GROUP, INC.,<br><br>      Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

[4118018.9]

Ex. A - 4

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

# INTRODUCTION

1.     This action arises from systematic and unlawful wage theft, unjust enrichment, and forced labor at two of Defendant GEO Group, Inc.'s ("GEO") civil immigration detention facilities in California—Mesa Verde ICE Processing Center ("Mesa Verde") and Golden State Annex ICE Processing Center ("Golden State Annex," and collectively "Facilities").

2.     Mesa Verde is a civil, not criminal, immigration detention center that GEO owns and operates for profit in Bakersfield, California.  It is a former prison with a 400-person capacity, and is used to detain people whose immigration status is contested.  GEO has operated Mesa Verde as a civil immigration detention center since 2015.

3.     Golden State Annex is a separate civil, not criminal, immigration detention center that GEO owns and operates for profit in McFarland, California.  It is a former correctional facility and serves as an annex location to Mesa Verde.  It has a 700-person capacity and is also used to detain people whose immigration status is contested.  GEO has operated Golden State Annex as a civil immigration detention center since September 2020.

4.     GEO is a multibillion-dollar corporation that owns and operates detention facilities around the world.  GEO operates at least fourteen civil immigration detention centers in the United States, including the Facilities.  GEO has made billions in revenue from its contracts with United States Immigrations and Customs Enforcement ("ICE") to operate these facilities.

5.     Although it is contractually required to provide all essential detention services at the Facilities, GEO uses the free or nearly-free labor of civilly detained immigrants to perform those services to maximize profits.

6.     GEO pays detained immigrants just $1 per day, or nothing at all, to maintain and operate the Facilities.  Detained workers perform basic and necessary tasks, such as cleaning shared showers, sinks, and toilets; sweeping, mopping, and waxing floors; and cleaning surfaces like walls, dining and other tables, chairs, windows, and handrails.

[4118018.9]                                      1                                      Ex. A - 5

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

Others work as painters in the facilities or assist detainees with disabilities to perform their daily activities.

7.    Detained workers are paid $1 per day, 5 days per week for their formally scheduled shifts.  Often, however, the same workers also work for no pay at all, on their days "off" and during unscheduled hours.  Other detained people who are not formally scheduled to work also perform job duties that are necessary for the basic functioning of the Facilities.

8.    This labor is not only unpaid and underpaid.  It is also not voluntary in any meaningful sense.  GEO maintains a corporate policy and uniform practice at the Facilities of depriving detained individuals of necessary cleaning services, personal hygiene supplies, and other services and items to ensure a ready supply of available labor needed to operate the Facilities.  Detained people are forced to submit to GEO's $1 per day scheme, the so-called "Voluntary" Activities Program ("Work Program"), to buy the basic necessities—including food, water, and hygiene products—that GEO systematically deprives them of.

9.    GEO also fails to staff the Facilities adequately to maintain minimum standards of cleanliness and sanitation.  At times GEO has no outside staff assigned to clean and sanitize the Mesa Verde and Golden State Annex dorms.  GEO also, at times, fails to hire any detained workers.  As a result, detained people must perform janitorial and custodial services both in the Work Program and informally, outside the Work Program.  They must do so or be forced to live in intolerably filthy conditions, with mold growing in the showers, a stench emanating from the restrooms, and pest running rampant.

10.    If and when detained immigrants fail to perform uncompensated or undercompensated labor, they must live in dirty and unsanitary conditions.  Such conditions were bad enough prior to the COVID-19 pandemic, but have been more harmful and even dangerous since the pandemic began.  The pandemic has rendered the basic cleaning and sanitation tasks unpaid and underpaid detainees perform even more critical and the pressure on detained people to perform these tasks has only increased.

[4118018.9]                                    2                                    Ex. A - 6
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

11.     In the Facilities, GEO also requires detained immigrants to perform uncompensated work under threat of or actual disciplinary action.  Disciplinary action can result in placement in segregated housing and criminal prosecution.  Both can interfere with detained individuals' ability to qualify for immigration relief.

12.     Detained immigrants also are threatened with the loss of recreation, chow, law library and telephone access, and lose their work assignments if they protest the inadequate pay.  GEO staff withhold access to ICE-mandated outdoor exercise from entire dormitories if individual detained workers do not work.

13.     Detained immigrants are charged fees to use ICE tablets to access email and video visit with their loved ones.  They also must use money in their accounts to call, text message, and retrieve voicemails from their loved ones, friends, and other contacts.  Many detained people do not have a source of income to access these services, other than earning $1 per day in the Work Program.

14.     Forced and underpaid labor is part of GEO's business model.  GEO significantly reduces its labor costs and expenses, and increases its already vast profits, by intentionally and unlawfully forcing and coercing detained immigrants to perform labor at subminimum wages, or without pay at all.

15.     The under- and uncompensated labor GEO extracts from immigrants detained in the Facilities is neither required nor permitted by ICE's Performance-Based National Detention Standards ("PBNDS") or GEO's contracts with ICE.  GEO's contracts with ICE do not require GEO to pay detained immigrants $1 per day, or nothing at all; GEO sets detained workers' pay rate within its discretion.

16.     GEO's policies and practices violate California minimum wage law, California common law, the California Unfair Competition Law, and the California and federal Trafficking Victims Protection Acts, which prohibit forced labor.

17.     Plaintiffs Jose Ruben Hernandez Gomez; Salesh Prasad; Guillermo Medina Reyes; Edgar Sanchez; Adan Castillo Merino; Ivan Oliva Sierra; Fidel Garcia; Isaac Cardona Hernandez; and Pedro Jesus Figueroa Padilla, individually and on behalf of all

others similarly situated, bring this class action lawsuit to stop the economic exploitation of detained immigrants in GEO's care, to recover unpaid wages, and to remedy the unjust enrichment resulting from GEO's unlawful failure to pay its detained workforce legal wages at the Facilities.

### JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Trafficking Victims Protection Act, 18 U.S.C. §§ 1589 *et seq*.

19.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant; there are more than 100 class members; the aggregate amount in controversy exceeds $5,000,000; and minimal diversity exists.

20.     Plaintiffs request that this Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over their state law claims arising under the California Minimum Wage Law, California Labor Law, and the California Unfair Competition Law.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims occurred in this District.

22.     This Court has personal jurisdiction over GEO because the corporation regularly conducts business in California and has sufficient minimum contacts with California.

### PARTIES

23.     Plaintiff Jose Ruben Hernandez Gomez is an adult resident of Bakersfield, California.  From November 26, 2021 through January 4, 2022, Mr. Hernandez was detained at Golden State Annex.  From January 4, 2022 through the present, Mr. Hernandez has been detained at Mesa Verde.

24.     Plaintiff Salesh Prasad is an adult resident of McFarland, California.  From August 19, 2021 through the present, Mr. Prasad has been detained at Golden State Annex.

25.     Plaintiff Guillermo Medina Reyes is an adult resident of McFarland,

California.  From December 9, 2021 through the present, Mr. Medina Reyes has been detained at Golden State Annex.

26.    Plaintiff Edgar Sanchez is an adult resident of Los Angeles, California.  From April 1, 2021 through February 24, 2022, Mr. Sanchez was detained at Golden State Annex.

27.    Plaintiff Adan Castillo Merino is an adult resident of McFarland, California.  From November 6, 2020 through the present, Mr. Castillo Merino has been detained at Golden State Annex.

28.    Plaintiff Ivan Oliva Sierra is an adult resident of Compton, California.  From January 12, 2021 through June 12, 2022, Mr. Oliva Sierra was detained at Golden State Annex.

29.    Plaintiff Fidel Garcia is an adult resident of McFarland, California.  From July 12, 2021 through the present, Mr. Garcia has been detained at Golden State Annex.

30.    Plaintiff Isaac Cardona Hernandez is an adult resident of Bakersfield, California.  From July 1, 2021 through October 2021, he was detained at Golden State Annex.  In October 2021, he was transferred to Mesa Verde, where he has been detained since.

31.    Plaintiff Pedro Jesus Figueroa Padilla is an adult resident of Bakersfield, California.  From October 29, 2021 through November 22, 2021 he was housed at Golden State Annex.  On November 22, 2021 he was transferred to Mesa Verde, where he continues to reside.

32.    Defendant GEO is a for-profit multinational corporation providing correctional, detention, and community reentry services.  GEO is a Florida corporation, with its principal office located at 624 NW 53rd Street, Suite 700, Boca Raton, Florida 33487.

## FACTUAL ALLEGATIONS

**A.    Immigration Detention Is Civil—Not Criminal.**

33.    Each year, hundreds of thousands of individuals are detained in

geographically isolated immigration detention facilities because their immigration status is contested.  These detained individuals include U.S. citizens, lawful permanent residents (green card holders) with longstanding family and community ties, survivors of torture, asylum seekers, victims of human trafficking, children, and pregnant women.

34.    Many of these detained individuals were brought to the United States as children.  Thousands ultimately have their United States citizenship or legal residency affirmed by an immigration court or federal judge.

35.    Immigration violations are civil violations, and immigration detention is civil in nature.[1]  Many individuals in immigration detention have no criminal history at all.

36.    Notwithstanding immigration detention's civil nature and purpose, detained individuals are often subjected to prison-like conditions.  According to the former head of ICE's Office of Detention Policy and Planning, most are held—systematically and unnecessarily—under circumstances inappropriate for immigration detention's noncriminal purposes.[2]  Detained immigrants are frequently subjected to punitive and long-term solitary confinement, inadequate medical care, sexual and physical assault, and other harsh conditions of confinement.[3]  In this case, Golden State Annex and Mesa Verde residents are housed in carceral facilities that recently have been repurposed for civil detention.

37.    Many detained immigrants submit to deportation simply to obtain release from these intolerable conditions, even when they have valid claims to remain in the United States, including claims to asylum or other discretionary relief.

**B.      The Privatization of Immigration Detention and GEO's Economic Windfall**

38.    Immigration detention in the United States expanded roughly eightfold over

---

[1] *See Fong Yue Ting v. United States*, 149 U.S. 698, 728–30 (1893) (observing that deportation proceedings have "all the elements of a civil case" and are "in no proper sense a trial or sentence for a crime or offense").

[2] Dora Schriro, U.S. Dep't of Homeland Sec., Immigration Detention Overview and Recommendations 10, 15 (2009).

[3] *See King v. Cty. of L.A.*, 885 F.3d 548 (9th Cir. 2018).

the past two decades, from a capacity of 5,532 detention beds in 1994[4] to a capacity of over 41,000 in 2017.[5]  Between February 2019 and January 2021, the total immigration detention bed capacity in California nearly doubled, from 4,160 to 7,408 beds.[6]  Private facilities, like GEO, accounted for 77% of the total immigration detention bed capacity in California in February 2019, increasing to 97% as of January 2021.[7]

39.     The California Legislature passed Assembly Bill 32 in 2019, which banned private detention centers in the State, with some limited exceptions.[8]  Due to AB 32's January 1, 2020 operative date, GEO and ICE scrambled to enter into new contracts allowing immigration detention centers, like the Facilities, to continue to operate in California.[9]  As part of this scramble, GEO expanded Mesa Verde's capacity from 400 to 1,800 beds by contracting with ICE to add Golden State Annex and a second annex location, both of which are located approximately 30 miles from Mesa Verde.[10]

40.     AB 32 was enacted to address "the serious, documented harms to the safety and welfare of those detained in private detention facilities, . . . exploitive conditions for detainees, and [private prisons'] prioritiz[ing of] profits over inmate rehabilitation and wellbeing."[11]  As California Attorney General Rob Bonta explained: "For-profit, private prisons and detention facilities that treat people like commodities pose an unacceptable

---

[4] Sharita Gruberg, How For-Profit Companies are Driving Immigration Detention Policies, Center for American Progress (Dec. 18, 2015), *available at* https://www.americanprogress.org/article/how-for-profit-companies-are-driving-immigration-detention-policies/.

[5] Jenny Jarvie, "This industry stands to benefit from Trump's crackdown on the border," Los Angeles Times (Feb. 14, 2017) *available at* http://www.latimes.com/nation/la-na-immigrant-detention-20170214-story.html.

[6] *Immigration Detention in California*, the California Department of Justice ("California DOJ"), at 5 (Jan. 2021).

[7] *Id.*

[8] *Id.* at i-ii.

[9] *Id.*

[10] *Id.* at 5.  The second annex to Mesa Verde does not currently house detainees.

[11] *GEO Grp. v. Newsom*, Petition for Rehearing En Banc, 9th Cir. Nos. 20-56172, 20-56304, Dkt. 80 at 5 (Nov. 17, 2020).

[4118018.9]                                7                                Ex. A - 11

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

risk to the health and welfare of Californians."[12]

41.    Given their track record, GEO and other private prison corporations have spent tens of millions of dollars on lobbying efforts.[13]

42.    As immigration detention has expanded, private prison corporations, particularly GEO, have gained an increasing share of the contracts for new detention beds.[14]

43.    GEO officials expect and rely on these lucrative ICE contracts to account for a significant percentage of the corporation's ongoing revenues.[15]  Contracts with ICE accounted for 28.2% of GEO's revenues in 2020 and 28.6% in 2019.[16]  GEO's contracts with ICE are essential to its profitability and business model.

44.    GEO's revenues in 2018, 2019, and 2020 were over $3 billion per year.  Its stock is publicly traded on the New York Stock Exchange.

45.    GEO's economic windfall, and the profitability of its immigration detention enterprise, arises from its policy of systemically understaffing and otherwise under-resourcing its facilities and thereby underserving detained immigrants.  The California Department of Justice reported in January 2021 that GEO's Adelanto Facility "is focused on providing detainees with the bare minimum of services required by ICE's detention

---

[12] *See* State of Cal. Dep't of Justice, *Attorney General Bonta Files for Rehearing En Banc*, *available at* https://oag.ca.gov/news/press-releases/attorney-general-bonta-files-rehearing-en-banc-defense-california%E2%80%99s-ban-profit (Nov. 17, 2020).

[13] Michael Cohen, "How for-profit prisons have become the biggest lobby no one is talking about," Washington Post (Apr. 28, 2015), *available at* https://www.washingtonpost.com/posteverything/wp/2015/04/28/how-for-profit-prisons-have-become-the-biggest-lobby-no-one-is-talking-about/?utm_term=.25de04ae71f9.

[14] Bethany Carson & Eleana Diaz, Payoff: How Congress Ensures Private Prison Profit with an Immigrant Detention Quota, Grassroots Leadership (Apr. 2015) at 4, Chart 1-AA, *available at* https://grassrootsleadership.org/sites/default/files/reports/quota_report_final_digital.pdf.

[15] The GEO Group, Inc., 2021 Form 10-K at 31, *available at* https://sec.report/Document/0001564590-21-006003/geo-10k_20201231.htm#ITEM_16_FORM_10K_SUMMARY

[16] *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

standards."[17]  Detained people at the Facilities similarly reported in mass surveys in October 2021 that GEO consistently provides inedible, unsanitary, and inadequate food and nutrition.[18]

46.     As a uniform policy and practice, GEO provides only the bare minimum to ensure a readily available, captive labor force that cleans, maintains, and operates the Facilities for subminimum wages under the threat of disciplinary action and solitary confinement; abuse of the legal process; loss of privileges, yard time, and work; inadequate amounts of necessary personal hygiene supplies, water, food, and other essentials; and unsanitary conditions.  Without this nearly free labor, GEO's windfall from immigrant detention would be substantially decreased.

**C.      GEO Controls Detained Immigrants' Work in the Work Program; that Work Is Necessary to Maintain and Operate Mesa Verde and Golden State Annex.**

47.     Through its so-called "voluntary" Work Program, GEO hires immigrants detained at the Facilities to perform work that directly contributes to basic institutional operations, at a rate of $1 per day.

48.     At all times, GEO controls workers' wages, hours, and working conditions.

49.     Detained people complete and submit an application to be hired into the Work Program.  After submitting an application, they are interviewed.  During the interview, they are asked, among other things, in what positions and shifts they are interested in working.  After workers complete the interview, they are hired into the program.

50.     Detained workers are provided safety and general training to perform their job duties.

51.     In the Work Program, detained immigrants are required to work according to an assigned work schedule.  Typical work shifts at the Facilities are either an 8-hour

---

[17] *See Immigration Detention in California*, California DOJ, at ii (Jan. 2021).

[18] *See* California Collaborative for Immigrant Justice, *Starving for Justice: The Denial of Proper Nutrition in Immigration Detention, available at* https://www.ccijustice.org/starving-for-justice.

morning shift, or an 8-hour afternoon shift.

52.   The handbooks for Mesa Verde and Golden State Annex state that GEO provides all personal protection equipment and work uniforms for those in the Work Program.  For example, workers who clean the bathrooms and showers are provided with and directed to wear gloves and rubber boots.  Other workers are trained and expected to wear goggles to perform their work duties.

53.   In the Work Program, GEO tracks the hours detained immigrants work.

54.   In the Work Program, GEO credits wages to detained workers' commissary accounts, typically on a daily basis, as reflected in line items on their accounts.

55.   When they are hired, detained workers are assigned specific job titles and job duties.

56.   GEO informs all detained immigrants entering the Facilities that the following work assignments may be available through the Work Program:

(a)   Food Service Helper

(b)   Dining Hall Cleaning

(c)   Laundry Assistant

(d)   Sanitation Cleaning

(e)   Dorm Porter

(f)   Haircutter/Barber

57.   In the course of their labor and employment by GEO, detained immigrants employed in the Work Program perform a wide range of work, including but not limited to:

(a)   Scrubbing bathrooms, showers, sinks, and toilets;

(b)   Cleaning tables, eating areas, and telephones;

(c)   Taking out the trash;

(d)   Painting dormitories;

(e)   Assisting individuals with disabilities as an ADA worker;

(f)   Helping other detained immigrants access and use tablets;

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

(g)    Translating for detained immigrants and staff;

(h)    Sweeping, mopping, and waxing floors throughout the facility;

(i)    Washing laundry;

(j)    Washing dishes;

(k)    Cleaning the kitchen and cafeteria before and after meals;

(l)    Providing barber services to detained immigrants; and

(m)    Cleaning and maintaining hallways, walls, doors, windows, and living and recreational areas.

58.    GEO maintains the ability to hire and fire detained immigrant workers in the Work Program.

59.    GEO does not pay and has not paid detained immigrant workers the California minimum wage—currently $15 per hour—for the hours they work at Mesa Verde and Golden State Annex.

60.    No clause in GEO's contract with ICE or any rule or standard incorporated by reference into the contract requires GEO to maximize its profits by underpaying workers.  GEO's contracts with ICE do not require it to pay workers in the Work Program just $1 per day.[19]  ICE's standards set $1 per day as the floor, but do not limit GEO's discretion to pay workers more than that floor.[20]

61.    GEO refers to detained workers participating in the Work Program as "employees."

62.    Detained workers participating in the Work Program and those who perform uncompensated work are "employees" under California's minimum wage laws.

63.    GEO is an "employer" under California's minimum wage laws.

64.    GEO's contract with ICE requires GEO to comply with all federal, state, and local laws.

[19] *Novoa v. GEO Grp., Inc.*, No. EDCV 17-2514 JGB (SHKx), 2022 WL 2189626, at *15 (Jan. 25, 2022).
[20] *Id.*

65.     GEO's policies and practices ensure that detained workers continue working for subminimum wages.  The Work Program allows GEO to reduce its operational costs and increase its own profits substantially.

**D.     Class Members Are Forced to Work or Be Subject to Discipline.**

66.     GEO punishes and threatens to punish detained people hired into the Work Program and those who do not have a formal work assignment, if they do not perform work in the Facilities.

67.     The Detainee Handbooks provided to each detained person during intake at Mesa Verde and Golden State Annex set forth a number of disciplinary infractions and associated punishments that are enforced against people detained at the Facilities.

68.     The Detainee Handbooks classify "[r]efusing to clean assigned living area and/or group activity areas" as a 300-level "High Moderate" offense punishable by, among other things, up to 72 hours in disciplinary restriction (also known as solitary confinement) or even criminal prosecution.  More than one high moderate or low moderate offense in a 90-day period "shall constitute a high offense," subject to more severe sanctions.

69.     "Failure to follow safety or sanitation regulations" and "Being unsanitary or untidy, failing to keep one's quarters in accordance with posted standards" are both 400-level "Low Moderate" offenses.  These offenses are punishable by, among other things, loss of privileges, property, job, or other program assignment, restriction to the person's housing unit, or a change in housing unit.

70.     The Detainee Handbooks also threaten solitary confinement for disobeying guards, conduct that disrupts the orderly operation of the Facilities, and refusing to comply with corporate facility policies, including GEO's housing sanitation policies, as discussed below.  These more general offenses can be classified as "Greatest," "High," "High Moderate," and "Low Moderate," depending on the circumstances.  Punishment for these offenses likewise varies with the particular circumstances.

71.     "High Offenses" at the 200-level, include offense number 213, "Engaging in, or inciting a group demonstration," and offense number 214, "Encouraging others to refuse

to work or to participate in a work stoppage."  Punishments for these offenses include initiating criminal proceedings, disciplinary transfer, disciplinary detention (in solitary confinement) for up to 30 days, and the loss of privileges, property, or job or other program assignments.

72.    Class representatives Adan Castillo Merino, Fidel Garcia, Pedro Jesus Figueroa Padilla, and Jose Ruben Hernandez Gomez, along with other detained workers, have recently initiated work stoppages to protest the conditions in which they are detained. The detained workers cited inadequate pay, lack of sufficient workers, unsanitary living conditions, and inadequate personal hygiene, clothing, bedding, food, water, nutrition, and other supplies and services as reasons for the stoppages.

73.    As a result of the work stoppages, class representatives and other detained workers have been charged with disciplinary offenses and placed in solitary confinement. On information and belief, the charges and discipline are retaliatory in nature, designed to force workers to continue to work for GEO at subminimum wages or for no pay at all.

**E.    GEO Uniformly Deprives Individuals Detained at the Facilities of Necessary Food, Water, Personal Hygiene, and Other Supplies, Forcing Detained Individuals to Work to Pay for Those Basic Supplies.**

74.    GEO maintains a corporate policy and uniform practice of withholding sufficient food, water, hygiene products, and other necessities from those detained at the Facilities.  As a result of this policy of deprivation, detained immigrants are forced either to purchase these daily necessities from the Facilities' commissaries or go without.

75.    In 2021, detained people at Golden State Annex reported unlivable and unsanitary housing conditions, including cockroaches and flies in their food, spoiled milk, walls covered in mold, and broken toilets that spit water out when flushed.[21]

76.    GEO also fails to provide adequate cleaning supplies to its detained immigrant workers.  It provides insufficient amounts of soap, solvents, and other cleaning

---

[21] ACLU. "First Amendment Retaliation Against Individuals in Immigration Detention in California" (Aug. 2021). *available at* https://www.aclunc.org/sites/default/files/OCRCL%20complaint.08.26.21%20_0.pdf.

solutions and materials for the amount of space that needs to be cleaned.  At times, detained workers must use their own personal hygiene supplies, such as shampoo, to perform their Work Program cleaning tasks.  GEO also provides watered down solutions that do not have a sufficient concentration of active ingredients to clean effectively or efficiently.

**F.     GEO Does Not Staff Its Facilities Sufficiently to Perform Necessary Cleaning and Sanitation Work.**

77.     GEO maintains a uniform practice of not hiring sufficient numbers of outside staff and detained workers to perform basic and necessary cleaning and sanitizing tasks.

78.     At times, GEO has no outside staff employed to perform these basic and necessary duties.  If detained immigrants choose not to clean shared living spaces, through the Work Program or on their own time without pay, they are forced to live in unsanitary conditions, and threatened with losing their jobs, yard time, and privileges, and with being subject to disciplinary action.

79.     Even with detained workers performing these tasks according to a regular schedule, the Facilities remain dirty and unsanitary because GEO intentionally understaffs the Facilities to maximize its profits.

**G.     GEO Has Not Provided Adequate COVID-19 Safety Prevention Measures at Mesa Verde and Golden State Annex.**

80.     The COVID-19 pandemic added a layer of urgency to detained individuals' preexisting need to live in a clean and hygienic setting.

81.     GEO failed to ensure COVID-19 safety prevention measures at Mesa Verde and further attempted to cover up its non-compliance with CDC COVID-19 guidelines.  In a December 3, 2020 order, Judge Vince Chhabria of the U.S. District Court for the Northern District of California noted GEO officials' "abominable performance" of running Mesa Verde during the pandemic, including that officers "deliberately avoided testing detainees and staff for fear that the results would require them to take expensive and

logistically challenging safety measures."[22]  Other GEO officials "gave false testimony several times" during the proceedings, and the Mesa Verde facility administrator was "proven to exercise his discretion in a reckless and indifferent fashion" with respect to detained immigrants' health and safety.[23]  In sum, GEO officials "cannot be trusted on their own to provide reasonably safe conditions to detainees at Mesa Verde."[24]

82.     Dozens of detained immigrants at Mesa Verde went on hunger strikes from April to July 2020 in part to protest the facility's hazardous living conditions and absence of COVID-19 safety prevention measures.[25]  Officials claimed that detained strikers "were just not interested in eating their facility-provided meals." *Id.*  Mesa Verde staff punished strikers for their protests.[26]  Staff threatened to remove their access to the commissary and computer tablets they use to call, text, and otherwise communicate with loved ones.[27]

83.     By maintaining these harsh conditions, punishing individuals for not working, failing to staff the Facilities at minimally adequate levels, and purposefully withholding basic necessities from those it detains, GEO ensures an available labor pool of detained immigrants who will work for only $1 per day, or no pay at all, thus allowing it to continue operating the Facilities at a significant profit.

**H.     GEO's Contracts with ICE Forbid GEO's Current Practices, But GEO Continues to Operate the Facilities Pursuant to Its Unlawful Policies.**

84.     At each civil immigration facility operated by GEO, GEO is contractually

---

[22] *Zepeda Rivas v. Jennings*, 504 F. Supp. 3d 1060, 1064 (N.D. Cal. 2020).

[23] *Id.* at 1064, 1070.

[24] *Id.* at 1070.

[25] Sam Morgen. "Hunger strike at Mesa Verde ends after four days" (Jun. 9, 2020). *available at* https://www.bakersfield.com/news/hunger-strike-at-mesa-verde-ends-after-four-days/article_490b6ee6-aa92-11ea-97a0-938736416877.html.

[26] *Id.*

[27] Sam Morgen. "Detainees at Mesa Verde, other immigrant detention centers allege violation of First Amendment in complaint" (Aug. 27, 2021). *available at* https://www.bakersfield.com/news/detainees-at-mesa-verde-other-immigrant-detention-centers-allege-violation-of-first-amendment-in-complaint/article_0d31b924-0785-11ec-a9cb-9bceb111c4c3.html.

[4118018.9]                                                    15                                    Ex. A - 19

required to comply with some version of ICE's 2011 PBNDS, as updated in 2016.

85.   GEO's contracts with ICE to operate civil immigration detention facilities, including Mesa Verde and Golden State Annex, incorporate the PBNDS.

86.   All applicable versions of the PBNDS require any labor performed by a detained immigrant to be voluntary:  "Work assignments are voluntary; however all detainees are responsible for personal housekeeping."  PBNDS § 5.8.V.C.[28]

87.   The Personal Housekeeping Requirement, PBNDS § 5.8.V.C,[29] provides:

> C. Personal Housekeeping Required
>
> Work assignments are voluntary; however, all detainees are responsible for personal housekeeping.
>
> Detainees are required to maintain their immediate living areas in a neat and orderly manner by:
>
> 1. making their bunk beds daily;
> 2. stacking loose papers;
> 3. keeping the floor free of debris and dividers free of clutter; and
> 4. refraining from hanging/draping clothing, pictures, keepsakes, or other objects from beds, overhead lighting fixtures or other furniture.

88.   Outside of the four personal housekeeping tasks enumerated in PBNDS § 5.8.V.C, GEO cannot force or compel individuals in immigration detention to work.

89.   In violation of the PBNDS, its contracts with ICE, and the California and federal forced labor statutes, GEO promulgates and enforces corporate policies known as Housing Unit Sanitation Policies ("HUSPs") at nearly all of its civil immigration detention facilities, including Mesa Verde and Golden State Annex.

90.   GEO's HUSPs require detained immigrants to perform a wide range of uncompensated work for the company's enrichment.

---

[28] *See also id.* § 5.8.II.2 ("Detainees shall be able to volunteer for work assignments but otherwise shall not be required to work, except to do personal housekeeping.")

[29] *Available at* https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf (last visited Apr. 1, 2022).

91. Under the HUSPs, detained immigrants are forced to perform uncompensated labor, such as cleaning and maintaining areas of GEO facilities outside the scope of the Personal Housekeeping Requirement, PBNDS § 5.8.V.C.  For instance, the HUSPs require detained immigrants to clean and sanitize walls, bathrooms, showers, toilets, microwaves, furniture, windows and floors—work well outside the four personal housekeeping tasks enumerated in PBNDS § 5.8.V.C.

92. Detained immigrants are not paid to perform labor under the HUSPs.

93. At Mesa Verde and Golden State Annex, GEO obtains compliance with its HUSPs by threatening detained immigrants with disciplinary write-ups and solitary confinement; deprivation of legally required services such as recreation, law library, and telephone time; understaffing its facilities; depriving detained individuals of food, water, basic hygiene, and other supplies; and abuse of legal process, including reporting misbehavior to ICE or to the immigration court and the threat of criminal prosecution.

94. Detained immigrants have no meaningful choice but to comply with a demand from a GEO official to perform free labor.

95. Detained immigrants are notified in the Detainee Handbooks when they enter the Facilities of GEO's requirement that they must perform uncompensated, non-personal cleaning and maintenance work, and that the consequence of refusal can be disciplinary action, including solitary confinement.

96. GEO's facility-specific Detainee Handbooks are intended to leave detained immigrants with the false impression that the company can compel them to perform work outside the four personal housekeeping tasks set forth in Section 5.8.V.C of the PBNDS.

97. No clause in GEO's contracts with ICE or any rule or standard incorporated by reference therein permits GEO to compel or force detained individuals to work for free at Mesa Verde or Golden State Annex.

98. GEO's contracts with ICE incorporating the PBNDS expressly prohibit the company from forcing, coercing, or mandating detained individuals to complete work assignments that fall outside the scope of the personal housekeeping requirement,

PBNDS § 5.8.V.C.

99.    The PBNDS requires detained workers in the Work Program "to work according to a schedule" and prohibits "work in excess of 8 hours daily and 40 hours weekly."  PBNDS § 5.8.H.

100.    As a federal contractor, GEO is also prohibited by Executive Order, the Federal Acquisition Regulations, and Homeland Security Acquisition Regulations from using forced labor in the performance of its contracts with ICE.

101.    GEO must promptly report allegations of forced labor made against the corporation to the federal government, regardless of whether it contests those allegations.

102.    On information and belief, GEO has not complied with the requirement that it promptly report allegations of forced labor made by Plaintiffs in this action to the federal government.

103.    By carrying out a scheme requiring detained immigrants to perform uncompensated janitorial and maintenance work pursuant to corporate HUSPs, GEO violates the federal and California forced labor statutes.[30]

**I.    At All Relevant Times, GEO Acted with Malice, Oppression, and Fraud by Forcing Detained Workers to Work and Intentionally and Illegally Reaping the Benefits of Detained Workers' Labor.**

104.    GEO's despicable conduct in depriving detained workers of food, water, and essential supplies, and punishing and threatening to punish detained workers for asserting their rights to a minimum wage and to be free from forced labor evidences its malicious and oppressive conduct in promulgating and operating the Work Program.[31]  GEO engaged in this malicious and oppressive conduct with a willful and conscious disregard of detained individuals' rights and safety, and in so doing subjected them to cruel and unjust hardship in disregard of their rights.

105.    In its Detainee Handbooks and through GEO staff's oral and other

---

[30] *See* 18 U.S.C. § 1589; Cal. Civ. Code § 52.5.

[31] *See* Cal. Civ. Code § 3294(a)-(c).

representations GEO fraudulently and intentionally misrepresented to detained people that they are and were required to perform work outside the requirements of the PBNDS and pursuant to the HUSPs, and that GEO could lawfully force them to perform such work under threat of and actual discipline and other sanctions.  GEO knew it could not lawfully require detained individuals to perform this work, but it intentionally and unlawfully forced detained individuals to work.  In doing so, GEO intended to reap the economic benefit of this forced and undercompensated labor; its business model relies on these practices.

**J.      Plaintiff Jose Ruben Hernandez Gomez Was Forced to Work for Little or No Pay.**

106.    Mr. Hernandez is a citizen of Mexico and a lawful permanent resident of the United States since he was 8 years-old.  He previously lived in Lodi, California.

107.    Mr. Hernandez was detained at Golden State Annex from November 26, 2021 through January 4, 2022.  He has been detained at Mesa Verde since January 4, 2022.

108.    Mr. Hernandez performed work for GEO at both the Mesa Verde and Golden State Annex facilities and was not paid California's minimum wage for that work.  At times he was not paid at all for his work.

109.    When Mr. Hernandez was housed at Golden State Annex, between November 26, 2021 and January 4, 2022, he worked in the quarantine section.  Staff did not clean the quarantine section at all, and no individuals were assigned to the Work Program in the quarantine section.  The detained people housed there organized their own cleaning schedules that they followed so that they did not have to live in filth.  Among other things, the detained people in the quarantine section cleaned bathrooms and eating areas.

110.    At Mesa Verde, Mr. Hernandez worked as a porter in Dorm A for about one month, between January and February 2022.  He cleaned restrooms, hallways, and dayrooms.  He used cleaning supplies and equipment provided by GEO.  Mr. Hernandez worked Monday through Friday from approximately 10:30 am until 11:20 am.  During that

hour, Mr. Hernandez swept and mopped floors, and cleaned showers and toilets.  In February 2022, Mr. Hernandez left Dorm A to live in Dorm C.  When he returned to Dorm A in March 2022 he again worked as a porter.  His work week after March 2022 ran from Tuesday through Saturday, and his hours varied, but generally started at 8 am and ended sometime between 9 am and 12 pm.  Again, he swept and mopped floors, and cleaned showers and toilets.  He also worked on his days off to prevent the dorm from becoming filthy.

111.    In return for his labor in the Work Program at Mesa Verde, GEO paid Mr. Hernandez $1 per day.  GEO credited these wages to Mr. Hernandez's commissary account.

112.    Mr. Hernandez used cleaning supplies and equipment provided by GEO, and is supervised by GEO employees.

113.    If Mr. Hernandez did not clean the bathrooms, eating areas, and other shared spaces, he would be forced to live in filth.

114.    If given a meaningful choice, Mr. Hernandez would not have worked for $1 per day.

115.    On June 29, 2022, Mr. Hernandez's dorm joined a work stoppage taking place at Mesa Verde that had already been ongoing in a different dorm since May 5, 2022.  The work stoppage is an effort to protest wages, working conditions, and worker treatment.  Mr. Hernandez and 16 other individuals in his dorm signed a note informing GEO in writing of the work stoppage.

116.    GEO retained the value of Mr. Hernandez's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detainees at Mesa Verde and Golden State Annex.

**K.    Plaintiff Salesh Prasad Was Forced to Work for Little or No Pay.**

117.    Mr. Prasad is citizen of Fiji and has been a permanent resident of the United States since he was 6 years-old.  He is seeking humanitarian relief in the United States under the Convention Against Torture.

118.    Mr. Prasad has been detained at Golden State Annex since August 19, 2021. He has been housed in Dorms B1, B2, A2, and A4, along with the Special Management Unit (SMU), GEO's solitary confinement unit at Golden State Annex.

119.    Between approximately September 9 or 10, 2021 and January 14, 2022, and from June 6, 2022 to June 21, 2022, Mr. Prasad was employed by GEO as a porter.

120.    Mr. Prasad performed work for GEO at Golden State Annex and was not paid California's minimum wage for that work.  At times he was not paid at all for his work.

121.    Mr. Prasad worked as a porter in the Work Program beginning in September 2021.  As a porter, Mr. Prasad cleaned the showers, toilets, and sinks at Golden State Annex.  He cleaned the floors and picked up trash.  He also cleaned the dayroom, windows, and other parts of the bathroom when other detainee workers did not perform these duties.  Mr. Prasad was scheduled to work the morning shift, Monday through Friday.

122.    Mr. Prasad used cleaning supplies and equipment provided by GEO, and was supervised by GEO employees.

123.    Between September 2021 and January 2022, Mr. Prasad was paid $1 per day for his 8-hour shift as a porter.

124.    Starting in September 2021, however, Mr. Prasad had to work for free on his days off and outside his regular work schedule because there were not enough workers to perform all necessary cleaning tasks.

125.    Starting in January 2022, no porters at all were employed to work in Dorm B1.  Mr. Prasad was unassigned from his porter position as well.  As a result, Mr. Prasad had to mop the whole dorm—the television room, dayroom, bed area, and phone area—but was not paid, even $1 per day, for doing so.

126.    In February 2022, when Mr. Prasad asked the B Dorm caseworker whether GEO could hire workers to clean the dorm, the caseworker deferred the question to the next week.  The following week, when Mr. Prasad asked again, the caseworker informed

Mr. Prasad that GEO would not be hiring more staff; they would be cutting positions. When Mr. Prasad asked the caseworker whether GEO wanted detained individuals to work for free, the caseworker responded, "I don't know, I just work here."

127.   Mr. Prasad and one other detainee worked 7 days per week because no other workers were available to clean in Dorm B1.

128.   On April 22, 2022, Mr. Prasad was moved to Dorm B2.  Again, Mr. Prasad had to work for free because there were no workers to perform necessary cleaning tasks. No porters at all were employed to work in Dorm B2.  As a result, Mr. Prasad had to mop the whole dorm—the television room, dayroom, bed area, phone area, and bathrooms.

129.   Between January 2022 and June 6, 2022, GEO was able to compel Mr. Prasad to work for free because no one else was available or willing to do necessary sanitation and cleaning.

130.   Beginning on June 6, 2022, Mr. Prasad was again hired as a porter.  He is being paid $1 per day.  GEO credits these wages to Mr. Prasad's commissary account.

131.   If given a meaningful choice, Mr. Prasad would not work for $1 per day or nothing at all.

132.   If given a meaningful choice, Mr. Prasad would not work 7 days per week.

133.   GEO retained the value of Mr. Prasad's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detainees at Mesa Verde and Golden State Annex.

**L.   Plaintiff Guillermo Medina Reyes Was Forced to Work for Little or No Pay.**

134.   Mr. Medina Reyes is a citizen of Mexico.  He is seeking humanitarian relief in the United States pursuant to the Convention Against Torture.

135.   Mr. Medina Reyes has been detained at Golden State Annex since December 9, 2021.

136.   Mr. Medina Reyes has performed work for GEO at Golden State Annex between January and March 2022, when he signed a Work Program contract to perform porter duties in Dorm A4.  Later in March he signed a new Work Program contract to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

perform the same job duties as a porter in Dorm A4.  In May 2022, he signed a new Work Program contract for a barber position.

137.    Mr. Medina Reyes asked GEO's case manager about becoming a porter because he noticed the dorms were not clean and were unsanitary.  Only two or three individuals were employed to clean the dorms.

138.    Mr. Medina Reyes has never been paid California minimum wage for the work he has performed.

139.    As a porter, Mr. Medina Reyes mopped and swept the entire dorm, including the dayroom, television room, and in between bunks.  After Mr. Medina Reyes began working as a porter, staff began adding duties to his job because there were not enough porters to complete necessary tasks.  At first Mr. Medina Reyes was just sweeping and mopping, but later he became responsible for wiping tables and telephones.  At times he had to clean bathrooms, including the toilets, sinks, floors, walls, mirrors, and showers.

140.    He used cleaning supplies and equipment provided by GEO, and is supervised by GEO employees.

141.    Mr. Medina Reyes has been paid $1 per day for his labor as a porter and a barber.  GEO credits these wages to Mr. Medina Reyes's commissary account.

142.    As a porter, Mr. Medina Reyes performed other janitorial and maintenance work for GEO.

143.    When Mr. Medina Reyes was housed in B Dorm for approximately 3 to 4 weeks in December 2021, no paid porters were assigned to clean and maintain the dorm. GEO staff in B Dorm told residents that no outside staff or detained workers would clean the dorm, meaning that they have to do it.  As a result, the detained individuals in B Dorm organized and performed all cleaning duties.  GEO staff provided cleaning supplies to the workers in B Dorm.

144.    While Mr. Medina Reyes was housed in B Dorm he cleaned the bathroom and showers on a daily basis.  He was not compensated for this work.  Mr. Medina Reyes did not feel like he had a choice not to clean because if he and other detained individuals

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

did not perform this work, no one would and their living spaces would become dirty and unsanitary.

145.   As a barber, Mr. Medina Reyes is responsible for providing haircuts to all individuals in his dorm.  He conducts his work in a room assigned by GEO, during specific daily work hours assigned by GEO.  GEO provides the clippers, trimmers, and barbicide he uses for his work.

146.   If given a meaningful choice, Mr. Medina Reyes would not work for $1 per day or no money at all.

147.   GEO retained the value of Mr. Medina Reyes's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detainees at Mesa Verde and Golden State Annex.

**M.     Plaintiff Edgar Sanchez Was Forced to Work for Little or No Pay.**

148.   Mr. Sanchez is a citizen of Mexico and has lived in California since he was 1 year-old.  He has lawful status pursuant to the Convention Against Torture and currently lives and works in Whittier, California.

149.   Mr. Sanchez was detained at Golden State Annex between April 1, 2021 and February 24, 2022.

150.   Mr. Sanchez performed work for GEO at Golden State Annex starting in June 2021, when he signed a Work Program contract to perform porter duties.  He worked as a porter for approximately 6 months.

151.   He was not paid the California minimum wage for the work he performed.

152.   As a porter, Mr. Sanchez mopped and swept his dorm.  He also cleaned and sanitized surfaces in the dorm.

153.   Mr. Sanchez used cleaning supplies and equipment provided by GEO, and was supervised by GEO employees.

154.   Mr. Sanchez was paid $1 per day for his labor as a porter.  GEO credited these wages to Mr. Sanchez's commissary account.

155.   Mr. Sanchez was compelled to work as a porter.  Officers at Golden State

Annex would tell him and other detained individuals that they were required to work, and that it was mandatory to do so.

156. Officers would also tell detained individuals that they would not be permitted to go to yard if they did not work. If Mr. Sanchez did not perform tasks as ordered by GEO staff, officers stopped recreation time for his entire dorm and/or denied the entire dorm legal library and/or chow access.

157. Mr. Sanchez would work so that the people in his dorm would not lose access to these activities.

158. Mr. Sanchez performed his porter duties even on days he was not scheduled to work to keep the dorm clean and sanitary in hopes of preventing or reducing disease among the population.

159. Officers threatened Mr. Sanchez with discipline if he did not work. They told Mr. Sanchez that if they disciplined him, that would interfere with his immigration case and his ability to seek relief.

160. Mr. Sanchez performed work under threat of harm to himself and his fellow detained immigrants and abuse of the legal process.

161. If given a meaningful choice, Mr. Sanchez would not have worked for $1 per day or nothing at all.

162. GEO retained the value of Mr. Sanchez's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detainees at Mesa Verde and Golden State Annex.

**N.    Plaintiff Adan Castillo Merino Was Forced to Work for Little or No Pay.**

163. Mr. Castillo Merino is a citizen of Mexico and has lived in Southern California since he was 8 years-old. He has been detained at Golden State Annex during the pendency of his immigration case before the Immigration Court, the Board of Immigration Appeals and the Ninth Circuit Court of Appeals since November 6, 2020.

164. Mr. Castillo Merino has performed work for GEO at Golden State Annex since November or December 2020. Starting in November or December 2020 and through

May 2021, Mr. Castillo Merino was assigned to work as a porter in the Work Program. His duties included sweeping, mopping, and cleaning the dorm restrooms, furniture, windows, and doors.

165.    In May 2021, Mr. Castillo Merino was assigned to work as a painter in the Work Program for one week. He and others were responsible for painting the dorms. As a member of the paint crew, Mr. Castillo Merino was promised $1 per day in pay. He was told that within one week of his employment, the painters would be able to meet with the warden to see if they could earn a small amount of additional pay. Instead of raising the painters' pay, the GEO staff fired everyone on the paint crew. Staff then hired other workers to constitute a new paint crew.

166.    Starting in May 2021 and through the present, Mr. Castillo Merino has once again been assigned to work as a porter in the Work Program. He is assigned to work the afternoon shift, from 2 pm to 10 pm. His responsibilities are similar to those he performed in his first porter position. His duties include sweeping, mopping, and cleaning the dorm restrooms, furniture, windows, and doors.

167.    Mr. Castillo Merino has never been paid California minimum wage for the work he has performed.

168.    Mr. Castillo Merino uses cleaning supplies and equipment provided by GEO, and is supervised by GEO employees.

169.    Mr. Castillo Merino has been paid $1 per day for his labor as a porter and a painter. GEO credits these wages to Mr. Castillo Merino's commissary account.

170.    Mr. Castillo Merino works on his putative days off and during hours when he is not scheduled because GEO has not hired sufficient outside staff and detained workers to perform necessary cleaning and sanitation tasks.

171.    Mr. Castillo Merino does not feel like he has a choice not to clean because if he and other detained immigrants do not perform under- and uncompensated work, no one will. Their living spaces would become dirty and unsanitary. When detained workers do not clean the dorms, mold grows in the showers, dust collects, and the toilets become dirty

because GEO staff do not clean them properly.

172. If given a meaningful choice, Mr. Castillo Merino would not work for $1 per day or no money at all.

173. On June 6, 2022, Mr. Castillo Merino and other workers on his dorm began a labor stoppage in response to conditions, including an increase in commissary fees, inadequate medical care, inadequate amounts of food, and excessive telephone, video call, and texting fees that make it difficult for detained individuals to keep in contact with their loved ones.

174. GEO retained the value of Mr. Castillo Merino's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detainees at Mesa Verde and Golden State Annex.

**O.     Plaintiff Ivan Oliva Sierra Was Forced to Work for Little or No Pay.**

175. Mr. Oliva Sierra is a citizen of Mexico and has lived in Southern California since he was approximately 6 years-old. He was detained at Golden State Annex from January 12, 2021 until on or about June 13, 2022. Although an Immigration Judge ultimately found on April 27, 2022 that Mr. Oliva Sierra warrants legal status in the United States under the Convention Against Torture, ICE refused to release him from detention for nearly two additional months.

176. Mr. Oliva Sierra currently resides in Compton, California.

177. Mr. Oliva Sierra worked in several positions at Golden State Annex.

178. At various times between April 2021 and May 2022, Mr. Oliva Sierra worked as porter, a barber, and an ADA assistant helping a person with disabilities with activities of daily living. In both the porter and ADA assistant assignments, Mr. Oliva Sierra performed work outside his scheduled hours because GEO did not provide for enough free or detained staff to perform these functions.

179. Mr. Oliva Sierra was never paid California minimum wage for the work he performed.

180. Mr. Oliva Sierra used cleaning supplies and equipment provided by GEO,

and is supervised by GEO employees.

181. When GEO paid Mr. Oliva Sierra for his work, GEO paid just $1 per day.

182. If given a meaningful choice, Mr. Oliva Sierra would not have worked for $1 per day or no money at all.

183. GEO retained the value of Mr. Oliva Sierra's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detainees at Mesa Verde and Golden State Annex.

**P.    Plaintiff Fidel Garcia Was Forced to Work for Little or No Pay.**

184. Mr. Garcia is a citizen of Mexico and has lived in the United States since he was approximately 5 years-old.  He has been detained at Golden State Annex during the pendency of his immigration case before the Immigration Court and the Board of Immigration Appeals.

185. Mr. Garcia has been detained at Golden State Annex since July 2021. Initially he was housed in B Dorm, but then was moved to the A1 Dorm after approximately two weeks.

186. Mr. Garcia has worked as a porter in the Work Program since approximately July 16, 2021.  As a porter, he cleans the bathrooms, including sweeping the floors, taking out the trash, and cleaning the toilets and showers.

187. Mr. Garcia is assigned to work as a porter 5 days per week for 8 hours per day, but actually works 7 days a week because there are not enough porters to cover all shifts and there are not enough assigned workers to complete all the necessary work.

188. When Mr. Garcia works on his days off, he does not get paid for his work. Staff do not record his extra shifts, so he does not get paid for them.

189. Mr. Garcia has never been paid California minimum wage for the work he has performed.

190. Mr. Garcia has been paid $1 per day for his labor.  GEO credits these wages to Mr. Garcia's commissary account.  At times Mr. Garcia has been paid nothing at all.

191. Mr. Garcia uses cleaning supplies and equipment provided by GEO, and is

supervised by GEO employees.

192.    Mr. Garcia feels like he has not had a choice not to work because if he and other detainees do not perform this uncompensated yet necessary work, no one will.

193.    If given a meaningful choice, Mr. Garcia would not work for $1 per day or no money at all.

194.    On June 6, 2022, Mr. Garcia and other workers on his dorm began a labor stoppage to protest GEO's exploitation of them, including increases of commissary fees at Golden State Annex.

195.    GEO retained the value of Mr. Garcia's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detainees at Mesa Verde and Golden State Annex.

**Q.    Plaintiff Isaac Cardona Hernandez Was Forced to Work for Little or No Pay.**

196.    Mr. Cardona Hernandez is a citizen of Guatemala.  He is currently detained at Mesa Verde during the pendency of his immigration case before the Ninth Circuit Court of Appeals.

197.    Mr. Cardona Hernandez was detained at Golden State Annex starting July 6, 2021.  He was housed in A Dorm.  In early October 2021, Mr. Cardona Hernandez was transferred to Mesa Verde.  He spent his first two weeks at Mesa Verde in A Dorm, and then moved to C Dorm, where he resided until June 9, 2022.  Between June 9 and July 7, 2022, Mr. Cardona Hernandez was housed in segregation.

198.    At both Facilities, Mr. Cardona Hernandez worked as a porter in the Work Program.  He began working in the Work Program at Golden State Annex in early July 2021, and at Mesa Verde about a week after being transferred there in early October 2021.

199.    Mr. Cardona Hernandez began cleaning at Mesa Verde, without pay, shortly after his arrival and before he was hired into the Work Program.

200.    To be hired as a porter at both Facilities, Mr. Cardona Hernandez signed applications and then participated in short interviews.  During the interview at Mesa Verde, staff asked Mr. Cardona Hernandez what work he wanted to perform and whether

he wanted to work a morning or afternoon shift. Mesa Verde staff asked Mr. Cardona Hernandez questions from a list during his interview for the Work Program.

201.    During the interview at Golden State Annex, staff discussed safety practices with Mr. Cardona Hernandez, including how to wear goggles and use gloves properly.

202.    As a porter, Mr. Cardona Hernandez cleaned the bathrooms completely, including sweeping the floors and cleaning the toilets and showers. At times, when needed, Mr. Cardona Hernandez has cleaned other areas of the Facilities as well.

203.    Mr. Cardona Hernandez was assigned to work one 8-hour shift per day, five days per week. He was assigned to work Monday through Friday. Due to inadequate staffing, however, Mr. Cardona Hernandez typically worked six days per week and at times he would cover both the morning and afternoon shifts in a single day. He was not paid for this additional work. Mr. Cardona Hernandez understood that if he did not perform the work, there were not enough staff and detained workers to clean.

204.    In approximately January 2022, the workers in Mr. Cardona Hernandez's dorm initiated a work stoppage because Mesa Verde cut the number of workers employed in the dorm from an average of 8 workers to no more than 6 workers. In early May 2022, GEO decided to cut the number of workers further, so that fewer than 6 workers were hired to clean the dorm.

205.    When the work stoppage began, GEO hired two outside staff members to clean the dorm where Mr. Cardona Hernandez lives. The outside staff do not clean the dorms well, so Mr. Cardona Hernandez continues to clean.

206.    In retaliation for the work stoppage, GEO removed popcorn and soda as items that detained workers could purchase from the commissary.

207.    On May 5, 2022, Mr. Cardona Hernandez filed a grievance asking GEO to clean the living areas better. In response to his grievance, GEO stated if Mr. Cardona Hernandez wanted to his living space to be cleaner, he should clean it himself. Mr. Cardona Hernandez believes he will have to start cleaning common dorm areas again because he does not want to live in filth.

208. On June 9, 2022, when Mr. Cardona Hernandez was still participating in the work stoppage, GEO staff placed him in segregation. He believes he was placed in segregation in retaliation for joining the work stoppage.

209. After being placed in segregation, Mr. Cardona Hernandez met two other people who also participated in work stoppages in other dorms and who were also moved out of their dorms and placed in segregation. Mr. Cardona Hernandez perceives these retaliatory moves as ways to separate the those participating in the work stoppages and break up the work stoppages.

210. Mr. Cardona Hernandez has never been paid California minimum wage for the work he has performed.

211. Mr. Cardona Hernandez has been paid $1 per day for his labor. GEO credits these wages to Mr. Cardona Hernandez's commissary account. At times Mr. Cardona Hernandez has been paid nothing at all.

212. Mr. Cardona Hernandez uses cleaning supplies and equipment provided by GEO, and is supervised by GEO employees.

213. Mr. Cardona Hernandez feels like he does not have a choice not to work because if he and other detainees do not perform this uncompensated yet necessary work, no one will.

214. If given a meaningful choice, Mr. Cardona Hernandez would not work for $1 per day or no money at all.

215. GEO retained the value of Mr. Cardona Hernandez's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detainees at Mesa Verde and Golden State Annex.

**R.    Plaintiff Pedro Jesus Figueroa Padilla Was Forced to Work for Little or No Pay.**

216. Mr. Figueroa is a citizen of Mexico. He has been detained at Golden State Annex and Mesa Verde during the pendency of his immigration proceedings.

217. Mr. Figueroa was detained at Golden State Annex from October 29, 2021

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

through November 22, 2021, in Dorm B1.  On November 22, 2021, he was transferred to Mesa Verde, where he lived in A Dorm for approximately one month.  He was transferred to D Dorm after his first month on A Dorm, and then transferred back to A Dorm on February 14, 2022.

218.    When Mr. Figueroa was at Golden State Annex, he would clean his dorm even though he had not been hired into the Work Program.  Mr. Figueroa felt he had no choice but to clean because no one was hired into the Work Program there.  While at Golden State Annex, Mr. Figueroa swept and mopped the entire dorm.  He shared these unofficial job duties with the other people in the dorm.

219.    Mr. Figueroa signed a Work Program contract to work as a porter at Mesa Verde in approximately December 2021, but was taken off the list due to medical issues. In approximately January 2022, when he was medically cleared to work again, he signed a new contract to work as a porter.  He worked as a porter at Mesa Verde from approximately February 2022 until June 28, 2022.

220.    He was assigned to an 8-hour shift, 5 days per week.

221.    His job duties as dorm porter included sweeping and mopping the dorm, cleaning the restrooms, and picking up trash, among other things.  On June 28, 2022, Mr. Figueroa's dorm joined the work stoppage taking place at Mesa Verde.  Mr. Figueroa and 16 other individuals in his dorm signed a note informing GEO in writing of the work stoppage.

222.    On June 29, 2022, Mr. Figueroa witnessed another individual who signed the note being taken out of the dorm and placed in segregation.  In the morning on June 30, 2022, Mr. Figueroa was approached by a lieutenant on the yard who told him he would be taken to medical for a segregation screening.  Mr. Figueroa asked the reason and was told it was for inciting a group demonstration.  Later that day, Mr. Figueroa received a paper stating the charge: engaging in or inciting a group demonstration and conduct that disrupts the operation of the facility.  On July 1, 2022, Mr. Figueroa received copies of incident reports stating the charges.  He believes that he and his dorm-mate were placed in

segregation as retaliation for joining the work stoppage.

223.   Mr. Figueroa has never been paid the California minimum wage for the work he has performed.

224.   Mr. Figueroa has been paid $1 per day for his labor.  GEO credits these wages to Mr. Figueroa's commissary account.  At times Mr. Figueroa is paid nothing at all.

225.   Mr. Figueroa used cleaning supplies and equipment provided by GEO, and was supervised by GEO employees.

226.   Mr. Figueroa feels he has had no choice but to work because if he and other detainees do not perform this necessary work, no one will, and he could be issued a disciplinary write-up.

227.   If given a meaningful choice, Mr. Figueroa would not work for $1 per day or no money at all.

228.   GEO retained the value of Mr. Figueroa's labor by realizing this value as corporate profits, rather than using it to provide safer, more humane living conditions for detainees at Mesa Verde and Golden State Annex.

**CLASS ACTION ALLEGATIONS**

229.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated under Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

**A.   Class Definitions**

230.   **The California Wage and Hour Class.**  For Plaintiffs' claims arising under the California Labor Code and Industrial Wage Commission ("IWC")Wage Orders, the California Unfair Competition Law, and the common law of unjust enrichment. Plaintiffs seek to certify the following class:  All civilly detained immigrants who (i) were detained at the Facilities any time between July 13, 2019 and the date of final judgment in this matter, and either (ii) participated in the Work Program at any point during their detention,

or (iii) performed work for no compensation as a result of GEO's policy not to hire sufficient outside staff and detained workers to keep the Facilities clean and sanitary, and to deprive detained people of necessary food, water, and other supplies.

231. **The California Forced Labor Class.** For Plaintiffs' claim for forced labor arising under the California Trafficking Victims Protection Act, Plaintiffs seek to certify the following class: All civil immigration detained individuals who (i) were detained at Mesa Verde and Golden State Annex any time between July 13, 2015 and the date of final judgment in this matter, and (ii) performed janitorial, maintenance, or other work at the Facilities above and beyond the four personal housekeeping tasks enumerated in PBNDS § 5.8.V.C ("California Forced Labor Class").

232. **The Federal Forced Labor Class.** For Plaintiffs' claim for forced labor arising under the federal Trafficking Victims Protection Act, Plaintiffs seek to certify the following class: All civilly detained immigrants who (i) were detained at Mesa Verde and Golden State Annex any time between July 13, 2015 and the date of final judgment in this matter, and (ii) participated in the Work Program or (iii) performed work without compensation at any point during their detention ("Federal Forced Labor Class").

233. Excluded from each class definition are the defendants, their officers, directors, management, subsidiaries, and affiliates, and all federal governmental entities. Plaintiffs reserve the right to revise the class definitions based upon information learned through discovery.

**B.    Class Certification Requirements Under Rule 23**

234. **Numerosity: Rule 23(a)(1).** Each class is so numerous that joinder of all members is impracticable. Plaintiffs do not know the exact size of the classes, since that information is within the control of GEO. Mesa Verde and Golden State Annex can house up to 1,100 individuals at any one time. Accordingly, Plaintiffs allege that the number of class members for each class is numbered in the thousands. Membership in each class is readily ascertainable from GEO's detention and employment records.

235. **Commonality and Predominance: Rules 23(a)(2) and 23(b)(3).** There are

numerous questions of law or fact common to each class, and those issues predominate over any question affecting only individual class members.

236. With respect to the California Wage and Hour Class, the common legal and factual issues include the following:

(a) Whether GEO is an "employer" and the detained immigrant workers are "employees" under the California Minimum Wage Law;

(b) Whether Plaintiffs and California Wage and Hour Class are entitled to the protections of the California Wage Orders;

(c) Whether Plaintiffs and California and Hour Wage Class performed compensable work;

(d) Whether Plaintiffs and California Wage and Hour Class were paid $1 per day for their labor;

(e) Whether GEO was unjustly enriched by paying subminimum wages to its detained immigrant workers;

(f) Whether GEO engaged in conduct that violated California law—including California Minimum Wage Law, the California Labor Code, associated California Wage Orders, and the California Unfair Competition Law;

(g) Whether Plaintiffs and California Wage and Hour Class are entitled to equitable relief, including injunctive and declaratory relief; and

(h) Whether Plaintiffs and California Wage Class are entitled to damages, penalties, and other monetary relief and, if so, in what amount.

237. With respect to the California and Federal Forced Labor Classes, common legal and factual issues include the following:

(a) Whether GEO unlawfully forces, coerces, or otherwise compels civil immigration detainees at the Facilities to work for no compensation;

(b) Whether GEO obtains detained immigrant labor through threats of withholding ICE-mandated yard and recreation time, library access, disciplinary infractions, and/or abuse of the legal process;

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

(c)      Whether GEO withholds basic living necessities from immigrants detained at Mesa Verde and Golden State Annex;

(d)      Whether GEO systematically understaffs and under-resources the Facilities such that detained people must work so as not to be forced to live in intolerably filthy and unsanitary conditions;

(e)      Whether GEO disciplines detained workers for failing to perform work, both pursuant to the Work Program and to comply with the HUSPs, including by placing them in solitary confinement, subjecting them to disciplinary transfers, and initiating criminal proceedings;

(f)      Whether GEO staff threaten to or actually abuse the legal process by reporting unlawful disciplinary charges to immigration officials;

(g)      Whether GEO's HUSPs require detained immigrants to perform janitorial, maintenance, or other work above and beyond the four personal housekeeping tasks enumerated in the ICE PBNDS;

(h)      Whether a reasonable person would provide labor to GEO under the circumstances present here;

(i)      Whether GEO's conduct violates the California and federal Trafficking Victims Protection Act;

(j)      Whether Plaintiffs and the California and Federal Forced Labor Classes are entitled to equitable relief, including injunctive and declaratory relief; and

(k)      Whether Plaintiffs and the California and Federal Forced Labor Classes are entitled to damages and other monetary relief and, if so, in what amount.

238.   **Typicality: Rule 23(a)(3).**  The claims asserted by Plaintiffs are typical of the claims of the Classes, in that the representative plaintiffs, like all class members, were paid subminimum wages—or nothing at all—while employed by GEO at the Facilities. Each Plaintiff, like each class member, was subject to similar GEO policies and practices, including the HUSPs, the Work Program, and GEO's policy of deprivation, and each faced the threats described above if they refused to work and/or would be required to live in

intolerably filthy and unsanitary conditions.  Each member of each proposed class has been similarly injured by GEO's misconduct.

239.  **Adequacy: Rule 23(a)(4).**  Plaintiffs will fairly and adequately protect the interests of the classes.  Plaintiffs have retained attorneys experienced in class and complex litigation, including wage and hour class action litigation.  Plaintiffs intend to vigorously prosecute this litigation.  Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other class members.

240.  **Superiority: Rule 23(b)(3).**  Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of GEO's wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of claims by many members of the proposed classes who could not individually afford to litigate a claim such as is asserted in this complaint.  This class action likely presents no difficulties in management that would preclude maintenance as a class action.

241.  **Rule 23(b)(2).**  This action concerns GEO policies and practices that place every detained individual at Mesa Verde and Golden State Annex in peril of wage theft, forced labor, attempted forced labor, and serious harm.  All members of the California Wage and Hour Class and the California and Forced Labor Classes seek similar injunctive relief.  Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**(California Minimum Wage Law)**
**Cal. Labor Code §§ 1182.12, 1194, 1197, 1197.1**

242.  Plaintiffs reallege and incorporate by reference herein all allegations above.

243.  The California Legislature set the following minimum wages for 2015

through 2022:[32]

| January 1, 2022 | $15.00 for employers with 26 employees or more |
| January 1, 2021 | $14.00 for employers with 26 employees or more |
| January 1, 2020 | $13.00 for employers with 26 employees or more |
| January 1, 2019 | $12.00 for employers with 26 employees or more |
| January 1, 2018 | $11.00 for employers with 26 employees or more |
| January 1, 2017 | $10.50 for employers with 26 employees or more |
| January 1, 2014 | $9.00 |

244. The minimum wage is an obligation of the employer and cannot be waived by any agreement.

245. Detained immigrants at the Facilities do not forfeit their rights to wage protections.

246. Employees protected by California's minimum wage laws must be paid at least the set hourly minimum wage.

247. Detained immigrants at the Facilities who participate in the Work Program qualify as GEO employees under California law.

248. GEO qualifies as an employer under California law, including IWC Wage Orders 5 and 15.

249. Labor in the immigration detention context is not intended as a punitive measure.

250. GEO does not compensate detained immigrants at California's minimum wage for the work they perform or performed at the Facilities. Instead, GEO pays detainees $1 per day—or nothing at all—for work they perform at the Facilities.

251. Plaintiffs and California Wage and Hour Class Members have suffered damages in an amount to be determined at trial.

---

[32] *See* https://www.dir.ca.gov/dlse/faq_minimumwage.htm; Cal. Labor Code § 1182.12.

252.   Plaintiffs and California Wage and Hour Class Members are entitled to recover unpaid minimum wages and other monetary damages, including liquidated damages.

253.   Plaintiffs and California Wage and Hour Class Members are entitled to recover their reasonable attorneys' fees and costs.

254.   Plaintiffs and California Wage and Hour Class Members are entitled to equitable relief, including injunctive and declaratory relief.

**SECOND CLAIM FOR RELIEF**
**(California Unfair Competition Law)**
**Cal. Bus. & Prof. Code § 17200, *et seq.***

255.   Plaintiffs reallege and incorporate by reference herein all allegations above.

256.   California's Unfair Competition Law ("UCL") prohibits unfair competition, defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [California's False Advertising Law]."[33]

257.   GEO willfully violated, and continues to violate, the "unlawful" prong of the UCL by violating California law in its employment practices.

258.   The acts, omissions, and practices of GEO constitute unfair and unlawful business acts and practices under the UCL in that GEO's conduct offends public policy against forced labor, and seeks to profit by violating Plaintiffs' rights under state and federal law.

259.   As a direct and proximate result of GEO's unlawful and unfair business practices, Plaintiffs and the California Wage and Hour Class have suffered economic injury.

260.   Plaintiffs and the California Wage and Hour Class have suffered damages in an amount to be determined at trial.

261.   Plaintiffs and the California Wage and Hour Class are entitled to recover

---

[33] Cal. Bus. & Prof. Code § 17200.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

their reasonable attorneys' fees and costs.

**THIRD CLAIM FOR RELIEF**
**(Unjust Enrichment)**
**California Common Law**

262.    Plaintiffs reallege and incorporate by reference herein all allegations above.

263.    GEO materially and significantly reduced its labor costs and expenses, and increased its profits, because Plaintiffs and California Wage Class Members perform under- and uncompensated labor.

264.    Plaintiffs and California Wage Class Members conferred non-gratuitous benefits upon GEO by performing work for $1 per day, or for no pay at all.  For the same work, GEO would otherwise have had to pay at least the applicable minimum wage or more, thereby significantly and materially increasing GEO's profits.  GEO was unjustly enriched at the expense of and detriment to Plaintiffs and California Wage Class Members.

265.    GEO's retention of any benefit collected directly and indirectly from this uncompensated labor violated principles of justice, equity, and good conscience.

266.    As a direct and proximate result of GEO's forced labor practices, Plaintiffs and California Wage Class Members have suffered concrete harm and injury, including physical and emotional injury, monetary loss, and the unlawful violation of their rights.

267.    Plaintiffs and California Wage Class Members have suffered damages in an amount to be determined at trial.

268.    Plaintiffs and California Wage Class Members are entitled to recover the benefits GEO has unjustly obtained through their under- and uncompensated labor.

269.    Plaintiffs and California Wage Class Members are entitled to recover their reasonable attorney's fees and costs.

**FOURTH CLAIM FOR RELIEF**
**(Forced Labor)**
**California Trafficking Victims Protection Act – Cal. Civ. Code § 52.5**

270.    Plaintiffs reallege and incorporate by reference herein all allegations above.

271.    Plaintiffs and California Forced Labor Class Members are victims of forced labor as defined by California Civil Code § 52.5.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

272.   Pursuant to the California Trafficking Victims Protection Act, California Civil Code § 52.5, "a victim of human trafficking, as defined in Section 236.1 of the Penal Code, may bring a civil action for actual damages, compensatory damages, punitive damages, injunctive relief, any combination of those, or any other appropriate relief."

273.   Human trafficking is defined as the deprivation or violation of the personal liberty of another "with the intent to obtain forced labor or services."[34]

274.   Forced labor or services is defined as "labor or services that are performed or provided by a person and are obtained or maintained through force, fraud, duress, or coercion, or equivalent conduct that would reasonably overbear the will of the person."[35]

275.   GEO violates California Civil Code § 52.5 by knowingly maintaining corporate policies and uniform practices at the Facilities aimed at obtaining free detainee labor and services by:

(a)   Forcing or coercing Plaintiffs and the California Forced Labor Class to perform uncompensated janitorial, maintenance, and other work at the Facilities above and beyond the four personal housekeeping tasks enumerated in the ICE PBNDS pursuant to GEO's HUSP;

(b)   Threatening Plaintiffs and the California Forced Labor Class with serious harm, including solitary confinement, referral to an ICE officer, disciplinary action, loss of privileges and ICE-mandated recreational activities, or even criminal prosecution, if they refuse to provide their under- or uncompensated labor; and

(c)   Subjecting Plaintiffs and the California Forced Labor Class to serious harm, including disciplinary action leading to solitary confinement, referral to an ICE officer, disciplinary action, loss of privileges and ICE-mandated recreational activities, or even criminal prosecution, if they refuse to provide their uncompensated labor.

(d)   Withholding daily necessities from Plaintiffs and the California

---

[34] Cal. Penal Code § 236.1(a).

[35] *Id.* § 236.1(h)(5).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

Forced Labor Class pursuant to GEO's deprivation policy, thereby forcing them to work for subminimum wages to buy those daily necessities for themselves and avoid serious harm, including, but not limited to, malnutrition, unsanitary living quarters, extreme isolation, and unhygienic conditions of confinement.

276.    In light of GEO's coercive acts and threats of and actual imposition of serious harm, a reasonable person in Plaintiffs' and the California Forced Labor Class's shoes would feel compelled to perform work in the Work Program for $1 per day and to perform uncompensated work.

277.    GEO materially and significantly reduced its labor costs and expenses, and increased its profits, by unlawfully forcing and coercing Plaintiffs and the California Forced Labor Class to perform uncompensated labor.  To drive profits, GEO acted with the intent to obtain forced labor or services from the people it detains.

278.    Plaintiffs and the California Forced Labor Class have suffered actual damages in an amount to be determined at trial.

279.    Plaintiffs and the California Forced Labor Class are entitled to recover from GEO all amounts that GEO has wrongfully and improperly obtained, and GEO should be required to disgorge to Plaintiffs and the California Forced Labor Class the benefits it has unjustly obtained.

280.    Plaintiffs and the California Forced Labor Class are also entitled to recover compensatory damages.[36]

281.    Plaintiffs and the California Forced Labor Class are also entitled to recover punitive damages.[37]  GEO acted with malice, oppression, fraud, and duress to coerce Plaintiffs and the California Forced Labor Class to participate in the Work Program for $1 per day and to perform uncompensated labor.

282.    Plaintiffs and the California Forced Labor Class are also entitled to recover

[36] *See* Cal. Civ. Code § 52.5(a).
[37] *See id.*

damages in the amount of three times their actual damages, or $10,000, whichever is greater.[38]

283.    Plaintiffs and the California Forced Labor Class are entitled to declaratory and injunctive relief.

284.    Plaintiffs and the California Forced Labor Class are entitled to recover their reasonable attorneys' fees and costs.

**FIFTH CLAIM FOR RELIEF**
**(Forced Labor)**
**Federal Trafficking Victims Protection Act – 8 U.S.C. §§ 1589(a) and 1594(a)**

285.    Plaintiffs and the Federal Forced Labor Class are victims of forced labor as defined by the federal Trafficking Victims Protection Act.

286.    18 U.S.C. §§ 1589(a) and 1594(a) prohibit any entity from knowingly providing or obtaining the labor of a person "by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."[39]

287.    Serious harm is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."[40]

288.    GEO provides or obtains the labor or services of Plaintiffs and the Federal Forced Labor Class by means of serious harm and threats of serious harm to Plaintiffs and others.[41]

289.    GEO provided or obtained the labor or services of Plaintiffs and the Federal Forced Labor Class by means of a scheme, plan, or pattern intended to cause them to

---

[38] *See id.* § 52.5(b).

[39] 18 U.S.C. § 1589(a).

[40] *Id.* § 1589(c).

[41] *Id.* § 1589(a)(1), (a)(2).

believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint, including solitary confinement.[42]

290.   GEO violates 18 U.S.C. §§ 1589(a) and 1594(a) by knowingly maintaining corporate policies and uniform practices at most of its civil immigration detention centers aimed at obtaining free labor and services from detained individuals by:

(a)   Forcing or coercing Plaintiffs and the Federal Forced Labor Class to perform uncompensated janitorial, maintenance, and other work at Mesa Verde and Golden State Annex above and beyond the four personal housekeeping tasks enumerated in the ICE PBNDS pursuant to GEO's HUSPs;

(b)   Threatening Plaintiffs and the Federal Forced Labor Class with serious harm, including solitary confinement, referral to an ICE officer, disciplinary action, loss of privileges and ICE-mandated recreational activities, or even criminal prosecution, if they refuse to provide their uncompensated labor, organize a work stoppage, or participate in a work stoppage;

(c)   Actually subjecting Plaintiffs and the Federal Forced Labor Class to serious harm, including disciplinary action leading to solitary confinement, referral to an ICE officer, loss of privileges and ICE-mandated recreational activities, or even criminal prosecution, if they refuse to provide their uncompensated labor, organize a work stoppage, or participate in a work stoppage; and

(d)   Depriving Plaintiffs and the Federal Forced Labor Class of daily necessities, thereby forcing them to work for subminimum wages to buy those daily necessities for themselves and avoid serious harm, including, but not limited to, malnutrition, unsanitary living quarters, and unhygienic conditions of confinement.

291.   GEO materially and significantly reduced its labor costs and expenses, and increased its profits, by unlawfully forcing and coercing Plaintiffs and the Federal Forced Labor Class to perform uncompensated labor.  To drive profits, GEO acted with the intent

---

[42] *Id.* § 1589(a)(4).

to obtain forced labor or services from its detainees.

292.    Plaintiffs and the Federal Forced Labor Class have suffered damages in an amount to be determined at trial.

293.    Plaintiffs and the Federal Forced Labor Class are entitled to recover from GEO all amounts that GEO has wrongfully and improperly obtained, and GEO should be required to disgorge to Plaintiffs and the Federal Forced Labor Class the benefits it has unjustly obtained.

294.    Plaintiffs and the Federal Forced Labor Class are also entitled to recover compensatory and punitive damages.

295.    Plaintiffs and the Federal Forced Labor Class are entitled to declaratory and injunctive relief.

296.    Plaintiffs and the Federal Forced Labor Class are entitled to recover their reasonable attorneys' fees and costs.

### SIXTH CLAIM FOR RELIEF
**(Representative Action Pursuant to Private Attorneys General Act of 2004)**
**Cal. Labor Code §§ 2698 *et seq*.**

297.    Plaintiffs and the California Wage and Hour Class also intend to bring a claim under California Labor Code §§ 2698 to 2699 in a representative capacity on behalf of all participants in the Work Program and/or who perform uncompensated work on the Facilities in the last four years.

298.    The California Labor Code Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 *et seq.*, grants California employees the right to bring a civil action for the violation of any provision of the Labor Code on behalf of themselves and other current or former employees to recover civil penalties.  PAGA is intended to assist in the achievement of maximum compliance with state labor laws by empowering aggrieved employees to act as private attorneys general to recover civil penalties for Labor Code violations that the State would otherwise prosecute.[43]

---

[43] *See Arias v. Super. Ct.*, 46 Cal. 4th 969, 980 (2009).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

299.    On July 13, 2022 pursuant to California Labor Code § 2699.3, Plaintiffs sent notice by certified mail to the Labor and Workforce Development Agency (LWDA) and Defendants of the specific provisions of the Labor Code that Plaintiffs allege Defendants violated, including the facts and theories to support the violations.  The LWDA received Plaintiffs' notice that same day: July 13, 2022.  The 65-day time limit for the LWDA to respond has not yet expired.  As such, Plaintiffs have not yet exhausted their administrative remedies.  When they do so, however, they intend to amend this complaint to plead a PAGA representative action.

300.    PAGA permits an aggrieved employee to collect the civil penalty authorized by law and normally collectible by the LWDA.  To address violations for which no penalty has been established, § 2699(f) creates a private right of action for aggrieved employees and a default penalty of $100 for each aggrieved employee per pay period for the initial violation, and $200 for each aggrieved employee per pay period for each subsequent violation.[44]  Plaintiffs will seek to collect these civil penalties for Defendants' Labor Code violations under California Labor Code §§ 201, 202, 203, 226, 246, 558, 1174, 1182.12, 1194, 1197, 1197.1, and 1198.5, and IWC Wage Orders 5 and 15.

301.    The facts underlying Plaintiffs' allegations regarding their minimum wage penalties are described above, and Plaintiffs seek PAGA penalties for these claims.

302.    In addition to the foregoing allegations, Plaintiffs and class members seek PAGA penalties for the following violations:

(a)      California Labor Code § 246 provides that California employees who work for an employer for more than thirty day shall accrue paid sick leave "at the rate of not less than one hour every 30 hours worked."  GEO failed to provide Plaintiffs and the California Wage and Hour Class with any paid sick leave in violation of Labor Code § 246.

(b)      California Labor Code § 201 states that an employer is required to pay

---

[44] *See* Cal. Labor Code § 2699(f).

an employee who is terminated all accrued wages and compensation at the time of termination.  California Labor Code § 202 states that an employer is required to provide an employee who resigns all unpaid wages within 72 hours of their resignation, or upon their resignation if the employee has provided at least 72 hours' notice.  California Labor Code § 203 states that if an employer willfully fails to pay compensation promptly upon discharge, in violation of §§ 201 and 202, then the employer is liable for waiting time penalties equivalent to the employee's daily wage, for a maximum of 30 days.  GEO failed to provide Plaintiffs and the California Wage and Hour Class with all accrued wages and compensation at the time of their terminations and/or resignations.

(c)      California Labor Code § 1198.5 requires GEO to provide detained workers the ability to inspect their personnel records and to receive copies of those records.  GEO failed to provide Plaintiffs and the California Wage and Hour Class access to inspect their personnel files and copies of those files.

(d)      California Labor Code § 226(a) requires GEO to provide detained workers with an accurate itemized statement in writing showing, among other things: (1) total hours worked by the worker; (2) the name of the worker and only the last four digits of his or her social security number or an employee identification number other than a social security number, (3) the name and address of the worker; and (4) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the worker.  GEO has violated and continues to violate California Labor Code § 226.3 by violating § 226(a) and failing to provide any wage statement to Plaintiffs and the California Wage and Hour Class.

(e)      California Labor Code § 558 provides that any employer who violates the Labor Code or any provision regulating hours and days of work in any IWC Wage Order will be subject to civil penalties.  Section 558 renders civil penalties available where an employer fails to pay employees the California minimum wage pursuant to Labor Code

§ 1194.[45]  Civil penalties awarded pursuant to § 558 are "in addition to an amount sufficient to recover underpaid wages."[46]  GEO is therefore subject to civil penalties pursuant to § 558 for its failure to pay a minimum wage to Plaintiffs and the California Wage and Hour Class.

303.   Plaintiffs are "aggrieved employees" as defined by PAGA and seek to represent all participants at the Facilities in California in the past four years who performed work and were paid less than the applicable California minimum wage as required by California law.

PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the classes they seek to represent, request that the Court:

1.   Certify this action as a class action, with the three classes as defined above;

2.   Find that Plaintiffs are proper representatives of the classes and appoint the undersigned as class counsel;

3.   Order GEO to pay for notifying class members of the pendency of this suit;

4.   Order disgorgement of GEO's unjustly-acquired revenue, profits, and other benefits resulting from its unlawful conduct;

5.   Award declaratory, restitution, and other equitable relief as is necessary to protect the interests of Plaintiffs and class members;

6.   Award injunctive relief as is necessary to protect the interests of Plaintiffs and class members, including enjoining GEO from continuing to conduct business through the unlawful and unfair practices alleged herein;

7.   Award Plaintiffs and class members compensatory damages in the amount of unpaid minimum wage compensation, including interest thereon subject to proof at trial;

8.   Award Plaintiffs and class members liquidated damages in an amount equal

---

[45] *See also* Cal. Labor Code § 1182.12.

[46] *See* Cal. Labor Code § 558(a)(1), (2).

to minimum wages unlawfully unpaid, according to proof, pursuant to California Labor Code § 1194.2;

9.     Award Plaintiffs and class members civil penalties pursuant to California Labor Code §§ 203, 226, 246, 558, and 1198.5, in an amount to be determined at trial;

10.    Order Defendant to pay restitution of all amounts owed to Plaintiffs for unpaid minimum wages, and interest thereon, in an amount according to proof, pursuant to Business & Professions Code § 17203;

11.    Award Plaintiffs and class members punitive damages, subject to proof at trial;

12.    Award Plaintiffs and class members their reasonable litigation expenses and attorneys' fees;

13.    Award interest on all sums at the maximum legal rate; and

14.    Award any further relief that the Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury.

DATED:  July 13, 2022                    Respectfully submitted,

                                         ROSEN BIEN GALVAN & GRUNFELD LLP

                                         By:  */s/ Ernest Galvan*
                                              Ernest Galvan

                                         Attorneys for Plaintiffs

[4118018.9]                              49                              Ex. A - 53
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

# EXHIBIT B

| | |
|---|---|
| **From:** | noreply@salesforce.com on behalf of LWDA DO NOT REPLY |
| **To:** | Jessica Winter |
| **Subject:** | Thank you for submission of your PAGA Case. |
| **Date:** | Wednesday, July 13, 2022 4:25:12 PM |

[EXTERNAL MESSAGE NOTICE]

7/13/2022

LWDA Case No. LWDA-CM-895259-22
Law Firm : Rosen Bien Galvan & Grunfeld LLP
Plaintiff Name : Jose Ruben Hernandez Gomez, et. al
Employer: The GEO Group, Inc.
Filing Fee : $75.00
IFP Claimed : No

Item submitted: Initial PAGA Notice

Thank you for your submission to the Labor and Workforce Development Agency. Please make a note of the LWDA Case No. above as you may need this number for future reference when filing any subsequent documents for this Case.

If you have questions or concerns regarding this submission or your case, please send an email to pagainfo@dir.ca.gov.

DIR PAGA Unit on behalf of
Labor and Workforce Development Agency

Website: http://labor.ca.gov/Private_Attorneys_General_Act.htm

Ex. B - 2